PROCEEDINGS                                    1044

1  he drew his authority for performing his duties from these

2  rules and regulations.  Among the authorities that he drew

3  was the right to punish people and the right to do what he's

4  doing.  And Mr. Isaacson is leaving the jury with the

5  impression, or wants to at least -- and he's certainly going

6  to argue this in closing, you can bet on it -- that he

7  didn't have that authority when we have a document that says

8  clearly more than ever that he had the authority from the

9  government.

10          THE COURT:  Your problem is you have words out of

11  the witness' own mouth saying he doesn't have the authority.

12          MR. MASON:  No, Your Honor.  No, no, to the

13  contrary.  He testified he did have the authority.

14          THE COURT:  And you can argue that to the jury.

15          MR. MASON:  But, Your Honor, why am I limited

16  given what --

17          THE COURT:  Because the jury, as I told you,

18  cannot determine what Chinese law is.

19          MR. MASON:  Your Honor --

20          THE COURT:  Mr. Mason, I've heard you.  I'm

21  adhering to my ruling.

22          MR. CRITCHLOW:  May I approach this from a

23  slightly different angle?

24          THE COURT:  You can try.

25          MR. CRITCHLOW:  Okay.  I heard the witness testify

**SPA-238**

PROCEEDINGS                                    1045

1   that he was talking about Penicillin when he wrote that.

2           THE COURT:  Correct.

3           MR. CRITCHLOW:  And Mr. Isaacson is asking

4   questions about Vitamin C or about verification and chop

5   generally.  This regulation clearly lists the products that

6   are under verification and chop.  And Penicillin is not one

7   of them.

8           THE COURT:  I know.  I see.  Penicillin is

9   omitted.

10          MR. CRITCHLOW:  Penicillin is not omitted.  It's

11  not covered.  It's not covered.

12          THE COURT:  Right.  So Vitamin C is listed in the

13  regulation.

14          MR. CRITCHLOW:  Vitamin C is listed and Penicillin

15  is not.  It's exactly what the witness is saying.

16          MR. ISAACSON:  They can ask him the question, is

17  Penicillin covered by verification and chop?  You don't need

18  to show a law and regulation on it.

19          MR. CRITCHLOW:  I think there's a difference

20  between the witness testifying from the stand where the jury

21  has to assess his credibility and the written terms of the

22  regulation itself, which unquestionably show what is covered

23  and what is not.

24          THE COURT:  I might allow a redacted version of

25  the regulation, a heavily redacted version, that would

**SPA-239**

PROCEEDINGS                                          1046

1   simply show nothing more than there is a regulation

2   authorizing verification and chop as to Vitamin C, but not

3   as to Penicillin.  You have to cut it to an absolute minimum

4   in order to do that, but on redirect, if there is such a

5   document, I will let him have that.

6                MR. CRITCHLOW:  Thank you.

7                MR. MASON:  Thank you.

8                MR. ISAACSON:  We would stipulate the verification

9   and chop does not cover Penicillin.

10               MR. MASON:  No.

11               THE COURT:  Well, let's talk about that.  Let's

12  talk about that.

13               Will you also stipulate that there is a regulation

14  issued by the Chinese government that requires verification

15  and chop for Vitamin C and a number of other products and

16  not Penicillin?

17               MR. ISAACSON:  Let me look at that over lunch

18  because we had other critiques of that regulation.

19               THE COURT:  Okay.  Well, that's why I'm saying a

20  heavily redacted form.  Simply to show the fact that I've

21  suggested could probably be stipulated to.

22               MR. CRITCHLOW:  Let me just address a relevant

23  point to that, it's Defendants' 31, which is that I think

24  that the full list of the regulation gives an important kind

25  of context because we're not talking about thousands of

**SPA-240**

PROCEEDINGS                                    1047

1    products that are subject to verification and chop.  We're

2    talking about a handful of products.

3          THE COURT:  I'll let you have in as part of the

4    redaction.

5          MR. CRITCHLOW:  So that the jury can see that when

6    the witness was writing his memo, there are hundreds of

7    products that are out there and he could be talking about

8    those with the verification and chop regime only covering a

9    few.

10          THE COURT:  I understand what you're saying.  And

11   I will allow the list as part of the redaction showing the

12   absence of Penicillin and the presence of Vitamin C plus

13   other products to come in.  What I will not allow is a lot

14   of legal-ese language that's in the regulation that goes

15   beyond that and appears to give it force of law or what the

16   enforcement mechanisms are or anything like that.

17          MR. CRITCHLOW:  I understand you completely, Your

18   Honor.  I was just making the point that a stipulation

19   doesn't quite get at the point that I was making.  The list

20   does.

21          THE COURT:  Well, you might include the list in

22   the stipulation.  I will allow the parties to try to work

23   that out over lunch.  If not, I will look at the redaction

24   that you'll prepare for me and see if that works.

25          MR. CRITCHLOW:  That's fine.

*Lisa Schwam, RPR, CRR, RMR*
*Official Court Reporter*

**SPA-241**

```
                      PROCEEDINGS                    1048

 1            THE COURT:  Okay.

 2                     (Luncheon recess taken.)

 3                  (Continued on the next page.)

 4                          * * * * *

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**SPA-242**

1520

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                        :
                                        :
IN RE:                                  : 06-MD-01738 (BMC)
                                        :
VITAMIN C ANTITRUST                     :
LITIGATION,                             :
                                        : United States Courthouse
        Plaintiff,                      : Brooklyn, New York
                                        :
                                        :
   -against-                            : Tuesday, March 12, 2013
                                        : 10:30 a.m.
                                        :
HEBEI WELCOME PHARMACEUTICAL            :
CO. LTD., ET AL.,                       :
                                        :
        Defendants.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S :

For the Plaintiff:    SUSMAN GODFREY, LLP
                          1000 Louisiana
                          Suite 5100
                          Houston, Texas 77002
                      BY: JAMES T. SOUTHWICK, ESQ.
                          SHAWN L. RAYMOND, ESQ.
                          KATHERINE H. KUNZ, ESQ.

                      BOIES SCHILLER & FLEXNER, LLP
                          5301 Wisconsin Avenue, N.W.
                          Suite 800
                          Washington, D.C. 20015
                      BY: WILLIAM A. ISAACSON, ESQ.
                          TANYA S. CHUTKAN, ESQ.
                          JENNIFER MILICI, ESQ.

VB        OCR        CRR

**SPA-243**

Proceedings                                                1542

1  charge to a standard jury.  There's no indication here of any

2  particular special mechanism for an advisory jury so I'm

3  taking it that Your Honor is not intending to use an advisory

4  jury.

5           If that were contemplated, which I submit at this

6  late date is a difficult point to address, Your Honor's

7  discussed this in the past.  There are two case, both 30 years

8  old, one from the Second Circuit which is the Mara case.

9  There's one from the Eastern District, which is the Chance

10  case.  The Mara case clearly said no advisory jury under

11  situations like this.  Your Honor's suggested that the Chance

12  case said differently, but if you look at the Chance case, it

13  allowed an advisory jury on a predicatory issue of choice of

14  law, but said that the jury in Chance would still determine

15  the ultimate facts on the merits, and that's what we're

16  talking about here.

17           And actually, I think I go back to what my evidence

18  professor Weinstein said in his decision.  Judge Weinstein, in

19  the City of New York v Barrett case which is a 2004 case here

20  in the Eastern District, 317 F. Supp. 193, and he said -- and

21  it's pretty simple -- he said when in doubt, send it to the

22  jury and that's exactly what we've got right here.

23           And so, I don't think that's what we're looking at,

24  but that's defendant's position on the question, Your Honor.

25           THE COURT:  Okay.

VB          OCR          CRR

**SPA-244**

Proceedings                                        1543

1      All right, well, let me start at the bottom, first.

2      I tend to agree that this is not going to be an

3  advisory jury.  I was concerned at the beginning of the case

4  that it might not be possible to avoid having the jury

5  determine some of the facts that I determined in the 44.1

6  inquiry.  However, that didn't happen.  It's entirely

7  possible.  There are a couple of slight overlaps that are

8  raised, I think, in plaintiff's motion in limine that was

9  filed early this morning, but I have no doubt that we can

10  straighten that out for the jury.

11      So, I will not be regarding the jury's verdict as

12  advisory.  It will be a binding verdict on the questions that

13  I am going to put to them and the charge that I'm going to

14  give to them.  So, that is not an issue.

15      Let me talk first about Tiger and Hualong.

16      MR. ISAACSON:  I'm sorry, to interrupt, Your Honor.

17      THE COURT:  Yes.

18      MR. ISAACSON:  Just to be, for the record, may we,

19  we just want to reserve our position that we would be entitled

20  to judgment as to matter of law with regard to compulsion with

21  regards to conspiracy with respect to Hebei.

22      THE COURT:  Understood.  Your position is reserved.

23      If there was some kind of presumption that these

24  contracts have an arbitration clause, then I could understand

25  defendant's point.  But as we know, there is no such

VB        OCR        CRR

Proceedings                                    1544

1   presumption possible.  We don't know that there is an

2   arbitration clause.  We don't know that there isn't.  I think

3   when the plaintiff, which clearly has the burden of proof on

4   all elements of its damage claim, puts the contracts of sale

5   into -- it quantifies them for purposes of claiming damages on

6   them, it has met its burden of going forward on that issue.

7          It then becomes incumbent on the defendants, it

8   seems to me, to come back and say wait a minute, that's wrong,

9   those contracts should not be included.  They are contracts.

10  They are prima facie evidence of sales and unless there's some

11  reason the defendants want to offer to show that they ought to

12  be excluded, then I think they should not be.  So, I am

13  rejecting that point.

14         On the Act of State doctrine I will adhere to all of

15  the statements I made on my prior ruling holding it

16  inapplicable.  I think this is clearly not a case where anyone

17  will be judging whether the Chinese government has acted in an

18  illegal fashion.  Plaintiffs can only prevail here if the jury

19  determines that the Chinese government did not act.  Period.

20  So, for that reason and the others that I've stated, I think

21  the Act of State doctrine is, the motion directed to that,

22  must be denied.

23         On the compulsion defense, I think we clearly have

24  factual issues.  I see them now much better than I did at the

25  beginning of the case and even beyond that, more clearly than

**SPA-246**

Proceedings                                        1545

1  I did when I was writing the summary judgment decision.  We

2  essentially start with minutes of meetings which show an

3  absence of compulsion; at least, a jury could reasonably find

4  that they show an absence of compulsion.

5          We then have witness testimony that says you can't

6  go strictly by the literal language of the minutes because

7  that's not what was going on.  That's an issue for the jury to

8  determine who is right on that.

9          This notion that the minutes don't mean what they

10  say and the presentation of a unanimous agreement is not

11  necessarily indicative of the true state of affairs is not

12  implausible to me.  It seems to me there are societies where

13  things are made to look like everyone is in perfect agreement

14  when, in fact, sometimes people have no choice.  But that's an

15  argument for the jury.

16          I didn't hear any expert testimony from a

17  sociologist or a political scientist explaining how this is a

18  basic rubric of Chinese society and, while I may have some

19  individual views about that, that obviously has no role in

20  this case.  So, I think we plainly have a factual issue on

21  compulsion and I'm very glad that we set up the trial this way

22  because I think it's really been teed-up excellently by both

23  sides and the jury will have the ability to determine who has

24  the more credible position on that.

25          The closest question is on Group Corp.  I am going

VB        OCR        CRR

Proceedings                                    1546

1   to adhere to my decision on summary judgment.  I think

2   Mr. Isaacson is right; that there is a little more suggestion

3   than there was then that Group Corp was involved in this

4   sufficiently to put liability.  I will tell you candidly, I'm

5   not entirely comfortable that there is enough there to sustain

6   a jury verdict.

7          It is certainly not uncommon for a parent

8   corporation or investors in a corporation to monitor the

9   financial activity of the corporation and it is also not

10  uncommon for there to be some shared facilities.

11         You know, it is not the fact of this case, although

12  it is common in many other cases, that a corporate family will

13  use a cash-sweep method where all cash and all subsidiaries is

14  swept up to the parent and then, doled out as operating funds

15  to the subsidiaries; even in that situation the parent is not

16  generally deemed to be acting for the subsidiary, but I do

17  think that it is a close enough issue where the exercise of

18  discretion suggests that I put it to the jury and let the jury

19  decide on it and then address it later, if necessary.

20

21         (Continued on following page.)

22

23

24

25

VB        OCR        CRR

**SPA-248**

1547

1    THE COURT:  (Continuing) I am therefore going to

2  reserve decision, which I think I can still do under Rule 50,

3  on that point.  If I can't do it, then I am denying the motion

4  to dismiss at this stage pending the jury's verdict.

5    All right.  That's my ruling on the Rule 50 motions.

6  Let's now start the charging conference.

7    What I propose to do is just ask in the first

8  instance if anybody has any objections or comments to part one

9  of the instructions.  That's the basic, frankly, boiler plate

10  that we use in almost every case.

11    Anything there that's bothering anybody?

12    MR. ISAACSON:  Nothing from plaintiffs, Your Honor.

13    MR. CRITCHLOW:  And nothing for the defendants, Your

14  Honor.

15    THE COURT:  All right.  What I will do now is

16  starting with the legal elements of the claim, I will start on

17  page 14.  I will call out each page and I will pause between

18  pages.  If anyone has an objection to anything that appears on

19  the page, or something that they want to insert on that page,

20  they can tell me.

21    At the end of this process, if there are additional

22  instructions, you can give them to me then, or if you think

23  they are properly insertable as we go through page by page,

24  you can let me know.  I will accept either way.  You don't

25  pass the right to ask for an additional instruction just

GR    OCR    CM    CRR    CSR

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                          :

IN RE VITAMIN C ANTITRUST LITIGATION    :    06-MD-1738 (BMC) (JO)

                                          :
------------------------------------------------------------ :
                                          :

This document relates to:                      :
                                          :

ANIMAL SCIENCE PRODUCTS, INC., et al.,   :
                                          :    05-CV-0453
                    Plaintiffs,        :
                                          :

v.                                                :
                                          :

HEBEI WELCOME PHARMACEUTICAL CO.   :
LTD., et al.,                                 :
                                          :
                    Defendants.      :

------------------------------------------------------------ X

## SPECIAL VERDICT FORM

We, the jury, unanimously agree to the answers to the following questions and return them under

the instructions of this Court as our verdict in this case:

**Question 1:**   Did plaintiffs prove, by a preponderance of the evidence, that the following defendants knowingly entered into an agreement or conspiracy with the purpose of or predictable effect of fixing the price or limiting the supply of Vitamin C?

A.     Hebei Welcome Pharmaceutical Co., Ltd.



YES                                         NO

B.     North China Pharmaceutical Group Corp.



YES                                         NO

If your answer to any part of Question 1 is "Yes," please answer Question 2.  If your answers to both parts of Question 1 are "No," please go to the end of the verdict form, and sign and date it where indicated.

1

**SPA-251**

**Question 2A:**  Did plaintiffs prove, by a preponderance of the evidence, that the plaintiff class was in fact injured as a result of defendants' alleged violation of the antitrust laws?



_____              _____
         YES                          NO

**Question 2B:**  Did plaintiffs prove, by a preponderance of the evidence, that defendants' alleged illegal conduct played a substantial part in bringing about or causing their injury, and that the injury was a direct and proximate result of the unlawful activity?



_____              _____
         YES                          NO

**Question 2C:**  Did plaintiffs prove, by a preponderance of the evidence, that defendants' alleged illegal conduct resulted in plaintiffs and the class members paying higher prices for their vitamin C purchases than they would have paid had the agreements not existed?



_____              _____
         YES                          NO

If your answer to all parts of Question 2 is "Yes," please answer Question 3. If your answers to any part of Question 2 is "No," please go to the end of the verdict form, and sign and date it where indicated.

2

**SPA-252**

**Question 3:**   Did defendants prove, by a preponderance of the evidence, that defendants were actually compelled by the Government of China to enter into agreements fixing the price or limiting the supply of vitamin C exported from China from the period of December 1, 2001 to June 30, 2006 and that defendants faced the prospect of penalties or sanctions for not complying with the directives or commands of the Chinese government in this regard?



                YES                                   NO

If your answer to Question 3 is "No," please answer Question 4.  If your answer to Question 3 is "Yes," please go to the end of the verdict form, and sign and date it where indicated.

**Question 4:**   Did plaintiffs prove, by a preponderance of the evidence, that they suffered damages in an amount that is ascertainable and not speculative?



_____          _____
        YES                              NO

If your answer to Question 4 is "Yes," please answer Question 5. If your answer to Question 4 is "No," please go to the end of the verdict form, and sign and date it where indicated.

4

**SPA-254**

**Question 5:**   What amount of damages have plaintiffs proved, by a preponderance of the evidence, that the plaintiff class suffered as a result of defendants' conduct?

$ ___ $54.1 m ___

(Please fill in total dollar amount)

[SIGNATURE PAGE FOLLOWS]

5

**SPA-255**

The jury foreperson must sign and date this form.

Signed: _____          Date: _____

           Foreperson

6

SPA-256

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                                                         :
IN RE VITAMIN C ANTITRUST LITIGATION                     :
                                                         :   06-MD-1738 (BMC) (JO)
  --------------------------------------------------     :
                                                         :
This document relates to:                                :
                                                         :
ANIMAL SCIENCE PRODUCTS, INC., et al.,                   :
                                                         :
                              Plaintiffs,                :   05-CV-0453
                                                         :
v.                                                       :
                                                         :
HEBEI WELCOME PHARMACEUTICAL CO.                         :
LTD., et al.,                                            :
                                                         :
                              Defendants.                :
                                                         :
-------------------------------------------------------- X

## JUDGMENT

The jury having rendered its verdict in this case in favor of plaintiff, the Ranis Company, Inc., as representative of the Direct Purchaser Class,[1] in the amount of Fifty Four Million One Hundred Thousand Dollars ($54,100,000.00), and the Court, upon motion of plaintiff, having directed entry of judgment upon trebling the damage award pursuant to 15 U.S.C. § 15(a), less Nine Million Dollars ($9,000,000) received from former defendants, it is hereby

ORDERED AND ADJUDGED, that the Ranis Company, as class representative, take judgment against defendants, Hebei Welcome Pharmaceutical Co., Ltd. and North China

---

[1] The Direct Purchaser Damages Class consists of all persons or entities, or assignees of such persons or entities, who directly purchased vitamin C for delivery in the United States, other than pursuant to a contract containing an arbitration clause, from any of Defendants or their co-conspirators, other than Northeast Pharmaceutical (Group) Co. Ltd., from December 1, 2001 to June 30, 2006. Excluded from this class are all governmental entities, defendants, their co-conspirators, and their respective subsidiaries or affiliates.

**SPA-257**

Pharmaceutical Group Corp., jointly and severally, in the amount of One Hundred Fifty Three Million Three Hundred Thousand Dollars ($153,300,000).


Date:   Brooklyn, New York
        March 14, 2013

S/BMC

_____
HON. BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE

2

**SPA-258**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                     :

IN RE VITAMIN C ANTITRUST LITIGATION  :
                                     :     06-MD-1738 (BMC) (JO)

   -----------------------------------------------------------  :
                                       :

This document relates to:              :
                                     :

ANIMAL SCIENCE PRODUCTS, INC., et al.,  :     **MEMORANDUM**
                                     :     **DECISION AND ORDER**

            Plaintiffs,       :
                                     :     05-CV-0453

v.                                    :
                                     :

HEBEI WELCOME PHARMACEUTICAL CO.  :
LTD., et al.,                       :
                                   :

           Defendants.      :

----------------------------------------------------------- X

**COGAN,** District Judge.

      On March 14, 2013, a jury reached found defendants Hebei Welcome Pharmaceutical

Co., Ltd. ("Hebei") and North China Pharmaceutical Group Corp. ("NCPGC")[1] liable to

plaintiffs[2] for violating the Sherman Act.  Currently before the Court are two post-trial motions.

First, pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, defendants have renewed

their motion for judgment as a matter of law on three grounds.  Second, the Injunction Class has

moved for an order permanently enjoining defendants from entering into any agreements to fix

the price or limit the supply of vitamin C.  Familiarity with the facts and procedural history of

---

[1] All other defendants in this action settled either prior to or during trial.  The jury's verdict only addressed the liability of Hebei and NCPGC.

[2] The Court certified two plaintiff classes in this action, the Director Purchaser Damages Class and the Injunction Class.

**SPA-259**

this action is presumed.  For the reasons set forth below, defendants' motion is denied and the Injunction Class's motion is granted.

## I. Defendants' Renewed Motion for Judgment as a Matter of Law

In order to succeed on their renewed motion for judgment as a matter of law, defendants must bear "a heavy burden."  Cash v. Cnty. of Erie, 654 F.3d 324, 333 (2d Cir. 2011).  A movant can be "awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'"  Id. (quoting Fed. R. Civ. P. 50(a)(1)).  "[T]he district court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  Zellner v. Summerlin, 494 F.3d 344, 370 (2d Cir. 2007) (internal quotations and alterations omitted).  Therefore, where, as here, a "jury has deliberated in the case and actually returned its verdict," the "court may set aside the verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it."  Cash, 654 F.3d at 333 (internal quotation marks omitted).  Here, defendants have sought judgment as a matter of law on three grounds.  I will address each ground in turn.

### A. Act of State, Foreign Sovereign Compulsion, and International Comity

First, defendants argue that the jury's verdict against them is barred as a matter of law by the doctrines of act of state, foreign sovereign compulsion, and international comity.[3]  In essence, defendants contend that the Court's prior rulings that Chinese law did not compel

---

[3] Defendants previously raised these arguments in a motion to dismiss, which was denied by the late Judge Trager, and in a motion for summary judgment, or, alternatively, a motion for a determination of foreign law under Fed. R. Civ. P. 44.1, which I denied.

defendants' actions were erroneous and that plaintiffs' claims never should have been brought before a jury.  Alternatively, defendants argue that even if it was proper to submit this matter to a jury, the trial was "fatally flawed" by my decision to exclude from the jury copies of Chinese laws and regulations and witness testimony about the meaning and content of those laws.  The Court stands by and reaffirms its prior rulings that Chinese law did not compel defendants to engage in antitrust violations, that the doctrines of act of state and international comity do not bar plaintiffs' suit, and that it was inappropriate to present evidence about the meaning of Chinese laws to the jury.  Nothing has changed from these pretrial rulings and defendants have stated no additional grounds to revisit them.

Moreover, defendants ignore that one purpose of the trial in this matter was to determine whether, regardless of what Chinese law authorized, defendants' conduct was actually compelled by the Chinese government as a matter of a fact.[4]  Therefore, the Court instructed the jury that it was required to return a defense verdict if defendants proved, by a preponderance of the evidence, that the Chinese government actually compelled them to fix the price or limit the supply of vitamin C and defendants have not challenged this instruction.

There was ample evidence presented at trial from which the jury could have found that the Chinese government did not actually compel defendants' decisions to fix the price and limit the supply of vitamin C – including evidence suggesting that the "verification and chop" mechanism did not actually compel defendants to enter into anticompetitive agreements and that the Vitamin C Subcommittee of the Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Chamber") was a voluntary trade association.  Moreover, in rejecting the compulsion defense, the jury necessarily assessed the credibility of witnesses'

---

[4] The need for a jury to determine whether factual compulsion became even clearer during the trial when several witnesses testified that contemporaneous documents offered as evidence on the compulsion issue – including memoranda addressed to China's Ministry of Commerce – were inaccurate.

**SPA-261**

testimony and, on a Rule 50(b) motion, the Court may not second-guess those determinations. See Zellner, 494 F.3d at 370. Chinese laws themselves were not placed on trial. Rather, the jury was only required to determine whether the Chinese government acted, not the propriety of its actions.

Nor, despite defendants' suggestion, was it error for the Court to exclude from the jury copies of Chinese laws and regulations and witness testimony about the meaning and content of those laws.[5] Pursuant to Fed. R. Civ. P. 44.1, the determination of foreign law is a question of law. It is for the Court, not for the jury, to decide questions of law and the Court did so when it ruled that, as a matter of law, Chinese law did not compel defendants' conduct. Accordingly, defendants' renewed motion for judgment as a matter of law based on the act of state, foreign sovereign compulsion, and international comity doctrines is denied.

B. NCPGC's Liability

Second, NCPGC seeks judgment as a matter of law dismissing plaintiffs' claims and vacating the jury's verdict against it on the ground that there was insufficient evidence for the jury to find that NCPGC was a member of the anticompetitive conspiracy at issue. NCPGC contends that the overwhelming weight of the evidence demonstrates that it was Hebei, its indirect subsidiary, which participated in the Chamber's vitamin C subcommittee meetings and entered into the relevant agreements, not NCPGC. It points to numerous memoranda summarizing meetings of the Vitamin C Subcommittee which provide no evidence that any NCPGC agents entered into anticompetitive agreements on behalf of NCPGC and it characterizes the evidence on which plaintiffs rely as "limited" and "marginal."

---

[5] Defendants have not sought a new trial because of the Court's exclusion of this supposed evidence.

4

I previously expressed my doubts concerning the sufficiency of plaintiffs' proof of NCPGC's participation in the conspiracy in the context of defendants' Rule 50(a) motion, but nonetheless denied the motion.  Although the evidence adduced by plaintiffs on this issue is hardly overpowering, I cannot conclude that there was a "complete absence of evidence" suggesting NCPGC's participation such that "the jury's findings could only have been the result of sheer surmise and conjecture."  Cash, 654 F.3d at 333.

NCPGC attacks several categories of evidence relied on by plaintiffs but, in order to deny NCPGC's motion, I need look no further than the evidence relating to Huang Pinqi.  The record shows that Mr. Huang served as Hebei's general manager and later board chairman.  In 2003, while Mr. Huang was still serving as Hebei's general manager, he also became the deputy general manager at NCPGC and remained in that position through the relevant time period.  It is undisputed that Mr. Huang participated in the meetings of the Vitamin C Subcommittee at which defendants entered into anticompetitive agreements.  But, according to defendants, the evidence shows that Mr. Huang participated in those meetings as a representative of Hebei, not NCPGC.  Indeed, Qaio Haili, a former Chamber official, testified that Mr. Huang always attended Subcommittee meetings as a Hebei representative and numerous documents regarding Subcommittee meetings describe Mr. Huang as a Hebei representative.

To demonstrate that Mr. Huang also participated in these meetings on behalf of NCPGC, plaintiffs rely on PX 124 – a November 2004 Chamber website announcement of Mr. Huang's election as the chair of the Vitamin C Subcommittee.  PX 124 refers to Mr. Huang by his NCPGC title.  Both Mr. Huang and Qaio Haili, a former Chamber official, testified that this reference was merely an honorific that does not suggest that Mr. Huang participated in the Chamber on behalf of NCPGC.  The persuasiveness of this explanation obviously depends on the

credibility of Mr. Huang and Mr. Qaio and, given the fact that these witnesses repeatedly

questioned the accuracy of certain contemporaneously created documents, there were ample

grounds for the jury to question their credibility.[6]  The jury had every right to credit the

documentary evidence over the conflicting testimony from defense witnesses and, in the context

of a motion for judgment as a matter of law, it is not appropriate for the Court to second-guess

this determination.

Additionally, Mr. Huang never denied attending Subcommittee meetings on behalf of

NCPGC and never testified that he only attended these meetings on behalf of Hebei.  Although

NCPGC was, of course, not required to disprove its participation, such testimony might have

suggested that PX 124 could not support an inference that NCPGC participated in the

conspiracy.  Further, Mr. Huang testified that, prior to this election as chair of the Subcommittee,

he moved his office from Hebei to NCPGC and, from that point forward, was "seldom" present

at Hebei.  The jury reasonably could have inferred that NCPGC participated in Subcommittee

meetings at which anticompetitive agreements were entered since, when he participated in those

meetings, Mr. Huang was working primarily from NCPGC.  Lastly, plaintiffs produced other

evidence, including NCPGC's descriptions of its activities on its website, Hebei reports

concerning vitamin C manufacturing sent to NCPGC during the relevant period, and memoranda

from a co-conspirator describing NCPGC's support for coordinated termination of vitamin C

production.  Although NCPGC criticizes each of these pieces of evidence individually, they were

all put before the jury and their cumulative effect cannot be discounted.  In light of PX 124,

possible questions about defense witness credibility, and this other supporting evidence, I hold

---

[6] For similar reasons, the jury properly could have discounted Mr. Qiao's testimony that NCPGC was not a member of the Vitamin C Subcommittee and was not eligible to be a member, especially in light of evidence showing that NCPGC participated in an agreement to fix penicillin prices despite being neither a member of the Penicillin Subcommittee nor a penicillin manufacturer.

**SPA-264**

that there was a sufficient evidentiary basis for the jury to conclude that NCPGC participated in the conspiracy and therefore deny NCPGC's motion.

        C.  <u>Reduction of Damages</u>

Third, defendants seek a reduction of the damages award due to the Direct Purchaser Damages Class by $7.5 million ($22.5 million after trebling).  According to defendants, this amount corresponds to purchases from two non-defendants alleged to be co-conspirators, Shandong Zibo Hualong Co., Ltd ("Hualong") and Anhui Tiger Biotech Co. ("Tiger"). Defendants contend that plaintiffs failed to prove that the contracts with Hualong and Tiger lacked arbitration clauses, and that if those contracts did have arbitration clauses, then plaintiffs would be relegated to arbitration, and cannot recover damages in this action.[7]  Defendants argue that, because of this lack of evidence, the Direct Purchaser Damages Class did not carry its burden of proving this portion of its damages, that the Court improperly shifted the burden of proof on to defendants, and that the jury's award is speculative.

As I said when I denied defendants' Rule 50(a) motion, I think they have this precisely backwards.  One can theorize all kinds of contractual provisions that might limit or eliminate the Hualong and Tiger contracts from the calculation of damages – <u>e.g.</u>, foreign selection clauses, liability caps, or shortened statutes of limitations.  Defendants have seized on the possibility of an arbitration clause in these contracts, but whatever the basis for excluding them from the calculation of damages, it was defendants' burden, not plaintiffs', to show the jury what that basis was.  Any provision in those contracts that might have reduced plaintiffs' damage claim was analogous to an affirmative response to plaintiffs' damage theory, and like an affirmative defense, defendants had to point to such provisions.  They failed to do so.

---

[7] Pursuant the definition of the certified Direct Purchaser Damages Class, only purchasers who bought vitamin C under contracts without arbitration clauses could recover damages.

**SPA-265**

The Direct Purchaser Damages Class presented expert testimony from Dr. Bernheim estimating the amount of vitamin C purchases falling within the class definition based on U.S. International Trade Commission data and documents produced by the conspirators – documents which demonstrated that Hualong and Tiger were members of the Vitamin C Subcommittee and that their representatives attended meetings with the other conspirators.  This evidence satisfied the Class's prima facie burden.  If defendants wanted to dispute the Class's damages estimate, it was incumbent upon them to present evidence that the Class's prima facie showing was inaccurate and that certain contracts should have been excluded from the damages award.  Defendants attempted to do that through the testimony of their expert, Dr. Wu, who testified that Dr. Bernheim's analysis was flawed.[8]  But the jury rejected Dr. Wu's testimony, as evidenced by the award of damages in its verdict, and defendants never offered evidence showing that any contracts with Hualong and Tiger actually contained arbitration clauses.  Therefore, I am not convinced that the damages award is impermissibly speculative and I deny defendants' motion to reduce the damages award (or alter or amend the judgment) by $7.5 million ($22.5 million after trebling).

## II.  The Motion for a Permanent Injunction

Finally, the Injunction Class seeks a permanent injunction, lasting ten years, against defendants under Section 16 of the Clayton Act, which authorizes the district courts to issue "injunctive relief . . . against threatened loss or damages by a violation of the antitrust laws."  15 U.S.C. § 26.  The parties agree that the determination of whether to issue an injunction is governed by the four-part test set forth in eBay Inc. v. MerchExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837 (2006).  Under that test, "a plaintiff seeking a permanent injunction must . . . .

---

[8] Defendants, however, never cross-examined Dr. Bernheim concerning his decision to include Tiger and Hualong sales in his damages estimate.

demonstrate (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. at 391, 126 S. Ct. at 1839.  I address each requirement in turn.

First, with regard to irreparable injury, in order to obtain a Section 16 injunction, a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130, 89 S. Ct. 1562, 1580 (1969).  Here, the Injunction Class has already proven injury, as demonstrated by the jury verdict.  Defendants argue that the jury verdict only applies to the class period – December 2001 through June 2006 – and that there is no evidence that the anticompetitive conspiracy is continuing.  But that argument is unpersuasive. See In re Data Gen. Corp. Antitrust Litig., MDL Dkt. No. 369, 1986 WL 10899, at * (N.D. Cal. July 30, 1986) (imposing an injunction despite the observation that "a permanent injunction almost by definition must rest on outdated facts").

Moreover, there is evidence that anticompetitive conduct is likely to recur if not enjoined. Documentary evidence indicates that the conspirators discussed performing future actions "in a more hidden and smart way" and testimony established that, after this lawsuit was filed, conspirators stopped keeping notes of their meetings.  Defendants have not renounced their conduct and they continue to contest their liability. See Coleman v. Cannon Oil Co., 849 F. Supp. 1458, 1472 (M.D. Ala. 1993) (issuing a permanent injunction in an antitrust case where, among other things, defendants "failed to acknowledge their wrong-doing").

**SPA-267**

For the indirect purchasers, who comprise the vast majority of Injunction Class members, the injury they already suffered and any similar injury they are likely to suffer in the future is irreparable. Indirect purchasers of vitamin C cannot bring a federal claim for damages, see generally Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061 (1977), and many also lack a state law-based cause of action for damages. Further, "[h]arm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to . . . measure, or that it is a loss that one should not be expected to suffer." Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010). It undoubtedly would be difficult to measure the injury that anticompetitive conduct would cause indirect vitamin C purchasers and no Injunction Class member should be expected to suffer injury as a result of illegal anticompetitive conduct. Accordingly, I conclude that the first eBay factor is satisfied.

For many of the same reasons, I conclude that the Injunction Class does not have an adequate remedy at law and the second eBay factor is satisfied. As noted, many indirect vitamin C purchasers cannot bring any claim for damages if defendants engage in further anticompetitive conduct. Further, even direct purchasers are only entitled to damages equal to the overcharge paid for vitamin C as a result of illegal conduct. As the eight-year (and still ongoing) history of this action attests, prosecuting international antitrust claims are difficult, costly, and time-consuming. Should defendants recommence their anticompetitive conduct, the Injunction Class will have to incur considerable expense in order to vindicate its rights.

With regard to the third eBay factor, the balance of hardships, contrary to defendants' contention, the injunction sought is neither "drastic" nor "extraordinary." It prohibits agreements "to fix the price or limit the supply of vitamin C sold in the United States in violation of Section 1 of the Sherman Act." In other words, all the injunction does is prohibit defendants from

10

committing what, independently, would constitute an illegal act.  See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218, 60 S. Ct. 811, 841 (1940) ("[T]his Court has consistently and without deviation adhered to the principle that price-fixing arrangements are unlawful per se under the Sherman Act.").  Mandating compliance with the law can hardly be considered burdensome.  And, as discussed, the Injunction Class would have to incur considerable expense if it had to vindicate its rights through another litigation.  Thus, I conclude that the balance of hardships favors the injunction.

Finally, the fourth eBay factor concerns the public interest.  Civil damages suits to enforce the antitrust laws are unquestionably in the public interest.  See Zenith, 395 U.S. at 133, 89 S. Ct. at 1582 ("[T]reble-damage cases, which are brought for private ends, . . . also serve the public interest in that they effectively pry open to competition a market that has been closed by defendants' illegal restraints.") (internal quotation marks omitted).  Defendants contend that a permanent injunction "would interfere with the Chinese government's sovereign authority and its ability to regulate its own domestic affairs."  This argument ignores the fact that the jury found defendants liable based on voluntary, uncompelled conduct.  If, in the future, the operation of the permanent injunction comes into conflict with China's sovereign regulatory authority, defendants, or any other enjoined party, may seek to have the injunction vacated or limited on that basis.  However, the Court will not deny the Injunctive Class relief to which it is otherwise entitled on the basis of speculative and uncertain future interference with the regulatory authority of another nation.  Therefore, I conclude that a permanent injunction is in the public interest and that the Injunction Class is entitled to the permanent injunction it seeks.

**SPA-269**

<u>**CONCLUSION**</u>

Defendants' renewed motion for judgment as a matter of law [688] is denied and the

Injunction Class's motion for a permanent injunction [693] is granted.  An Amended Judgment

and Decree will issue by separate order.


**SO ORDERED.**

Digitally signed by Brian M.
Cogan
_____
U.S.D.J.


Dated: Brooklyn, New York
　　　　November 25, 2013

**SPA-270**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                  :

IN RE VITAMIN C ANTITRUST LITIGATION    :     MASTER FILE
                                  :     06-MD-1738 (BMC) (JO)

   ------------------------------------------------------ :
                                    :

This document relates to:                       :

ANIMAL SCIENCE PRODUCTS, INC., et al.,   :
                                    :

               Plaintiffs,         :     05-CV-0453

v.                                     :

HEBEI WELCOME PHARMACEUTICAL CO.   :
LTD., et al.,                           :

              Defendants.       :

------------------------------------------------------------ X

## AMENDED JUDGMENT AND FINAL DECREE

       The jury having rendered its verdict in this case in favor of plaintiff, the Ranis Company,

Inc., as representative of the Direct Purchaser Class,[1] in the amount of Fifty Four Million One

Hundred Thousand Dollars ($54,100,000.00), and in favor of plaintiff, Animal Science Products,

Inc., as representative of the Injunction Class,[2] and the Court, upon motion of plaintiff, having

---

[1] The Direct Purchaser Damages Class consists of all persons or entities, or assignees of such persons or entities, who directly purchased vitamin C for delivery in the United States, other than pursuant to a contract containing an arbitration clause, from any of Defendants or their co-conspirators, other than Northeast Pharmaceutical (Group) Co. Ltd., from December 1, 2001 to June 30, 2006.  Excluded from this class are all governmental entities, defendants, their co-conspirators, and their respective subsidiaries or affiliates.

[2] The Injunction Class consists of all persons or entities, or assignees of such persons or entities, who purchased vitamin C manufactured by Defendants for delivery in the United States, other than pursuant to a contract with a Defendant containing an arbitration clause, from December 1, 2001 to the present, requiring injunctive relief against Defendants to end Defendants' antitrust violations.

directed entry of judgment upon trebling the damage award pursuant to 15 U.S.C. § 15(a), less Nine Million Dollars ($9,000,000) received from former defendants, and the Court, having entered its Memorandum Decision and Order of November 26, 2013, granting the motion of the Injunctive Class for a permanent injunction, it is hereby:

**ORDERED AND ADJUDGED**, that The Ranis Company, as class representative, will take damages of defendants – Hebei Welcome Pharmaceutical Co., Ltd. and North China Pharmaceutical Group Corp. – jointly and severally, in the amount of One Hundred Fifty Three Million Three Hundred Thousand Dollars ($153,300,000); and it is further

**ORDERED, ADJUDGED AND DECREED**, as follows:

1.  Defendants, their officers, directors, agents, servants, employees, successors, assigns and those persons acting in concert with them who receive actual notice of this injunction, are each ENJOINED and RESTRAINED from agreeing, directly or indirectly, to fix the price or limit the supply of vitamin C sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.  Any party may seek modification of this Order, at any time, by written motion and for good cause based on changed circumstances or otherwise.

3.  This Court shall retain jurisdiction to enforce this Order.  In the event that any part of this Order is violated by the parties named herein or other persons, Plaintiffs may, by motion with notice to the attorneys for the defendants, apply for sanctions or other relief that may be appropriate.

**SPA-272**

    4.  Unless this Court grants an extension, the injunction will expire without further action of this Court ten years from the date of its entry, or if timely appealed, ten years after the final order of the highest-level appellate court.

**SO ORDERED.**

_____
                         U.S.D.J.

Dated: Brooklyn, New York
       November 27, 2013

**SPA-273**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

| | |
|---|---|
| IN RE: VITAMIN C ANTITRUST LITIGATION | **SECOND AMENDED JUDGMENT**<br>**AND FINAL DECREE** |

----------------------------------------------------------

This document relates to:

ANIMAL SCIENCE PRODUCTS, INC., et al.,

                               Plaintiffs,

          v.

HEBEI WELCOME PHARMACEUTICAL CO.
LTD., et al.,
                        Defendants.

----------------------------------------------------------X

MASTER FILE
06-MD-1738 (BMC) (JO)

05-CV-0453

      The jury having rendered its verdict in this case in favor of plaintiff, The Ranis Company, Inc., as representative of the Direct Purchaser Class,[1] in the amount of Fifty Four Million One Hundred Thousand Dollars ($54,100,000.00), and in favor of plaintiff, Animal Science Products, Inc., as representative of the Injunction Class,[2] and the Court, upon motion of plaintiff having directed entry of judgment upon trebling the damage award pursuant to 15 U.S.C. § 15(a), less Nine Million Dollars ($9,000,000) received from former defendants, and the Court having entered its

---

    [1]  The Direct Purchaser Damages Class consists of all personas or entities, or assignees of such persons or entities, who directly purchased vitamin C for delivery in the United States, other than pursuant to a contract containing an arbitration clause, from any of Defendants or their co-conspirators, other than Northeast Pharmaceutical (Group) Co. Ltd., from December 1, 2001 to June 30, 2006.  Excluded from this class are governmental entities, defendants, their co-conspirators, and their respective subsidiaries or affiliates.

    [2]  The Injunction Class consists of all persons or entities, or assignees of such persons or entities, who purchase vitamin C manufactured by Defendants for delivery in the United States, other than pursuant to a contract with a Defendant containing an arbitration clause, from December 1, 2001 to the present, requiring injunctive relief against Defendants to end Defendants antitrust violations.

**SPA-274**

**<u>SECOND AMENDED JUDGMENT AND FINAL DECREE 06-MD-1738; 05-CV-0453</u>**

Memorandum Decision and Order of November 26, 2013, granting the motion of the Injunctive

Class for a permanent injunction and the Court having entered its Decision and Order dated

December 30, 2013 awarding plaintiffs attorneys' fees in the amount of $4,903,163.35 and directing

the Clerk to enter a Second Amended Judgment and Final Decree adding said amount to plaintiffs'

recovery, with interest nunc pro tunc to March 14, 2013, it is hereby:

> **ORDERED, ADJUDGED AND DECREED**, that The Ranis Company, as class

representative, will take of defendants Hebei Welcome Pharmaceutical Co., Ltd. and

North China Pharmaceutical Group Corp., jointly and severally, damages in the amount of One

Hundred Fifty Three Million Three Hundred Dollars ($153,300,000) plus attorneys' fees in the

amount of $4,903,163.35, for a total judgment amount of One Hundred Fifty Eight Million Two

Hundred Three Thousand One Hundred Sixty Three Dollars and 35/100 ($158,203,163.35) with

post judgment interest thereon pursuant to 28 U.S.C. § 1961 nunc pro tunc to March 14, 2013; and

it is further

> **ORDERED, ADJUDGED AND DECREED**, as follows:

1. Defendants, their officers, directors, agents, servants, employees, successors, assigns and

those persons acting in concert with them who receive actual notice of this injunction, are each

ENJOINED and RESTRAINED from agreeing, directly or indirectly, to fix the price or limit the

supply of vitamin C sold in the United States in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.

2. Any party may seek modification of this Order, at any time, by written motion and for

good cause based on changed circumstances or otherwise.

3. The Court shall retain jurisdiction to enforce this Order. In the event that any part of this

**SECOND AMENDED JUDGMENT AND FINAL DECREE 06-MD-1738; 05-CV-0453**

Order is violated by the parties named herein or other persons, Plaintiffs may, by motion with notice

to the attorneys for the defendants, apply for sanctions or other relief that may be appropriate.

    4.  Unless the Court grants an extension, the injunction will expire without further action

of the Court ten years from the date of its entry, or if timely appealed, ten years after the final order

of the highest-level appellate court.

Dated: Brooklyn, New York
      December 30, 2013

Douglas C. Palmer
Clerk of Court

by:

Digitally signed by Michele Gapinski
DN: cn=Michele Gapinski,
ou=Federal Judiciary,
o=U.S.Government, c=US

Michele Gapinski
Chief Deputy

3

**SPA-276**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

IN RE: VITAMIN C ANTITRUST LITIGATION

----------------------------------------------------------

This document relates to:

ANIMAL SCIENCE PRODUCTS, INC., et al.,

                               Plaintiffs,

          v.

HEBEI WELCOME PHARMACEUTICAL CO.
LTD., et al.,
                               Defendants.

----------------------------------------------------------X

**THIRD AMENDED JUDGMENT
AND FINAL DECREE**

MASTER FILE
06-MD-1738 (BMC) (JO)

05-CV-0453

      The jury having rendered its verdict in this case in favor of plaintiff, The Ranis Company, Inc., as representative of the Direct Purchaser Class,[1] in the amount of Fifty Four Million One Hundred Thousand Dollars ($54,100,000.00), and in favor of plaintiff, Animal Science Products, Inc., as representative of the Injunction Class;[2] and the Court, upon motion of plaintiff having directed entry of judgment upon trebling the damage award pursuant to 15 U.S.C. § 15(a), less Nine Million Dollars ($9,000,000) received from former defendants; and the Court having entered its

---

    [1]  The Direct Purchaser Damages Class consists of all personas or entities, or assignees of such persons or entities, who directly purchased vitamin C for delivery in the United States, other than pursuant to a contract containing an arbitration clause, from any of Defendants or their co-conspirators, other than Northeast Pharmaceutical (Group) Co. Ltd., from December 1, 2001 to June 30, 2006.  Excluded from this class are governmental entities, defendants, their co-conspirators, and their respective subsidiaries or affiliates.

    [2]  The Injunction Class consists of all persons or entities, or assignees of such persons or entities, who purchase vitamin C manufactured by Defendants for delivery in the United States, other than pursuant to a contract with a Defendant containing an arbitration clause, from December 1, 2001 to the present, requiring injunctive relief against Defendants to end Defendants antitrust violations.

<u>**THIRD AMENDED JUDGMENT AND FINAL DECREE 06-MD-1738; 05-CV-0453**</u>

Memorandum Decision and Order of November 26, 2013, granting the motion of the Injunctive Class for a permanent injunction and the Court having entered its Decision and Order dated December 30, 2013 awarding plaintiffs attorneys' fees in the amount of $4,903,163.35 and directing the Clerk to enter a Second Amended Judgment and Final Decree adding said amount to plaintiffs' recovery, with interest nunc pro tunc to March 14, 2013; and a further Order of Honorable Brian M. Cogan, United States District Judge, having been filed on February 12, 2014, granting the motion for reconsideration; ordering that Plaintiffs have now belatedly made clear that the fees award they requested was not to be paid to Class Counsel, but to the Direct Purchasers themselves; directing that the full amount of each settlement will already be offset against the total damages owed by Defendants, off-setting the portion of those settlements paid as fees to Class Counsel-money already included in the settlement total- would be double counting; and further, directing the Clerk of Court to enter a Third Amended Judgment and Final Decree in the amount of $147,831,471.03 with interest *nunc pro tunc* to March 14, 2013 it is hereby:

**ORDERED, ADJUDGED AND DECREED**, that The Ranis Company, as class representative, will take of defendants Hebei Welcome Pharmaceutical Co., Ltd. and North China Pharmaceutical Group Corp.,  jointly and severally, damages in the amount of One Hundred Forty Seven Million Eight Hundred Thirty One Thousand Four Hundred Seventy One Dollars and 03/100 ($147,831,471.03) with post judgment interest thereon pursuant to 28 U.S.C. § 1961 nunc pro tunc to March 14, 2013; and it is further

**ORDERED, ADJUDGED AND DECREED**, as follows:

1. Defendants, their officers, directors, agents, servants, employees, successors, assigns and those persons acting in concert with them who receive actual notice of this injunction, are each

2

**SPA-278**

**THIRD AMENDED JUDGMENT AND FINAL DECREE 06-MD-1738; 05-CV-0453**

ENJOINED and RESTRAINED from agreeing, directly or indirectly, to fix the price or limit the supply of vitamin C sold in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.   Any party may seek modification of this Order, at any time, by written motion and for good cause based on changed circumstances or otherwise.

3.   The Court shall retain jurisdiction to enforce this Order.  In the event that any part of this Order is violated by the parties named herein or other persons, Plaintiffs may, by motion with notice to the attorneys for the defendants, apply for sanctions or other relief that may be appropriate.

4.   Unless the Court grants an extension, the injunction will expire without further action of the Court ten years from the date of its entry, or if timely appealed, ten years after the final order of the highest-level appellate court.

Dated: Brooklyn, New York                    Douglas C. Palmer
       February 12, 2014                     Clerk of Court

                              by:
                                   Michele Gapinski
                                   Chief Deputy

3

SPA-279



c

United States Code Annotated Currentness
  Constitution of the United States
    Annotated
      Amendment V. Grand Jury Indictment for Capital Crimes; Double Jeopardy; Self-Incrimination; Due Process of Law; Just Compensation for Property (Refs & Annos)
      **➡➡ AmendmentV. Grand Jury Indictment for Capital Crimes; Double Jeopardy; Self-Incrimination; Due Process of Law; Just Compensation for Property**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

    <This amendment is further displayed in five separate documents according to subject matter,>

    <see USCA Const Amend. V-Capital Crimes>

    <see USCA Const Amend. V-Double Jeopardy>

    <see USCA Const Amend. V-Self Incrimination>

    <see USCA Const Amend. V-Due Process>

    <see USCA Const Amend. V-Just Compensation>

Current through P.L. 113-74 approved 1-16-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

SPA-280

▷

**Effective: June 22, 2004**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)
    **→→ § 1. Trusts, etc., in restraint of trade illegal; penalty**

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

CREDIT(S)

(July 2, 1890, c. 647, § 1, 26 Stat. 209; Aug. 17, 1937, c. 690, Title VIII, 50 Stat. 693; July 7, 1955, c. 281, 69 Stat. 282; Dec. 21, 1974, Pub.L. 93-528, § 3, 88 Stat. 1708; Dec. 12, 1975, Pub.L. 94-145, § 2, 89 Stat. 801; Nov. 16, 1990, Pub.L. 101-588, § 4(a), 104 Stat. 2880; June 22, 2004, Pub.L. 108-237, Title II, § 215(a), 118 Stat. 668.)

Current through P.L. 113-74 approved 1-16-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**SPA-281**

*Westlaw.*

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 15. Commerce and Trade
    Chapter 1. Monopolies and Combinations in Restraint of Trade (Refs & Annos)
    → → § 6a. Conduct involving trade or commerce with foreign nations


Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--


  **(1)** such conduct has a direct, substantial, and reasonably foreseeable effect--

    **(A)** on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

    **(B)** on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

  **(2)** such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.


If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.


CREDIT(S)

(July 2, 1890, c. 647, § 7, as added Oct. 8, 1982, Pub.L. 97-290, Title IV, § 402, 96 Stat. 1246.)


Current through P.L. 113-74 approved 1-16-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

# SPA-282



c

United States Code Annotated Currentness
  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
    Title IV. Parties
      **Rule 23. Class Actions**

<Notes of Decisions for 28 USCA Federal Rules of Civil Procedure Rule 23 are displayed in two separate documents. Notes of Decisions for subdivisions I and II are contained in this document. For Notes of Decisions for subdivisions III to end, see second document for 28 USCA Federal Rules of Civil Procedure Rule 23.>

**(a) Prerequisites.**One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

  **(1)** the class is so numerous that joinder of all members is impracticable;

  **(2)** there are questions of law or fact common to the class;

  **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

  **(4)** the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.**A class action may be maintained if Rule 23(a) is satisfied and if:

  **(1)** prosecuting separate actions by or against individual class members would create a risk of:

    **(A)** inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

    **(B)** adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SPA-283**

**(2)** the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)** the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

**(1)** *Certification Order.*

**(A)** *Time to Issue.* At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

**(B)** *Defining the Class; Appointing Class Counsel.* An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

**(C)** *Altering or Amending the Order.* An order that grants or denies class certification may be altered or amended before final judgment.

**(2)** *Notice.*

**(A)** *For (b)(1) or (b)(2) Classes.* For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

**(B)** *For (b)(3) Classes.* For any class certified under Rule 23(b)(3), the court must direct to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

   **(i)** the nature of the action;

   **(ii)** the definition of the class certified;

   **(iii)** the class claims, issues, or defenses;

   **(iv)** that a class member may enter an appearance through an attorney if the member so desires;

   **(v)** that the court will exclude from the class any member who requests exclusion;

   **(vi)** the time and manner for requesting exclusion; and

   **(vii)** the binding effect of a class judgment on members under Rule 23(c)(3).

  **(3)** *Judgment.* Whether or not favorable to the class, the judgment in a class action must:

   **(A)** for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

   **(B)** for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

  **(4)** *Particular Issues.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues.

  **(5)** *Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

**(d) Conducting the Action.**

  **(1)** *In General.* In conducting an action under this rule, the court may issue orders that:

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SPA-285**

**(A)** determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

**(B)** require--to protect class members and fairly conduct the action--giving appropriate notice to some or all class members of:

  **(i)** any step in the action;

  **(ii)** the proposed extent of the judgment; or

  **(iii)** the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

**(C)** impose conditions on the representative parties or on intervenors;

**(D)** require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

**(E)** deal with similar procedural matters.

  **(2)** ***Combining and Amending Orders.*** An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

  **(1)** The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

  **(2)** If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

  **(3)** The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page50 of 95

**SPA-286**

**(4)** If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

**(5)** Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

**(g) Class Counsel.**

**(1)** *Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

**(A)** must consider:

**(i)** the work counsel has done in identifying or investigating potential claims in the action;

**(ii)** counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

**(iii)** counsel's knowledge of the applicable law; and

**(iv)** the resources that counsel will commit to representing the class;

**(B)** may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

**(C)** may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

**(D)** may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

**(E)** may make further orders in connection with the appointment.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(2)** *Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

**(3)** *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

**(4)** *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

**(h) Attorney's Fees and Nontaxable Costs.** In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

**(1)** A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

**(2)** A class member, or a party from whom payment is sought, may object to the motion.

**(3)** The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

**(4)** The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

CREDIT(S)

(Amended February 28, 1966, effective July 1, 1966; March 2, 1987, effective August 1, 1987; April 24, 1998, effective December 1, 1998; March 27, 2003, effective December 1, 2003; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009.)

Amendments received to 2-24-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SPA-288**



C

United States Code Annotated Currentness
  Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
    Title VI. Trials
      **Rule 44.1. Determining Foreign Law**

A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

CREDIT(S)

(Adopted February 28, 1966, effective July 1, 1966; amended November 20, 1972, effective July 1, 1975; March 2, 1987, effective August 1, 1987; April 30, 2007, effective December 1, 2007.)

Amendments received to 2-24-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SPA-289**



C

United States Code Annotated Currentness
 Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos)
  Title VI. Trials
   ➡➡ **Rule 50. Judgment as a Matter of Law in a Jury Trial; Related Motion for a New Trial; Conditional Ruling**

**(a) Judgment as a Matter of Law.**

 **(1)** *In General.* If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

  **(A)** resolve the issue against the party; and

  **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

 **(2)** *Motion.* A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

**(b) Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment--or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged--the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

 **(1)** allow judgment on the verdict, if the jury returned a verdict;

 **(2)** order a new trial; or

 **(3)** direct the entry of judgment as a matter of law.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page54 of 95

**SPA-290**

**(c) Granting the Renewed Motion; Conditional Ruling on a Motion for a New Trial.**

**(1) *In General.***If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

**(2) *Effect of a Conditional Ruling.***Conditionally granting the motion for a new trial does not affect the judgment's finality; if the judgment is reversed, the new trial must proceed unless the appellate court orders otherwise. If the motion for a new trial is conditionally denied, the appellee may assert error in that denial; if the judgment is reversed, the case must proceed as the appellate court orders.

**(d) Time for a Losing Party's New-Trial Motion.** Any motion for a new trial under Rule 59 by a party against whom judgment as a matter of law is rendered must be filed no later than 28 days after the entry of the judgment.

**(e) Denying the Motion for Judgment as a Matter of Law; Reversal on Appeal.**If the court denies the motion for judgment as a matter of law, the prevailing party may, as appellee, assert grounds entitling it to a new trial should the appellate court conclude that the trial court erred in denying the motion. If the appellate court reverses the judgment, it may order a new trial, direct the trial court to determine whether a new trial should be granted, or direct the entry of judgment.

CREDIT(S)

(Amended January 21, 1963, effective July 1, 1963; March 2, 1987, effective August 1, 1987; April 30, 1991, effective December 1, 1991; April 22, 1993, effective December 1, 1993; April 27, 1995, effective December 1, 1995; April 12, 2006, effective December 1, 2006; April 30, 2007, effective December 1, 2007; March 26, 2009, effective December 1, 2009.)

Amendments received to 2-24-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**SPA-291**



Federal Rules of Evidence Rule 403, 28 U.S.C.A.                                    Page 1


**C**

United States Code Annotated Currentness
  Federal Rules of Evidence (Refs & Annos)
    Article IV. Relevance and Its Limits
      **→→ Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons**


The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.


CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1932; Apr. 26, 2011, eff. Dec. 1, 2011.)


Amendments received to 2-24-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

**SPA-292**



c

United States Code Annotated Currentness
  Federal Rules of Evidence (Refs & Annos)
    Article VIII. Hearsay (Refs & Annos)
      **➡➡ Rule 803. Exceptions to the Rule Against Hearsay--Regardless of Whether the Declarant Is Available as a Witness**

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

  **(1) Present Sense Impression.** A statement describing or explaining an event or condition, made while or immediately after the declarant perceived it.

  **(2) Excited Utterance.** A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused.

  **(3) Then-Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

  **(4) Statement Made for Medical Diagnosis or Treatment.** A statement that:

  **(A)** is made for--and is reasonably pertinent to--medical diagnosis or treatment; and

  **(B)** describes medical history; past or present symptoms or sensations; their inception; or their general cause.

  **(5) Recorded Recollection.** A record that:

  **(A)** is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;

  **(B)** was made or adopted by the witness when the matter was fresh in the witness's memory; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page57 of 95

**(C)** accurately reflects the witness's knowledge.

If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

**(6) Records of a Regularly Conducted Activity.** A record of an act, event, condition, opinion, or diagnosis if:

    **(A)** the record was made at or near the time by--or from information transmitted by--someone with knowledge;

    **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

    **(C)** making the record was a regular practice of that activity;

    **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

    **(E)** neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

**(7) Absence of a Record of a Regularly Conducted Activity.** Evidence that a matter is not included in a record described in paragraph (6) if:

    **(A)** the evidence is admitted to prove that the matter did not occur or exist;

    **(B)** a record was regularly kept for a matter of that kind; and

    **(C)** neither the possible source of the information nor other circumstances indicate a lack of trustworthiness.

**(8) Public Records.** A record or statement of a public office if:

    **(A)** it sets out:

        **(i)** the office's activities;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page58 of 95

**SPA-294**

**(ii)** a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or

**(iii)** in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and

**(B)** neither the source of information nor other circumstances indicate a lack of trustworthiness.

**(9) Public Records of Vital Statistics.** A record of a birth, death, or marriage, if reported to a public office in accordance with a legal duty.

**(10) Absence of a Public Record.** Testimony--or a certification under Rule 902--that a diligent search failed to disclose a public record or statement if:

**(A)** the testimony or certification is admitted to prove that

**(i)** the record or statement does not exist; or

**(ii)** a matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind; and

**(B)** in a criminal case, a prosecutor who intends to offer a certification provides written notice of that intent at least 14 days before trial, and the defendant does not object in writing within 7 days of receiving the notice--unless the court sets a different time for the notice or the objection.

**(11) Records of Religious Organizations Concerning Personal or Family History.** A statement of birth, legitimacy, ancestry, marriage, divorce, death, relationship by blood or marriage, or similar facts of personal or family history, contained in a regularly kept record of a religious organization.

**(12) Certificates of Marriage, Baptism, and Similar Ceremonies.** A statement of fact contained in a certificate:

**(A)** made by a person who is authorized by a religious organization or by law to perform the act certified;

**(B)** attesting that the person performed a marriage or similar ceremony or administered a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page59 of 95

**SPA-295**

sacrament; and

**(C)** purporting to have been issued at the time of the act or within a reasonable time after it.

**(13) Family Records.** A statement of fact about personal or family history contained in a family record, such as a Bible, genealogy, chart, engraving on a ring, inscription on a portrait, or engraving on an urn or burial marker.

**(14) Records of Documents That Affect an Interest in Property.** The record of a document that purports to establish or affect an interest in property if:

**(A)** the record is admitted to prove the content of the original recorded document, along with its signing and its delivery by each person who purports to have signed it;

**(B)** the record is kept in a public office; and

**(C)** a statute authorizes recording documents of that kind in that office.

**(15) Statements in Documents That Affect an Interest in Property.** A statement contained in a document that purports to establish or affect an interest in property if the matter stated was relevant to the document's purpose--unless later dealings with the property are inconsistent with the truth of the statement or the purport of the document.

**(16) Statements in Ancient Documents.** A statement in a document that is at least 20 years old and whose authenticity is established.

**(17) Market Reports and Similar Commercial Publications.** Market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations.

**(18) Statements in Learned Treatises, Periodicals, or Pamphlets.** A statement contained in a treatise, periodical, or pamphlet if:

**(A)** the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and

**(B)** the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**SPA-296**

If admitted, the statement may be read into evidence but not received as an exhibit.

**(19) Reputation Concerning Personal or Family History.** A reputation among a person's family by blood, adoption, or marriage--or among a person's associates or in the community--concerning the person's birth, adoption, legitimacy, ancestry, marriage, divorce, death, relationship by blood, adoption, or marriage, or similar facts of personal or family history.

**(20) Reputation Concerning Boundaries or General History.** A reputation in a community--arising before the controversy--concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation.

**(21) Reputation Concerning Character.** A reputation among a person's associates or in the community concerning the person's character.

**(22) Judgment of a Previous Conviction.** Evidence of a final judgment of conviction if:

  **(A)** the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

  **(B)** the conviction was for a crime punishable by death or by imprisonment for more than a year;

  **(C)** the evidence is admitted to prove any fact essential to the judgment; and

  **(D)** when offered by the prosecutor in a criminal case for a purpose other than impeachment, the judgment was against the defendant.

The pendency of an appeal may be shown but does not affect admissibility.

**(23) Judgments Involving Personal, Family, or General History, or a Boundary.** A judgment that is admitted to prove a matter of personal, family, or general history, or boundaries, if the matter:

  **(A)** was essential to the judgment; and

  **(B)** could be proved by evidence of reputation.

**(24) [Other Exceptions.]** [Transferred to Rule 807.]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

# SPA-297

CREDIT(S)

(Pub.L. 93-595, § 1, Jan. 2, 1975, 88 Stat. 1939; Pub.L. 94-149, § 1(11), Dec. 12, 1975, 89 Stat. 805; Mar. 2, 1987, eff. Oct. 1, 1987; Apr. 11, 1997, eff. Dec. 1, 1997; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011; Apr. 16, 2013, eff. Dec. 1, 2013.)

Amendments received to 2-24-14

Westlaw. (C) 2014 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

[TRANSLATION]

*Note: This Notice has been abolished by *List of 26 Abolished Ministerial Regulations of the Fourth Batch by Ministry of Foreign Trade and Economic Cooperation* (promulgation date: March 21, 2002, effective date: March 21, 2002).

## 1997 MOFTEC & SDA Notice

### Notice Relating to Strengthening the Administration of Vitamin C Production and Export by Ministry of Foreign Trade and Economic Cooperation and State Drug Administration

### ((1997) MOFTEC Guan Fa No. 664)

(Issued on November 27, 1997, effective from January 1, 1998)

The Foreign Trade & Economic Cooperation Commissions (Departments and Bureaus) of each province, autonomous region and municipality, State Drug Administration (the "SDA") and relevant departments of drug administration, all Companies directly under the MOFTEC and local counterpart of MOFTEC, all representative offices of MOFTEC, China Chamber of Commerce of Medicines & Health Products Importers &Exporters (the "Chamber"):

China is one of the biggest countries manufacturing and exporting Vitamin C. At present, Vitamin C export encounters intense competitions and challenges from the international market. In order to rectify the operational order and optimize the operational team of Vitamin C export, realize the scale-operation on export, improve the competitiveness of our Vitamin C products in the international market, promote the healthy development of Vitamin C export and maintain the interest of our country and enterprises, we hereby set forth the following:

1.      The scale of Vitamin C production shall be strictly controlled.

    (1)      The establishment of Vitamin C manufacturing enterprises (including foreign investment enterprises) shall be strictly controlled, and the existing enterprises shall not expand production capacity any more.

    (2)      The production licensing system shall apply to those Vitamin C manufacturing enterprises that already started production (not including foreign investment enterprises). The SDA shall issue the production licenses to the Vitamin C manufacturing enterprises, and be responsible for publicizing information of annual production guidance.

    (3)      For the enterprises that has been in continuous production in recent years and achieved certain scales, the production license can be issued to them.

    (4)      Only the products manufactured by the enterprises that are verified by the SDA and obtained the production license can be supplied for export.

SDA shall formulate specific regulations to implement the above principles and circulate such regulations to the enterprises after seeking comments from MOFTEC.

**DEFENDANT'S TRIAL EXHIBIT**
E.D.N.Y. / 06-MD-01738

**DTX-012**

2.    MOFTEC shall consult with SDA and relevant departments when determining the total volume of Vitamin C export and the principles for quota allotment.

3.    The enterprises qualified to operate Vitamin C export are: the export enterprises whose annual export volume reached 200 tons in any one of the continuous years from 1994 to 1996, which include foreign trading companies, manufacturing enterprises with the right to export their own products, and foreign investment companies (excluding those starting production in 1997). One of the attachments hereof is a list of the authorized enterprises (Please refer to Annex 1).

4.    The method for allocating export quota shall be improved, Vitamin C export operation team shall be optimized in order to achieve scale-operation on export.

Every local counterpart of MOFTEC shall distribute the export quota set by MOFTEC to the enterprises qualified to operate Vitamin C export in strict accordance with the provisions hereof. It is imperative to follow the principle of fostering the excellent and scrapping the obsolete, distribute the quotas in preference to the enterprises with proper operational capabilities and outstanding profitability.

5.    The Chamber shall improve the coordination on Vitamin C export, and shall monitor, supervise and examine how this notice is implemented by Vitamin C export enterprises, and timely report to MOFTEC about the relevant issues and problems.

6.    The Chamber shall establish a Vitamin C Coordination Group (which was the temporary name of the Vitamin C Sub-committee before the Vitamin C Sub-committee is officially approved). The main responsibilities of this Group are to coordinate with respect to Vitamin C export market, price and customers, and to organize the enterprises in contacting foreign entities. All enterprise qualified to operate Vitamin C export shall participate in such Coordination Group and subject themselves to the coordination of the Group. The specific method for coordination shall be formulated by the Chamber, and filed to MOFTEC for record.

7.    Vitamin C Export Coordination Group shall timely organize meetings for the major Vitamin C export enterprises according to the domestic and international market development, to conduct studies on marketing strategies, timely formulate and adjust export coordination price, which the Vitamin C export enterprises must strictly implement in accordance with. With respect to the enterprises competing at low price and reducing price through any disguised means, a penalty shall be imposed in strict accordance with Article 10 of this Notice.

8.    The organisations that authorized by MOFTEC to issue export licenses shall strictly verify the qualification of Vitamin C export and operation of the enterprises, and verify their export contracts and issue export license according to the Vitamin C coordinated price and volume quotas.

9.    Vitamin C export enterprises shall report the export situations to the Chamber at regular intervals (for detailed information, please refer to Annex 2). With respect to the export enterprises that make report beyond time or disguise report, a penalty shall be imposed as applicable.

2

10. With respect to the export enterprises with violations of relevant provisions hereof, if substantiated, penalties shall be imposed, specifically, the Vitamin C export quota may be reduced, in the worst case their Vitamin C export right shall be revoked.

11. Relevant provisions of this Notice shall enter into force as of the date of January 1, 1998.

Annex:

1. Vitamin C Export and Operation Enterprises List

2. Table of Vitamin C Export Status

Ministry of Foreign Trade & Economic Cooperation of People's Republic of China

State Drug Administration

November 27, 1997

3

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page65 of 95

**SPA-301**

Case 1:06-md-01738-BMG-JO   Document 691-12   Filed 04/11/13   Page 7 of 25 PageID #:
Case 1:06-md-01738-DGT-JO   Document 170-2   Filed 08/10/2007   Page 6 of 9
20470

[TRANSLATION]

### 2002 MOFTEC & Customs Notice

## Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Export Products Subject to Price Review by the Customs

MOFTEC MAO FA [2002] No. 187

Promulgation Date: March 29, 2002

Effective Date: May 1, 2002

Issued by: the Ministry of Foreign Trade and Economic Cooperation (hereinafter "MOFTEC") and the General Administration of Customs (hereinafter "GAC") [tr.]

To:     Guangdong Branch, Tianjin and Shanghai Commissioners' Offices of GAC, Directly Subordinated Customs Offices, the Commissions (Offices/Bureaus) of Trade and Economic Cooperation of Every Province, Autonomous Region, Municipality and City Specifically Designated in the State Plan, the Commissioners' Offices of MOFTEC at Various Cities, and the Chambers of Import and Export

MOFTEC and GAC have made the decision to adjust the catalogue of export products subject to price review by the customs for year 2002, in order to accommodate the new situations since China's entry into WTO, maintain the order of market competition, make active efforts to avoid anti-dumping sanctions imposed by foreign countries on China's exports, promote industry self-discipline and facilitate the healthy development of exports. The decision includes the following aspects:

1.     After adjustment, 30 categories of export products are subject to price review by the customs (see the Attachment for the Table of Export Products). All of the products are subject to Price Verification and Chop ("PVC") by the chambers, and no longer subject to supervision and review by the customs.

2.     The relevant chambers of import and export and customs offices shall strengthen communication and cooperation among themselves in accordance with the Rules for Co-ordination with Respect to Customs Price Review of Export Products issued together with the

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page66 of 95
**SPA-302**
Case 1:06-md-01738-BMG-JO   Document 691-12   Filed 04/11/13   Page 8 of 25 PageID #:
Case 1:06-md-01738-DGT-JO   Document 170-2   Filed 08/10/2007   Page 7 of 9
20471

Notice of the Rules on Price Reviews of Export Products by the Customs ([1997] MOFTEC GUAN ZONG HAN ZI No. 21), promptly report any issues arising from export price review exercise, jointly perform the export price review responsibility and file the annual price review report with MOFTEC and GAC.

3.     Following the adjustment made under this Notice, the relevant chambers must, by April 20, 2002, submit to Guangzhou Commodity Price Information Center of GAC information on industry-wide negotiated prices for those export products subject to price review, in both soft copy (in required format) and hard copy; in addition, each chamber shall file the name of personnel responsible for price review, addresses, telephone and fax numbers with the Foreign Trade Department of MOFTEC, the Duty Collection and Administration Department and Guangzhou Commodity Price Information Center of GAC.

4.     The relevant chambers of import and export shall follow the PVC procedures pursuant to the Provisional Rules on Export Price Verification and Chop for Key Products subject to Price Review, which Rules were issued together with the Notice of the Rules on Price Reviews of Export Products by the Customs ([1997] MOFTEC GUAN ZONG HAN ZI No. 21). The adoption of PVC procedure shall be convenient for exporters while it is conducive for the chambers to coordinate export price and industry self-discipline. The PVC procedures shall be performed in a way that it could assist in maintaining good export order on the one hand and effectively reduce the export costs of enterprises, promoting the development of the industries and exports. From 2002, each relevant chamber shall learn from the experience of the Chamber of Machinery and Electronic Products in implementing classified PVC for binoculars, and select at least one of the products with the jurisdiction of its chamber for trial.

5.     Given the drastically changing international market, the customs and chambers may suspend export price review for certain products with the approvals of the general members' meetings of the sub-chamber (coordination groups) and filing with GAC. __and MOFTEC

6.     The adjusted catalogue of export products subject to price review shall become effective from May 1, 2002. The Notice for Adjusting the Catalogue of Export Products Subject to Customs Price Review ([2000] MOFTEC GUAN FA No. 661) jointly issued by MOFTEC and GAC on December 25, 2000 shall become void then.

Attachment: Catalogue of Export Products Subject to Price Review by the Customs for year 2002 (30 categories)

2

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page67 of 95

**SPA-303**

Case 1:06-md-01738-BMC-JO — Document 691-12 — Filed 04/11/13 — Page 9 of 25 PageID #:
Case 1:06-md-01738-DGT-JO — Document 170-2 — Filed 08/10/2007 — Page 8 of 9
20472

Ministry of Foreign Trade and Economic Cooperation of the People's Republic of China

General Administration of Customs of the People's Republic of China

March 29, 2002

Attachment

Catalogue of Export Products Subject to Price Review by the Customs for year 2002

(30 categories)

| Classification | Category | HS Code | Unit | Method of Price Review |
|---|---|---|---|---|
| Machinery and Electronic Products | 1. electromotor | 85014000 | set | PVC |
| | | 85015100 | | |
| | | 85015200 | | |
| | 2. single-cylinder diesel engine | 84072100 | set | PVC |
| | | 84082090 | | |
| | | 84089091 | | |
| | | 84089092 | | |
| | | 84099199 | kilogram | |
| | | 84099910 | | |
| | | 84099920 | | |
| | | 84099999 | | |
| | 3. binocular | 90051000 | piece | PVC |
| | 4. air conditioner | 84151010 | set | PVC |
| | | 84151021 | | |
| | | 84151022 | | |
| | | 84158110 | | |
| | | 84158210 | | |
| | | 84158300 | | |
| | 5. axletree | 84821000 | set | PVC |
| | | 84822000 | | |
| | | 84823000 | | |
| | | 84824000 | | |
| | | 84825000 | | |
| | | 84828000 | | |
| | | 84832000 | | |
| | 6. laser video CD player | 85219010 | set | PVC |
| | 7. vacuum cleaner | 85091000 | set | PVC |
| | 8. color TV set | 85281291 | set | PVC |
| | | 85281292 | | |

3

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page68 of 95

**SPA-304**

Case 1:06-md-01738-BMC-JO   Document 691-12   Filed 04/11/13   Page 10 of 25 PageID #:
Case 1:06-md-01738-DGT-JO   Document 170-2   Filed 08/10/2007   Page 9 of 9
20473

| | | 85281293 | | |
|---|---|---|---|---|
| | 9. sewing machine | 84521010 | set | PVC |
| | | 84521090 | | |
| | | 84522110 | | |
| | | 84522190 | | |
| | | 84522900 | | |
| Light Industrial Products and Arts-Crafts | 1. cereal straw and product | 12130000 | kilogram | PVC |
| | | 46019190 | | |
| | 2. wooden pencil | 96091010 | kilogram / hundred pieces | PVC |
| | | 96091020 | | |
| Minerals and Chemical Products | 1. glyphosate (weedicide) and glyphosate technical | 38083019 | kilogram | PVC |
| | | 29209019.10 | | |
| | 2. citric acid | 29181400 | | PVC |
| | 3. sodium tripolyphosphate | 28353100 | | PVC |
| | 4. ferro-silico-manganese | 72023000 | | PVC |
| | 5. disodium sulfate and other sulfate | 28331100 | | PVC |
| | | 28331900 | | |
| | 6. yellow phosphorus (white phosphorus) | 28047010 | | PVC |
| | 7. phosphorus ore (apatite) | 25101010 | metric ton | PVC |
| | | 25101090 | | |
| | | 25102010 | | |
| | | 25102090 | | |
| | 8. natural graphite | 25041010 | | PVC |
| | | 25041090 | | |
| | | 25049000 | | |
| Medicines and Health Care Products | 1. soluble gluside | 29251100 | kilogram | PVC |
| | 2. paracetamol | 29242920 | | PVC |
| | 3. fresh royal jelly and fresh royal jelly powder | 04100020 | | PVC |
| | | 04100030 | | PVC |
| | 4. vitamin C | 29362700 | | PVC |
| | 5. panax | 12112091 | | PVC |
| | | 12112099 | | |
| | | 12112020 | | |
| Foodstuffs, Native Produce & Animal By-Products | 1. freshwater crayfish | 03061911 | kilogram | PVC |
| | | 03061919 | | |
| | | 16054011 | | |
| | | 16054019 | | |
| | 2. apple juice | 20097000 | | PVC |
| | 3. roasted eel | 16041910 | | PVC |
| | 4. bee honey | 04090000 | | PVC |
| | 5. adzuki beans | 07133210 | | PVC |
| | | 07133290 | | |
| | 6. disposable chopsticks | 44190010 | | PVC |

4

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page69 of 95
**SPA-305**
Case 1:06-md-01738-BMC-JO   Document 691-13   Filed 04/11/13   Page 10 of 16 PageID #:
20498
Case 1:06-md-01738-DGT-JO   Document 170-3   Filed 08/10/2007   Page 9 of 15

[TRANSLATION]

### Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China (No. 36, 2003)

According to the relevant provisions of *the Foreign Trade Law of the People's Republic of China*, in order to maintain the order of foreign trade and create a fair trade environment and in response to the demands of the industries engaging in export and import, as well as on the basis of the coordination by relevant industrial associations, starting from January 1, 2004, the export of citric acid and 35 other commodities (please refer to Exhibit 1: Catalogue of Export Commodities Subject to the Verification and Chop System, hereinafter the "Catalogue") shall be subject to the Verification and Chop ("V&C") system on an experimental basis. The Catalogue shall be subject to further adjustment and announcement by the Ministry of Commerce in consultation with the General Administration of Customs, upon application of the relevant Chambers of Commerce and according to the development of various industries.

With respect to those included in the Catalogue, if the commodities are exported under general trade, processing trade with customer's materials, processing trade with self-sourced materials and processing trade with exported materials, the exporters shall declare to the Customs with export contracts affixed with the V&C chop by the relevant Chambers of Commerce for Import and Export. The Customs shall not accept any application for export when the export contracts are not affixed with such chop. The commodity number shall be the basis for the Customs to verify export contracts with V&C chop, while the commodity name works only as a reference.

Each Chamber of Commerce for Import and Export shall follow the principle of facilitating export activities and promoting industrial development, and strictly observe the Procedures for Implementing the Verification and Chop System on Export Commodities (Exhibit 2).

Enterprises exporting by forging the V&C chop on the contracts will be punished by the Customs and Chambers of Commerce according to relevant rules.

We hereby make this announcement.

BJI 38124v.2

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page70 of 95
**SPA-306**
Case 1:06-md-01738-BMC-JO   Document 691-13   Filed 04/11/13   Page 11 of 16 PageID #: 20499
Case 1:06-md-01738-DGT-JO     Document 170-3     Filed 08/10/2007     Page 10 of 15

Exhibits:  1.  Catalogue for Export Commodities Subject to the Verification and Chop System

          2.  Procedures for Implementing the Verification and Chop System on Export Commodities

          3.  Contact Persons of the Chambers Responsible for Implementing the Verification and Chop System

Ministry of Commerce of the People's Republic of China

General Administration of Customs of the People's Republic of China

November 29, 2003

BJ1 38124v.2

2

**Exhibit 1:** Catalogue of Export Commodities Subject to the Verification and Chop System (36 Categories)

| Chamber of Commerce | Category | HS Code | Unit |
|---|---|---|---|
| China Chamber of Commerce for Import and Export of Machinery and Electronic Products | 1. single-cylinder diesel engine | 84082090 | set / kilowatt |
| | | 84089091 | |
| | | 84089092 | |
| | | 84099199 | kilogram |
| | | 84099920 | |
| | | 84099999 | |
| | 2. air conditioner | 84151010 | set |
| | | 84151021 | |
| | | 84151022 | |
| | | 84158110 | |
| | | 84158210 | |
| | | 84158300 | |
| | 3. sewing machine | 84521000 | set |
| | | 84522110 | |
| | | 84522190 | |
| | | 84522900 | |
| | 4. electromotor | 85014000 | set |
| | | 85015100 | |
| | | 85015200 | |
| | | 85015300 | |
| | 5. binocular | 90051000 | piece |
| | 6. DVD player | 85219012 | set |
| | | 85219019 | |
| | 7. color TV set | 85281221 | set |
| | | 85281222 | |
| | | 85281223 | |
| | | 85281224 | |
| | | 85281238 | |
| | | 85281239 | |
| | | 85281248 | |
| | | 85281249 | |
| | | 85281290 | |
| | 8. axletree | 84821000 | set |
| | | 84822000 | |
| | | 84823000 | |
| | | 84824000 | |
| | | 84825000 | |
| | | 84828000 | |
| | | 84832000 | |
| | 9. digital camera | 85254050 | set |

| Chamber of Commerce | Category | HS Code | Unit |
|---|---|---|---|
| China Chamber of Commerce for Import and Export of Light Industrial Products and Arts-Crafts | 1. baby stroller | 95010000 | kilogram |
| | 2. wooden pencil | 96091010 | kilogram / hundred pieces |
| | | 96091020 | |
| | 3. tent | 63062100 | piece / kilogram |
| | | 63062200 | |
| | | 63062900 | |
| China Chamber of Commerce of Metals, Minerals and Chemicals Importers and Exporters | 1. glyphosate (weedicide) and glyphosate technical | 38083019 | kilogram |
| | | 29209019.10 | |
| | 2. citric acid | 29181400 | |
| | 3. sodium tripolyphosphate | 28353100 | |
| | 4. ferro-silico-manganese | 72023000 | |
| | 5. disodium sulfate and other sulfate | 28331100 | |
| | | 28331900 | |
| | 6. yellow phosphorus (white phosphorus) | 28047010 | |
| | 7. phosphorus ore (apatite) | 25101010 | kilogram |
| | | 25101090 | |
| | | 25102010 | |
| | | 25102090 | |
| | 8. natural graphite | 25041010 | |
| | | 25041090 | |
| | | 25049000 | |
| | 9. molybdenum and molybdenum product | 26131000 | |
| | | 26139000 | |
| | | 28257000 | |
| | | 72027000 | |
| China Chamber of Commerce of Medicines & Health Products Importers & Exporters | 1. soluble gluside | 29251100 | kilogram |
| | 2. paracetamol | 29242920 | |
| | 3. fresh royal jelly and fresh royal jelly powder | 04100020 | |
| | | 04100030 | |
| | 4. vitamin C | 29362700 | |
| | 5. panax | 12112091 | |
| | | 12112099 | |
| | | 12112020 | |
| China Chamber of Commerce for I/E of Foodstuffs, Native Produce & Animal By-Products | 1. freshwater crayfish | 03061911 | kilogram |
| | | 03061919 | |
| | | 16054011 | |
| | | 16054019 | |
| | 2. apple juice | 20097000 | |
| | 3. roasted eel | 16041910 | |
| | 4. bee honey | 04090000 | |
| | 5. adzuki beans | 07133211 | |
| | | 07133219 | |
| | | 07133290 | |
| | 6. hygienic chopsticks | 44190010 | |

4

| Chamber of Commerce | Category | HS Code | Unit |
|---|---|---|---|
| | 7. canned orange | 20083010 | |
| | 8. garlic | 07032010 | |
| | | 07032090 | |
| | 9. dry and fresh mushroom | 07095920 | |
| | | 07123910 | |
| China Chamber of Commerce for Import & Export of Textiles | towel | 58021109 | meter/kilogram |
| | | 58021909 | |
| | | 63023192 | piece/kilogram |
| | | 63026000 | |

5

BJI 38124v.2

Case 13-4791, Document 154-2, 07/28/2014, 1280870, Page74 of 95
**SPA-310**
Case 1:06-md-01738-BMC-JO Document 691-13 Filed 04/11/13 Page 15 of 16 PageID #: 20503
Case 1:06-md-01738-DGT-JO Document 170-3 Filed 08/10/2007 Page 14 of 15

**Exhibit 2:** Procedures for Implementing the Verification and Chop System on Export Commodities

China Chamber of Commerce for Import and Export of Light Industrial Products and Arts-Crafts, China Chamber of Commerce of Metals, Minerals & Chemicals Importers & Exporters, China Chamber of Commerce for Import and Export of Foodstuffs, Native Produce And Animal By-Products, China Chamber of Commerce for Import & Export of Machinery & Electronic Products, China Chamber of Commerce of Medicines & Health Products Importers & Exporters and China Chamber of Commerce for Import & Export of Textiles (collectively "Chambers") shall be responsible for implementing the verification and chop system (hereinafter "V&C") on export commodities. The procedures are set forth as follows:

A.     For the commodities included in the Catalogue of Export Commodities Subject to the Verification and Chop System (hereinafter the "Catalogue"), exporters shall deliver or fax (in urgent cases) the export contracts (or copies thereof) to the relevant Chambers for verification before Customs declaration. If it is verified that the contracts are correct, the Chambers shall fill in the Verification and Chop Form of China Chamber of Commerce for XX (hereinafter "V&C Form") and affix the counter-forgery V&C chop at the designated block of the V&C Form and to the export contracts at the blocks where the prices and quantities are specified, and then deliver them back to the exporters. The exporters shall declare to the Customs with the originals of the V&C Forms and the export contracts that have been verified and affixed with the V&C chop by the Chambers.

B.     For contracts where exports will be in several batches, exporters may apply to the Chambers for V&C of the whole contracts. After the Chambers have verified that the quantities and prices of each batch comply with the relevant batch contracts, the Chambers shall use the same serial number on the V&C Forms for all the batches of exports.

C.     The Chambers shall verify the submissions by the exporters based on the industry agreements and in accordance with the relevant regulations promulgated by the Ministry of Commerce ("MOFCOM") and the General Administration of Customs ("GAC"). For commodities of special standards or brands that are not included in the industry agreements of the relevant Chambers, the Chambers may refer to the same or similar types of commodities manufactured and exported during the same period of time. The relevant

6

BJ1 38124v.2

Chambers shall file the industry agreements with MOFCOM and GAC within 10 days after
the public announcements are made, and any modifications to such industry agreements shall
be filed with MOFCOM and GAC within 10 days after such modifications are made.

    D.    The Chambers shall promptly verify the exporters' submissions, affix V&C
chop to the conforming applications and deliver them back to the applicant enterprises via
express mail within 3 business days (as per postmark). The Chambers shall not affix the V&C
chop to non-conforming export contracts and shall notify the exporters within 2 business days.
In the event that no response is received from the Chambers 10 days after the exporters have
submitted the export contracts to the Cambers for V&C, such exporters shall report the same
to MOFCOM.

    E.    The Chambers shall establish a V&C administration system, and report to
MOFCOM and GAC every three months the implementation of the V&C system for the
commodities included in the Catalogue of the passing quarter.

    F.    The Chambers shall not charge any fees other than the necessary
documentation costs involved in the verification of export contracts that are subject to the
V&C system. For V&C applications made by non-member exporters, the Chambers shall
give them the same treatment as to member exporters.

    G.    The Chambers shall keep confidential the exporters' submissions, and shall
not willfully disclose such submissions.

    H.    For V&C related inquiries, the first person being inquired shall be responsible
for giving responses. When being inquired by the Customs relating to the V&C, the contact
persons of the Chambers (as listed in Exhibit 3) shall reply within 24 hours.

**Exhibit 3:**    **Contact Persons of the Chambers Responsible for Implementing
the Verification and Chop System**

(Omitted.)

7

# SPA-312



**REGULATION**

**CHINA CHAMBER OF COMMERCE OF MEDICINES & HEALTH PRODUCTS IMPORTERS & EXPORTERS**

## Chapter I   General Provisions
### Article 1
The name of this entity is China Chamber of Commerce of Medicines & Health Products Importers & Exporters (hereinafter referred to as the Chamber of Commerce). The abbreviation of the name shall be CCCMHPIE.

### Article 2
The Chamber of Commerce is a national-wide and self-disciplined social entity voluntarily organized by various economic organizations registered in the territory of the People's Republic of China and engaging in the import and export of medicines and health products and other relevant activities, with objectives of the trade coordination and service. The Chamber of Commerce shall be non-profitable and not involved in business activities irrelevant with its coordination operations and in conflict with interests of its members.

### Article 3
The Chamber of Commerce shall abide by the Constitution, national laws, administrative regulations, national principles and policies on foreign trade, observe the social morals and carry out the principles of democracy, openness, fairness and justice. The objective of the Chamber of Commerce is to coordinate and guide the import and export of medicines and health products and other relevant activities, provide consultancy service to members and other organizations, maintain the order of foreign trade, defend fair competition, secure interests of the state and the trade, safeguard lawful rights and interests of member organizations, and to boost the sound development of the import and export of medicines and health products.

### Article 4
With the approval of the competent authority under the State Council, the Chamber of Commerce is registered according to the law and shall have the independent status of legal person.

### Article 5
The emblem of the Chamber of Commerce is a capsule of patent medicine with the English abbreviation of China Chamber of Commerce of Medicines & Health Products Importers & Exporters printed in the middle and two are arrowheads in the opposite directions at the top and the bottom, the color of which is green.

### Article 6
The domicile of the Chamber of Commerce: No. 12, Pan Jia Yuan Nan Li, Chao Yang District, Beijing.

## Chapter II   Scope of Business
### Article 7
The Chamber of Commerce shall:

(1) Guide and coordinate the foreign trade activities for its members, and provide consultancy service;

(2) Strengthen the relationship with the relevant departments of the government and promote the realization of the overall objectives of the government; represent the interest of the trade and its member enterprises, reflect opinions and requests of the member enterprises to the government, and render consultations and proposals to the government for policy-making;

(3) Reinforce the contact, interchange and cooperation with the same trade organizations of scientific research, manufacture and domestic circulation, accelerate the integration of research, manufacture and commercial trade, and jointly maintain the order of the import and export; coordinate the import and export prices, market and clients of medicines and health products in accordance with the authorization of the government or the collective demands and the agreements of the same trade;

(4) Propagandize national laws, regulations and policies on foreign trade, and the rules of the World Trade Organization, and assist the competent authority under the State Council to guide and supervise the lawful operations of its member enterprises;

(5) Establish and develop internet websites and business information databases, collect, study and exchange business information data, issue publications, carry out investigation and study on the market and situation of the import and export of medicines and health products's international trade practices and conventions and trade-restraint measures of certain countries, and render information and consultation service to member enterprises;

(6) Organize enterprises concerned in the trade to respond to antidumping or countervailing lawsuits or claims against China's medicines and health products; carry out investigations on the dumping or other unfair competition activities of foreign medicines and health products within China's customs territory and report to the government thereof;

(7) Organize domestic and international symposiums and undertake home and oversea training on business operation;

(8) Organize imports and exports fairs and expos for medicines and health products; organize or coordinate the participation of enterprises of the trade in home and oversea fairs, exhibitions and expos; organize oversea study tours, market promotions, product procurements and technical exchanges; assist its members in product advertisements and international market promotions.

(9) Join international organizations of the same trade as the representative of China's domestic trade; attend relevant international professional conferences, and strengthen the contact, cooperation and exchange with

# SPA-313

foreign organizations of the same trade;

(10) Mediate the disputes between its member enterprises fairly, promote the self-discipline of this trade and the inter-discipline and self-discipline of this trade, and safeguard the normal operation order of the import and exports and the common interests of its member enterprises;

(11) Implement the authorizations of the competent authority under the State Council, and fulfill other obligations endowed by the common demands of its member enterprises and agreements of the same trade.

Chapter III  Member

### Article 8

The member of the Chamber of Commerce shall be an entity principally.

### Article 9

Entities with desire to be a member of the Chamber of Commerce shall satisfy the following requirements:

(1) Supporting of the Articles of Association of the Chamber of Commerce;

(2) The Expression of its desire to join the Chamber of Commerce;

(3) Established and registered in the territory of China according to law and involvement in trade of import and export of medicines and health products or other relevant activities.

### Article 10

The procedures of joining the Chamber of Commerce shall be as follows:

(1) To submit a written application;

(2) To submit registration documents issued by relevant departments of the government;

(3) After passing the examination of qualification by the Chamber of Commerce and the payment of registration fee, the applicant shall be registered as a member and be awarded a membership certificate.

### Article 11

Rights of members shall be as follows:

(1) To vote and to stand for election;

(2) To participate in activities organized by the Chamber of Commerce;

(3) To enjoy all kinds of services provided by the Chamber of Commerce with priority;

(4) To supervise the work of the Chamber of Commerce, and to put forward comments and suggestions thereof;

(5) To impeach, propose punishments and to defend itself when indicted;

(6) To voluntarily join and freely quit the Chamber of Commerce.

### Article 12

Obligations of members shall be as follows:

(1) To abide by national laws and administrative regulations, and implement the national guiding principles and policies on foreign trade.

(2) To observe by the Articles of Association of the Chamber of Commerce, carry out its resolutions and stipulations, and fulfill tasks assigned by the Chamber of Commerce;

(3) Maintain interests of the statement and the trade, and not to infringe upon interests of other members;

(4) To pay membership dues in accordance with the Articles of Association;

(5) To report the statement of work affairs, relevant information and statistics data to the Chamber of Commerce.

### Article 13

Should a member intend to quit the Chamber of Commerce, it shall submit a written application to the Chamber of Commerce and hand in its membership certificate.

### Article 14

The Chamber of Commerce is entitled to suspend and/or abrogate the membership of a member in case that anyone of the following conditions is satisfied:

(1) Membership dues have been in arrears for more than two years;

(2) Nonparticipation of activities organized by the Chamber of Commerce

has been more than two years.

### Article 15

Should a member violate the Articles of Association of the Chamber of Commerce or the coordination regulations and disregard the exhortation, the Chamber of Commerce could circulate a notice of criticism, issue a warning or suspend the membership of this member; in case of fairly serious violation in nature, the Chamber of Commerce could, with the approval of the board of directors or the standing board of directors, deprive this member of its membership.

Chapter IV Organization Structure, Election and Dismission of Persons in Charge

### Article 16

The supreme power of the Chamber of Commerce rests with the General Member (or Member Representative) Meeting.

The General Member (or Member Representative) Meeting executes the following powers:

(1) To formulate and amend the Articles of Association of the Chamber of Commerce;

(2) To elect or dismiss members of the Board of Directors;

(3) To examine the work report and financial report of the Board of Directors;

(4) To examine the proposals from the Board of Directors, branches of the Chamber of Commerce and members;

(5) To terminate the Chamber of Commerce;

(6) To decide other important matters.

### Article 17

Representatives to the General Member (or Member Representative) Meeting shall be elected democratically or decided by democratic consultation. The detailed election rules shall be made by the board of directors in charge of the preparation for the General Member (or Member Representative) Meeting.

### Article 18

The General Member (or Member Representative) Meeting shall be convened with the presence of more than two thirds of members of the Chamber of Commerce, and resolutions shall come into force when half of votes presented at the General Member (or Member Representative) Meeting uphold them.

### Article 19

The tenure of each General Member (or Member Representative) Meeting is three years. Special General Meeting (or Member representative) Meeting for reelection shall be convened in advance or postponed in case of emergency or proposal by more than one third of members. The convene of the Special general Meeting (or member representative) meeting shall comply with the prescription of Article 18 and be approved by the government department directly regulating the trade and the government agency responsible for social affairs registration, but in no case the postponement of reelection can be more than one year.

### Article 20

The executive body of the General Member (or Member Representative) Meeting is the board of directors. The board of directors shall be responsible for the routine operation of the Chamber of Commerce between sessions of the General Member (or Member Representative) Meeting.

The General Member (or Member Representative) Meeting shall elect the board of directors from candidates proposed by a member itself or by members jointly in accordance with the principle of democratic consultation. The measures to determine the candidate list shall be made by the board of directors in charge of the preparation for the General Member (or Member Representative) Meeting.

# SPA-314

### Article 21

board of directors shall be responsible to the General Member (or
Member Representative) Meeting and executive the following powers:
To carry out the resolutions of the General Member (or Member
Representative) Meeting;
To elect and dismiss the president, vice president, secretary-general of
board of directors; to appoint the vice secretary-general;
To prepare for the convene of the General Member (or Member
Representative) Meeting;
To determine the membership dues and the payment;
To make the work report and the financial statements to the General
Member (or Member Representative) Meeting;
To examine and approve annual work plans;
To examine and approve the annual financial budget and final accounts;
To authorize affiliated working departments to recruit enterprises;
To determine on other important matters.

### Article 22

The board of directors shall be convened with the presence of more than
two thirds of directors, and the affirmative votes of more than two thirds of
present directors shall validate the resolutions of the board of directors.

### Article 23

The meeting of the board of directors shall be held at least once a year and
chaired by the president of the Chamber of Commerce. Where
considered to be necessary by the president or requested jointly by more
than one third of directors, a special meeting of the board of directors may
be held. Under certain particular circumstances, the meeting could be held
by means of communications.

### Article 24

The standing board of directors shall be set up and the number of standing
directors shall not exceed one third of the number of directors in principle.
The standing board of directors shall be elected by the board of directors
and be responsible for it. The functions of the standing board of directors
between sessions of the board of directors shall be as follows:
To carry out resolutions of the General Member (or Member
Representative) Meeting and the board of directors;
To decide on the disciplinary actions against members concerned;
To direct the routine operation of affiliated departments of the Chamber of
Commerce;
To determine on the establishment of branches, representative offices
and affiliated entities and organization and staff-members thereof;
To determine on the establishment of departments under the standing
working organizations and staff members thereof;
To examine and approve criterions of this trade, agreements, regulations
and management rules;
To decide on other important matters.

### Article 25

The meeting of the standing board of directors shall be convened with the
presence of more than two thirds of standing directors, and resolutions
shall come into force with the approval of more than two thirds of present
standing directors.

### Article 26

The standing board of directors shall be convened semiannually and be
chaired by the president of the Chamber of Commerce. Where considered
to be necessary by the president or requested jointly by more than one
third of standing directors, a special meeting of the standing board of
directors may be held. Under certain particular circumstances, the meeting
could be held by means of communications.

### Article 27

The Chamber of Commerce comprises of one president, several vice

presidents (inclusive of part-time vice president when necessary) and
one secretary-general (maybe concurrently held by a full-time vice
president).

### Article 28

The candidates for the president, vice presidents and the secretary-
general may be recommended by the competent authorities, or be
recommended jointly by more than one third of members and approved
by the competent authorities.
The candidates recommended by the competent authorities for the
president, vice presidents and the secretary-general shall be taken as
candidates for directors.

### Article 29

The presidential management meeting shall be set up under the
Chamber of Commerce. The president convenes and chairs this
meeting and the member of it shall be the president, full-time vice-
presidents and secretary-general. The presidential management
meeting makes decisions on routine operation affairs according to the
principles of democracy and centralization. The president, on behalf
of the presidential management meeting, exercises the following
powers:
(1) To convene and preside meetings of the board of directors and the
standing board of directors;
(2) To inspect the implementation of resolutions made by the General
Member (or Member Representative) Meeting, the board of directors
and the standing board of directors;
(3) To sign important documents as the representative of the Chamber
of Commerce;
(4) To recommend vice secretary-general candidates for the approval
of the board of directors;
(5) To make proposals of the department establishment of standing
working organizations and staff members thereof, and decide the
employment of principal managers;
(6) To make proposals of the establishment and withdrawal of branches,
representative offices, affiliated entities and personnel thereof, and
decide on the employment of principal managers;
(7) To decide on the employment of full-time personnel in standing
working organizations, branches, representative offices and affiliated
entities;
(8) To take charge of the routine operation of working organizations
and organize the fulfillment of annual work plans;
(9) To direct the operation of branches, representative offices and
affiliated entities;
(10) To deal with other daily affairs.
Vice presidents and the secretary-general shall assist the president in
the operation of the Chamber of Commerce.

### Article 30

The president, vice presidents and the secretary-general shall satisfy
the following requirements:
(1) Adhering to the routes, guidelines and policies of the Party, and
possess sound political qualification;
(2) Having working experiences in the trade of the Chamber of
Commerce;
(3) Complying with the age requirement stipulated by the state;
(4) Physically healthy for daily work;
(5) No record of criminal punishments in conjunction with the deprival
of political rights;
(6) Having full civil right ability.

### Article 31

The president, the vice-president or the secretary-general, whose age
exceeds the limitation prescribed by the competent authorities, may
assume office when firstly be approved by the board of directors, and

# SPA-315

then be rectified by the competent authorities and the government agency responsible for social entity registration.

### Article 32

The president, the vice-president and the secretary-general may serve a term of three years and may continue to serve one more term provided being elected again, but no more than two consecutive terms. Where it is necessary for the prolong of the tenure, the continuation of that position shall firstly be approved by the General Member (or Member Representative) Meeting, and then be rectified by the competent authorities and the government agency responsible for social entity registration.

### Article 33

The legal representative of the Chamber of Commerce shall be the president. Where it is necessary for one vice-president or the secretary-general to be the legal representative, it shall be approved by the competent authorities and the government agency responsible for social entity registration.

The president, full-time vice presidents and the secretary-general of the Chamber of Commerce shall not take part-time positions in other entities, while the part-time vice president may maintain his position in his former entity.

### Article 34

The Chamber of Commerce may employ an honorary president and a certain number of advisors when necessary.

### Chapter V    Working Bodies and Branches
### Article 35

Where it is necessary for the work, departments subordinate to the working bodies may be set up to deal with routine operation of the Chamber of Commerce with the approval of the board of directors or the standing board of directors. The establishment of standing working bodies shall comply with the stipulations of the state.

### Article 36

Where it is necessary for the business development, the Chamber of Commerce may establish its branches in charge of various kinds of products imported and exported (hereinafter referred to as Branches), and may also set up representative offices in the main producing areas of the export products, principal ports and central foreign markets. The establishment of Branches and representative offices shall be determined by the board of directors or the standing board of directors firstly, and then approved by the government department directing regulating the trade of the Chamber of Commerce and the government agency responsible for social entity registration.

### Article 37

Branches shall consist of the member enterprises operating the same kind of products, and for one kind of products only one branch can be established

### Article 38

Branches and representative offices of the Chamber of Commerce shall not set up branches.

### Article 39

Branches and representative offices of the Chamber of Commerce, without individual legal person status, are integral parts of and regulated by the Chamber of Commerce. Under the guidance and supervision of the Chamber of Commerce, branches and representative offices shall carry out functions within authorization in accordance with the Articles of Association the Chamber of Commerce.

### Article 40

Branches shall convene meeting of their members regularly and irregularly when necessary. The functions of the meeting are as follows:

(1) To elect or remove the members of the board of directors of Branches;
(2) To enact or amend management rules and work plans of branches, and examine the work reports of the board of directors the branches;
(3) To enact or amend the specific coordinating stipulations of import and exporting products;
(4) To formulate or adjust the pricing plans of importing and export products;
(5) To examine and approve the proposals of the board of directors branches or members of branches;
(6) To examine whether the coordinating stipulations of importing exporting products and the price coordinating plans are well carried out, and to make suggestions on solutions of problems arising in the coordinating work and punishment against wrongdoing member enterprises.

### Article 41

The board of directors of Branches shall be responsible to the meeting of branch members, and exercise functions of the meeting of branch members when it is not in session. In accordance with the regulations of the Chamber of Commerce, resolutions of the meeting of branch members and work plans, the board of directors of branches carry out routine operation of work and be responsible for reporting the state of work affairs to the Chamber of Commerce and opinions on the disposal of specific matters.

### Article 42

The board of directors of branches shall be elected by the meeting of branch members and consist of the president, the vice president, secretary-general, the vice secretary-general and a certain number of directors of that branch.

### Article 43

Generally a branch shall not maintain a standing administrative body. The routine work of a branch shall be taken over by the Chamber of Commerce when the board of directors of the branch is not in session. While with the approval of the standing board of directors of the Chamber of Commerce, a branch may set up a standing administrative body for special need.

### Article 44

No branch membership dues be paid. The funds of branches shall be appropriated and managed by the Chamber of Commerce.

### Article 45

Upon the request of members, each province, municipality autonomous region may set up liaison institutions in order to promote the contact of members, and such institutions shall be responsible the liaison work and information exchange between members with its own region, and when necessary, undertake a certain special assignments with the authorization of the Chamber of Commerce.

### Chapter VI    Management of Finance
### Article 46

Sources of funds of the Chamber of Commerce are the following:
(1) Membership dues;
(2) Donations;
(3) Government financial aid;
(4) Income from approved business operations and service;
(5) Interests;
(6) Other lawful incomes.

### Article 47

The Chamber of Commerce demands membership dues pursuant to

regulations of the state.

### Article 48

...mbership dues payable to the Chamber of Commerce shall be spent on ...development of business with the business scope prescribed by the ...rticles of Association, and shall not be distributed among members.

### Article 49

...e Chamber of Commerce adopts restrict financial system on budget and ...al accounting. All revenue and expenditure shall be included in the budget ...d accounted uniformly. The budget and final accounting of finance shall ...e carried out annually and approved by the board of directors. Especially ...e budget for government appropriate funds or government financial aid ...d entrusted projects shall be implemented with the approval of the ...overnment authorities concerned.

### Article 50

...e budget and final accounting of finance shall be formulated and carried ...t in accordance with the principles of "the balance of revenue and ...penditure and the elimination of budget deficit"

### Article 51

...nnual budget and final accounting of finance shall include the following: ...evenue to be budgeted and accounted according to the sources thereof; ...xpenditures to be budgeted and accounted according to items ...cribed for institution expenditures including operating expenses, public ...fe expense, expense for special projects, expense for fixed assets, ...sonnel expense, etc.

### Article 52

...board of directors may authorize directors of the Chamber of Commerce ...spect the fulfillment of the budget and final accounts of finance regularly ...regularly.

### Article 53

...ferring to The Financial Accounting System for Institutions during the ...rmal operation, the Chamber of Commerce shall constitute perfect ...tems of internal controlling and division of functions and responsibilities, ...d establish restrict financial management system so as to secure the ...ity, authenticity, accuracy and integrality of account data.

### Article 54

...e Chamber of Commerce shall be provided with accountant staff with ...fessional qualification. The accountant staff cannot act as cashiers ...currently. Provided that an accountant is transferred to other positions ...esign, the procedure of delivery to the successor must be finalized ...efore.

### Article 55

...asset management of the Chamber of Commerce shall abide by the ...tem of finance management stipulated by the state, and be subject to the ...ervision of the General Member (or Member Representative) Meeting ...d the financial authorities of the government. Provided that the assets ...from government-appropriated funds, social donations or financial aids, ...asset management shall be subject to the supervision of the auditing ...tities of the government.

### Article 56

...efore the reelection of the Chamber of Commerce or the change of legal ...resentative, financial audit shall be carried out in accordance with ...ulations of the competent authorities and the government agency ...ponsible for social entity registration.

### Article 57

...asset of the Chamber of Commerce shall be usurped on, distributed or

embezzled by any entity or individual.

### Article 58

The salary, welfare and social security of full-time staff of the Chamber of Commerce may refer to the state stipulations on institution entity.

## Article VII   The Amendment Procedure of the Articles of Association
### Article 59

The amendment to the Articles of Association shall be submitted to the General Member (or Member Representative) Meeting for examination after the approval of the board of directors.

### Article 60

The amended Articles of Association shall come into force after it is submitted within 15 (fifteen) days since the approval day of the General Member (or Member Representative) Meeting and is ratified by the competent authorities and the government agency responsible for social entity registration

## Article VIII   Termination and Asset Disposal
### Article 61

Under circumstances such as the fulfillment of objectives, voluntary termination, merger or separation of the Chamber of Commerce, the board of directors may propose motions to terminate the Chamber of Commerce.

### Article 62

The motion of termination shall be approved by the General Member (or Member Representative) Meeting and submitted to the competent authorities for ratification.

### Article 63

Before termination, a liquidation group shall be set up, under the guidance of the competent authority and other competent institutions, to liquidate credits and debts, and deal with problems concerned with termination. No activities other than liquidation shall be carried out during the period of liquidation.

### Article 64

The Chamber of Commerce shall be terminated after the registration at the government agency in charge of social entity registration is cancelled.

### Article 65

Under the supervision of the competent authority and the government agency in charge of social entity registration, the surplus assets after termination shall be employed to develop undertakings concerned with objectives of the Chamber of Commerce in accordance with the stipulations of the state.

## Chapter IX   Miscellaneous Provisions
### Article 66

The Articles of Association have been approved at the meeting of the general member meeting on March 22, 2002.

### Article 67

The board of directors is entitled to interpret the Articles of Association.

### Article 68

The Articles of Association shall come into force as of the date of the ractification by the government agency responsible for social entity registration.

**SPA-317**



# CHINA CHAMBER OF COMMERCE OF MEDICINES & HEALTH PRODUCTS IMPORTERS & EXPORTERS

## MAJOY EXPORT COMMODITIES TO BE COORDINATED

- **Chinese Traditional Medicinal Materials (including those from the South)**
  1. Herbs
  2. Animal Products
  3. Minerals
- **Chinese Patent Medicines**
- **Medicated wines**
- **Health care drugs**
- **Pharmaceuticals**
  1. Antibiotics
  2. Sulfonamides
  3. Antituberculotics
  4. Antiparasitics
  5. Antineoplastics
  6. Cardio vascular drugs and diuretics
  7. Steroids
  8. Vitamins
  9. Antipyretics and analgesics
  10. Sedatives & Tranquilizers
  11. Respiratory agents
  12. Gastrointestinal agents
  13. Poultry and Livestock drugs and feed additives
  14. Biochemical pharmaceuticals/biologi-cals
  15. Amino acids
  16. Drugs for farming and animal hubandry
  17. Isotopic drugs
  18. Miscellaneous
- **Western Patent Medicines**
- **Pharmaceutical media**
- **Chemical reagents**
- **Medical instruments and equipments**
- **Medical rubber products**
- **Medical dressings**
- **Technology and services (in relation to the above mentioned commodities)**

**SPA-318**

[TRANSLATION]

### Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters

(passed upon discussions on the founding conference of Vitamin C Coordination Group on October 11, 1997)

#### Chapter I       General Terms

**Article1**       This Charter is constituted in accordance with provisions in *Foreign Trade Law of People's Republic of China, Provisional Regulations on Chamber of Commerce of Importers and Exporters of People's Republic of China, Charter of China Chamber of Commerce of Medicines and Health Products Importers and Exporters* and *Notice Relating to Strengthening the Administration of Vitamin C Production and Export.*

**Article2**       Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Sub-Committee") is an industrial organization organized, upon approval by the Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") and under leadership of the Chamber, by those member enterprises of China Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Chamber") who have Vitamin C import and export operation rights and have certain extent of operational scale and ability.

**Article3**       The Sub-Committee has the following tenets: complying with laws of the country; implementing and executing the state policies and regulations on foreign trade; maintaining orderly export of Vitamin C products; exploring international market and serving for an ordered and highly efficient development of Vitamin C foreign trade on the basis of unified coordination.

**Article4**       The Sub-Committee is located in Beijing.

#### Chapter II       Functions

**Article5**       The Sub-Committee performs coordination, direction, consultation, service and supervision & inspection functions over its members. It bridges and ties the enterprises and the government. The Sub-Committee has certain industrial function. It shall, representing the basic interests and demands of the members, inform certain issues to the relevant government department and to cause such issues to be promptly solved.

**Article6**       In accordance with Vitamin C exports and changes on international markets, the Sub-Committee will make proposals on the export development plan and annual export quota allocation, supervise the implementation of export license by member enterprises and advises on allocation and adjustment of export quota, and issuance of export license.

**Article7**       The Sub-Committee shall coordinate and administrate market, price, customer and operation order of Vitamin C export, represent or organize the members to communicate in unison with foreign parties in accordance with international trade principles to protect the rights and interests of the country and the members.

# SPA-319

**Article8**    The Sub-Committee shall actively develop connections with domestic and foreign industries, exchange information, broadly build and develop business partnership and represent the industry to participate in relevant international conferences.

**Article9**    The Sub-Committee shall collect and organize Vitamin C information and materials with respect to domestic and international market, customers, productions and sales, and provide consulting service to the members.

**Article10**    The Sub-Committee shall hold, periodically or otherwise, working meetings for Vitamin C export to exchange information, summarize and communicate experience, analyze and work out coordinated prices for Vitamin C export, to supervise and inspect the implementation of such coordinated export prices set by the Sub-Committee and relevant business activities related to the enterprises.

## ChapterIII    Members

**Article11**    Any member of China Chamber of Commerce of Medicines and Health Products Importers and Exporters whose Vitamin C export volume in any year from 1994 to 1996 is above 200 tons can apply to join the Sub-Committee.

**Article12**    Only the members of the Sub-Committee have the right to export Vitamin C and are simultaneously qualified to have Vitamin C export quota.

**Article13**    Any member who wants to withdraw from the Sub-Committee, shall submit a 3-month prior written application and such withdrawal shall be subject to approval by the Sub-Committee's Council.

**Article14**    Member's rights

    (1)    To elect, to be elected and to vote;

    (2)    To supervise and give suggestions and comments on the Sub-Committee's work;

    (3)    To participate in activities organised by the Sub-Committee, enjoy various services including information and consultation provided by the Sub-Committee;

    (4)    To report and suggest punishment measures on any conduct violating laws and the Charter of the Sub-Committee, harmful to the state and industrial interests, and infringing legitimate rights and interests of the members.

**Article15**    Member's obligations

    (1)    To comply with various directives, policies and regulations with respect to foreign trade, comply with the Charter and regulations of Vitamin C Sub-Committee and implement Sub-Committee's resolution;

    (2)    To foreign trade enterprises can purchase Vitamin C from or act as Vitamin C export agents only from those manufacturing enterprises verified by the Sub-Committee. A manufacturing enterprise can only

2

# SPA-320

export its own products and can supply its products only to those foreign trade enterprises verified by the Sub-Committee;

(3)     The members shall voluntarily adjust their production outputs according to changes of supplies and demands on international market;

(4)     Manufacturing enterprise members and foreign trade enterprise members shall establish the cooperation relationship, understand and yield to each other and jointly share benefits and risks;

(5)     To report Vitamin C exports of previous two months to the Sub-Committee every odd month;

(6)     Strictly execute export coordinated price set by the Chamber and keep it confidential.

**Article16**   Any violation of the Charter of the Sub-Committee, failure to implement any resolution or regulation of the Sub-Committee and failure to perform any member's obligation shall be punished by the Sub-Committee by means of, according to gravity of circumstances, warning, open criticism and even revocation of its membership. The Sub-Committee will suggest to the competent governmental department, through the Chamber, to suspend and even cancel the Vitamin C export right of such violating member.

## ChapterIV    Organisation

**Article17**   The Members Meeting is the highest authority of the Sub-Committee. The Members Meeting will be held once a year and shall only be duly convened when attended by representatives from two thirds of the members. The Members Meeting may be held earlier or later when necessary. The Sub-Committee has a Council. A Council Meeting will be held once every half year and may be earlier or later when necessary. The Council Meeting shall not be duly convened unless it is attended by two thirds of the Council's Directors.

**Article18**   Functions of Members Meeting are:

(1)     to approve and amend the Charter of the Sub-Committee;

(2)     to review applications to join or withdraw from the Sub-Committee;

(3)     to elect, appoint and dismiss members of the Council of the Sub-Committee;

(4)     to review and pass work report of the Council and determine work plans of the Sub-Committee;

(5)     to discuss and set export coordinated price;

(6)     to inspect Vitamin C export coordination and administration and the implementation of export coordinated prices, and to suggest on punishment measures on violating member;

(7)     to review and discuss proposals of the Council and the members.

# SPA-321

Case 1:06-md-01738-BMC-JO   Document 394-1   Filed 11/20/08   Page 180 of 301 PageID #:
Case 1:06-md-01738-DGT-JO   Document 70-7   Filed 09/22/06   Page 5 of 26
8314

**Article19**    Functions of the Council

    (1)    Implementing and executing resolution of the Member Meeting and reporting to the Member Meeting;

    (2)    Stipulating specific regulations and measures of products operation and organising implementation;

    (3)    Proposing principle of annual export quota allocation;

    (4)    Calling for regular or temporary Members Meeting;

    (5)    Electing Chief Director and appointing General Secretary of the Council;

    (6)    Discussing and determining coordinated prices and other relevant issues under urgent circumstances.

**Article20**    The Council of the Sub-Committee has one Chief Director, seven to nine Directors and one General Secretary. Members of the Council will be composed with the members from the Chamber and the members of the Sub-Committee. Chief Director, Director and General Secretary will be elected upon nomination by the Chamber.

**Article21**    Chief Director, Director and General Secretary have a term of three years, which can be renewed upon re-election. The Sub-Committee does not have any permanent body. General Secretary will be responsible for daily work when the Council is not in session.

## ChapterV    Funding Source

**Article22**    The Chamber will bear daily expenses of the Sub-Committee, but expenses on meetings and researches shall be collected and expensed by the Sub-Committee itself.

## ChapterVI    Miscellaneous

**Article23**    This Charter will be passed by the Members Meeting and will become effective upon verification and approval by China Chamber of Commerce of Medicines and Health Products Importers and Exporters. The Members Meeting has the right to amend this Charter and the Council has the right to construe this Charter. Any amendment and supplementation to this Charter shall be verified and approved by China Chamber of Commerce of Medicines and Health Products Importers and Exporters.

BJ1 35809v1

[TRANSLATION]

## Document of Personnel, Education and Labor Department of

## Ministry of Foreign Trade & Economic Cooperation

[1998] MOFTEC Ren Lao Zi No. 175

---

### Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines & Health Products Importers &Exporters

China Chamber of Commerce of Medicines & Health Products Importers &Exporters

("the Chamber"):

We hereby acknowledge the receipt of the document entitled Request for Establishing the Vitamin C Sub-Committee within the Chamber with reference number of [1998] Yi Shang Zi No.20. We hereby give a reply as follows:

1.      Request for Establishing the Vitamin C Sub-Committee within the Chamber is approved. The major responsibilities of VC Sub-Committee are: to be responsible for coordinating the Vitamin C export market, price and customers of China, to improve the competitiveness of Chinese Vitamin C produce in the world market and promote the healthy development of Vitamin C export of China.

2.      The Vitamin C Sub-Committee is formed as a branch of the Chamber by the member enterprises of the Chamber that are engaged in Vitamin C export. It does not have a legal person status and is under the Chamber's leadership and administration. The Vitamin C Sub-Committee will not separately develop members or charge additional membership fees. The Chamber shall assist the Vitamin C Sub-Committee in staffing its personnel from the current staff of the Chamber.

3.      Please proceed with the relevant procedure at the Ministry of Civil Affairs and carry out work in accordance with laws.

We hereby make this reply.

March 23, 1998

(Seal of Personnel Education and Labor Department of the MOFTEC)

Chopped by the Chamber acknowledging the receipt of this document on March 27, 1998 as No. A34

Handwritten notes by Mr. Qiao Haili on April 15, 1998: "Already in process."



**DEFENDANT'S TRIAL EXHIBIT**
EDNY / 06-MD-01738
**DTX-013**

1

**SPA-323**

Copy to:    Social Organization Department of the Ministry of Civil Affairs

## China Chamber of Commerce for Import & Export of Medicines & Health Products VC Subcommittee

List of members (member organizations) of the Vitamin C Subcommittee Council, China Chamber of Commerce for Import & Export of Medicines & Health Products

| | |
|---|---|
| Chairman of the Council: | Qiao Haili (also assuming the position of) Director of Western Medicine Department at China Chamber of Commerce for Import & Export of Medicines & Health Products |
| Member Organizations: | Northeast General Pharmaceutical Factory Import and Export Company<br>Jiangsu Jiangshan Pharmaceutical Co., Ltd.<br>Weisheng Pharmaceutical (Shijiazhuang) Co., Ltd.<br>Hebei Welcome Pharmaceutical Co., Ltd. |
| Secretary General: | Qiao Haili (also assuming the position of) Director of Western Medicine Department at China Chamber of Commerce for Import & Export of Medicines & Health Products |
| Deputy Secretary General: | Wan Ning, Western Medicine Department at China Chamber of Commerce for Import & Export of Medicines & Health Products |

### List of member enterprises of the VC Subcommittee of CCCMHPIE

1. Northeast General Pharmaceutical Factory Import and Export Company
2. Jiangsu Jiangshan Pharmaceutical Co., Ltd.
3. Weisheng Pharmaceutical (Shijiazhuang) Co., Ltd.
4. Hebei Welcome Pharmaceutical Co., Ltd.
5. Shanghai Medicines & Health Products Import & Export Corporation
6. Shanghai Sunve Pharmaceutical Co., Ltd.
7. Shijiazhuang Pharmaceutical Group Import and Export Trading Co., Ltd.
8. Jiangxi Medicines & Health Products Import & Export Corporation
9. Sinochem Hebei Import and Export Corporation
10. Anhui Chemicals Import and Export Co., Ltd.
11. Shandong Medicines & Health Products Import & Export Corporation
12. Hebei Medicines & Health Products Import & Export Corporation
13. Jiangsu Medicines & Health Products Import & Export (Group) Corporation
14. Zhuhai Baifuli Trade Development Co., Ltd.
15. Shandong Zibo Hualong Pharmaceutical Co., Ltd.



**DEFENDANT'S**
**TRIAL EXHIBIT**
E.D.N.Y. / 06-MD-01738
**DTX-032-B**

WSC 11401

**PX 68/PX 73**

## The Administrative Rules of the VC Subcommittee,
## China Chamber of Commerce for Import & Export of Medicines & Health Products

### Chapter One    General Principles

**Article One**    *The Administrative Rules of VC Subcommittee of CCCMHPIE* is formulated in accordance with the relevant state laws, regulations and the *Bylaws of China Chamber of Commerce for Import & Export of Medicines & Health Products*.

**Article Two**    The name of this organization is VC Subcommittee of China Chamber of Commerce for Import & Export of Medicines & Health Products (referred to as "the Subcommittee" hereafter), and is registered with the state's administrative organ for associations in accordance with the law.

**Article Three**    The Subcommittee is a component of China Chamber of Commerce for Import & Export of Medicines & Health Products (referred to as "the Chamber of Commerce" hereafter), and is a self-disciplinary trade organization jointly established on voluntary basis by members of the Chamber of Commerce engaging in vitamin C import and export business. It does not have the status of a legal person.

**Article Four**    The purpose of the Subcommittee is to: observe the state laws, regulations and the bylaws of the Chamber of Commerce; coordinate and guide vitamin C import and export business as well as relevant activities, and provide consultancy and services to members and governmental departments; maintain the normal order of vitamin C import and export activities, and protect fair competition; protect the national interests and the legal rights and interests of members, and promote healthy development of vitamin C import and export trade.

**Article Five**    The Subcommittee accepts guidance and supervision from the Chamber of Commerce.

### Chapter Two    Functions

**Article Six**    The Subcommittee plays the role of bridging and connecting between the government and the members, between the domestic and overseas markets, and between the relevant industries.

**Article Seven**    The Subcommittee introduces the state economic and trade laws, regulations, guidelines and policies to the members, and guides and supervises the members to operate their businesses in accordance with the law.

**Article Eight**    The Subcommittee coordinates and guides vitamin C import and export activities, promotes self-discipline in the industry, maintains the regular order of vitamin C import and export operations, and protects the interests of the state, the industry and the members.

**Article Nine**    The Subcommittee studies methods and measures for expansion of vitamin C import and export trade, and organizes discussions about strategy and planning of import and export trade. The Subcommittee represents the interests of the members, inform relevant government departments of members' status, opinions and suggestions, and makes suggestions to relevant government departments as the government makes policies concerning vitamin C import and export trade.

**Article Ten**    The Subcommittee participates in domestic and overseas activities and international exchanges for promotion of vitamin C import and export, establishes and develops cooperative

relationship with the domestic and international industrial organizations of the same nature, and helps members explore the international market.

**Article Eleven**      The Subcommittee exchanges experiences with regard to developing vitamin C production, improving quality, improving operation and management, and promoting the integration of industry and commerce; collects and sorts relevant information about domestic and overseas VC markets, clients, production and sales, and provides consulting service to members.

**Article Twelve**      The Subcommittee organizes relevant enterprises to respond to dumping accusations by foreign countries against vitamin C of our country; makes investigations into dumping or unfair competition activities of foreign products in our country that are reported by members, and request governmental departments to take measures according to the requirements of the industry.

**Article Thirteen**  The Subcommittee implements other duties authorized by the government or the Chamber of Commerce, requested by members, or entrusted by trade agreement.

## Chapter Three   Member

**Article Fourteen**  The following requirements must be met to apply for membership of the Subcommittee:

(1) Be a member of China Chamber of Commerce for Import & Export of Medicines & Health Products;

(2) Support this document;

(3) Be willing to engage in vitamin C import and export business and operate in accordance with the law;

(4) Have the intention to join the Subcommittee.

**Article Fifteen**    Procedures for joining the Subcommittee:

(1) Submit application for joining the Subcommittee;

(2) Submit documents of registration with relevant regulatory departments of the state;

(3) The Subcommittee reviews the application according to aforementioned requirements, approves those who meet the requirements for joining the Subcommittee, and processes paperwork for registration.

**Article Sixteen**    Rights of Members:

(1) The rights to elect, to be elected and to vote at the Subcommittee;

(2) Participate in various activities organized by the Subcommittee;

(3) Enjoy various services provided by the Subcommittee;

(4) Bring forth opinions, suggestions and proposals about relevant issues involving import and export;

(5) Bring forth opinions, suggestions and proposals on relevant issues involving the Subcommittee;

(6) Monitor the work of the Subcommittee, and bring forth opinions and suggestions about it;

(7) Expose enterprises and individuals who violate the state laws, regulations and policies, or provisions of this document, disobey the coordination of the Subcommittee, or damage the interests of the state or other members;

(8) Freedom to withdraw from the Subcommittee.

**Article Seventeen**   Member's Obligations:

(1) Observe the *Administrative Rules* of the Subcommittee;

(2) Carry out resolutions and agreements of the Subcommittee;

(3) Actively participate in various activities organized by the Subcommittee;

(4) Complete work entrusted by the Subcommittee;

WSC 11401

(5) Keep the Subcommittee informed by providing relevant information, materials and data;

(6) Accept coordination by the Subcommittee.

**Article Eighteen**  A member shall inform the Subcommittee in writing of withdrawal from the Subcommittee, return relevant certificates related to membership, and process paperwork for membership cancellation.

**Article Nineteen**   The Subcommittee will discipline members engaging in the following activities:

(1) Violate provisions of this document;

(2) Failure to carry out resolutions of the Subcommittee;

(3) Failure to carry out industrial agreements;

(4) Violate the state laws, regulations and rules in its business activities;

The disciplinary actions of the Subcommittee include: circulation of notice of criticism, issuance of warning, temporary suspension of membership, or cancellation of membership. Punishment must be approved by the Council of the Subcommittee (referred to as "the Council" hereafter).

**Article Twenty**   The Subcommittee requires periodical member registration, and the time and content for registration will be determined by the Council. Failure to register within the defined time frame will result in automatic loss of membership.

### Chapter Four    Organizational Structure

**Article Twenty-One**          The general meeting of the Subcommittee (referred to as "the General Meeting" hereafter) is the highest authority of the Subcommittee.

**Article Twenty-Two**          The General Meeting exercises the following duties:

(1) Make decision on the work guideline and tasks of the Subcommittee;

(2) Formulate, review, and amend the *Administrative Rules* of the Subcommittee;

(3) Formulate, review, and amend the important policies and rules of the Subcommittee;

(4) Review the work report of the Council;

(5) Elect and dismiss Council members of the Subcommittee;

(6) Elect and dismiss members of the investigation team of the Subcommittee;

(7) Review proposals of the Council and the members;

(8) Make decisions on issues of termination;

(9) Make decisions on other important issues.

**Article Twenty-Three**          The General Meeting is held once every year, and can be held in advance or postponed under special circumstances, upon approval by the Council through voting or upon a proposal brought forth by more than one half of the members.

**Article Twenty-Four**  Upon a proposal jointly brought forth by one third of the members or by more than one half of the Council members, or upon a request by the government department in charge, an interim General Meeting may be held.

**Article Twenty-Five**          The Interim General Meeting exercises the following duties:

(1) Review proposals by the Council or by the members;

(2) Formulate specific coordination plans;

(3) Coordinate other issues related to the work of the Subcommittee.

**Article Twenty-Six**       The General Meeting or the interim General Meeting can be held only when two thirds of the members are attending. Resolutions of the Meeting are valid only when they are approved through voting by more than two thirds of the attending members.

**Article Twenty-Seven**       A Council is set up in the Subcommittee. The Council is the executive body of the General Meeting, performs the routine work of the Subcommittee when the General Meeting is not in session, and reports to the General Meeting. The Council exercises the following duties:

(1) Carry out resolutions of the General Meeting and the interim General Meeting;

(2) Elect and dismiss the chairman, the deputy chairman, the secretary general and the deputy secretary general;

(3) Guide the routine work of the Subcommittee;

(4) Prepare for convening the General Meeting or the Interim General Meeting;

(5) Submit work report to the General Meeting;

(6) Organize and coordinate the specific implementation of plans;

(7) Admit enterprises into the Subcommittee;

(8) Receive, review and respond to proposals by members;

(9) Accept the arbitral decisions made by the investigation team of the Subcommittee, and penalize members in violation of the rules;

(10) Carry out other duties authorized by the government or the Chamber of Commerce, or entrusted by the General Meeting.

**Article Twenty-Eight**       The term of each Council is four years. Upon completion of the term, the General Meeting shall be held to elect a new Council. When the General Meeting is postponed or is held ahead of the scheduled time, the beginning and end of the Council's term will be defined accordingly.

**Article Twenty-Nine**   The list of candidates for the new councils of the Subcommittee and how the Council will be produced will be proposed after the Council responsible for preparation for the General Meeting have collected input from all members in writing. The Council is democratically elected by the General Meeting, and the Council members must be a member of the Subcommittee. Council members can be reelected.

**Article Thirty**       The Council holds two meetings every year, which are called and presided by the Council chairman. When the Council Chairman thinks it necessary, an interim Council meeting may be called after seeking opinions from Council members, or when it is proposed by more than one half of the Council members. Under special circumstances, the meeting can be held by way of telecommunications.

**Article Thirty-One**       The Council meeting can be held only when more than three quarters of Council members are attending. The resolutions thereof are valid only when they are voted on and approved by more than two thirds of the attending Council members.

**Article Thirty-Two**   An investigation team is set up in the Subcommittee. The investigation team is the supervisory organ of the Subcommittee, and reports to the General Meeting of the Subcommittee.

**Article Thirty-Three**       The investigation team of the Subcommittee exercises the following functions and powers:

(1) Monitor the implementation of the *Administrative Rules* of the Subcommittee and of various resolutions of the Subcommittee;

(2) The head of the investigation team is concurrently held by the secretary general;

WSC 11401

(3) Receive reports from members of the Subcommittee on violation of the state laws, regulations, the *Administrative Rules* or resolutions of the Subcommittee, and carry out investigations accordingly;

(4) Organize inquiries of the violating members;

(5) Vote to arbitrate member activities to decide whether or not they are violations;

(6) Submit work report to the General Meeting of the Subcommittee;

(7) Submit arbitral decision on violations to the Subcommittee Council;

(8) Carry out other duties entrusted by the General Meeting of the Subcommittee or required by trade agreements.

    **Article Thirty-Four**    The term of the investigation team is the same as the Council, and a new team shall be elected along with the Council. Members of the investigation team are democratically elected by the General Meeting, and can only be produced from members of the Subcommittee. Members of the investigation team can be reelected. A member of the investigation team cannot be concurrently a Council member (Chamber of Commerce staff are exceptions).

    **Article Thirty-Five**    The investigation team of the Subcommittee does not hold regular meetings, and a meeting will be convened by team director based on circumstances and needs.

**Chapter Five    Leadership**

    **Article Thirty-Six**    The Subcommittee has one Council chairman, one deputy chairman, one investigation team director, one secretary general, and one deputy secretary general.

    **Article Thirty-Seven**    The chairman and the deputy chairman are produced through democratic election by the Council with a one-year term, and can be reelected. The chairman can only be elected from the representatives of the member organizations of the Council.

    **Article Thirty-Eight**    The term of the director of the investigation team is one year, and can be reelected.

    **Article Thirty-Nine**    The deputy chairman of the Council, the secretary general, and the deputy secretary general of the Subcommittee are positions assumed by personnel of the permanent administrative body of the Chamber of Commerce. Chairman of the Chamber of Commerce nominates candidates for deputy chairman of the Council, secretary general and deputy secretary general of the Subcommittee who are then voted on by the Council. Their terms are the same as the rest of the leadership as mentioned before. The secretary general can be reelected.

    **Article Forty**    Duties of the Council Chairman

(1) Convene and preside over the Council meetings;

(2) Represent the Subcommittee to the external world, and represent the Subcommittee in signing relevant important documents;

(3) Take charge of the work at the Subcommittee and the Council;

(4) Inspect the implementation of resolutions of the General Meeting and the Council;

(5) Report to the General Meeting and brief the latter on his or her work.

    **Article Forty-One**    The deputy chairman assists the chairman; and when the chairman cannot perform his/her duties for some reason, the deputy chairman shall work in the chairman's capacity.

    **Article Forty-Two**    Duties of the Director of the investigation team:

(1) Convene and preside over meetings of the Subcommittee investigation team;

WSC 11401

(2) Take charge of the work of the investigation team;

(3) Inspect the implementation of the investigation team's decisions;

(4) Report to the General Meeting and brief the latter on the team's work.

**Article Forty-Three** Duties of the Secretary General

(1) Carry out resolutions of the General Meeting and the Council, and organize to implement the Subcommittee's work plans;

(2) Assist the chairman and deputy chairman of the Council;

(3) Take charge of the routine secretary and liaison work at the Subcommittee;

(4) Take charge of the management of routine meetings of the Subcommittee;

(5) Recruit staff for the Subcommittee based on the needs of the Subcommittee;

(6) Carry out other duties entrusted by the General Meeting, the Council, the investigation team, the chairman of the Council and the director of the investigation team.

**Article Forty-Four** The deputy secretary general assists the secretary general; and when the secretary general cannot perform his/her duties for some reason, the deputy secretary general shall work in the capacity of the secretary general. The deputy secretary general attends the Council meeting as a nonvoting delegate.

### Chapter Six Procedure for Amendment of the *Administrative Rules*

**Article Forty-Five** These *Administrative Rules* can be amended only when a motion for amendment is put forward by one half of the Subcommittee members or two-thirds of the Council members.

**Article Forty-Six** The amended version of the *Administrative Rules* must first be voted on and approved by the Council before being submitted to the General Meeting for review.

**Article Forty-Seven** The amended *Administrative Rules* must be approved by the General Meeting. Once approved, it must be submitted to the Chamber of Commerce for review. It takes effect upon approval by the Chamber of Commerce.

### Chapter Seven Termination Procedure

**Article Forty-Eight** When the Subcommittee needs to be cancelled for reasons such as the completion of purpose, voluntary dissolution, division, or merging, the Council shall put forward a motion for termination.

**Article Forty-Nine** The motion for termination put forward by the Subcommittee must be approved through voting by the General Meeting. It then must be reviewed and approved by the Chamber of Commerce and the overseeing department of the Ministry of Foreign Trade and Economic Cooperation.

**Article Fifty** The Subcommittee will be terminated upon completing paper work for cancellation with the state regulatory organ for associations.

### Chapter Eight Supplementary Articles

WSC 11401

**Article Fifty-One**   The Subcommittee shall have no independent financial department, and fund needed for operation will be collected and expended by the Subcommittee itself.

**Article Fifty-Two**   In order to monitor the implementation of self-disciplinary agreements within the industry, the coordination plans or resolutions of the industry, the Subcommittee—with members' consensus—can collect a certain amount of guarantee deposit for breach of contract. The specifics of collection and expenditure will be separately formulated by the Subcommittee General Meeting, the Interim General Meeting or the Council.

**Article Fifty-Three**   The *Administrative Rules* was voted on and approved by members on June 7, 2002.

**Article Fifty-Four**   The Subcommittee Council will have the authority to interpret the *Administrative Rules*.

**Article Fifty-Five**   The *Administrative Rules* takes effect on the day when it is approved by the Chamber of Commerce.

WSC 11401