## INTEREST OF THE AMICI

In this lawsuit, plaintiffs seek to recover treble damages from four Chinese manufacturers of vitamin C, and the affiliates of one of these manufacturers, based on conduct that was compelled by Chinese law. Because the conduct that allegedly violated U.S. antitrust law occurred entirely in the territory of China, and because the defendants were required by the laws of China to engage in that conduct, this lawsuit cannot be resolved without interfering with Chinese industrial policy respecting the operation of domestic firms within China and without impermissible inquiry into the motives of the Chinese government. Accordingly, three closely related doctrines, the foreign sovereign compulsion doctrine, the act of state doctrine, and principles of international comity, mandate dismissal of this action.

*Amicus* the Ministry of Commerce of the People's Republic of China (hereinafter "the Ministry")[1] is deeply interested in the prompt and proper resolution of this lawsuit. The Ministry is a component of the State Council (the central Chinese government) and is the highest administrative authority in China authorized to regulate foreign trade, including export commerce. It is the equivalent in the Chinese governmental system of a cabinet level department in the U.S. governmental system. The Ministry formulates strategies, guidelines and policies concerning domestic and foreign trade and international economic cooperation, drafts and enforces laws and regulations governing domestic and foreign trade, and regulates market operation to achieve an integrated, competitive and orderly market system.

If this Court were to find the defendants' conduct violated U.S. antitrust laws, it would improperly penalize defendants for the sovereign acts of their government and would adversely affect implementation of China's trade policy. The Ministry therefore files this brief

---

[1]     The Ministry was initially known as the Ministry of Foreign Trade and Economic Cooperation. This brief uses the term "Ministry" to refer to both this predecessor entity and the current Ministry of Commerce.

to inform the Court of the regulatory scheme that governed defendants during the period encompassed by the Complaint[2] and that dictated the conduct alleged to violate U.S. antitrust laws.  The Ministry accordingly supports the defendants' request that this action be dismissed.

The information the Ministry is providing is properly considered in connection with a motion to dismiss under Rule 12(b) because each of the foreign sovereign compulsion doctrine, the act of state doctrine, and principles of international comity implicate this Court's subject matter jurisdiction.  See Robinson v. Gov't of Malaysia, 269 F.3d 133, 141 n.6 (2d Cir. 2001) (a district court "must" consider materials outside complaint if they "may result in the dismissal of the complaint for want of jurisdiction").  Indeed, both the United States Supreme Court and the Second Circuit have recognized that the statements of a foreign government about the scope and meaning of its laws are to be given binding and conclusive effect by U.S. courts. See U.S. v. Pink, 315 U.S. 203, 218-21 (1942) (statement of Soviet Commissariat for Justice concerning extraterritorial effect of nationalization decree deemed "conclusive"); Agency of Canadian Car & Foundry Co. v. American Can Co., 258 F. 363, 368-69 (2d Cir. 1919) (authoritative representation by Russian government is "binding and conclusive in the courts of the United States").  Since 1978, the U.S. government has encouraged foreign governments to present their views concerning pending judicial proceedings directly to the U.S. courts,[3] and the

---

[2]     The "Relevant Period" referenced in the Complaint is December, 2001 through the present.

[3]     See Letter from Solicitor General McCree to Legal Adviser Hansell (May 2, 1978), reprinted in U.S. Dep't of State, 1978 Digest of United States Practice in International Law 560, reprinted in part in 73 Am. J. Int'l L. 122, 125 (1979);  Department of State Circular Diplomatic Note to Chiefs of Mission in Washington, D.C. (Aug. 17, 1978), reprinted in U.S. Dep't of State, 1978 Digest of United States Practice in International Law 560, reprinted in part in 73 Am. J. Int'l L. 122, 124 (1979); see also Letter from Deputy Legal Adviser Marks (June 15, 1979) (described in 73 Am. J. Int'l L. 669, 678-79 (1979)).  A copy of the foregoing is submitted herewith as Exhibit A to the declaration of Joel M. Mitnick, dated June 29, 2006 ("Mitnick Decl.").

2

U.S. Solicitor General has taken the position that a foreign government's submission of its views in the form of an amicus curiae brief should be "dispositive."[4]

It is particularly appropriate to accord the views of the Ministry dispositive weight here because the Complaint employs terms that have very different meanings under Chinese law, and within the Chinese regulatory system, than those same terms have in the United States. Plaintiffs allege that a Chinese "trade association" facilitated an illegal cartel, which "coordinated" vitamin C export pricing as part of a series of "voluntary" or "self-restraint" agreements. In fact, the "association," or "social organization," is a Ministry-supervised entity authorized by the Ministry to regulate vitamin C export prices and output levels, and the price "coordination," or so-called "voluntary self-restraint," it facilitated is a government-mandated price and output control regime. Because China's ongoing transition from a state-run command economy to a market-driven economy is utterly foreign to the economic history and traditions of the United States, there is a very significant risk of misunderstanding by U.S. lawyers and judges of the regulatory concepts China has adopted to manage this transition. Accordingly, the Ministry files this amicus brief to explain those very different concepts as well as to emphasize that the conduct alleged in the complaints here is mandated by Chinese law. Properly understood, China's regulation of vitamin C exports mandates dismissal of this lawsuit.

---

[4]     See Brief for United States as Amicus Curiae Supporting Appellants, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348 (1985) (No. 83-2004) at 17 (explicit and detailed statement by foreign government should be "given dispositive weight"), Mitnick Decl., Ex. B.

## BACKGROUND

### I.    Allegations of the Complaint

In January 2005, Plaintiffs Animal Science Products Inc. and the Ranis Company ("plaintiffs") filed the first Complaint in this action (the "Complaint")[5] in which they allege that defendants, four Chinese manufacturers and exporters of raw vitamin C products, and affiliates of one of these manufacturers,[6] violated Section 1 of the Sherman Act by agreeing on the price and volume of vitamin C products exported from China to the United States.

Specifically, plaintiffs allege that the defendants formed "a cartel to control prices and the volume of exports for vitamin C. . . . [and] successfully reached an autonomy agreement" in which they allegedly agreed "to control export quantities and achieve stable and enhanced price goals," "to restrict their exports of vitamin C in order to create a shortage of supply in the international market," and "to 'restrict quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically.'" Compl. ¶ 43.  Plaintiffs allege that, as a result of the cartel, the prices of vitamin C products exported from China to the United States increased from $2.50 per kilogram in December, 2001, to as high as $7 per kilogram in December, 2002, and that they, as purchasers of vitamin C products, were forced to pay higher prices as a result. Compl. ¶ 45.

Plaintiffs further allege that in 2003, defendants met and agreed to limit production levels further and increase prices (Compl. ¶ 52), and that in 2004, defendants agreed to suspend production in an effort to stabilize prices (Compl. ¶ 56).

---

[5]    Subsequent complaints have not been consolidated into a single complaint, but all of the complaints make substantially identical allegations.

[6]    The Chinese defendants are:  Hebei Welcome Pharmaceutical Co. Ltd., Jiangsu Jiangshan Pharmaceutical Co. Ltd., Northeast Pharmaceutical Group Co. Ltd., Weisheng Pharmaceutical Co. Ltd., and China Pharmaceutical Group, Ltd.  In addition, the Ministry is informed that a defunct U.S. affiliate of one of these defendants was also named in the Complaint.

Plaintiffs claim that the meetings held by defendants, and the agreements to which defendants were party, were "facilitated by the efforts of their trade association," the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China.[7]  Compl. ¶ 43.  This "association," it is alleged, also "coordinated" the meetings at which defendants agreed to the limitations of sales and exports to the United States (Compl. ¶ 46), called a late 2003 "emergency meeting" attended by the defendants in which the "association" discussed how the defendants were to "rationalize the market and restrain and limit the production levels of vitamin C to increase prices" (Compl. ¶ 53), and met with the defendants at the "China Exhibition of World Pharmaceutical Ingredients," during which they "devised plans to rationalize the market and to limit production levels and increase prices" (Compl. ¶ 54).

## II.   The Regulation of the Vitamin C Export Industry in China

### A.   The Nature and Regulatory Role of the Chamber of Commerce of Medicines and Health Products Importers & Exporters

As an initial matter, the allegations of the Complaint rest on a fundamental misunderstanding concerning the nature of the Chamber of Commerce of Medicines and Health Products Importers & Exporters ("Chamber") and its role in the vitamin C industry in China. The Complaint characterizes the Chamber as a mere "trade association" that has facilitated the collusive actions of a "cartel."  Compl. ¶ 43.  In fact, the Chamber is vastly different from a U.S. trade association, or private Chamber of Commerce.  Rather, it is an entity under the Ministry's direct and active supervision that plays a central role in regulating China's vitamin C industry. What the Complaint describes as a "cartel,"[8] and an "ongoing combination and conspiracy to

---

[7]      The official Chinese name of this entity translates as the "Chamber of Commerce of Medicines and Health Products Importers and Exporters."  As described infra, this entity, among other things, regulates China's import and export of pharmaceuticals (or "Western medicines") and health care products, including vitamin C.

[8]      In their Complaint, and before Magistrate Judge Orenstein, plaintiffs sound a simplistic

suppress competition" through price-fixing (Compl. ¶¶ 43-44), is a regulatory pricing regime

mandated by the government of China – a regime instituted to ensure orderly markets during

China's transition to a market-driven economy and to promote, in this transitional period, the

profitability of the industry through coordination of pricing and control of export volumes.  Most

importantly, this regime was established to safeguard the national interests of China.[9]

      The United States has never had a state-run command economy with state-owned

industries.  In the years following the Civil War, chambers of commerce and other trade

associations sprang up voluntarily throughout the country as a means of gathering and providing

information to members of particular industries.  See Maple Flooring Mfrs. Ass'n v. U.S., 268

U.S. 563 (1925).  The proliferation of numerous voluntary commercial and trade organizations

led President Taft to note the need for a central organization in touch with such groups

throughout the United States.  President William Howard Taft, Third Annual Message to

Congress (Dec. 5, 1911).  This, in turn, led to the creation the following year of the U.S.

Chamber of Commerce, an entirely voluntary, non-governmental organization created to, among

other things, represent business interests before the federal government.

---

but very misleading theme: defendants here have "stepped into the shoes" of a defunct cartel of European and Japanese vitamin manufacturers, many of whom pleaded guilty to criminal price fixing charges.  Hr'g Tr. 48:2-3, May 3, 2006.  This theme is a blatant attempt to "poison the well" before the Court has an opportunity to understand the fundamentally different conditions under which the Chinese vitamin C export industry operated from its European and Japanese counterparts.  Other than that both industries involved vitamin C, the circumstances of how those industries priced their export products could not have been more different.

[9]    As China carried out its economic reform beginning in 1978, namely through de-centralizing Government control over, and direct management of, economic activities by permitting state-owned entities to have decision-making power and by encouraging wide private ownership in the economic sector, China was concerned about the possible effects (as it saw them) of unfettered competition between and among enterprises, including that it could retard the orderly development of a stable domestic vitamin C industry and adversely effect levels of employment in that industry.  The Government attempted to temper the effects of economic reform in its regulation of domestic and foreign commerce.

The origins and purposes of that institution stand in stark contrast to those of the similarly-named, but functionally very different, Chamber here. Prior to the advent of any free market system in China, the government itself participated in and controlled the manufacturing and exporting of goods. Only a number of state-owned national exporting entities were allowed to engage in exporting, and no private enterprises or manufacturing enterprises were allowed to export directly. These designated state-owned national exporting enterprises functioned to regulate exports under the Ministry's direction. Subsequently, however, when other types of enterprises (both private and state-owned) were allowed to obtain export licenses, the function of regulating export had to be stripped away from these state-owned national exporting entities so that they were not in the position of regulating the exports of their competitors. The Chamber was established, in part, to serve that role with respect to imports and exports of pharmaceutical products, including vitamin C; it regulates the export of those products under the authority and direction of the Ministry and the General Administration of Customs ("Customs").[10]

---

[10]   The Chamber described its role in Chinese foreign commerce during the Relevant Period as:

> To meet the need of building the *socialist market economy* and *deepening the reform of foreign economic and trade management system*, the China Chamber of Commerce of Medicines & Health Products Importers & Exporters was established in May 1989 in an effort to boost the sound development of foreign trade in medicinal products. As a social body formed along business lines and enjoying the status of legal person, the Chamber is composed of economic entities registered in the People's Republic of China dealing in medicinal items as authorized by the departments under the [S]tate Council responsible for foreign economic relations and trade as well as organizations empowered by them. *It is designated to coordinate import and export business in Chinese and Western medicines* and provide service for its member enterprises. Its over 1100 members are scattered all over China. The Chamber abides by the state laws and administrative statutes, *implements its policies and regulations governing foreign trade, accepts the guidance and supervision of the responsible departments under the States Council. The very purpose is to coordinate and supervise the import and export operations in this business, to maintain business order and protect fair competition, to safeguard the legitimate rights and interests of the state, the trade and the members and to promote the sound development of foreign trade in medicinal items.*

7

Although the Chamber is denominated a "social organization," this term also has a very different meaning under Chinese law than it has in the United States. The Chinese notion of a "social organization" includes within its scope the various "chambers" that exist under Chinese law for the purpose, when authorized, of regulating specific industries (e.g., the Chamber regulates certain pharmaceutical industries, including the vitamin C industry).[11]  See the Ministry's implementing regulation for the administration of "social organizations" (including "chambers") in foreign trade, Measures for Administration over Foreign Trade and Economic Social Organizations (February 26, 1991) Arts. 2 and 14 ("Measures for Administration"), Mitnick Decl., Ex. D (emphasis added) ("Social organizations established with *coordination and industry regulation functions as authorized by [the Ministry]* must implement the administrative rules and regulations relating to foreign trade and economy."). As discussed, infra, regulation over export pricing and output levels was a specific vitamin C "industry regulation function" delegated by the Ministry to the Chamber.

---

China Chamber of Commerce of Medicines & Health Products Importers & Exporters, Publication of Administration and Regulation (2003), at 3 (emphasis added), Mitnick Decl., Ex. C.

This document, along with all Ministry rules or regulations cited herein and attached to the Mitnick Declaration, have been authenticated under the procedures of Federal Rule of Evidence 902(3), which governs self-authentication of foreign public documents. First, an authorized official of the Ministry or the Chamber, as applicable, attested in the presence of a P.R.C. notary public to the authenticity of each document. (In the case of the Chamber, the attestation was also in the presence of a Ministry official who further authenticated the Chamber attestation.) Next, the attestation was further certified by the Consular Department of the P.R.C. Ministry of Foreign Affairs and the U.S. Embassy in Beijing. See Mitnick Decl., document index, for a summary of the attestation(s) and certification(s) applicable to each such document. Translations of all Chinese language documents attached to the Mitnick Declaration are certified by a qualified translation agency and further notarized by a P.R.C. notary public.

[11]    "Chambers [defined as 'chambers of commerce of importers and exports'] are social organizations." Notice of [Ministry] Regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters (Sept. 23, 1994) ("Notice Regarding Chamber Personnel Management") at 1, Mitnick Decl., Ex. E.

The Ministry's authority over the Chamber is plenary: covering such aspects as the Chamber's selection of its leaders, its personnel management system, its budget and accounting systems and its salary structure. Id. Art. 16. See also, Notice Regarding Chamber Personnel Management, Annex II, 4 (Ministry shall verify and approve Chamber's authorized number of personnel); Annex III, 8 (Chamber's general working staff "shall be chosen primarily from the employees in service of their membership organizations or the competent authorities in charge of foreign trade and economics and the public institutions directly under their leadership"); Annex IV, 13 (candidates for senior positions within the Chamber "are recommended by [the Ministry] or recommended by over 1/3 of the [C]hamber's member companies and approved by [the Ministry]"); and Annex V, 17 (Ministry shall "verify and approve the total amount of salary of the [C]hamber"). The Chamber, in turn, must submit to the Ministry its "annual working plan and arrangements of major events," including all "important meetings and activities." Measures for Administration, Art. 21. Similarly, the Chamber "must implement the administrative rules and regulations relating to foreign trade and economy." Id. Art. 14. In short, the Chamber is the instrumentality through which the Ministry oversees and regulates the business of importing and exporting medicinal products in China.

**B.     The Vitamin C Sub-Committee**

Throughout the Relevant Period, the Chamber exercised its regulatory authority with respect to vitamin C exports through its Vitamin C Sub-Committee. The Sub-Committee was established in 1997, at the Ministry's order, against a backdrop of "intense competition and challenges from the international [vitamin C] market." Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines & Health Products Importers & Exporters (issued March 23, 1998), Mitnick Decl., Ex. F. The Sub-Committee, operated under the Chamber's direction and administration, is responsible for "coordinating the Vitamin C

9

export market, price and customers of China, to improve the competitiveness of Chinese Vitamin C produce in the world market and promote the healthy development of Vitamin C export of China." Id. ¶ 2.

Only companies that exported vitamin C in certain specified volumes were eligible to be members of the Sub-Committee.  Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters (October 11, 1997) Art. 11 ("Vitamin C Sub-Committee Charter"), Mitnick Decl., Ex. G.  Pursuant to the Vitamin C Sub-Committee Charter, only Sub-Committee members "have the right to export Vitamin C and are simultaneously qualified to have Vitamin C export quota." Id. Art. 12.  With this right come a series of "obligations," including the duty to "comply with the . . . regulations of the Vitamin C Sub-Committee and implement [its] resolution," and to export and supply vitamin C "only to those foreign trade enterprises verified by the Sub-Committee." Id. Art. 15(1)&(2).  Most significantly for purposes of this case, members are obligated to *"[s]trictly execute export coordinated price set by the Chamber and keep it confidential."* Id. Art. 15(6) (emphasis added).  The Charter further provides that any "failure to implement any resolution or regulation of the Sub-Committee and failure to perform any member's obligation shall be punished by the Sub-Committee." Id. Art. 16.  Authorized punishments include "warning, open criticism and even revocation of . . . membership," and imposition of monetary penalties.  Id.  In addition, the Sub-Committee may recommend, through the Chamber, that the Ministry "suspend and even cancel the Vitamin C export right of such violating member," id., resulting in a total ban on participation in exporting altogether.

   1.    **Initial Regulations Mandating Coordination (So-Called "Voluntary Self-Restraint") in Establishing Export Price and Quantity**

Shortly after it mandated the establishment of the Vitamin C Sub-Committee, the Ministry, acting in conjunction with the State Drug Administration, promulgated a new

regulation authorizing and requiring the Chamber and Sub-Committee to limit the production of

vitamin C for export and to set export prices.  Notice Relating to Strengthening the

Administration of Vitamin C Production and Export ("1997 Ministry & SDA Notice"), Mitnick

Decl., Ex. H.  The regulation limited participation in the vitamin C export industry to those

companies qualified to be members of the Sub-Committee, then required all such eligible entities

to "participate in such [Sub-Committee] and subject themselves to the coordination of the [Sub-

Committee]."  Id. at 2.  The Sub-Committee, in turn, was required to *"formulate and adjust [the]*

*export coordination price, which the Vitamin C export enterprises must strictly implement."*  Id.

(emphasis added).

Under this regulation, qualified vitamin C manufacturers and import and export

companies were able to receive a Vitamin C export quota license.  The issuance of Vitamin C

export licenses was subject to two criteria.  First, the export volume was required to be in

compliance with the export quota.  Second, the export price was required to be no lower than the

price established by the Vitamin C Subcommittee's coordinated price agreements.  See id. ("The

organizations that [are] authorized by [the Ministry] to issue export licenses [were to] strictly

verify the qualification of Vitamin C export and operation of the enterprises, and verify their

export contracts and issue export license according to the Vitamin C coordinated price and

volume quotas.").  In addition, the volume to be exported by each qualified entity under this

"Production and Export Licensing System" was determined by the Ministry, in conjunction with

the State Drug Administration and "relevant departments."  Id. at 1-2.  Attempts to circumvent

the verification process were subject to penalties, including a reduction in an entity's export

quota or the revocation of its exporting license.  Id. para. 7 ("Vitamin C Export Coordination

Group shall timely organize meetings for the major Vitamin C export enterprises . . . to . . .

formulate and adjust export coordination price, which the Vitamin C export enterprises must

11

strictly implement in accordance with.  With respect to enterprises competing at low price and reducing price through any disguised means, a penalty shall be imposed . . . .") and para. 10 (". . . penalties [for violating provisions of Paragraph 7] shall be . . . the Vitamin C export quota may be reduced, in the worst case their Vitamin C export right shall be revoked").

   As the foregoing makes clear, price "coordination" within this regulatory system does not mean that prices are established independently or, even, by "voluntary" agreement among manufacturers, as that term is normally understood in the West.  Rather, the decisions to limit the volume of exports and to set export prices were made by the Ministry.  The Ministry chose to implement these policies by limiting vitamin C exporting rights to certain qualified entities, compelling those entities to participate in a subcommittee of a Ministry-approved and supervised regulatory body, and requiring that subcommittee to set export prices that exporters were then required to implement, subject to a verification system that included severe penalties for non-compliance.  Within this system, therefore, "coordination" refers to the government mandated multilateral process in which prices were set—as opposed to a unilateral process in which the Ministry alone set prices.  (Indeed, the Sub-Committee was originally designated the "Vitamin C *Coordination* Group," and was referred to by that name in the 1997 Ministry & SDA Notice.  see id. at 2.)  The industry participants in this multilateral process, thus, acted pursuant to governmental compulsion; when establishing price controls, they were exercising governmental regulatory power; and the price controls developed through this multilateral process were legally binding and governmentally-enforced.[12]

---

[12]  Plaintiffs rely heavily on a document from the Chamber's website that states:

  In December 2001, through efforts by the Vitamin C Chapter of the China Chamber of Commerce of Medicines and Health Products Importers and Exporters, the manufacturers were able to successfully reach a self-restraint agreement, whereby they would voluntarily control the quantity and pace of exports, so as to achieve the goal of stabilizing and raising export prices.

This system of Ministry-mandated and Chamber-administered "coordination" was adopted to forestall potential market disorders that might have limited the development of a healthy vitamin C export industry during China's transition from a command economy to a market-driven economy. <u>See</u> Interim Regulations of the Ministry of Foreign Trade and Economic Cooperation on Punishment for Conduct at Exporting at Lower-Than-Normal Price (March 20, 1996), Mitnick Decl., Ex. I (explaining that the Ministry promulgated interim regulations to "ensure orderly development of the country's export trade, safeguard the legitimate rights and interests of the State and enterprises and prevent conduct of exporting at lower-than-normal price"). A system of government-mandated "coordination" among industry participants served the Ministry's goal of transitioning to a healthy market-based economy: it established mandatory coordinated export price and output levels (thereby forestalling what the government feared could be destructive export competition before the foundation for a healthy industry could be laid) by vitamin C manufacturers, although the Ministry itself did not decide what specific prices should be. Instead, this governmental function was delegated to market participants and the Chamber, in their capacities as Vitamin C Sub-Committee members, acting in a coordinated fashion.

---

Letter from William Isaacson and Alana Rutherford to Honorable James Orenstein (May 12, 2006) at 3 and Exhibit C (emphasis added); <u>see also</u> Hr'g Tr. 47-48, May 3, 2006; Pretrial Order (JO), May 4, 2006, 2-3. In the context of the Ministry's regulation of the vitamin C industry through the Chamber, however, the characterizations by the Chamber of the conduct as "self-restraint" and "voluntary" are unremarkable. The vitamin C industry was under a direct Ministry order to reach a "coordinated" agreement in order to stabilize export pricing. Thus, it is understandable that the Chamber would express its pleasure publicly that the parties were able to comply with the Ministry's order to coordinate pricing and quantities on their own (*i.e.,* "voluntarily" and in "self-restraint") as opposed to requiring more direct Ministerial intervention to reach that result. Indeed, as discussed in Point II.B.2., <u>infra</u>, this regulatory system was expressly enacted "to promote [among other things] industry self-discipline."

2.    **Revised Regulation of Export Pricing and Quantity: Verification and Chop**

In 2002, the Ministry changed the way in which compliance with the Chamber's "coordination" was confirmed by abolishing the Export Licensing System and establishing a so-called "verification and chop" system.  See Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Export Products Subject to Price Review by the Customs ("2002 Ministry & Customs Notice"), Mitnick Decl., Ex. J.  The Ministry adopted this new system "in order to accommodate the new situations since China's entry into WTO, maintain the *order* of market competition, make active efforts to avoid anti-dumping sanctions imposed by foreign countries on China's exports, *promote industry self-discipline* and facilitate the healthy development of exports."  Id. at 1, Preamble (emphasis added).  The Ministry explained that this new system would be both "convenient for exporters while it is conducive for the Chambers to coordinate export price and industry self-discipline."  Id. at 2, para. 4.  The basis of the new system was a process of *"industry-wide negotiated prices."*  Id. at 2, para. 3 (emphasis added).

Under this system, the Chamber reported the "coordinated," or "industry-wide negotiated," prices for vitamin C exports to Customs.  Id.  Manufacturers were required to submit documentation to the Chamber which indicated both the amount and price of vitamin C to be exported.  The Chamber "verified," *i.e.,* approved, the contract price and volume.  If the price was at or above the minimum acceptable price set by coordination through the Chamber, the Chamber affixed a special seal, known as a "chop," on the contract and returned it to the manufacturer.  Upon export, the contract was reviewed by Customs and allowed to go through only if the contract bore the Chamber's "chop."  Id.  The penalty for violating the system was draconian: withholding of the Chamber's "chop" meant complete denial by Customs of the ability to export.

14

In 2003, the "verification and chop" system was continued with respect to several commodities industries, including the vitamin C industry.  Vitamin C exporters were required to submit contracts to the Chamber, which "verified" the exporters' submissions "*based on the industry agreements* and in accordance with the relevant regulations promulgated by the Ministry of Commerce . . . and the General Administration of Customs."  Announcement of Ministry of Commerce of the People's Republic of China, General Administration of Customs of the People's Republic of China (November 29, 2003) (Exhibit 2, para. C) (emphasis added), Mitnick Decl., Ex. K.  "Enterprises exporting by forging the [Verification & Chop] on the contracts will be punished by the Customs and Chambers of Commerce according to relevant rules."  Id. at 1.  Through its 2003 announcement, in conjunction with the General Administration of Customs, the Ministry extended this system throughout the Relevant Period.

**ARGUMENT**

**I.      Dismissal Is Mandated By The Foreign Sovereign Compulsion Doctrine**

"Under the foreign sovereign compulsion doctrine the courts will immunize private defendants from antitrust liability for conduct that is actually compelled, not merely permitted by a foreign sovereign acting within its jurisdiction.  In that case, the acts of the private party 'become effectively acts of the sovereign.'"  P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 274c at 406-07 (2d ed. 2000), quoting Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F. Supp. 1291, 1298 (D. Del. 1980) (other citations omitted).[13]

---

[13]      In their Antitrust Enforcement Guidelines for International Operations, the U.S. Department of Justice and the Federal Trade Commission provide the following illustration of conduct that they acknowledge cannot be challenged under U.S. antitrust law:

> Assume for the purpose of this example that the overseas production cutbacks have the necessary effects on U.S. commerce to support jurisdiction.  As for the participants from the two countries that did not impose any penalty for a failure to reduce production, the Agencies would not find that sovereign compulsion precluded prosecution of this agreement.  As for participants from the country that did compel production cut-backs

15

U.S. courts, including the Second Circuit, have recognized that they lack subject matter jurisdiction over antitrust actions that challenge private conduct that is compelled by a foreign government. Certified O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 453 (2d Cir. 1987) cert. denied 488 U.S. 923, (1988); Mannington Mills, Inc. v. Congoleum Corp., 595 F.2d 1287, 1293 (3d Cir. 1979); Timberlane Lumber Co. v. Bank of America, N.T. and S.A, 549 F.2d 597, 606-07 (9th Cir. 1976); Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Prod. Holdings (North America), Inc., 954 F. Supp. 733, 736 (S.D.N.Y. 1997); McElderry v. Cathay Pacific Airways, Ltd., 678 F. Supp. 1071, 1080 (S.D.N.Y. 1988); cf. Interamerican, 307 F. Supp. at 1296-98 (granting summary judgment on the merits based on the defense).

The foreign sovereign compulsion doctrine is "[a] corollary to the act of state doctrine"; it recognizes "that corporate conduct which is compelled by a foreign sovereign is . . . protected from antitrust liability, as if it were an act of the state itself." Timberlane, 549 F.2d at 606. "When the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the foreign government, claims under the

---

through the imposition of severe penalties, the Agencies would acknowledge a defense of sovereign compulsion.

Greatly increased quantities of commodity X have flooded into the world market over the last two or three years, including substantial amounts indirectly coming into the United States. Because they are unsure whether they would prevail in an antidumping and countervailing duty case, U.S. industry participants have refrained from filing trade law petitions. The officials of three foreign countries meet with their respective domestic firms and urge them to "rationalize" production by cooperatively cutting back. Going one step further, one of the interested governments orders cutbacks from its firms, subject to substantial penalties for non-compliance. Producers from the other two countries agree among themselves to institute comparable cutbacks, but their governments do not require them to do so.

Antitrust Enforcement Guidelines for International Operations, issued by the U.S. Department of Justice and the Federal Trade Commission (April, 2005), Illustrative Example K, Section 3.32.

16

antitrust laws are dismissed" for lack of subject matter jurisdiction. <u>O.N.E. Shipping</u>, 830 F.2d

at 453 (affirming jurisdictional dismissal based on the defense); see also <u>McElderry</u>, 678 F.

Supp. at 1080 (same). The doctrine is applicable where "the foreign decree was basic and

fundamental to the alleged antitrust behavior and more than merely peripheral to the overall

illegal course of conduct." <u>Mannington Mills</u>, 595 F.2d at 1293.

   The foreign sovereign compulsion doctrine is fully applicable – and dispositive –

here. Chinese law, promulgated by the Ministry and administered through the Chamber,

compelled defendants, as members of the Vitamin C Sub-Committee, to coordinate export prices

and maximum export volumes and to abide by those requirements. Under the Ministry's

regulations, defendants were compelled to become participating members of the Vitamin C Sub-

Committee, 1997 Ministry & SDA Notice at 2 Ex. H, and Vitamin C Sub-Committee Charter,

Art. 12, Ex. G, they were compelled to *"formulate and adjust [the] export coordination price,"*

1997 Ministry & SDA Notice at 2 (emphasis added), Ex. H, and they were compelled to abide by

and implement that "coordinated" price, <u>id.</u>, and Vitamin C Sub-Committee Charter, Art. 15(6),

Ex. G. Defendants would not have been eligible to export vitamin C at all if they failed to

participate in these price-setting and production-limiting activities. 1997 Ministry & SDA

Notice, Ex. H; Vitamin C Sub-Committee Charter, Art. 12, Ex. G. Government entities policed

defendants' compliance with the resulting prices and volume limits, and non-compliance would

subject defendants to severe penalties, including, among other things, reduction in export quotas

(resulting in further economic loss), and, possibly, loss of export rights. 1997 Ministry & SDA

Notice at 2, Ex. H; Vitamin C Sub-Committee Charter, Art. 16, Ex. G; 2002 Ministry & Customs

Notice at 2, Ex. J.

   As noted above, while China is in the process of moving actively from its former

state-run command economy to a market economy more of a type familiar to the United States,

the current economic system is transitional and there remains a level of active state direction and coordination that has no analogue in the United States. Thus, for example, one would not find in the United States a government mandate to "maintain order in market competition," to "promote industry self-discipline," or to mandate export pricing and output levels "based on the *industry agreements*"; nor would one find a governmentally-directed organization, such as the Chamber, directing parties to attend meetings, such as those referred to in the complaints, to discuss prices or export quotas, with a view to maximizing industry profitability in export commerce.

That, however, is precisely the transitional framework under which the vitamin C industry functioned throughout the Relevant Period. Thus, while the Government did not, itself, determine specific prices or quantities, it most emphatically did insist on those matters being determined *through industry coordination*. That, of course, is all that is alleged in the complaints here and that is conduct that was compelled by the Chinese government in the interests of insuring "order in market competition."

It is thus clear that these mandates of Chinese law were "basic and fundamental to the alleged antitrust behavior and more than merely peripheral to the overall illegal course of conduct." Mannington Mills, 595 F.2d at 1293. The central allegations of the Complaint are that defendants "agreed to control export quantities and achieve stable and enhanced price goals," and that plaintiffs were injured because the price of vitamin C products "has been fixed, raised, maintained and stabilized at artificial and non-competitive levels." Compl. ¶¶ 43 and 62. The decision to control export quantities and require coordinated export prices was made by the Ministry. Defendants were compelled to implement these decisions through participation in the Vitamin C Sub-Committee. Similarly, the Complaint alleges that the allegedly unlawful prices and production limits were established through defendants' "participat[ion] in meetings and conversations in China and elsewhere in which the prices, volume of sales and exports to the

18

United States, and markets for vitamins were discussed and agreed upon." Compl. ¶ 46. Again, contrary to the allegations of the complaint, defendants were compelled by the Ministry to engage in these very activities. The government-supervised Chamber facilitated and coordinated those meetings, and was required to advise the Ministry of such meetings.

Accordingly, the price "coordination" alleged in the complaint cannot serve as a basis for the imposition of antitrust liability. Indeed, just as in O.N.E. Shipping, this "antitrust suit represents a direct challenge to [the Ministry's medicinal product export] laws and to the legality of [defendants'] agreements under those laws." 830 F.2d at 451. Those "laws were designed to promote the development of a strong [Chinese medicinal products industry] and to assist [China's] economic development." Id. Accordingly, here, as in O.N.E. Shipping, "the causal chain between a defendant's alleged conduct and plaintiff's injury cannot be determined without an inquiry into the motives of the [Ministry]." Id. at 453. See also Trugman-Nash, Inc., 954 F. Supp. at 736 (New Zealand dairy producers entitled to defense of foreign sovereign compulsion where New Zealand law required export licensing board to disapprove "of sales price competition among New Zealand dairy producers in respect of exports to nations like the United States that restrict import quantities").[14]

---

[14]    The arguments of the United States in its amicus brief in Matsushita (see footnote 4, supra) apply here with equal force:

> [T]he court of appeals should have given dispositive weight to the statement submitted to the district court by the Japanese Government, which indicated explicitly that part of petitioners' conduct was compelled. The court's rejection of petitioners' sovereign compulsion defense has caused deep concern to the Government of Japan and to the governments of other countries that are significant trading partners of the United States and threatens to affect adversely the foreign policy of the United States. Mitnick Decl., Ex. B at 6.

> The court of appeals erred in rejecting petitioners' sovereign compulsion defense. The Government of Japan explained in the MITI [Ministry of International Trade] Statement that it "directed" petitioners "to enter into" the check price agreement.... [T]hat explicit and detailed statement by a foreign sovereign that it mandated the check price agreement

Finally, this case stands in stark contrast to those where courts have deemed the foreign sovereign compulsion doctrine inapplicable. For example, in Continental Ore Co. v. Union Carbide and Carbon Corp., 370 U.S. 690 (1962), the Court held that the defense was not available to a Canadian entity that was given the exclusive right to import vanadium oxide into Canada, but then decided, "within its area of discretionary powers," to use that right to conspire with a U.S. subsidiary to boycott and destroy a competitor. Id. at 706-07. The Supreme Court emphasized that there was "no indication that [any] official within the . . . Canadian government approved or would have approved of" this conduct, and that no "law in any way compelled discriminatory purchasing." Id. Here, the Ministry not only approved defendants' conduct in establishing export limits and price coordination, it compelled that very conduct.

Similarly, plaintiffs do not—and cannot—allege that defendants entered into a price-fixing conspiracy, then worked to secure laws or regulations that blessed their arrangements. Cf. U.S. v. Sisal Sales Corp., 274 U.S. 268 (1927) (conspiracy formed in the United States for the purpose of monopolizing sales to the United States was not immunized simply because one element of the conspiracy involved securing laws that recognized the conspirators as exclusive traders and imposed discriminatory sales taxes on rivals). Here, the Ministry imposed the relevant laws on defendants. Indeed, the impetus for these and other price coordination measures was not to endorse existing price-fixing conspiracies, but to prevent disorderly competition.

---

in accordance with its laws ... should have been given dispositive weight. It follows that the foreign sovereign compulsion defense precluded use of the check price agreement as a basis for liability under the Sherman Act. Id. at 12.

The MITI Statement also explained that MITI had directed the regulations [through] the Japan Machinery Exporters Association.... Id.

In sum, Chinese Law mandated the participation of entities engaged in vitamin C export to coordinate with respect to export pricing and volume quotas and to adhere to such limits. Each defendant conducted itself as Chinese law required when it participated in Sub-Committee meetings at which agreements were reached with respect to pricing and volume controls. Refusal to subject oneself to the coordination of the Sub-Committee and the Chamber is unlawful under relevant regulations and would result in severe punishment, either through monetary penalty or loss of ability to participate in the industry altogether. Because all of the elements of the foreign sovereign compulsion doctrine are satisfied, this lawsuit should therefore be dismissed.

## II.     The Act of State Doctrine Also Mandates Dismissal

The act of state doctrine also forbids judicial inquiry into China's motives in regulating its foreign commerce. The act of state doctrine differs from the foreign sovereign compulsion defense in that the act of state doctrine is grounded in principles of federalism and reflects the view that the courts, in deciding whether to accord recognition to certain foreign acts of state, might hinder the conduct of foreign affairs by the Executive Branch. W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 404 (1990). The Supreme Court has acknowledged "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations." U.S. v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936). See also Japan Line, Ltd. v. Los Angeles County, 441 U.S. 434, 448-49 (1979) and Dames & Moore v. Regan, 453 U.S. 654, 669 (1981). "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative – 'the political' – departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918).

21

The act of state doctrine, in essence, is "designed primarily to avoid judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government. Such an inquiry is foreclosed under the act of state doctrine." O.N.E. Shipping, 830 F.2d at 452 (citing Hunt v. Mobil Oil Corp., 550 F.2d 68, 73 (2d Cir. 1977), cert. denied, 434 U.S. 984, 98 S.Ct. 508 (1977)). See also W.S. Kirkpatrick 493 U.S. at 404.

The burden of proving an act of state rests on the party asserting the applicability of the doctrine. Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 684-85, (1976), cert. denied, Saksand Company v. Republic of Cuba, 425 U.S. 991 (1976). "[T]his burden requires that a party offer some evidence that the government acted in its sovereign capacity and some indication of the depth and nature of the government's interest." Liu v. Republic of China, 892 F.2d. 1419, 1432 (9th Cir. 1989) (citing Timberlane, 549 F.2d at 607-08).

The act of state doctrine mandates that this Court decline to exercise jurisdiction over this action. As set forth above, the conduct alleged to have been violative here was compelled by the Chinese government. The Chinese government compelled such conduct in its oversight of its foreign trade regulation. Any determination by this Court into the conduct as alleged by the plaintiffs will necessarily invoke an inquiry into the legitimacy of China's foreign policy concerning the manufacture and export of vitamin C. To permit the validity of the policy-making decisions of China "to be reexamined and perhaps condemned by [this] court[] would very certain[ly] 'imperil the amicable relations between [the two] governments and vex the peace of nations." Oetjen, 246 U.S. at 304. It cannot be denied that the possibility of insult to China is significant – "the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means" of regulating domestic conduct. See

Int'l Ass'n of Machinists & Aerospace Workers v. OPEC, 649 F.2d 1354, 1361 (9th Cir. 1981)

cert. denied, 454 U.S. 1163 (1982). Such an inquiry is prohibited by the act of state doctrine – if

China's regulation of its foreign policy implicates U.S. interests as alleged, then the proper

forum for such discussions between the United States and China is not in this Court.

**III.     This Suit Should Be Dismissed Based on Principles of International Comity**

        Principles of international comity also render the exercise of jurisdiction over the

Complaint inappropriate. Comity

> is the recognition which one nation allows within its territory to the
> legislative, executive or judicial acts of another nation, having due
> regard both to international duty and convenience, and to the rights
> of its own citizens or of other persons who are under the protection
> of its laws.

O.N.E. Shipping, 830 F.2d at 451 n.3 (quoting Hilton v. Guyot, 159 U.S. 113, 163-64 (1895)).

The Second Circuit has adopted the multi-factor test set forth in Timberlane for determining

when comity principles require courts to decline to exercise jurisdiction over the conduct of

foreign actors. See U.S. v. Javino, 960 F.2d 1137, 1142-43 (2d Cir. 1992) cert. denied, Javino v.

U.S., 506 U.S. 979 (1992); O.N.E. Shipping, 830 F.2d at 451. Here, virtually all of these factors

militate in favor of dismissal.

        First, for all of the reasons discussed above, there is an irreconcilable conflict

between the requirements of U.S. antitrust law and the laws and policies of China. See

Timberlane, 549 F.2d at 614 (courts must examine "the degree of conflict with foreign law or

policy"). Simply put, Chinese law mandates conduct that U.S. antitrust law proscribes. See

Trugman-Nash, Inc., 954 F. Supp. at 736 (dismissing on comity grounds after finding "actual

and material conflict between American antitrust law and New Zealand law in respect of the

marketing of dairy export produce"); McElderry, 678 F. Supp. at 1079 (dismissing on comity

grounds based on "direct conflict between" U.S. antitrust law and the law of the United

Kingdom).  And that Ministry-mandated conduct, all of which occurs in China, is far more "importan[t] to the violations charged" than any "conduct within the United States."

Timberlane, 549 F.2d at 614.

Accordingly, an exercise of jurisdiction cannot achieve "compliance" with U.S. antitrust law:  as Chinese entities with their principal places of business in China, defendants cannot export vitamin C at all if they do not comply with the laws of China.  See id. (courts must consider the nationality of the parties and their principal places of business and the extent to which enforcement by either state can be expected to achieve compliance).  This lawsuit, therefore, cannot compel defendants to conform their future conduct to the requirements of U.S. antitrust law, because they will remain subject to the Ministry's price-coordination requirements.

Those requirements of Chinese law, moreover, were not adopted with "the explicit purpose to harm or effect American commerce," nor were any such harms or effects reasonably foreseeable.  See id.  To the contrary, the Ministry adopted these requirements to prevent self-destructive price competition during China's transition from a state-run to a market-driven economy.  As a consequence, the "significance of effects on the United States" is far smaller than the significance of the effects in China.  Id.  The price coordination and production limits plaintiffs challenge lie at the very heart of the Ministry's efforts to oversee and facilitate a sweeping transformation of China's entire economic system.  Whatever effects defendants' compliance with the Ministry's requirements has allegedly caused in the United States, those effects plainly do not implicate an historic transformation of the U.S. economy.

Finally, and as a consequence, punishing defendants (through an award of treble damages) for their compliance with mandates that the Ministry has deemed essential for the development of a stable market-driven economy can only adversely affect relations between the United States and China.  See id. at 609 (noting that nations "have sometimes resented and

24

protested, as excessive intrusions into their own spheres, broad assertions of authority by American courts"); <u>Mannington Mills</u>, 595 F.2d at 1297 (warning against a "provincial approach" to the exercise of antitrust jurisdiction over foreign conduct and noting examples of hostile reactions by British and Canadian authorities to such exercises). Insofar as China's sovereign policy decisions about how best to manage its economic transformation conflict with the policies embodied in U.S. antitrust laws, that conflict should be addressed "through diplomatic channels," and not through "the unnecessary irritant of a private antitrust action." <u>O.N.E. Shipping</u>, 830 F.2d at 454.

## CONCLUSION

For all of the foregoing reasons, this Court should decline to exercise jurisdiction and should dismiss the Complaint.

Dated:

SIDLEY AUSTIN LLP

By: _____
Joel M. Mitnick (JM-0044)
Tracey R. Seraydarian (TS-5988)

787 Seventh Avenue
New York, NY 10019
(212) 839-5300

Of Counsel:

Joseph R. Guerra*
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
*Not admitted to the Eastern District
of New York

Attorneys for Amicus Curiae
The Ministry of Commerce of the
People's Republic of China

NY1 5906502v.1

China Chamber of Commerce of Medicines
and Health Products Importers and Exporters

Page 1 of 2

| [See source for logo] www.cccmhpie.org.cn | China Chamber of Commerce of Medicines and Health Products Importers and Exporters Information Website | | | | | |
|---|---|---|---|---|---|---|
| Home | Overview of the Chamber of Commerce | Board Member Organizations | Membership Information | Online Exhibition | Online FAQ | Contact Us |

| Information Department | Department of Traditional Chinese Medicine | Department of Western Medicine | Membership Department | Exhibition Department | Legal Department | Office |
|---|---|---|---|---|---|---|

### Concerns remain while good news on our country's vitamin C exports

_____

_____  [Search]

>>ICQ Service]

Receive ID _____

Concerns remain while there is good news about our country's vitamin C exports

Send Code _____

Password _____

Confirmation _____ 4960

Deliver        Register

China is the largest vitamin C producer and exporter in the world. Vitamin C is the largest type of western medicine-ingredient produced by China. The two-step fermentation method invented in our country is on par with international level. In recent years, the recovery rate of vitamin C from sorbitol has been improved to over 60% from 48%, thus significantly increase the Chinese market share of vitamin C on the world market. Currently, the annual vitamin C consumption on the international market is around 80,000 tons, and our country exports about 43,000 tons a year. Currently there is a tripartite confrontation on the international market, with BASF AG of Germany, F. Hoffmann-La Roche of Switzerland and the four major Chinese vitamin C manufacturers competing against each other.

Between May 2000 and late December 2001, vitamin C in our country experienced the second "price war" since 1995 export prices plummeted from 5.0 US Dollars to less than 2.8 US Dollars; which has caused direct economic losses about 200 million US Dollars. Relevant countries are ready to launch their anti-dumping lawsuits against China soon.

In December 2001, through efforts by the Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters, each domestic manufacturers were able to reach a self-regulated agreement successfully, whereby they would voluntarily control the quantity and pace of exports, to achieve the goal of stabilization while raising export prices. Such self-restraint measures, mainly based on "restricting quantity to safeguard prices, export in a balanced and orderly manner and adjust dynamically" have been completely implemented by each enterprises' own decisions and self-restraint, without any government intervention. Beginning on May 1, 2002, vitamin C was listed as a product requiring price reviews by China's Customs and a seal of pre-approval by the

China Chamber of Commerce, which has provided powerful oversight and safeguards for the implementation of self-restraint agreements among domestic manufacturers.

Through the work of the Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers and Exporters during the past year, and due to products discontinuation or reduction by foreign multi-national firms such as BASF Takeda, Merck and F. Hoffmann-La Roche of the United States, export prices of vitamin C have increased to over 3.35 US Dollars from 2.80 US Dollars in late 2001. Currently, the actual quotes have reached about 10.00 US Dollars. According to Custom's statistics, our country's vitamin C exports reached 146 million US Dollars in 2002.

China Chamber of Commerce of Medicines
and Health Products Importers and Exporters

Page 2 of 2

taking up 4.9% of exports as western medicine-ingredient by our country, which has created an unprecedented good atmosphere for domestic vitamin C business. According to estimasis, every 10 cents in US Dollar increases in the vitamin C export will generate earnings of nearly 4 million US Dollars for the entire industry. If the export price of 2.80 US Dollars prior to the industry self-restraint is used as the base number, in 2002, earnings from our domestic vitamin C exports in 2002 increased by about 20 million US Dollars.

The current good situation for the vitamin C exports has been hard-won and is the result of the short-term general interaction of different factors. Currently, abnormal export price increases may stimulate new manufacturing enterprises to join the competition. In the meantime, we expect that the supply of vitamin C will soon exceed demand when foreign multi-national firms resume their production. This will lead to a reduction or precipitous drop in profits from vitamin C, or even negative profits for certain domestic enterprises.

Regarding the current export situation for vitamin C, we must remain clear-minded, as we faced so much experiences and lessons from the past. The manufacturing enterprises must remain cool-headed and soundly judge the situation of vitamin C on the international market, and make joint efforts with the China Chamber of Commerce of Medicines and Health Products, to avoid vicissitudes in the production and exports of vitamin C, for maintaining a stable, healthy situation for it for the long run.

(Department of Western Medicine)

Print this page    Recommend to a friend

[Background graphic]
All Rights Reserved China Chamber of Commerce of Medicines
and Health Products Importers and Exporters 1999-2004
http://www.cccmpie.org.cn
Technology provided by Szechuan Chinese Herbal Medicine Co., Ltd. http://www.tcm1.com

[See original for English]

Case 1:06-md-01738-DGT-JO     Document 46-5    Filed 08/16/2006    Page 6 of 11

| [See source for logo] www.ccemhpie.org.cn | China Chamber of Commerce of Medicines and Health Products Importers and Exporters Information Website | | | | | |
|---|---|---|---|---|---|---|
| Home | Overview of the Chamber of Commerce | Board Member Organizations | Membership Information | Online Exhibition | Online FAQ | Contact Us |
| Information Department | Department of Traditional Chinese Medicine | Department of Western Medicine | Membership Department | Exhibition Department | Legal Department | Office |

[See original for English]

[See original for English]

[See original for English]

Case 1:06-md-01738-BMC-JO   Document 248-2   Filed 02/08/08   Page 8 of 10 PageID #: 5194

Case 1:06-md-01738-DGT-JO    Document 46-5    Filed 08/16/2006    Page 9 of 11

中国医药保健品进出口商会

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page34 of 150

A-184

Case 1:06-md-01738-BMC-JO   Document 248-2   Filed 02/08/08   Page 9 of 10 PageID #: 5195

Case 1:06-md-01738-DGT-JO   Document 46-5   Filed 08/16/2006   Page 10 of 11

Page 2 of 3

当前，很多出口的良好局面来之不易，是各种因素在现状内综合作用的结果。目前出口形势许正常运作。有可能影响我们的生产企业从入进来参与竞争，同时还将继续集团公司积极生产，致力于预料，但主要C州太平洋的局面不久后将会出现，并且许多热地集出来CH利的减少和调整，东亚某某企业会出现双手的，对当前扭来出来口的部分，客将持有现状的认识，以比能支面的局综续相同已经太多了，客生产企业一定要从局冶外，正铺出我针经来出CH中的国际作形多的，努力地负担坐在CH产生出CH出现永远大处大程的状况，为争创持其有长期，功定。最既的良好形势。

（医药册）

打印本页  将要给朋友

中国医药保健品进出口商会

原文附有中国医药保健品进出口商会 1999-2004
http://www.comhpie.org.cn
http://www.comhpie.com.cn
四川省中赐富有限公司提供技术支持 http://www.kml.com



**OCE Translations**

609 Mayflower Drive
Greensboro, NC 27403, USA
☎ (+1) 336-272-3557
📠 (+1) 775-890-3643
usa@oce-translations.com
🌐 www.oce-translations.com

10 November 2005

Certificate of Accuracy

I, Martin Heimann, project manager at OCE Translations LLC, hereby certify that the foregoing translation from Chinese into English, attached hereto and consisting of 7 pages, is a true and correct translation of the original document.

Martin Heimann

State of NC
County of Guilford

Sworn to and subscribed before me this 10ᵗʰ day of November, 2005.

Notary Public

My commission expires:  8-25-07

**A-186**

CONFIDENTIAL AND LAWYERS ONLY – This document is filed under seal pursuant to the Protective Order of the Court, dated March 20, 2007. (D.E. 133).

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re VITAMIN C ANTITRUST LITIGATION | 1:06-MD-01738 (DGT) (JO) |
| THIS DOCUMENT RELATES TO:<br><br>ANIMAL SCIENCE PRODUCTS, INC. and THE RANIS COMPANY, INC.,<br><br>                    **Plaintiffs,**<br><br>v.<br><br>HEBEI WELCOME PHARMACEUTICAL CO., LTD., *et al.*<br><br>                    **Defendants.** | CV-05-453 |

DECLARATION OF DARRELL PRESCOTT IN SUPPORT OF
DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION
OF THE RANIS COMPANY FOR CLASS CERTIFICATION

DARRELL PRESCOTT hereby declares under penalty of perjury:

      1.    I am an attorney admitted to the Bar of the United States District Court for the Eastern District of New York and a principal of the firm Baker & McKenzie LLP, attorneys for Hebei Welcome Pharmaceutical Co., Ltd. ("Hebei"), a defendant in the above-captioned action.    I submit this declaration in support of Defendants' Memorandum of Law in Opposition to the Motion of The Ranis Company, Inc. ("Ranis") for Class Certification.

      2.    Annexed hereto are true and correct copies of the cover page and certain

transcript pages from the June 13, 2007 deposition of Alfred J. Gordon, President of Ranis.

     3.     Annexed hereto are true and correct copies of Exhibits numbered 1-6, 9, 22-73, and 86 produced from the business records of The Graymor Chemical Company ("Greymor") which purports to have assigned the claim to Ranis, as marked at the June 13, 2007 deposition of Alfred J. Gordon (highlighting provided).

     4.     Annexed hereto as Exhibits A-E and J-L are true and correct copies of documents cited in Defendants' Memorandum of Law in Opposition to the Motion of the Ranis Company, Inc. for Class Certification at pages 6-7, 9, 25, 29 and 32 (highlighting provided).

     5.     Annexed hereto as Exhibits F-I are true and correct copies of business records produced by Ranis from the files of Graymor and cited in Defendants' Memorandum of Law in Opposition to the Motion of the Ranis Company, Inc. for Class Certification at pages 15-17 and 28-29 (highlighting provided).

Dated: August 2, 2007

 

 

DARRELL PRESCOTT    DP-0275

## Robert Conway

| | |
|---|---|
| From: | "Robert Conway" <rconway@graymorusa.com> |
| To: | "David Kang" <dkang25@hotmail.com> |
| Sent: | Wednesday, September 24, 2003 11:18 AM |
| Subject: | Re: Status of our P.O. Nos. 4887 + 4888 (5 FCLS ex-Hebei Welcome) |

Dear Mr. Kang,

Thank you for your phone call and subsequent email message of today.

We believe that Hebei Welcome's revealing of Graymor's name to DNP was not intentional and that they just wanted to clear the material promptly for our release. Of course, had Pacific Chemicals been notified of the details by Hebei Welcome, we are sure you would have contacted Graymor and asked how we wanted to handle the release to which we would have answered for Hebei Welcome to use the names of our freight forwarders, Charles M. Shayer and Jumbo Transport as the consignee which would have avoided revealing Graymor's name to DNP.

We are relieved that you were able to have Hebei Welcome change the consignee to our freight forwarder's name, Jumbo Transport for the 2 FCLS in Chicago.

We now need to learn from Rich Shipping when the 2 FCLS in LA and the 2 FCLS in Chicago are legally released to Graymor and Jumbo so we can take possession of the goods.

We will keep you updated.

Thanks again for your assistance in this matter.

Best regards,

Rob Conway

----- Original Message -----
From: "David Kang" <dkang25@hotmail.com>
To: <rconway@graymorusa.com>
Sent: Wednesday, September 24, 2003 9:13 AM
Subject: Re: Status of our P.O. Nos. 4887 + 4888 (5 FCLS ex-Hebei Welcome)


> Dear Mr. Conway,
>
> We are sorry that Graymor is known by DNP in the transaction. I believe
> Hebei Welcome did not intend to do so.
>
> For the rest 2 fcls to Chicago, Hebei agreed to put Jumbo Transport as the
> consignee, which means Graymor did not show in the documentation for the
two
> fcls. I believe DNP would not know anything about Graymor here.
>
> For the fcl to NY, everything would be fine. Hebei has changed the
consignee
> to Graymor before the fcl arrives and Graymor would be clearing the
custom.
> It is just like the normal shipment.
>
> Hebei also told me the story about the 5 fcls. It was bought by DNP

9/24/03

**Confidential**
**Attorneys' Eyes Only**
**RAN00824**

> initially but when the products were shipped, DNP wanted Hebei to reduce
> price. Hebei got so angry with DNP and refused their request. It happened
> just when Chinese had a meeting to have production control. When DNP
learned
> the news and wanted to keep the five containers, Hebei refused it and sold
> them to us. It is Hebei's intention that DNP can never buy from Hebei
> because of its bad practice.
>
> Please make payment accordingly once you check everything is fine.
>
> Thanks and best regards
>
> David
>
>
>
> >From: "Robert Conway" <rconway@graymorusa.com>
> >Reply-To. "Robert Conway" <rconway@graymorusa.com>
> >To: "David Kang" <dkang25@hotmail.com>
> >Subject: Status of our P.O. Nos. 4887 + 4888 (5 FCLS ex-Hebei Welcome)
> >Date: Tue, 23 Sep 2003 15.29:31 -0400
> >
> >Dear Mr. Kang,
> >
> >Today I spoke with Shan Zhao at Rich Shipping Company, Ltd. in Los
Angeles.
> >
> >Please note that M.s Zhao's contact information is as follows:
> >
> >Telephone: (323) 446-8855
> >Fax       (323) 980-8033
> >Email:    szhao@richshipping.com
> >
> >Ms. Zhao informed me about the following status of the 2 FCLS in Los
> >Angeles
> >and the 2 FCLS in Chicago. She didn't have any information on the 1 FCL
> >direct to NY.
> >
> >2 FCLS ex-Los Angeles:
> >-------------------------
> >1) 1 FCL cleared customs and DDC charge and has been warehoused at the
> >terminal since 9-2-03 for additional charge of US$1020.00 demurrage
charge.
> >
> >Remarks: DNP sent release form to Rich Shipping showing Graymor Chemical
as
> >consignee. We are now waiting for customs to allow Rich Shipping to
release
> >possession of the FCL to Graymor Chemical. Upon release (hopefully 1-2
> >days)
> >we can pay Hebei Welcome for the goods.
> >
> >2) 1 FCL in LA for transshipment NY
> >
> >As above this product has cleared customs, DDC has been paid possibly
> >additional charge of US$1020.00 demurrage charge as above. Rich Shipping
> >informed me that Hebei Welcome would also be paying the transshipment to
> >NY.
> >
> >Remarks: DNP has also released the goods to Graymor Chemical. We are
> >waiting

9/24/03

**Confidential
Attorneys' Eyes Only
RAN00825**

>>for Rich Shipping to advise us when the FCL is official Graymor's.
>>
>>2 FCLS ex-Chicago:
>>------------------------
>>
>>Ms. Zhao informed me the Hebei Welcome must urgently have the 2 FCLS
>>cleared
>>by customs, otherwise they will go to G.O. status which means they will be
>>warehoused with additional demurrage charges the same a in LA. Rich
>>Shipping
>>would take care of the transshipment to NY and bill Hebei Welcome direct.
>>
>>Remarks: Hebei Welcome must have DNP customs clear the 2 FCLS in Chicago
>>and release the goods to Hebei Welcome and/ or Graymor Chemical.
>>
>>1 FCL en-route NY:
>>--------------------
>>
>>We have no information on this FCL, is this also to DNP, if so Hebei
>>Welcome
>>must again negotiate with DNP the clearing of the goods and their release
>>to
>>Graymor's possession.
>>
>>
>>Conclusion:
>>-------------
>>
>>Mr Kang, Graymor is not happy that DNP knows that we have taken
possession
>>of these containers. Had Hebei Welcome given you more details, we could
>>have
>>worked with Pacific Chemicals to have Hebei Welcome request DNP to
release
>>the FCLS to Hebei Welcome and Hebei Welcome would in turn release the
FCLS
>>to Graymor without DNP's knowledge.
>>
>>Now that DNP knows that Graymor knows their last price, they will
pressure
>>Northeast and Weisheng to offer even lower prices in the market which may
>>affect our prices causing a price war. This is the last thing Graymor,
>>Pacific Chemicals or Hebei Welcome needs as the market is already
volatile
>>
>>Please clarify the above points with Hebei Welcome (Graymor does not want
>>to
>>be in contact with DNP) and also feel free to contact Ms. Shan Zhao
should
>>you wish to get more information directly from the person handling these
>>above said 4 FCLS.
>>
>>Thanks and best regards,
>>
>>Rob Conway
>>
>>P.S. Mr. Kang you need to also get Hebei Welcome to update the contact
>>information for Rich Shipping which is two years old.
>>
>>

9/24/03

**Confidential
Attorneys' Eyes Only
RAN00826**

> >---- Original Message ---
> >From: "David Kang" <dkang25@hotmail.com>
> >To: <rconway@graymorusa.com>
> >Sent: Tuesday, September 23, 2003 10:58 AM
> >Subject: Re: Our Customer Confirms Receiving Graymor's Proposal
> >
> >
> > > Dear Mr Cobway,
> > >
> > > Thank you for your confirmation.
> > >
> > > We are also confident to work with Graymor to win the bid.
> > >
> > > In addition, I received documents for 3 fcls (1 to NY, 2 to LA) and am
> > > faxing to you. The fcl to NY will be arriving in a few days; the two
> >fcls
> >to
> > > LA have arrived: you can pick up one for your LA customer and tranship
> >the
> > > another one to NY, in which case Hebei Welcome will pay the
transhipment
> > > fees.
> > >
> > > Regarding the two fcls to Chicago, Hebei will have the changes done by
> > > tomorrow. Hebei would need Graymor to tranship the fcls to NY at
Hebei's
> > expense.
> > >
> > > Please advise the transhipment fees once available.
> > >
> > > Regards
> > >
> > > David
> > >
> > >
> > > >The Graymor Chemical Company, Inc.
> > > >Corporate Headquarters
> > > >40 Parker Road, Suite 210
> > > >Elizabeth, New Jersey 07208 USA
> > > >
> > > >Tel #: 00 1 (908) 354-3100
> > > >Fax:# 00 1 (908) 353-0819
> > > >Email: rconway@graymorusa.com
> > > ><< RobertConway.vcf >>
> > >
> > >
> > > The new MSN 8: advanced junk mail protection and 2 months FREE*
> > > http://join.msn.com/?page=features/junkmail
> > >
> > >
> >
>
>
> Protect your PC - get McAfee.com VirusScan Online
> http://clinic.mcafee.com/clinic/ibuy/campaign.asp?cid=3963
>
>

9/24/03

Confidential
Attorneys' Eyes Only
RAN00827

Rob Conway

| | |
|---|---|
| From: | David Kang [dkang25@hotmail.com] |
| Sent: | Tuesday, September 21, 2004 6:40 PM |
| To: | rconway@graymorusa.com |
| Subject: | RE: Your Visit at JSPC |

Dear Mr. Conway,

The meeting with the manager of JSPC will be on 25 sep and I will update the
developments then.

The market seems to be waiting for some strong force to turn around
dramatically.

I am in Jiangsu Province now and will be Jiangsu Jingjiang in three days.

Regards

David Kang

>From: "Rob Conway" <rconway@graymorusa.com>
>To: "'David Kang'" <dkang25@hotmail.com>
>Subject: RE: Your Visit at JSPC
>Date: Tue, 21 Sep 2004 14:49:06 -0400
>
>Dear Mr. Kang,
>
>Following up on your visit to JSPC.
>
>Hoping your meetings were productive.
>
>Any new information on pricing in the coming weeks?
>
>Best regards,
>
>Rob Conway
>
>-----Original Message-----
>From: David Kang [mailto:dkang25@hotmail.com]
>Sent: Thursday, September 16, 2004 9:14 AM
>To: rconway@graymorusa.com
>Subject  RE: Your Visit at JSPC
>
>Dear Mr. Conway,
>
>Thank you for your email.
>
>We do appreciate your understandings of our cooperation and potential
>of
>
>successes in the future and we will try our best to get compensating
>prices from JSPC.
>
>I heared that Hebei Welcome will increase its prices of Ascorbic Acid
>from next week. Please keep alert of any change of market signal so
>that we do
>not miss any possible buying opportunities.
>
>I will meet JSPC next week and keep you informed of any developments.
>
>Best regards
>

**Confidential
Attorneys' Eyes Only
RAN00570**

>David Kang
>
>Pacific Chemicals Inc.
>
> >
> >From: "Rob Conway" <rconway@graymorusa.com>
> >To: <dkang25@hotmail.com>
> >Subject: Your Visit at JSPC
> >Date: Wed, 15 Sep 2004 14:55:44 -0400
> >
> >Dear Mr. Kang,
> >
> >We are in receipt of your today's email.
> >
> >At this point, we will wait for your meeting with JSPC asking for
>better
> >prices for future spot business  We certainly hope you are correct
>about
> >possible dramatic price increases as we have seen over the past two
> >years  In such cases where the Chinese manufacturers might dishonor
> >long-term contracts our two companies may find future business
> >opportunity.
> >
> >David, I have known you now for eight years and Graymor has worked
> >with Pacific Chemicals at least two years. I believe we will find a
> >solution to our current situation and that we will all be a lot more
> >sharper
>from
>both the suppliers and end-users the next time around.
> >
> >Good luck with your visit.
> >
> >Best regards,
> >
> >Rob Conway
> >
> >
> >The Graymor Chemical Company, Inc.
> >Corporate  Headquarters
> >40 Parker Road, Suite 210
> >Elizabeth, New Jersey   07208   USA
> >
> >Tel #: 00 1 (908) 354-3100
> >Fax:# 00 1 (908) 353-0819
> >Email: rconway@graymorusa.com
> >
> >
>
>Take charge with a pop-up guard built on patented Microsoft®R
>SmartScreen
>
>Technology
>http://join.msn.com/?pgmarket=en-ca&page=byoa/prem&xAPID=1994&DI=1034&S
>U
>=http://hotmail.com/enca&HL=Market_MSNIS_Taglines
>  Start enjoying all the benefits of MSNR Premium right now and get the
>first two months FREE*.
>
>

Scan and help eliminate destructive viruses from your inbound and outbound
e-mail and attachments
http://join.msn.com/?pgmarket=en-ca&page=byoa/prem&xAPID=1994&DI=1034
&SU=http://hotmail.com/enca&HL=Market_MSNIS_Taglines
  Start enjoying all the benefits of MSN® Premium right now and get the
first two months FREE*.

2

**Confidential**
**Attorneys' Eyes Only**
**RAN00571**

A-194

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE**<br>**VITAMIN C ANTITRUST LITIGATION**<br><br>**This Document Relates The Following Case:**<br><br>• *Animal Science Products, Inc., et al. v. Hebei Welcome Pharmaceutical Co., Ltd., et al.*, Case No. 1:05-CV-00453 (DGT)(JO) (E.D.N.Y.) | **MASTER FILE 1:06-MD-1738 (DGT)(JO)**<br><br>**DECLARATION OF**<br><br>**YANG JIANFU**<br><br>**IN SUPPORT OF MOTION OF**<br><br>**NORTH CHINA PHARMACEUTICAL GROUP CORP.**<br><br>**TO DISMISS THE COMPLAINT** |

Yang Jianfu hereby declares as follows:

1.     I am the Deputy General Manager of North China Pharmaceutical Group Corporation (hereinafter "NCP Group Corp."), and have been with NCP Group Corp. since 1996. In this capacity I have knowledge of the books, records, and operations of NCP Group Corp. I have read the Second Amended Complaint in the above-captioned action and submit this declaration in support of NCP Group Corp.'s motion to dismiss.

2.     My statements made in this declaration are based upon my personal knowledge, my review of documents prepared and maintained by NCP Group Corp. in the ordinary course of business, and upon information provided by NCP Group Corp. employees responsible for and with knowledge of the business or accounting records of NCP Group Corp.

3.      NCP Group Corp. is an investment holding company, formerly known as North China Pharmaceutical Factory, organized in 1953 under the laws of the People's Republic of China. Its one and only office is located at 388 Heping East Road, Shijiazhuang, Hebei, China.

4.      NCP Group Corp. is owned by the State-Owned Assets Supervision and Administration Commission of Hebei Province ("SASAC"). Although there are other minority ownerships in NCP Group Corp., it is a state-owned company established under the laws of the People's Republic of China.

5.      NCP Group Corp. owns directly or indirectly predominant stakes in defendants North China Pharmaceutical Co., Ltd. ("NCPC Limited") and in North China Pharmaceutical Group International Trade Co., Ltd., (formerly known as North China Pharmaceutical Group Corporation Import and Export Trade Co., Ltd) ("NCPC I&E"). Although others own smaller numbers of shares in these entities, the predominant stake is held by NCP Group Corp., and all these entities are separate legal entities indirectly state-owned by SASAC.

6.      Defendant NCPC Limited owns defendant Hebei Welcome Pharmaceutical Co., Ltd. ("Hebei Welcome"), in which it holds a majority share, although there are other owners with minority interests, thereby making NCP Group Corp. an indirect owner in Hebei Welcome as well.

7.      In essence, NCP Group Corp. is an investment vehicle whereby SASAC holds interest in a variety of corporate business entities. NCP Group Corp. itself does not engage in the production, manufacture or sale of any products itself, leaving such activities to these various separate corporate subsidiary entities.

8.      Specifically as regards the various entities named as defendants in this litigation, NCP Group Corp., NCPC I&E, NCPC Limited and Hebei Welcome are all separate legal entities,

**A-196**

each with its own corporate staff, management, officers and directors. Each functions separately with separate responsibility for its day to day business activities. In particular, NCP Group Corp. does not involve itself in the day to day activities of any of the three other entities, relating to them solely in the manner that a predominant shareholder normally relates to a subsidiary corporation, observing all necessary corporate formalities and requirements. None of these companies interjects itself in the day-to-day business of any other, and each maintains its own separate records, assets and accounts.

9.     Specifically as regards defendant Hebei Welcome, where NCP Group Corp. has an indirect ownership interest, NCP Group Corp. relates to it only in the general way a predominant shareholder would relate to a subsidiary, nominates directors of Hebei Welcome as a shareholder would in accordance with applicable laws, but strictly maintains a corporate separation. NCP Group Corp. does not participate in, control, manage, administer, coordinate, or otherwise directly involve itself in any of Hebei Welcome's business decisions related to the production, pricing, marketing, and sale of Hebei Welcome's Vitamin C products.

10.     The officers of Hebei Welcome have been entirely separate and distinct from those of NCP Group Corp., with the limited exception that the President of Hebei Welcome is also an officer of NCP Group Corp. Prior to 2003, another individual was the General Manager of NCP Group Corp. and also a director of Hebei Welcome. However, these individuals have at all times kept and performed their functions entirely separately, always acting solely in their capacity with Hebei Welcome when involving themselves in the day to day business activities of Hebei Welcome.

11.     NCP Group Corp. has never been qualified, authorized or registered to do business in New York, let alone anywhere else in the United States. NCP Group Corp. has never

## A-197

had or maintained a registered agent for service of process in New York, let alone anywhere else in the United States.

     12.    NCP Group Corp. does not own or lease any real property in New York, let alone anywhere else in the United States.

     13.    NCP Group Corp. does not have any offices, manufacturing plants, distribution centers, facilities or any other place of business in New York, let alone anywhere else in the United States. NCP Group Corp. has never maintained any inventory of products for sale in New York, let alone anywhere else in the United States.

     14.    NCP Group Corp. does not have a bank account, post office box, a telephone listing, a facsimile listing or electronic mail listing anywhere in New York, let alone anywhere else in the United States.

     15.    To my knowledge, since January 1, 2000, no NCP Group Corp. employees have made business travels to the United States to conduct manufacture, production, sale or marketing of vitamin C. Only few people made isolated trips to the United States on unrelated matters.

     16.    NCP Group Corp. has never filed, nor been required to file, any income tax returns or filings in New York or anywhere else in the United States.

     17.    NCP Group Corp. has never commenced any lawsuit in any court in New York or anywhere else in the United States. Indeed, the only litigation in which it is involved is the instant case.

     18.    NCP Group Corp. has never directly sold, solicited sales of, or marketed any vitamin C products in New York or anywhere else in the United States.

**A-198**

19. NCP Group Corp. has not entered into any business contracts with any resident or business located in New York or anywhere else in the United States or conducted any regular commercial business in New York or anywhere else in the United States.

20. Specifically as regards the allegations in the Second Amended Complaint, NCP Group Corp. has never participated in any meeting of the Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China as alleged therein, nor has it participated in any conspiracy as alleged therein. Without limiting the foregoing, no NCP Group Corp. agent, officer or employee has ever participated in that capacity in any meeting as alleged in paragraphs 49, 52-54 or 60-62 of the Second Amended Complaint. No one from NCP Group Corp., including specifically the sole person in NCP Group Corp. who has also held an officer position in Hebei Welcome since 2003, has ever been elected Vice President of a subcommittee as alleged in paragraph 54.

21. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

In witness whereof, I have executed this declaration on this 11th day of April, 2008, by signing or affixing my personal Chop.

[Yang Jianfu's signature]

**A-199**

# 方達律師事務所

## FANGDA PARTNERS

上海 Shanghai • 北京 Beijing • 深圳 Shenzhen
http://www.fangdalaw.com

中国北京市建国门外大街 1 号
国贸大厦 1 座 35 楼
邮政编码：100004

35/F, China World Tower 1
No. 1, Jian Guo Men Wai Avenue
Beijing 100004, PRC

电子邮件 E-mail: email@fangdalaw.com
电 话 Tel.: 86-10-6505-5557
传 真 Fax: 86-10-6505-8997
文 号 Ref.: 07DR028

## Certificate of Accuracy

I, Wang Xiaomeng, am fluent in Chinese and English and certify that the attached translation which I have made is a true and correct translation of the original document.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 14, 2008

**A-200**

美国联邦地区法院
纽约东区

| | |
|---|---|
| 有关<br>维生素 **C** 反垄断诉讼<br><br>本文件适用于以下案件：<br><br>• *动物科学制品公司等人诉河北维尔康制<br>  药有限公司等人*，案件号：1:05-CV-<br>  00453(DGT)(JO) (E.D.N.Y.) | 司法档案 1:06-MD-1738<br>(DGT)(JO)<br><br><br>杨建福<br>为支持华北制药集团有限责任公司驳回起<br>诉状动议的声明书 |

杨建福在此声明如下：

1.　　我现任华北制药集团有限责任公司（以下简称"华药集团公司"）的副总经理，我自 1996 年就加入了华药集团公司。因此我了解华药集团公司的账簿、记录和经营情况。我已阅读了题述案件中第二次修改后的起诉状，在此提交本声明书支持华药集团公司驳回起诉的动议。

2.　　我在本声明书中所做陈述都是根据我个人所知道的情况，我所看过由华药集团公司在正常经营活动中准备并保存的文件，以及由负责并知晓华药集团公司的业务或会计记录的华药集团公司员工所提供的信息。

1

CONFIDENTIAL AND LAWYERS ONLY

3. 华药集团公司是一家投资控股公司，依据中华人民共和国法律成立于 1953 年，其前身是华北制药厂。其有且仅有一处办公场所，位于中国河北省石家庄市和平东路 388 号。

4. 华药集团公司为河北省国有资产监督管理委员会（"国资委"）所有。虽然还有少量华药集团的股份为其他人持有，华药集团是依据中华人民共和国法律成立的国有公司。

5. 华药集团公司直接或间接地持有被告华北制药股份有限公司（"华药股份"）和华北制药集团国际贸易有限公司（其前身为华北制药集团进出口贸易有限责任公司）（"华药进出口"）具有支配地位的股权。虽然还有他人持有这两个实体的、与华药集团公司相对数量相对较少的股份，华药集团公司持有这两个公司具有支配地位的股权，所有这些实体都是间接为国资委持有的国有独立法人。

6. 被告河北维尔康制药有限公司（"河北维尔康"）为被告华药股份所有，虽然有少量股权为其他人所有，但华药股份持有河北维尔康的多数股权，从而使得华药集团公司成为河北维尔康的间接所有者。

7. 实际上，华药集团公司是国资委借以在各个商业公司实体中持有利益的投资工具。华药集团公司本身并不从事任何产品的生产、制造或销售，而是将这些活动交由各个独立的子公司实体进行。

8. 具体关于在本诉讼中被列为被告的各个实体——华药集团公司、华药进出口、华药股份和河北维尔康都是独立的法人实体，它们各自有各自的公司员工、管理层、管理人员和董事。各个公司都独立运行，单独对各自的日常商业活动负责。特别是华药集团公司本身并没有牵涉到另外三个实体中任何一个的日常活动中，与它们之间的关系仅仅是

2

CONFIDENTIAL AND LAWYERS ONLY

**A-202**

具有支配地位的股东与其子公司的正常关系，遵守了所有必要的公司程序和要求。这些公司并没有任何一个插手其他公司的日常经营，而且每一个公司都保留各自独立的档案、资产和帐户。

9.　　　具体关于被告河北维尔康，华药集团公司间接拥有河北维尔康的股权，与它的关系仅仅是具有支配地位的股东与其子公司应有的一般关系，作为股东依法选派河北维尔康的董事，但仍然严格保持公司的独立性。华药集团公司没有参与、控制、管理、执行、协调或以其他方式直接涉足河北维尔康有关其维生素 C 产品的生产、定价、营销和销售的商业决策。

10.　　河北维尔康的管理人员与华药集团公司的管理人员一直是完全独立并互不相同的，其中有限的例外是河北维尔康的董事长也是华药集团公司的管理人员。2003 年之前，一位个人在担任华药集团公司总经理的时候也兼任河北维尔康的董事。但是，这些个人一直都能区分并分别履行不同的职能，当他们参与河北维尔康的日常商业活动时，一直都是只行使其在河北维尔康担任职务的职能。

11.　　华药集团公司从来没有取得在美国纽约州营业的资格，或得到营业的授权或进行营业登记，更不必说在美国的其他地方。华药集团公司从来不曾拥有或保留注册的代理人接受纽约州的送达程序，更不必说美国的其他地方。

12.　　华药集团公司在美国纽约州不拥有或租赁任何不动产，更不必说在美国的其他地方。

13.　　华药集团公司在美国纽约州没有任何办公室、生产工厂、配销中心、设施或其它任何营业地，更不必说在美国的其他地方。华药集团公司从来没有在美国纽约州保留任何供销售的产品存货，更不必说在美国其他地方。

3

CONFIDENTIAL AND LAWYERS ONLY

14. 华药集团公司在美国纽约州没有银行账户、邮政信箱、电话清单、传真清单或电子邮件清单，更不必说在美国的其他地方。

15. 就我所知，自 2000 年 1 月 1 日以来，华药集团公司没有派人员前往美国从事维生素 C 的制造、生产、销售或营销活动。只有少量人员去美国，也仅仅是与此不相关的单独的行程。

16. 华药集团公司从来没有在美国纽约州或美国其他地方提交或被要求提交任何所得税退回或申报。

17. 华药集团公司从来没有在美国纽约州或美国其他地方的法院提起任何诉讼。实际上，华药集团公司唯一被牵涉到的诉讼就是当前的诉讼。

18. 华药集团公司从来没有在美国纽约州或美国其他地方直接销售、兜售、营销任何维生素 C 产品。

19. 华药集团公司没有与美国纽约州或美国其他地方的任何居民或企业签订任何商业合同，或在美国纽约州或美国其他地方进行任何常规商业交易。

20. 具体关于第二次修改后的起诉状中的指控，华药集团公司从来没有参加过任何起诉状中所称的中国医药保健品进出口商会西药部的会议，也没有参与其中所称的任何共谋。不限于前文所述，没有任何华药集团公司的代理、管理人员或员工曾经因其职能代表公司出席第二次修改后的起诉状中第 49、52-54、60-62 段所称的会议。没有任何来自华药集团公司的人，特别包括华药集团公司的、同时从 2003 年起在河北维尔康任管理职务唯一一个人，如第 54 段所述被选举为分会的副会长。

21. 我在美国法律作伪证将受到惩罚的规定下宣誓：在我所知范围内以上所述皆真实无误。

4

CONFIDENTIAL AND LAWYERS ONLY

**A-204**

特此证明，本人于 2008 年 4 月 _11_ 日以签名和加盖个人印章的形式签署本声明书。

（以上共5页）

5

CONFIDENTIAL AND LAWYERS ONLY

Case 1:06-md-01738-BMC-JO   Document 306-3   Filed 06/09/08   Page 1 of 3 PageID #: 6062

Authorized Translation

# 中 华 人 民 共 和 国 商 务 部

## MINISTRY OF COMMERCE OF THE PEOPLE'S REPUBLIC OF CHINA
## 2, DONG CHANG'AN STREET, BEIJING, CHINA 100731

### STATEMENT IN *IN RE* VITAMIN C ANTITRUST LITIGATION

June 9, 2008

### Introduction

*Amicus* The Ministry of Commerce of the People's Republic of China (the "Ministry") authorizes its Department of Treaty and Law to respectfully submit this Statement (together with an authorized English translation) in response to plaintiffs' April 24, 2008 Supplemental Memorandum in Opposition to Defendants' Motion to Dismiss ("Supplemental Opposition"). At the outset, the Ministry would like to express its continuing appreciation to this Court for permitting the Ministry to submit to the Court the official views of the People's Republic of China.

The Ministry would also like to take this opportunity to ratify the *amicus* filing that was submitted previously on its behalf. Although in filing that brief the Ministry followed the procedures advised by the U.S. State Department with respect to the preferred method by which a foreign government should make its views known to a U.S. court, the Ministry wants the Court to know that it participated actively in the drafting of that brief, which was reviewed and edited word-for-word in Beijing by officials of the Ministry and the U.S. counsel engaged by the Ministry. That brief accurately sets forth the views and understandings of certain PRC government agencies, serving as an official view on behalf of the Ministry. The Ministry's U.S. counsel, acting within the scope of its authorization,

submitted relevant documents to this Court on behalf of the Ministry in line with U.S. law and applicable procedures. The Ministry will assume the Court's familiarity with the contents of its *amicus* brief and will not repeat the facts or arguments it contains.

## The Regulatory Regime

The Supplemental Opposition reflects a misunderstanding of the nature of the PRC government's regulation of the vitamin C industry that the Ministry's initial *amicus* brief was intended to dispel. Throughout their submission, plaintiffs trivialize China's organs of regulation where those organs differ in structure or function from ones more familiar to the plaintiffs.

As explained in the Ministry's *amicus* brief, the system of regulation the Ministry imposed on China's vitamin C export industry centered around a process not a price. The Ministry was careful to direct its U.S. counsel to explain to the Court that specific chambers of commerce, ***when authorized by the Ministry to regulate***, act in the name, with the authority, and under the active supervision, of the Ministry. When acting in this manner, a chamber performs a governmental function so authorized under Chinese law. In this case, the Ministry specifically charged the Chamber of Commerce of Medicines and Health Products Importers and Exporters (the "Chamber") with the authority and responsibility, subject to Ministry oversight, for regulating, through consultation, the price of vitamin C manufactured for export from China so as to maintain an orderly export.

In summary, the Ministry wishes that this Court would continue to trust and adopt the views contained in the *amicus* brief submitted by the Ministry, and support the Defendants' Motion to Dismiss.

Accordingly, the Chinese government respectfully submits that, to the extent the plaintiffs take issue with the Chinese government's sovereign actions over the conduct

solely of its own citizens, that issue should not be addressed in the courts of the United States but rather through bilateral trade negotiations conducted by the executive branches of the respective sovereign nations involved consistent with recognized norms of international law and diplomacy.

Respectfully submitted,

Department of Treaty and Law
Ministry of Commerce of the
People's Republic of China

[affixed seal]

3

# Greenberg
# Traurig

August 26, 2008

**VIA HAND DELIVERY & ECF**

The Honorable James Orenstein
United States Magistrate Judge
U.S. District Court, Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:    **In re: Vitamin C Antitrust Litigation - Opposition to Motion to Compel**

Dear Magistrate Judge Orenstein:

Defendant Northeast Pharmaceutical Group Co., Ltd. ("NEPG") submits this opposition to Plaintiffs' August 21, 2008 motion seeking to compel the production of documents[1] prepared by or for NEPG in connection with the defense of this litigation ("Motion"). Plaintiffs improperly seek "the production of written statements and mental impressions" of NEPG's counsel and employees without any showing of "necessity," "prejudice," "hardship or injustice," *Hickman v. Taylor*, 329 U.S. 495, 508 (1947), based on their contention that NEPG waived its protection by sending the documents to the Ministry of Commerce ("Ministry") and other entities of the People's Republic of China ("PRC").[2] Plaintiffs' argument lacks merit. The documents reflect advice, opinions, and mental impressions of counsel, and are protected from discovery by the work product doctrine. *See* Fed. R. Civ. P. 26(b)(3). The documents also all reflect confidential attorney-client communications and are further protected by the "common interest rule."

## I.    NEPG Has Not Waived Work Product Protection For the Challenged Documents

The work product doctrine protects from discovery all "documents...that are prepared in anticipation of litigation...by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). Its purpose is to "preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman*, 134 F.3d 1194, 1196 (2nd Cir. 1998) (quoting *Hickman*, 329 U.S. at 510-11). The Federal Rule offers heightened protection for the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative." Fed. R. Civ. P. 26(b)(3)(B). Plaintiffs do not dispute that most of the documents are work product,[3] but rather contend that such protection was waived.

---

[1] All references to document numbers herein correspond with the numbers on NEPG's Revised Privilege Log ("Priv. Log"), which was attached to Plaintiffs' Motion as Exhibit A.
[2] Seven of the documents were sent to the Ministry, and one each was sent to the Ministry of Foreign Affairs ("MOFA") and the Shenyang Municipal Bureau of Foreign Trade and Economic Cooperation ("SMBFTEC").
[3] Priv. Log. Nos. 3 and 4 are work product because they were prepared *for* a party – NEPG and the Defendants. *See* Fed. R. Civ. P. 26(b)(3)(A). The fact that the amicus brief itself was prepared for the Court, Motion at 3 n.9, is

The Honorable James Orenstein
August 26, 2008
Page 2

However, when a party shares its work product, the protection is waived only if such disclosure "substantially increased the opportunities for potential adversaries to obtain the information." *In re Visa Check/Master Money Antitrust Litig.*, 190 F.R.D. 309, 314 (E.D.N.Y. 2000) (citations omitted).[4]  Plaintiffs did not – and cannot – assert that NEPG's sharing of documents increased the likelihood of their disclosure to Plaintiffs.  Indeed, there was *no* possibility that the PRC would allow opinion work product related to the defense of this litigation to fall into Plaintiffs' hands particularly given the common legal interest it shares with NEPG (*see* Point II, *infra*).  The cases cited by Plaintiffs in support of their contention that work product protection was waived due to NEPG's voluntary disclosure to the government "in an effort to enlist its help against a litigation opponent," Motion at 3, do not stand for such a proposition and are plainly inapposite.[5]  There is no such waiver where, as here, "the disclosing party and the government…share a common interest in developing legal theories and analyzing information."  *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993).  Here, the communications involved the PRC's interest in developing legal strategies directly related to this litigation.

## II.     The Challenged Documents Are Protected by the Common Interest Rule

The challenged documents are also shielded from discovery by the joint defense privilege, or "common interest rule." This privilege is an "extension of the attorney client privilege," *U.S. v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989), that protects confidential attorney-client communications between individuals who "share a common interest about a legal matter." *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y. 1996).[6]  The key inquiry is whether the parties "demonstrate actual cooperation toward a common legal goal" and whether the parties undertook a coordinated legal strategy. *Shamis v. Ambassador Factors Corp.* 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999). The common interest rule applies to communications with non-parties to a litigation when such a common legal interest exists. *Gen. Elec. Co. v. Prince*, No. 06CIV0050 (SAS)(MHD), 2006 WL 3741114 at *1 (S.D.N.Y. Dec. 19, 2006).

The relationship between the Ministry as regulator and the Defendants as regulated parties, together with the Ministry's active involvement in the case, demonstrates the existence of a

---

irrelevant, as that is not the document being challenged.
[4] *See also E.B. v. N.Y. City Bd. of Educ.*, 2007 WL 2874862 at *6 (E.D.N.Y. Sept. 27, 2007); *In re Grand Jury Subpoenas Dated Dec. 18, 1981 and Jan. 4, 1982*, 561 F. Supp. 1247, 1257 (E.D.N.Y. 1982). This is because "there may be legitimate reasons to disclose attorney work product to persons outside the attorney-client relationship." *Bank of Am. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 169 (S.D.N.Y. 2002). Indeed, work product may be shared with third-parties without waiving the protection "simply because there [is] some good reason to show it." *U.S. v. Adlman*, 134 F.3d 1194, 1200 n.4 (2d Cir. 1998).
[5] In all of their cited cases, the disclosure is an attempt to persuade the government to pursue a competitor or adversary. *See, e.g., Info. Res., Inc. v. Dun & Bradstreet Corp.*, 999 F. Supp. 591, 593 (S.D.N.Y. 1998).
[6] While the *Walsh* case declines to extend the privilege to communications between non-attorneys, Motion at 2-3, it does not proscribe its application to a privileged communication *from* an attorney to a client which is then transmitted by the client to a non-attorney third-party with which it shares a common interest. *See Walsh*, 165 F.R.D. at 18-19. Indeed, a document need not be written by or for a lawyer to be privileged if it reflects the advice of counsel. *See Bank Brussels Lambert v. Credit Lyonnaise (Suisse) S.A.*, 160 F.R.D. 437, 442 (S.D.N.Y. 1995).

The Honorable James Orenstein
August 26, 2008
Page 3

common legal interest and strategy. Shortly after these lawsuits began, the Defendants entered into Joint Defense Agreements ("JDAs")[7] with the China Chamber of Commerce of Medicines & Health Products Importers & Exporters (the "Chamber") and its counsel, as well as an oral agreement with the Ministry that they share a common legal interest in opposing and dismissing this litigation.[8] In addition, the contested documents make clear that both the Ministry and the Chamber have been actively involved in coordinating and approving Defendants' legal strategy.[9]

The Ministry's use of the "amicus curiae" vehicle to express its views does nothing to diminish its unambiguously stated common interest with Defendants.[10] Further, Plaintiffs ignore the Ministry's "Statement in In re Vitamin C Antitrust Litigation," submitted in further support of the Motion to Dismiss ("Statement"), which strengthens the common interest rule claim. While sharing a desire to succeed is not enough alone to establish a common interest, the Ministry's submissions make clear that it believes it has a compelling legal interest in the issues and defenses raised in this litigation, which has attacked the propriety of its state-mandated regulatory scheme. *See* Exh. C, Brief of Amicus Curiae ("Amicus Brief") at 1-2 (a finding of liability "would improperly penalize defendants for the sovereign acts of their government and would adversely affect implementation of China's trade policy"); Exh. D Statement at 2-3 ("[T]o the extent the plaintiffs take issue with the Chinese government's sovereign actions over the conduct solely of its own citizens, that issue should not be addressed in the courts of the United States but rather through bilateral trade negotiations."). As such, the nine challenged documents are protected by the joint defense privilege, or common interest rule.[11]

Based on the foregoing, along with the appendix of documents provided ex parte for in camera review, all nine documents are protected from discovery by the work product doctrine and the common interest rule. As such, NEPG requests that the Plaintiffs motion to compel be denied.

Respectfully Submitted,

Kenneth A. Lapatine

---

[7] The JDAs provide that                                    Redacted

[8] Defendants understand that the Ministry will be seeking the Court's consent to be heard in opposition to the Motion with respect to documents that it either received or authored.

Redacted

[10] Indeed, the U.S. State Department prefers that a foreign government wishing to state its views do so through an amicus brief. An amicus need not be wholly disinterested. *See, e.g., Concerned Area Residents for The Env't v. Southview Farm*, 834 F.Supp. 1410, 1413 (W.D.N.Y. 1993). Contrary to Plaintiff's contention, the Ministry was not merely "informing" the Court of its views, Motion at 2, and its Amicus Brief is plainly not impartial.
[11] All of the communications here are protected because the Ministry has expressed the "official views" of the PRC (Statement at 1). MOFA and SMBTEC are as agencies of the PRC and share a common interest with the Defendants; MOFA because this litigation implicates issues of international affairs as well as economic regulatory issues, and SMBFTEC as a local branch of the Ministry.

Exhibit A1

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page63 of 150

# Exhibit A2

Submitted for In Camera Review

Privileged and Confidential

# Exhibit B

Submitted for In Camera Review

Privileged and Confidential

## <u>Appendix to Letter Motion in Opposition to Plaintiffs'</u> <u>Letter Motion to Compel Documents Withheld by NEPG</u>

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page68 of 150

# Exhibit 1A

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page70 of 150

A-220

Exhibit 1B

# A-221

*Entry from NEPG's Revised Privilege Log – July 25, 2008*

| | |
|---|---|
| Privilege Log Entry #: | 1 |
| Bates Numbers: | NEPGPRIV-0001/003 |
| Date: | 20050207 |
| Author: | Wang Renzhi (General Manager of NEP I/E - Export and Import Company of Northeast General Pharmaceutical Factory ("EXIM")) or Wang Zhenghe (EXIM Assistant General Manager) |
| Recipient: | Officers of the Ministry of Commerce of the People's Republic of China |
| Type: | Letter |
| Privilege Claimed: | Attorney-Client<br>Work Product<br>Joint Defense |
| Description: | Letter from NEPG to the officers of the Ministry of Commerce reflecting confidential thoughts, opinions and legal analysis of Ge Yaping (Head of Northeast General Pharmaceutical Factory ("NEGPF") Legal Department) regarding the pending Vitamin C antitrust litigation and potential risks of that litigation. |

Exhibit 1C

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 1D

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 2A

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page77 of 150

A-227

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 2B

*Entry from NEPG's Revised Privilege Log - July 25, 2008*

| | |
|---|---|
| Privilege Log Entry #: | 3 |
| Bates Numbers: | NEPGPRIV-0007/009 |
| Date: | 20050909 |
| Author: | Ministry of Commerce -- Department of Treaty and Law |
| Recipient: | Wang Zhenghe (EXIM Assistant General Manager); Sidley Austin Brown & Wood |
| Type: | Report |
| Privilege Claimed: | Attorney-Client<br>Work Product<br>Joint Defense |
| Description: | Report from Ministry of Commerce sent to outside litigation counsel and NEPG regarding the Ministry's draft amicus curiae brief in connection with the pending Vitamin C antitrust litigation and containing a confidential request for legal advice regarding the legal representation of the Ministry. |

# Exhibit 2C

Submitted for In Camera Review

Privileged and Confidential

Exhibit 3A

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page84 of 150

**A-234**

# Exhibit 3B

*Entry from NEPG's Revised Privilege Log - July 25, 2008*

Privilege Log Entry #:        4

Bates Numbers:               NEPGPRIV-0010/011

Date:                        20050909

Author:                      Ministry of Commerce -- Department of Treaty and Law

Recipient:                   Wang Zhenghe (EXIM Assistant General Manager); Sidley Austin
                             Brown & Wood

Type:                        Report

Privilege Claimed:           Attorney-Client
                             Work Product
                             Joint Defense

Description:                 Report from Ministry of Commerce sent to outside litigation
                             counsel and NEPG regarding the Ministry's draft amicus curiae
                             brief in connection with the pending Vitamin C antitrust litigation
                             and containing a confidential request for legal advice regarding the
                             legal representation of the Ministry.

Exhibit 3C

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page88 of 150

A-238

# Exhibit 3D

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 4A

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 4B

*Entry from NEPG's Revised Privilege Log - July 25, 2008*

| | |
|---|---|
| Privilege Log Entry #: | 6 |
| Bates Numbers: | NEPGPRIV-0013/015 |
| Date: | 20050207 |
| Author: | Wang Renzhi (EXIM General Manager) or Wang Zhenghe (EXIM Assistant General Manager) |
| Recipient: | Officers of the Ministry of Commerce |
| Type: | Letter |
| Privilege Claimed: | Attorney-Client<br>Work Product<br>Joint Defense |
| Description: | Letter from NEPG to the officers of the Ministry of Commerce reflecting confidential thoughts, opinions and legal analysis of Ge Yaping (Head of NEGPF Legal Department)regarding the pending Vitamin C antitrust litigation and potential risks of that litigation. |

Exhibit 4C

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 4D

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page98 of 150

# Exhibit 5A

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page100 of 150

# Exhibit 5B

**A-251**

*Entry from NEPG's Revised Privilege Log - July 25, 2008*

Privilege Log Entry #:       7

Bates Numbers:              NEPGPRIV-0016/018

Date:                       20050207

Author:                     Wang Renzhi (EXIM General Manager) or Wang Zhenghe (EXIM
                            Assistant General Manager)

Recipient:                  Officers of the Ministry of Commerce

Type:                       Letter

Privilege Claimed:          Attorney-Client
                            Work Product
                            Joint Defense

Description:                Letter from NEPG to the officers of the Ministry of Commerce
                            reflecting confidential thoughts, opinions and legal analysis of Ge
                            Yaping (Head of NEGPF Legal Department)regarding the pending
                            Vitamin C antitrust litigation and potential risks of that litigation.

Exhibit 5C

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page103 of 150

Submitted for In Camera Review

Privileged and Confidential

Exhibit 5D

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page105 of 150

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page106 of 150

A-256

# Exhibit 6A

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page107 of 150

Submitted for In Camera Review

Privileged and Confidential

Exhibit 6B

### *Entry from NEPG's Revised Privilege Log - July 25, 2008*

| | |
|---|---|
| Privilege Log Entry #: | 8 |
| Bates Numbers: | NEPGPRIV-0019/0022 |
| Date: | 20050208 |
| Author: | Chen Gang (NEPG General Manager & Chairman of the Board) |
| Recipient: | Minister Xilai Bo of the Ministry of Commerce |
| Type: | Letter |
| Privilege Claimed: | Attorney-Client<br>Work Product<br>Joint Defense |
| Description: | Letter from Chen Gang to Xilai Bo reflecting confidential thoughts, opinions, legal analysis and strategy of Ge Yaping (Head of NEGPF Legal Department)regarding the defense of the pending Vitamin C antitrust litigation. |

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page110 of 150

A-260

Exhibit 6C

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page111 of 150

A-261

Submitted for In Camera Review

Privileged and Confidential

Exhibit 6D

Submitted for In Camera Review

Privileged and Confidential

Exhibit 7A

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 7B

*Entry from NEPG's Revised Privilege Log - July 25, 2008*

Privilege Log Entry #:      13

Bates Numbers:              NEPGPRIV-0059/062

Date:                       20050208

Author:                     Wang Renzhi (EXIM General Manager) or Wang Zhenghe (EXIM Assistant General Manager)

Recipient:                  Officers of the Ministry of Foreign Affairs of the People's Republic of China

Type:                       Letter

Privilege Claimed:          Attorney-Client
                            Work Product
                            Joint Defense

Description:                Letter from NEPG to the Ministry of Foreign Affairs reflecting thoughts, opinions and legal analysis of Ge Yaping (Head of NEGPF Legal Department)regarding the pending Vitamin C antitrust litigation.

Exhibit 7C

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page119 of 150

A-269

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 7D

# Submitted for In Camera Review

## Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page122 of 150

# Exhibit 8A

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page123 of 150

# Submitted for In Camera Review

# Privileged and Confidential

Exhibit 8B

### *Entry from NEPG's Revised Privilege Log – July 25, 2008*

| | |
|---|---|
| Privilege Log Entry #: | 17 |
| Bates Numbers: | NEPGPRIV-0069/070 |
| Date: | 20050829 |
| Author: | Ge Yaping (Head of NEGPF Legal Department) |
| Recipient: | Minister Xilai Bo of the Ministry of Commerce |
| Type: | Letter |
| Privilege Claimed: | Attorney-Client<br>Work Product<br>Joint Defense |
| Description: | Letter from NEPG to Xilai Bo containing thoughts, opinions, legal analysis and strategy of Ge Yaping and outside litigation counsel regarding the defense of the pending Vitamin C antitrust litigation and the potential risks of that litigation. |

# Exhibit 8C

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page127 of 150

Submitted for In Camera Review

Privileged and Confidential

Exhibit 8D

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page129 of 150

**A-279**

Submitted for In Camera Review

Privileged and Confidential

Exhibit 9A

Submitted for In Camera Review

Privileged and Confidential

# Exhibit 9B

*Entry from NEPG's Revised Privilege Log – July 25, 2008*

Privilege Log Entry #:        43

Bates Numbers:        NEPGPRIV-0093/096

Date:        20050218

Author:        Wang Renzhi (EXIM General Manager) or Wang Zhenghe (EXIM Assistant General Manager)

Recipient:        Shenyang Municipal Bureau of Foreign Trade and Economic Cooperation

Type:        Report

Privilege Claimed:        Attorney-Client
Work Product
Joint Defense

Description:        Letter from NEPG to the officers of the Shenyang Municipal Bureau of Foreign Trade and Economic Cooperation reflecting thoughts, opinions and legal analysis of Ge Yaping (Head of NEGPF Legal Department)regarding the pending Vitamin C antitrust litigation and potential risks of that litigation.

Exhibit 9C

Submitted for In Camera Review

Privileged and Confidential

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page136 of 150

**A-286**

Exhibit 9D

Submitted for In Camera Review

Privileged and Confidential

## Jill McCrary

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **Sent:** | Tuesday, August 26, 2008 4:48 PM |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:06-md-01738-DGT-JO In Re Vitamin C Antitrust Litigation Response in Opposition to Motion |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND** to this e-mail because the mail box is unattended.
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

### U.S. District Court

### Eastern District of New York

### Notice of Electronic Filing

The following transaction was entered by Lapatine, Kenneth on 8/26/2008 at 5:47 PM EDT and filed on 8/26/2008
**Case Name:**       In Re Vitamin C Antitrust Litigation
**Case Number:**    1:06-md-1738
**Filer:**            Defendant(s) in Civil Action Animal Science vs Hebei, 05-CV-453
**Document Number:** 321

**Docket Text:**
**RESPONSE in Opposition re [317] Letter MOTION to Compel *Documents Withheld by NEPG* filed by Defendant(s) in Civil Action Animal Science vs Hebei, 05-CV-453. (Attachments: # (1) Exhibit A, # (2) Exhibit B, # (3) Exhibit C, # (4) Exhibit D, # (5) Appendix Cover Page, # (6) Appendix Exhibit 1, # (7) Appendix Exhibit 2, # (8) Appendix Exhibit 3, # (9) Appendix Exhibit 4, # (10) Appendix Exhibit 5, # (11) Appendix Exhibit 6, # (12) Appendix Exhibit 7, # (13) Appendix Exhibit 8, # (14) Appendix Exhibit 9) (Lapatine, Kenneth)**

**1:06-md-1738 Notice has been electronically mailed to:**

Suyash Agrawal    sagrawal@susmangodfrey.com, jingram@susmangodfrey.com

Donald Chidi Amamgbo    donald@amamgbolaw.com

Brian C. Baker    bbaker@bsfllp.com

Joseph W. Bell    jbell@zelle.com

Stephen V. Bomse    stephen.bomse@hellerehrman.com

Dale C. Christensen    christensen@sewkis.com

Tanya S. Chutkan    tchutkan@bsfllp.com

8/26/2008

Robert W. Coykendall    rcoykendall@morrislaing.com

Charles Howard Critchlow    charles.h.critchlow@bakernet.com

Eric B. Fastiff    efastiff@lchb.com, dschuman@lchb.com

Besrat J. Gebrewold    bgebrewold@cmht.com

Richard Scott Goldstein    rgoldstein@hellerehrman.com

Gary R. Greenberg    greenbergg@gtlaw.com

Daniel C. Hedlund    dhedlund@gustafsongluek.com

Jiangxiao Hou    ahou@zelle.com

William A. Isaacson    wisaacson@bsfllp.com, llaing@bsfllp.com

Rachel Lois Izower    izowerr@gtlaw.com, schaefferc@gtlaw.com

David E. Kovel    dkovel@kmllp.com

Brent W. Landau    blandau@cmht.com

Kenneth Alan Lapatine    lapatinek@gtlaw.com, gtcourtalert@gtlaw.com

Daniel Mason    dmason@zelle.com, sljohnson@zelle.com

Joel M. Mitnick    jmitnick@sidley.com

Tina J. Moore    tmoore@morrislaing.com

Patricia K. Oliver    poliver@linerlaw.com

Ian P. Otto    iotto@straus-boies.com, bmorris@straus-boies.com, ecf@straus-boies.com, jwelsh@straus-boies.com

Darrell Prescott    darrell.prescott@bakernet.com

James Quadra    quadra@meqlaw.com

Brian A. Ratner    bratner@cmht.com

Shawn L. Raymond    sraymond@susmangodfrey.com, ddefranco@susmangodfrey.com

Alanna Rutherford    arutherford@bsfllp.com, NYC_Managing_Clerk@bsfllp.com

Annapoorni R. Sankaran    sankarana@gtlaw.com

Joseph R. Saveri    jsaveri@lchb.com, aacuna@lchb.com, dclevenger@lchb.com

R. Alexander Saveri    rick@saveri.com

Richard Saveri    rick@saveri.com

8/26/2008

Tracey R. Seraydarian    tseraydarian@sidley.com

James Ian Serota    serotaj@gtlaw.com, gtcourtalert@gtlaw.com

Sylvia Sokol    sokol@meqlaw.com

James T. Southwick    jsouthwick@susmangodfrey.com, jmccrary@susmangodfrey.com

Reginald Von Terrell    reggiet2@aol.com

Joseph G. Veenstra    joe@johnsflaherty.com, lisaf@johnsflaherty.com

Kenneth G. Walsh    kwalsh@kmllp.com, cstudebaker@kmllp.com

**1:06-md-1738 Notice will not be electronically mailed to:**

Timothy Battin
Straus & Boies, LLP
2 Depot Plaza
2nd Floor
Bedford Hills, NY 10507

Rebecca Bedwell-Coll
Lieff, Cabraser, Heimann & Bernstein, LLP
780 Third Avenue
48th Fl
New York, NY 10017

Judith Blackwell
Blackwell & Blackwell
584 Valle Vista Avenue
Oakland, CA 94610

David Boies
Straus & Boies, LLp
2 Depot Plaza
2nd Floor
Bedford Hills, NY 10507

Sophia Tsokos
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-0]
[e335ef0dd1cfcf5d5492aa967ea1b465b3ef5a6ba675a19440f9bbe44300a595ce1fb
4a38562a347d6ca827179cbb7c192ee8a2ab63c182d70ea73580f760916]]
**Document description:**Exhibit A

8/26/2008

**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-1]
[01a43a054e7c3ceda13061aabf1d460b37c32f1fe081510e42aa63ed9875c1ccb4eb3
7e8245f1842be9c8e7c925835efd9744aa5bde5e058cc0b46d5311ec5e7]]
**Document description:**Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-2]
[042376d8169071d6abeef9e9c736d4a630c37946e758b2258a825a6eb29f29a323901
ba9979c1b892c7676b66e00dd4f8dcea6f0e8d1a8af172ca3ce1707472e]]
**Document description:**Exhibit C
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-3]
[4270af68c08eb28e2b0da372dbff7a25863750fbcd6fe6d1fd406ea5c400dabf42908
ff8a0f34818920708de1990a8a6a9ff745a48e0055de603790295bacd71]]
**Document description:**Exhibit D
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-4]
[5f66f9b22b4585f4e843cb38613e1f54fa817943d392e3940178a65d3e5f2fb58f7ea
5307d8d39d4f6692a9a63beafe6b65938fc2c995f5af66a38e32281e5e0]]
**Document description:**Appendix Cover Page
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-5]
[d3362dad6978723a7ab72b1d54fddcdc7e5bded9b8d8f217eaf15b41b54d6b48bfdde
c134219afa4e601d67109335c779be79cc9ed51cabe81d8a63ad3e8bdbe]]
**Document description:**Appendix Exhibit 1
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-6]
[7cf1ca21e915a8aceeca62f6a9ace3e7b83288c2cf79929795a4a54dca1b50494d836
3ecf63fa1a5b233582316a9827f32b39c0d78e124a498133839a2317540]]
**Document description:**Appendix Exhibit 2
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-7]
[837746fd4f7a02b90b720d4a945ab2e2dcb78e12f37716b9b703333cc360df34b5121
30f6cf594851a66add47900c19e9e5ff266d84b1665bdb5efc3ca072181]]
**Document description:**Appendix Exhibit 3
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-8]
[c49914c5b299ea3240aa57b5ae710d7d5b128607bcd5d1a96f21c1b6844139ab10ae9
c9b04a394b897980bcba95747c0fb0afa4cfecdcfc4d9c71d63296abb7a]]
**Document description:**Appendix Exhibit 4
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-9]
[59a29ef7968c0e8fa585c9de8609b3d5470fbe2bb7dcaf2f4141c1940cdf715c2b5cf
f6bf74f560d6a81f7d1189b519d9d7ef6fe093bc2ddb1b5cf03c502e772]]
**Document description:**Appendix Exhibit 5

8/26/2008

**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-10]
[6f3b7f777a6c63f55d7212f343f00b2d1921b10f763e6888218ceba37e2daba0a1c3
fae593d2f24abda86f4f798cedc265cbf96c52808afbf94bc8b038ced783]]
**Document description:**Appendix Exhibit 6
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-11]
[4b6e42cf0187a20b2cda01f062a06f9e688cbacad413797bcbbef7e99cf2a06d7111
5872171253d77109a85d6facc6fa42ac0c33505197476d9fb5d49d5fc748]]
**Document description:**Appendix Exhibit 7
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-12]
[7b0727fcacf79ec8c5f5d51a0d3599b1ebbee416dd49ff738c35247b54d77818a1ff
0d9613dd4e241283ff9913a6aafdd09e9c024e923852d23594115e6d2849]]
**Document description:**Appendix Exhibit 8
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-13]
[498fad4a72e039d009583c955948d3543f3cb92fbe9547185d6e36a5c4b08d82160e
b781dc5b9f3bd8ffebe438a99f32e78734f67cdce0bc9c686d04019494e9]]
**Document description:**Appendix Exhibit 9
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/26/2008] [FileNumber=3895268-14]
[689bf0d65e640f2aab21bd472033df259b594187b651bb9bbf2be115f8df1a57e524
327ef66c87a2f622533c38cf02615e866ff16de0a4d6c3519d397b450510]]

Case 13-4791, Document 155-2, 07/28/2014, 1280876, Page143 of 150

**A-293**

## Multiple Documents

To view the main document and its attachments without incurring a PACER fee, click on the hyperlinks displayed on this menu. You may incur a PACER fee to view CM/ECF documents from hyperlinks within the documents.

Select the document you wish to view.

| Part | Description | |
|------|-------------|---|
| 1 | Main Document | 3 pages |
| 2 | Exhibit A | 4 pages |
| 3 | Exhibit B | 2 pages |
| 4 | Exhibit C | 30 pages |
| 5 | Exhibit D | 4 pages |
| 6 | Appendix Cover Page | 1 page |
| 7 | Appendix Exhibit 1 | 8 pages |
| 8 | Appendix Exhibit 2 | 6 pages |
| 9 | Appendix Exhibit 3 | 8 pages |
| 10 | Appendix Exhibit 4 | 8 pages |
| 11 | Appendix Exhibit 5 | 8 pages |
| 12 | Appendix Exhibit 6 | 8 pages |
| 13 | Appendix Exhibit 7 | 8 pages |
| 14 | Appendix Exhibit 8 | 8 pages |
| 15 | Appendix Exhibit 9 | 8 pages |



| SIDLEY AUSTIN LLP<br>787 SEVENTH AVENUE<br>NEW YORK, NY 10019<br>(212) 839 5300<br>(212) 839 5599 FAX | BEIJING<br>BRUSSELS<br>CHICAGO<br>DALLAS<br>FRANKFURT<br>GENEVA<br>HONG KONG<br>LONDON | LOS ANGELES<br>NEW YORK<br>SAN FRANCISCO<br>SHANGHAI<br>SINGAPORE<br>SYDNEY<br>TOKYO<br>WASHINGTON, D.C. |

jmitnick@sidley.com
(212) 839-5871

FOUNDED 1866

August 29, 2008

**FILED BY ECF**
**COURTESY COPY BY HAND**

The Honorable James Orenstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *In re: Vitamin C Antitrust Litigation*, MDL No. 1738

Dear Judge Orenstein:

We respectfully submit this letter on behalf of our client, *amicus* The Ministry of Commerce of the People's Republic of China (the "Ministry"), in response to Plaintiffs' August 21, 2008 letter seeking this Court's order to compel Defendant Northeast Pharmaceutical Group Co., Ltd ("NEPG") to produce nine confidential documents that it exchanged with the Ministry and other instrumentalities of the Chinese government. The Ministry appreciates the opportunity to make its views known to the Court. The Ministry concurs in the opposition papers submitted by NEPG and makes the following additional representations.

At the outset of its *amicus* brief, the Ministry stated it "is deeply interested in the prompt and proper disposition of this lawsuit." *Amicus* Br. at 1. That interest stems from the fact that the complaint directly challenges a system of duly enacted laws and regulations of the Chinese government that compelled the conduct challenged by the plaintiffs. Moreover, by challenging the compelled conduct, the plaintiffs in essence challenge under US antitrust law the Chinese government's right to compel compliance by its own corporate citizens, and solely within its borders, of a pricing regime designed by the Chinese government for the purpose of maintaining an orderly export market. Accordingly, the Ministry, the relevant Chamber of Commerce (which is an instrumentality of the Ministry), and the defendants have shared a common interest from the time this lawsuit was filed in seeking its prompt dismissal. To facilitate that common interest, and upon the advice of counsel, the Ministry, the Chamber and the defendants entered into an oral common interest agreement within the first several weeks after the first complaint in this class action was filed. That agreement was soon thereafter confirmed in writing as between the Chamber (which the Ministry had designated as the government contact to coordinate with the defendants in their defense of the action) and the defendants. In order to remain informed

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships



SIDLEY

The Honorable James Orenstein
August 29, 2008
Page 2

about the defense of the action, and to consult on it as it saw fit, the Ministry subscribed orally to the written agreement as of the date it was written.

Again, the Ministry is grateful to this Court for its courtesies in permitting the Ministry to make this *amicus* filing.

Respectfully submitted,

Joel M. Mitnick
Counsel for *Amicus* The Ministry
of Commerce of the People's
Republic of China

NY1 6726221v.1

Page 1 of 3

## Jill McCrary

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **Sent:** | Friday, August 29, 2008 2:40 PM |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:06-md-01738-DGT-JO In Re Vitamin C Antitrust Litigation Letter |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Eastern District of New York

**Notice of Electronic Filing**

The following transaction was entered by Mitnick, Joel on 8/29/2008 at 3:40 PM EDT and filed on 8/29/2008
**Case Name:**  In Re Vitamin C Antitrust Litigation
**Case Number:**  1:06-md-1738
**Filer:**  Ministry of Commerce for the Peoples Republic of China
**Document Number:** 322

**Docket Text:**
**Letter _from J. Mitnick_ by Ministry of Commerce for the Peoples Republic of China (Mitnick, Joel)**

**1:06-md-1738 Notice has been electronically mailed to:**

Suyash Agrawal    sagrawal@susmangodfrey.com, jingram@susmangodfrey.com

Donald Chidi Amamgbo    donald@amamgbolaw.com

Brian C. Baker    bbaker@bsfllp.com

Joseph W. Bell    jbell@zelle.com

Stephen V. Bomse    stephen.bomse@hellerehrman.com

Dale C. Christensen    christensen@sewkis.com

Tanya S. Chutkan    tchutkan@bsfllp.com

Robert W. Coykendall    rcoykendall@morrislaing.com

Charles Howard Critchlow    charles.h.critchlow@bakernet.com

Eric B. Fastiff    efastiff@lchb.com, dschuman@lchb.com

8/29/2008

Besrat J. Gebrewold    bgebrewold@cmht.com

Richard Scott Goldstein    rgoldstein@hellerehrman.com

Gary R. Greenberg    greenbergg@gtlaw.com

Daniel C. Hedlund    dhedlund@gustafsongluek.com

Jiangxiao Hou    ahou@zelle.com

William A. Isaacson    wisaacson@bsfllp.com, llaing@bsfllp.com

Rachel Lois Izower    izowerr@gtlaw.com, schaefferc@gtlaw.com

David E. Kovel    dkovel@kmllp.com

Brent W. Landau    blandau@cmht.com

Kenneth Alan Lapatine    lapatinek@gtlaw.com, gtcourtalert@gtlaw.com

Daniel Mason    dmason@zelle.com, sljohnson@zelle.com

Joel M. Mitnick    jmitnick@sidley.com

Tina J. Moore    tmoore@morrislaing.com

Patricia K. Oliver    poliver@linerlaw.com

Ian P. Otto    iotto@straus-boies.com, bmorris@straus-boies.com, ecf@straus-boies.com, jwelsh@straus-boies.com

Darrell Prescott    darrell.prescott@bakernet.com

James Quadra    quadra@meqlaw.com

Brian A. Ratner    bratner@cmht.com

Shawn L. Raymond    sraymond@susmangodfrey.com, ddefranco@susmangodfrey.com

Alanna Rutherford    arutherford@bsfllp.com, NYC_Managing_Clerk@bsfllp.com

Annapoorni R. Sankaran    sankarana@gtlaw.com

Joseph R. Saveri    jsaveri@lchb.com, aacuna@lchb.com, dclevenger@lchb.com

R. Alexander Saveri    rick@saveri.com

Richard Saveri    rick@saveri.com

Tracey R. Seraydarian    tseraydarian@sidley.com

James Ian Serota    serotaj@gtlaw.com, gtcourtalert@gtlaw.com

8/29/2008

# A-298

Sylvia Sokol    sokol@meqlaw.com

James T. Southwick    jsouthwick@susmangodfrey.com, jmccrary@susmangodfrey.com

Reginald Von Terrell    reggiet2@aol.com

Joseph G. Veenstra    joe@johnsflaherty.com, lisaf@johnsflaherty.com

Kenneth G. Walsh    kwalsh@kmllp.com, cstudebaker@kmllp.com

**1:06-md-1738 Notice will not be electronically mailed to:**

Timothy Battin
Straus & Boies, LLP
2 Depot Plaza
2nd Floor
Bedford Hills, NY 10507

Rebecca Bedwell-Coll
Lieff, Cabraser, Heimann & Bernstein, LLP
780 Third Avenue
48th Fl
New York, NY 10017

Judith Blackwell
Blackwell & Blackwell
584 Valle Vista Avenue
Oakland, CA 94610

David Boies
Straus & Boies, LLp
2 Depot Plaza
2nd Floor
Bedford Hills, NY 10507

Sophia Tsokos
Greenberg Traurig, LLP
200 Park Avenue
New York, NY 10166

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP NYEDStamp_ID=875559751 [Date=8/29/2008] [FileNumber=3902104-0]

[b0c10944af81de3b77732c19eb14a793b46c68e97fc42b45c815ad53827147313d33a
ccf34596e48ca3135ff28390cfa3b47b704eddbed38be56bd50488b9155]]

8/29/2008

# EXHIBIT
# 2

**SIDLEY AUSTIN LLP**

# SIDLEY

SIDLEY AUSTIN LLP
787 SEVENTH AVENUE
NEW YORK, NY 10019
(212) 839 5300
(212) 839 5599 FAX

| | |
|---|---|
| BEIJING | LOS ANGELES |
| BRUSSELS | NEW YORK |
| CHICAGO | SAN FRANCISCO |
| DALLAS | SHANGHAI |
| FRANKFURT | SINGAPORE |
| GENEVA | SYDNEY |
| HONG KONG | TOKYO |
| LONDON | WASHINGTON, D.C. |

jmitnick@sidley.com
(212) 839-5871

FOUNDED 1866

September 29, 2008

**FILED BY ECF**
**COURTESY COPY BY HAND**

The Honorable James Orenstein
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    *In re: Vitamin C Antitrust Litigation*, MDL No. 1738

Dear Judge Orenstein:

I have read the transcript of the hearing held in this matter before you on September 10, 2008 and Your Honor's docket Minute Entry of the same date. On behalf of my client, the Ministry of Commerce of the People's Republic of China, I write to address an issue that was raised at the hearing.

In both their written submission with respect to the pending motion to compel and at the hearing, plaintiffs suggested that the fact of the Ministry's common interest with the defendants somehow disqualifies the Ministry as an *amicus*[1]. *See, e.g.*, Transcript of Hearing before Hon.

---

[1] At the Ministry's first appearance in this litigation, I identified that the Ministry had two interests in this litigation, one that the Ministry had in common with the defendants and one that was an independent interest of the Ministry. With respect to the common interest, I stated that the Ministry desired to present its views as a foreign sovereign of the regulatory framework governing these specific defendants in order to "present[ ] the predicates for what Mr. Bomse [one of defense counsel] and others have described as a foreign sovereign compulsion defense." (Transcript of hearing before Hon. James Orenstein, May 3, 2006, at 38.) As stated more recently, "by challenging the compelled conduct, the plaintiffs in essence challenge under US antitrust law the Chinese government's right to compel compliance by its own corporate citizens, and solely within its borders, of a pricing regime designed by the Chinese government for the purpose of maintaining an orderly export market." Letter of J. Mitnick to Hon. James Orenstein, dated August 29, 2008. It should, therefore, come as no surprise that the Ministry and the defendants have coordinated their strategies in connection with their common interest in having the complaint dismissed. *See, e.g.*, Letter of Richard S. Goldstein to Hon. David G. Trager, dated June 26, 2006 (informing Judge Trager in advance of defendants' knowledge that the Chinese government would seek permission to submit an *amicus* brief on defendants' behalf). In addition, I articulated an interest in the litigation that the Ministry held independently of the defendants. "The government very much would like to be able to assist the Court in establishing the principle that these specific kinds of Chinese laws resulted in compelled conduct that created an immunity from antitrust law. The

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships