# 13-4791-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

In Re: Vitamin C Antitrust Litigation

ANIMAL SCIENCE PRODUCTS, INC., THE RANIS COMPANY, INC.,

*Plaintiffs-Appellees,*

—against—

HEBEI WELCOME PHARMACEUTICAL CO. LTD., and NORTH CHINA PHARMACEUTICAL GROUP CORPORATION,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## JOINT APPENDIX
## VOLUME III OF XV
## (Pages A-601 to A-900)

JONATHAN M. JACOBSON
DANIEL P. WEICK
JUSTIN A. COHEN
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas,
  40th Floor
New York, New York 10019
(212) 999-5800

SCOTT A. SHER
BRADLEY T. TENNIS
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1700 K Street, N.W., 5th Floor
Washington, D.C. 20006
(202) 973-8800

*Attorneys for Defendants-Appellants*

(*Counsel continued on inside cover*)

WILLIAM A. ISAACSON
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW
Washington, DC 20015
(202) 237-2727

MICHAEL D. HAUSFELD
BRIAN A. RATNER
MELINDA R. COOLIDGE
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
(202) 540-7200

BRENT W. LANDAU
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, Pennsylvania 19106
(215) 985-3273

JAMES T. SOUTHWICK
SHAWN L. RAYMOND
KATHERINE KUNZ
SUSMAN GODFREY LLP
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
(713) 651-9366

*Attorneys for Plaintiffs-Appellees*

# TABLE OF CONTENTS

PAGE

Docket Entries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-1

Transfer Order, dated February 14, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . A-144

Brief of Amicus Curiae The Ministry of Commerce of The People's
    Republic of China in Support of the Defendants' Motion to
    Dismiss the Complaint, dated September 22, 2006 . . . . . . . . . . . . . . . . A-147

### Memorandum in Support of the Ranis Company's
### Motion for Class Certification, dated April 11, 2007

Exhibit A—
China Chamber of Commerce of Medicines and Health Products
    Importers and Exporters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-176

Declaration of Darrell Prescott in Support of Defendants'
    Memorandum of Law in Opposition to the Motion of The Ranis
    Company for Class Certification, dated August 2, 2007 . . . . . . . . . . . A-186

    Exhibit H to Prescott Declaration—
    Email from Robert Conway to David Kang,
    dated September 24, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-188

    Exhibit L to Prescott Declaration—
    Email from David Kang to Robert Conway,
    dated September 21, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-192

Declaration of Yang Jianfu in Support of Motion of North China
    Pharmaceutical Group Corp. to Dismiss the Complaint,
    dated April 11, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-194

ii

PAGE

**Letter from Joel M. Mitnick to The Honorable David G. Trager, dated June 9, 2008**

Attachment II—
Statement in *In Re Vitamin C Antitrust Litigation*,
dated June 9, 2008 ............................................. A-205

Letter from Kenneth A. Lapatine to The Honorable James Orenstein,
dated August 26, 2008, with Exhibits ........................... A-208

Letter from Joel M. Mitnick to The Honorable James Orenstein,
dated August 29, 2008 ......................................... A-294

**Declaration of Annabelle Chan in Support of Defendants' Motion for Summary Judgment or, in the Alternative, for Determination of Foreign Law and Entry of Judgment Pursuant to Rule 44.1, Fed. R. Civ. P., dated August 31, 2009**

Exhibit 2—
Letter from Joel M. Mitnick to The Honorable James Orenstein,
dated September 29, 2008 ...................................... A-299

Exhibit 4—
Report of Professor Shen Sibao.................................. A-302

Exhibit 5—
Report of Professor James B. Speta ............................. A-369

Exhibit 15—
China Chamber of Commerce of Medicines & Health Products
Importers & Exporters, Publication of Administration and
Regulation (2003) ............................................. A-407

Exhibit 42—
Excerpts of Deposition Transcript of Dr. Paula Stern,
dated July 28, 2009 ........................................... A-441

Exhibit 43—
Report of Dr. Paula Stern ..................................... A-461

iii

**Declaration of Jennifer Milici in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment or, in the Alternative, for Determination of Foreign Law and Entry of Judgment, dated October 16, 2009**

Exhibit P—
Decree of the State Council of the People's Republic of China,
No. 332, Regulations of the People's Republic of China on the
Administration of the Import and Export of Goods................ A-488

Exhibit Q—
Excerpts of Deposition Transcript of Professor Shen Sibao,
dated April 16, 2009 ............................................. A-507

Exhibit T—
World Trade Organization Communication from China ........... A-519

Exhibit KK—
Ministry of Commerce of the People's Republic of China
Announcement, No. 12, 2008, March 6, 2008..................... A-562

Exhibit LL—
Transcript of Motion, dated June 5, 2007......................... A-599

Exhibit MM—
Circular of the General Office of the State Council on the
Reiteration of the Provisions Concerning the Promulgation of
National Regulations and Policies on Foreign Economic
Relations and Trade............................................. A-631

Exhibit YY—
Excerpts of Deposition Transcript of James B. Speta,
dated May 1, 2009 .............................................. A-635

**Letter from Richard S. Goldstein to The Honorable David G. Trager, dated November 23, 2009**

Attached to Letter—
Statement in *In Re Vitamin C Antitrust Litigation*,
06-MD-1738 (DGT), dated August 31, 2009...................... A-650

iv

PAGE

Order Reassigning Litigation, dated January 19, 2011 . . . . . . . . . . . . . . . . . A-658

Northeast Pharmaceutical Group Co., Ltd.'s Objection to Magistrate
    Orenstein's January 20, 2011 Memorandum and Order,
    dated February 3, 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-659

Letter from Richard S. Goldstein to The Honorable James Orenstein,
    dated February 9, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-679

**Non-Settling Defendants' Notice of Filing of Affidavit of Qiao Haili
Pursuant to the Court's Order of July 11, 2012 and Statement Thereon,
dated August 8, 2012**

Exhibit B to Letter—
Affidavit of Qiao Haili Pursuant to the Court Order of
July 11, 2012, dated August 5, 2012, with exhibits . . . . . . . . . . . . . . . A-683

Select Statements of Fact Made by the Ministry of Commerce of the
    People's Republic of China in its *Amicus Curiae* Brief in Support
    of Defendants' Motion to Dismiss, dated August 15, 2012 . . . . . . . . A-986

Exhibit 6—
Expert Report of Lawrence Wu, dated June 29, 2012
(Redacted, Sealed Version in Volume XV) . . . . . . . . . . . . . . . . . . . . . . . A-990

Exhibit 8—
Excerpts of the Deposition Transcript of
Douglas Bernheim, PhD, dated May 16, 2012 . . . . . . . . . . . . . . . . . . . . A-993

Proffer of Testimony of Qiao Haili Pursuant to the Court Order of
    October 12, 2012, dated October 29, 2012. . . . . . . . . . . . . . . . . . . . . . . . A-999

Memorandum Decision and Order Denying North China
    Pharmaceutical Group Corporation's Motion for Summary
    Judgment and Granting in Part and Denying in Part Plaintiffs'
    Motion to Compel, dated February 8, 2013 . . . . . . . . . . . . . . . . . . . . . . . A-1030

v

PAGE

Defendants' Proposed Preliminary Jury Instructions,
dated February 23, 2013 ........................................ A-1050

### Defendants' Notice of Motion and Renewed Motion for Judgment as a Matter of Law under Fed. R. Civ. P. 50(B) Based on Act of State and Foreign Sovereign Compulsion and International Comity, dated April 11, 2013

Exhibit M—
China-Measures Related to the Exportation of Various Raw
Materials, Reports of the Panel .................................. A-1073

Exhibit N—
2003 Report to Congress on China's WTO Compliance .......... A-1389

Exhibit O—
2004 Report to Congress on China's WTO Compliance .......... A-1463

Exhibit P—
2006 Report to Congress on China's WTO Compliance .......... A-1554

Exhibit Q—
Article titled "US Vitamin fine 'unfair and inappropriate' says
Mofcom"...................................................... A-1664

Exhibit R—
Article titled "China Criticizes U.S. Ruling on Vitamin C
Makers"...................................................... A-1667

Exhibit S—
Article titled "MOFCOM's Shang says US judgment in vitamin C
case shows 'disrespect'" ...................................... A-1669

### Defendants' Reply in Support of Their Renewed Motion for Judgment as a Matter of Law, dated May 31, 2013

Exhibit A—
Regular Press Conference of the Ministry of Commerce
on March 19, 2013............................................ A-1673

vi

PAGE

**Excerpts of Trial Transcripts**

Trial Transcript, dated February 26, 2013 .......................... A-1683

Trial Transcript, dated February 27, 2013 .......................... A-1713

Trial Transcript, dated February 28, 2013 .......................... A-1732

Trial Transcript, dated March 4, 2013 .............................. A-1748

Trial Transcript, dated March 5, 2013 .............................. A-1755

Trial Transcript, dated March 6, 2013 .............................. A-1776

Trial Transcript, dated March 7, 2013 .............................. A-1823

Trial Transcript, dated March 11, 2013 ............................. A-1856

Trial Transcript, dated March 12, 2013 ............................. A-1866

Trial Transcript, dated March 13, 2013 ............................. A-1889

Trial Transcript, dated March 14, 2013 ............................. A-1911

**Plaintiff's Trial Exhibits**

Exhibit 42—
2006 VC and product lines American marketing and sales
strategy ....................................................... A-1913

Exhibit 52—
China Chamber of Commerce for Import and Export of
Medicines and Health Products .................................. A-1934

Exhibit 53—
VC Chapter Meeting Memo (07/23-2003) ........................ A-1939

Exhibit 57—
Memorandum of CCCMHPIE Meeting, dated March 19, 2004 .... A-1943

vii

PAGE

Exhibit 58—
VC Subcommittee Memorandum (12/10/04) . . . . . . . . . . . . . . . . . . . . . A-1948

Exhibit 73—
China Chamber of Commerce for Import & Export of Medicines
& Health Products VC Subcommittee . . . . . . . . . . . . . . . . . . . . . . . . . . A-1953

Exhibit 78—
Import/Export Department June Work Summary . . . . . . . . . . . . . . . . A-1967

Exhibit 81—
Import Export Department February 2004 Work Summary . . . . . . . A-1973

Exhibit 83—
June 2004 Work Summary Import/Export Department . . . . . . . . . . . A-1978

Exhibit 85—
Interim Meeting Memorandum, dated May 28, 2004 . . . . . . . . . . . . . A-1985

Exhibit 86—
Email from Wang Qi, dated January 5, 2005 . . . . . . . . . . . . . . . . . . . . A-1992

Exhibit 87—
Email from Wang Qi, dated May 22, 2005 . . . . . . . . . . . . . . . . . . . . . . A-2000

Exhibit 111—
Email from tangql@mail.ncpcwelcome.com,
dated March 14, 2003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2005

Exhibit 118—
Memorandum, dated September 26, 2007 . . . . . . . . . . . . . . . . . . . . . . A-2035

Exhibit 119—
North China Pharmaceutical Group Corporation Work Summary
for January to June, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-2042

Exhibit 124—
CCCMHPIE Major Events, November-December, 2004 . . . . . . . . . . A-2061

Exhibit 133—
Email from Wang Qi, dated September 4, 2005 . . . . . . . . . . . . . . . . . . A-2070

viii

PAGE

Exhibit 134—
China Chamber of Commerce of Medicines & Health Products
Importers & Exporters .......................................... A-2078

Exhibit 135—
Import and Export Work Summary for April [2003] ............. A-2091

Exhibit 137—
Periodical Summary for December-Import and Export ........... A-2099

Exhibit 139—
Email from Chu Jiang, dated April 8, 2004 ...................... A-2105

Exhibit 141—
Recognize New Trends, Develop on Both Fronts, and Build a
Healthy, Sustainable and Harmonious Jiangshan,
dated January 28, 2005 .......................................... A-2110

Exhibit 142—
Memorandum of VC Chapter Meeting of CCCMHPIE,
dated April 19, 2005 ............................................ A-2147

Exhibit 144—
Memo, dated November 16, 2005 ............................... A-2153

Exhibit 151—
Chamber Meeting Memorandum ................................ A-2159

Exhibit 165—
The Prospect of VC Series Products in the First Half of the Next
Year and Our Corresponding Measures ......................... A-2161

Exhibit 173—
Memorandum, dated April 13, 2001 ........................... A-2166

Exhibit 234—
Chamber of Commerce for Import & Export of Medicines &
Health Products (CCCMHPIE) ................................. A-2173

ix

PAGE

Exhibit 249—
Charter of the Vitamin C Subcommittee of the China Chamber of
Commerce of Medicines and Health Products Importers and
Exporters .................................................... A-2180

Exhibit 252—
Report on Henan Xinxiang Housing Pharmaceuticals' Refusal to
Comply with the Industry's Self-Regulation Agreement.......... A-2201

Exhibit 259—
Email from Wang Qiang, dated November 16, 2005 ............. A-2206

Exhibit 273A—
Meeting Summary ........................................... A-2216

Exhibit 300—
North China Pharmaceutical Group Corporation
Company Profile ........................................... A-2221

Exhibit 301—
North China Pharmaceutical Group Corporation Products ........ A-2224

Exhibit 302—
North China Pharmaceutical Group Corporation Products ........ A-2228

Exhibit 306—
North China Pharmaceutical Group Corporation
Work Summary 2004 ........................................ A-2233

Exhibit 318—
Import & Export Dept. May 2004 Work Summary ............... A-2249

Exhibit 320—
Report on the Current International VC Market:
Status and Trends........................................... A-2254

Exhibit 386—
Sales Contract ............................................. A-2267

Exhibit 386A—
Sales Contract ............................................. A-2540

x

                                                              PAGE

Exhibit 386B—
Sales Contract ................................................ A-2545

Exhibit 425—
Sales Contract ................................................ A-2565

Exhibit 425A—
Sales Confirmation ........................................... A-2971

Exhibit 425B—
Sales Contract ................................................ A-3014

Exhibit 426—
Sales Contract ................................................ A-3020

Exhibit 426A—
Sales Contract ................................................ A-3376

Exhibit 427—
Sales Contract ................................................ A-3431

Exhibit 442—
China Economic Development Forum, November 7, 2003 ........ A-3670

## Defendant's Trial Exhibits

Exhibit 3—
Regulations of the Ministry of Foreign Trade and Economic
Cooperation on Enhancing Coordination Regulation of Export
Commodity .................................................... A-3691

Exhibit 4—
MOFTEC Measures for Social Organizations .................... A-3712

Exhibit 6A—
Interim Provisions for Administration of Export Commodities
(approved by the States Council on December 21, 1992, issued
and announced by the Ministry of Foreign Trade and Economic
Cooperation on December 29, 1992) ........................... A-3747

xi

PAGE

Exhibit 6B—
Interim Provisions for Administration of Export Commodities
(Promulgated by the Ministry of Foreign Economic Relations and
Trade on December 29, 1992) ................................... A-3755

Exhibit 7—
Notice of Ministry of Foreign Trade and Economic Cooperation
regarding Printing and Distribution of Several Regulations for
Personnel Management of Chambers of Commerce for Importers
and Exporters ................................................. A-3769

Exhibit 9—
Interim Regulations of the Ministry of Foreign Trade and
Economic Cooperation on Punishment for Conduct of Exporting
at Lower-than-Normal Price .................................... A-3795

Exhibit 12—
1997 MOFTEC & SDA Notice ................................. A-3821

Exhibit 13—
Document of Personnel, Education and Labor Department
of Ministry of Foreign Trade & Economic Cooperation .......... A-3852

Exhibit 28—
China Chamber of Commerce of Medicines & Health Products
Importers & Exporters ......................................... A-3879

Exhibit 29—
List of the Fourth Batch of Departmental Decisions Abolished
by the Ministry of Foreign Trade and Economic Cooperation..... A-3886

Exhibit 31—
2002 MOFTEC & Customs Notice .............................. A-3893

Exhibit 31A—
2002 MOFTEC & Customs Notice as Presented to the Jury ...... A-3917

Exhibit 32A—
Charter of the Vitamin C Subcommittee of the China Chamber
of Commerce of Medicines and Health Products Importers and
Exporters .................................................... A-3926

xii

PAGE

Exhibit 32B—
China Chamber of Commerce for Import & Export of Medicines
& Health Products VC Subcommittee ........................... A-3947

Exhibit 44—
Announcement of Ministry of Commerce of the People's
Republic of China, General Administration of Customs of the
People's Republic of China (No. 36, 2003) ...................... A-3961

Exhibit 68—
Chamber of Commerce Meeting Minutes,
dated December 23, 2005 ..................................... A-3976

Exhibit 96—
North China Pharmaceutical Group Corporation Contact
Information ................................................. A-3979

Exhibit 97—
North China Pharmaceutical Group Corp. Listed Companies
Temporary and Periodic Reports............................... A-3980

Exhibit 98—
North China Pharmaceutical Group Corp. List of Group
Members .................................................... A-3984

Exhibit 99—
NCPC Hebei Welcome Pharmaceutical Co., Ltd. Website ........ A-3988

**Video Exhibits**

Exhibit 5—
Qiao, Haili-08/31/2012 ....................................... A-3991

Exhibit 6—
Qiao, Haili-08/30/2012 ....................................... A-4005

xiii

PAGE

Notice of Appeal, dated December 23, 2013 . . . . . . . . . . . . . . . . . . . . . . . . . A-4008

Amended Notice of Appeal, dated January 6, 2014 . . . . . . . . . . . . . . . . . . A-4010

Second Amended Notice of Appeal, dated February 18, 2014 . . . . . . . . . A-4013

**Filed Under Seal**

**Defendants' Notice of Motion and Motion to Exclude Foreign Purchases from Plaintiffs' Claims for Lack of Subject Matter Jurisdiction and to Exclude Certain Other Claims as Without Evidentiary Support, dated September 28, 2012**

Exhibit 6—
Excerpts of Expert Report of Lawrence Wu,
dated June 29, 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A-4016

6-5-07 Hearing Transcript

4   dismiss this case under Rule 12 on the basis of foreign
5   sovereign compulsion.  Alternatively, on the basis of the act
6   of state doctrine, or as a matter of Your Honor's discretion
7   under the doctrine of comity.
8        Of course, those are related doctrines, but they get
9   it at slightly different things.  I am going to address then,
10  therefore, separately, attempting to be brief, although I
11  would be more than delighted if Your Honor interrupts me with
12  questions when I say something that is not clear or which
13  would prompt that.
14       I believe Your Honor has agreed that Mr. Mitnick,
15  who is here on behalf of the government of China, may also
16  participate in argument and I am going to leave, therefore,
17  some of the things that perhaps are best in his bailiwick for
18  him, those relating principally to the question of the
19  regulatory regime.
20       It seems to me that before we get to, and maybe
21  almost in lieu of our getting to the specific doctrines on
22  which we rely, there are a couple of threshold questions that
23  are presented.
24       The first is, are we properly here under Rule 12?  I
25  think the answer to that --

GR    OCR    CM    CRR    CSR

6

1        THE COURT:  What do you mean by that?
2        MR. BONSE:  That is, is this a matter that can be
3   adjudicated by the Court under Rule 12.  We have made our
4   motion, citing both 12(b)(1) and 12(b)(6), and there are a

6-5-07 Hearing Transcript

5   variety of cases that we have cited which have invoked both of
6   those principles.
7        The plaintiff's view is that we are not here
8   appropriately, that we need discovery, that we need further
9   proceedings.
10       THE COURT:  You mean, on the motion to dismiss?
11       MR. BONSE:  Yes.
12       THE COURT:  I thought you meant jurisdictionally?
13       MR. BONSE:  No.
14       There really isn't a question, in our view, that the
15  Court has subject matter jurisdiction, as we understand that
16  term.  That is true, whichever of the doctrines you are
17  talking about.
18       On the other hand, it seems to me that it is equally
19  clear that courts quite frequently invoking a variety of
20  rubrics have adjudicated motions like this under Rule 12,
21  either saying that the matters are not justiciable,
22  suggesting, as I think Your Honor did in Films by Jove, that
23  you may have a doctrine of abstention when it comes to the act
24  of state doctrine, although you also noted that it has been
25  referred to as a rule of decision.

GR    OCR    CM    CRR    CSR

7

1        Again, I am not sure that we need to get terribly
2   hung up on that here, except to the extent Your Honor has
3   questions about it because it seems to me quite clear that
4   Your Honor has the ability to resolve and dismiss this issue
5   if you are so inclined at this stage of the proceedings.
6        That brings me to the second point that I want to

6-5-07 Hearing Transcript

7   make here, and that has to do with the fact that we are joined
8   today by the government of China, which has submitted an
9   amicus brief, which is the traditional way -- and I don't
10  think there is really any dispute about that -- it is the
11  traditional way in which foreign governments are now invited
12  to make their views known to the court.
13       In much earlier days, the practice was that there
14  would be diplomatic notes that would be transmitted and that
15  procedure has been disapproved.  So again, unless Your Honor
16  has questions about that, I think that the way in which the
17  government's position has been brought before you is not a
18  matter of dispute.
19       But what is very important, in our view,
20  dispositive, and I am going to talk about that, in our view,
21  very important or dispositive, is the fact that in a quite
22  extraordinary act, the government of China has come before
23  this court, has said that the conduct here is mandated.  They
24  have explained to you why, they have explained to you how, and
25  they have said that they believe on that basis this is an

GR    OCR    CM    CRR    CSR

8

1   appropriate case for dismissal.
2        Now, that's your decision to make.  It is not their
3   decision to make.
4        THE COURT:  Okay.  I am not bound to accept what
5   they say is the ultimate truth, as being true, in every
6   respect.
7        MR. BONSE:  That gets me to dispositive.

6-5-07 Hearing Transcript

8        THE COURT:  That's really the heart of it, isn't it?
9        MR. BONSE:  I don't know that it is the heart of it
10  because you can, with a good deal more lenient standard than
11  dispositive, still say that you are going to agree with what
12  they say, accept what they say.
13       THE COURT:  Okay.  All right.  Go ahead.  I didn't
14  mean to interrupt.  Go ahead.
15       MR. BONSE:  No.  That's fine, Your Honor.
16       I think this is important.  In our view, and we have
17  cited cases, the Pink case, the Anoco Cadiz case, several
18  other cases, which have said that when a foreign government in
19  a proper fashion, by authorized officials, comes before the
20  court and represents what its law is, the court is not to look
21  behind that.  That's conclusive.
22       The Department of Justice in the only other case
23  that I am -- only other antitrust case that I am aware of
24  where this issue has arisen, which was the Matsushita, they
25  filed briefs in that case and they said that when a foreign

GR    OCR    CM    CRR    CSR

9

1   government presents its views concerning its own domestic
2   regime, that should be deemed conclusive.  That's what they
3   asked the Court to rule.
4        The Court ended up not reaching the issue when it
5   decided that case because it had some important things to say
6   about predatory pricing that I guess it thought was more
7   important.  But at least we do know what the position of the
8   government is, and, in fact, the guidelines, the so-called
9   international guidelines of the Department of Justice, repeat

6-5-07 Hearing Transcript

10  that same position.

11       Now, if in fact that is right, then it seems to me

12  that that really ought to be the end of the inquiry here

13  because -- and I would be happy to do it at great length.

14  I've got five pages of quotations that I was delighted to see

15  taken from the brief, in which the government of China quite

16  clearly explains how its regime for the regulation of

17  Vitamin C works, what the Chamber of Commerce that's involved

18  here is, and, therefore, why this matter ought not to be a

19  subject of adjudication, because of both foreign sovereign

20  compulsion and act of state, not to mention discretionary

21  review.

22       But it seems to me that I would be entirely unfair

23  both to the argument and to Your Honor if I didn't say that of

24  course I read what you had to say about the subject in Pharma

25  by Dove.  You were quite clear, that in that case you did not

                    GR    OCR    CM    CRR    CSR

                                                    10

1  think that what you were in effect being asked to do there

2  with respect to giving effect to some Russian court judgment

3  was binding on you.  I am not pandering when I say you were

4  exactly right.

5       THE COURT:  How do you distinguish?

6       MR. BONSE:  I --

7       THE COURT:  Okay.

8       MR. BONSE:  That's what I want to do.

9       THE COURT:  Okay.

10      MR. BONSE:  There must be a reason why the united

                    Page 9

---

6-5-07 Hearing Transcript

11  States Supreme Court in Pink said that it was conclusive, why

12  several other courts have said that is is conclusive, why the

13  DOJ says that's conclusive.

14       I think the reason -- they don't mean conclusive in

15  the sense that you don't have to act to make a decision.  They

16  said it in the sense of because of the nature of this process,

17  you as a --

18       THE COURT:  Let's get things -- let me just ask you.

19  Maybe I should ask them.

20       If these companies were in effect state controlled

21  companies, under the Foreign Sovereign Immunity Act they

22  wouldn't they fall under the commercial

23  exception?

24       MR. BONSE:  They would, if they were all

25  foreign -- foreign controlled entities, which they are not.

                    GR    OCR    CM    CRR    CSR

                                                    11

1       THE COURT:  But were they?  In other words, could

2  the Chinese government through its agency come and claim

3  immunity from antitrust liability, were they themselves to

4  engage in predatory pricing or an attempt to monopolize the

5  American market?

6       MR. BONSE:  An attempt to monopolize is --

7       THE COURT:  I spent a lot of time the last couple of

8  weeks, thanks to you guys, rereading the statement.  It

9  strikes me that really -- the defense you are really saying

10  is, we are caught between a rock and a hard place.  That's the

11  defense.

12       MR. BONSE:  That's certainly one of the defenses.

                    Page 10

---

6-5-07 Hearing Transcript

13       THE COURT:  I am having a little trouble

14  understanding why, if they themselves would be liable and

15  could not escape -- would not be immune from liability, why I

16  should take such a deferential view when they are dealing with

17  private companies who may have used the state agency to

18  sanction what may be a price fixing scheme?

19       We will get to whether it was mandated or not in a

20  little while.  I am having a little trouble in the big picture

21  understanding this parsing of the case.

22       MR. BONSE:  We often -- let me try -- let me try to

23  be as direct as I can.

24       If in fact all of these companies were state owned

25  companies, then we would be here on a different motion.

                    GR    OCR    CM    CRR    CSR

                                                    12

1       THE COURT:  Right.

2  What would that motion be?

3  Foreign Sovereign Immunity Act, right?

4       MR. BONSE:  Perhaps, but that isn't the one I had in

5  mind.

6       The one I had in mind was, that then you wouldn't

7  have a Sherman Act case at all.  Because you would then have

8  one entity and one entity cannot fix prices.  One entity --

9       THE COURT:  That's an attempt to monopolize.  I

10  will recharacterize.  They get together with a second party, a

11  private party.  So we have a conspiracy.

12       MR. BONSE:  I think, Your Honor, that it makes a lot

13  of difference what we have.  If in fact you have a sovereign

                    Page 11

---

6-5-07 Hearing Transcript

14  entity acting in a purely commercial capacity, then assuming

15  otherwise they are subject to jurisdiction, they are subject

16  to jurisdiction and there is a commercial exception, Foreign

17  Sovereign Immunity Act.

18       We can create hypotheticals and parse that out, but

19  I am not sure that's going to advance us.  What we need to do

20  is say, why should the result be different here.  The result

21  should be different here because you don't have the

22  government, what you have is parties that are controlled by

23  the government per the brief being told that that they've got

24  to behave in a particular way.

25       THE COURT:  Please keep your finger there.  I will

                    GR    OCR    CM    CRR    CSR

                                                    13

1  give you all the time you need.

2       Some of the descriptions of these companies, I was

3  sort of -- are they all private companies or does this -- they

4  have like NEF is a holding company.  They describe it with

5  four partners.

6       Are they all private individuals or are any of the

7  people having -- are there any state entities that have any

8  interest in these companies?

9       Some of them are clearly listed on the stock -- one

10  of them, the Hong Kong Stock Exchange.  There were so many

11  papers here, I forget who is who.

12       MR. BONSE:  One of the unique aspects, all of these

13  companies at one time were state owned.

14       THE COURT:  Right.

15       MR. BONSE:  I think it is fair to say, they are all

                    Page 12

6-5-07 Hearing Transcript

16   in the process of transitioning. One of the reasons why we
17   think that this court ought not to keep this case is that we
18   are in such a unique situation. That is, the only reason that
19   we are even talking about the antitrust laws is because China
20   decided to go, to transition to a market economy, which it is
21   in the process of doing, though it's by no means complete, as
22   this case I think indicates.
23              But the answer is, certainly -- the client I
24   represent, Jiangsu, is not state owned now. It has some
25   residual minority interest in regional governments because you

GR   OCR   CM   CRR   CSR

14

1   have to have things sold off.
2              But for purposes here, we have entities that cannot
3   come to you and say, we are --
4        THE COURT: State instrumentalities or state
5   agencies?
6        MR. BOWSE: Right.
7        THE COURT: Okay.
8        MR. BOWSE: That is what puts us in the position of
9   the Chinese government, where these companies exist, and
10   pursuant to whose laws they operate, says you are to behave in
11   a particular way. You are to get together, you are to agree
12   upon prices or output quotas in order to keep up your profits
13   because that's what we want you to do.
14              Then the United States antitrust laws would say,
15   thou shalt not do that. There is no question, that horizontal
16   price fixing when done by United States companies is, in the

Page 13

17   6-5-07 Hearing Transcript
17   absence of something else, unlawful.
18              They are, as you put it, between a rock and a hard
19   place, and that is the posture in which we find ourselves and
20   I think it is the posture in which Your Honor needs to
21   adjudicate this.
22              By the way, I don't want to -- unless Your Honor
23   invites it, I don't want to get too deeply into how the
24   antitrust laws would work if this was a Chinese entity trying
25   to monopolize the United States market. But I think there

GR   OCR   CM   CRR   CSR

15

1   would be -- the reason that that wouldn't involve immunity
2   would have to do with the fact that it wasn't domestic
3   conduct.
4              Here, you have in China the Chinese government
5   imposing obligations that cannot be met without violating
6   Chinese law, and yet which are said to violate American law.
7   I think that is exactly what the Foreign Sovereign Compulsion
8   Doctrine was intended to get at.
9              I think that we rely primarily on the foreign
10   sovereign compulsion doctrine, on InterAmerican and
11   Trugman-Nash cases in which in situations where there was no
12   representation before the Court about -- by the government
13   that was concerned, the Court still said, there is compulsion
14   here. We are not going to put you in that position.
15              Again, the antitrust division guidelines say that
16   you shouldn't be put in that position.
17              So in terms of foreign sovereign compulsion, those
18   are the cases we rely upon and the principle is, I think,

Page 14

6-5-07 Hearing Transcript

19   quite straightforward and quite clear.
20              I am happy to go into that more, but I'd rather move
21   along to the act of state doctrine, if the Court is --
22        THE COURT: I don't know which is the more helpful.
23   I don't know whether this question more appropriately is
24   directed to the representative of the Chinese government here.
25              It just -- we will come back to the act of state. I

GR   OCR   CM   CRR   CSR

16

1   just am reading papers and trying to understand, what was the
2   purpose of the Chamber and the so-called subcommittee at the
3   time they were formed, which goes back, as I understand it, to
4   the early nineties?
5        MR. BOWSE: To oversee and regulate as appropriate.
6        THE COURT: What did they do?
7        MR. BOWSE: They -- I can't -- I don't think I could
8   possibly answer your question fully. I really don't know all
9   of the things they did.
10        I know what the charter --
11        THE COURT: One thing they didn't seem to do is to
12   do any price fixing until there was a market power
13   established.
14        MR. BOWSE: Again, without being able to go into
15   what was in their mind, that's not --
16        THE COURT: That's part of my problem on the motion
17   to dismiss.
18        MR. BOWSE: Your Honor, the fact that the government
19   may at some times have chosen to be more active and at some

Page 15

20   6-5-07 Hearing Transcript
20   times chosen to be less active does not affect the nature of
21   the regulatory scheme or at least --
22        THE COURT: There is something strange here. They
23   didn't get very active. Theoretically, as I see the powers as
24   described here, they were -- had greater powers at the time
25   when prices weren't being fixed and took a lesser role when

GR   OCR   CM   CRR   CSR

17

1   the prices were being fixed. They changed the whole system to
2   basically this, we approve what you have done. You've got to
3   agree and we approve it, as opposed to them actually fixing
4   it.
5        Isn't it sort of strange?
6        MR. BOWSE: I don't -- I don't think so, thinking
7   about this as an antitrust lawyer, at all. If you
8   don't -- this was, after all, we -- we had in this world a
9   real vitamin cartel. It didn't involve the Chinese. It
10   involved the Germans. It involved the Japanese. It was a
11   real price fixing cartel, international in scope.
12        THE COURT: Right.
13        MR. BOWSE: That's not what we are even alleged to
14   have here. What we are alleged to have here are just four
15   domestic Chinese companies, and if four companies without any
16   market power were to try to raise prices it would have no
17   effect.
18        THE COURT: So they made no effort because they
19   couldn't achieve their goal. But the minute that the other
20   price fixing scheme fell apart and they found themselves with
21   a powerful market share, then they decided they'd get together

Page 16

6-5-07 Hearing Transcript

22   and fix the prices.
23        MR. BOWSE:  No.  I don't think Your Honor has the
24   facts exactly right.
25        the --

                GR    OCR    CH    CRR    CSR

                                                        18

 1        THE COURT:  You can say I have them totally wrong
 2   but this is --
 3        MR. BOWSE:  That's right.  But again, I -- that's
 4   right.  I don't think we ought to be looking into those facts.
 5   I don't think we need to go behind that.
 6        But I want to answer Your Honor's question.  The
 7   answer is, that what really happened was, the Chinese became
 8   more efficient.  They were lower cost.  We read that in the
 9   newspaper every day about the issues involving china being
10   lower cost.
11        They became lower cost.  That in effect undermined
12   the existing cartel, gave these little companies the ability
13   to go out and capture market share.  And they did that.
14        It occurred over a period of a number of years.
15   Prices were going down.  American consumers were wonderfully
16   better off, worldwide consumers were wonderfully better off.
17        THE COURT:  Absolutely.
18        MR. BOWSE:  Now, at -- you might say, it was -- as a
19   matter of American antitrust law, that should have continued.
20   But as a matter of Chinese antitrust law, the government says
21   you know, this is wonderful that you are out there doing all
22   of these things.  But you are also undermining the ability to

                Page 17

---

6-5-07 Hearing Transcript

23   have a stable profitable vitamin c industry here in China.
24   And so what --
25        THE COURT:  How did the government become aware

                GR    OCR    CH    CRR    CSR

                                                        19

 1   that this was causing this problem?  In other words, how did
 2   the -- how did the government become aware?  Except at the
 3   defendants instigation?
 4        You are describing a wonderful market.  Free
 5   enterprise, they were more efficient, they are selling better.
 6   It seems to me that's pretty good, pretty profitable.
 7        MR. BOWSE:  It's what the United States antitrust
 8   laws generally want.
 9        By the way, sometimes the United States decides it's
10   going to protect an industry or a group of people as well.  We
11   don't always base competition as the be all and end all in
12   this country either.
13        THE COURT:  I realize that.
14        MR. BOWSE:  It is why we have the Parker against
15   Brown doctrine where states dictate how companies ought to
16   behave.
17        I am not here to say that the American antitrust
18   laws are wrong when they say that they want competition.  I am
19   here to say that it's not the only model.  In fact, the --
20        THE COURT:  Why don't we get to the bottom line?  We
21   are just going around in circles here a little bit.
22        Even if I accept everything that's in the Chinese
23   paper, I am having trouble understanding how these prices were
24   mandated.  In other words, why didn't they just -- the

                Page 18

---

6-5-07 Hearing Transcript

25   government wanted them to agree.

                GR    OCR    CH    CRR    CSR

                                                        20

 1        MR. BOWSE:  Yes.
 2        THE COURT:  Why can't they agree on a non-cartel
 3   price but a normal competitive price.  They could have agreed
 4   on that.
 5        MR. BOWSE:  They not only could have, they may have.
 6   If the case goes --
 7        THE COURT:  Then we will find out.  Then they have
 8   no damage here.
 9        MR. BOWSE:  That's right.
10        But the -- but we don't get to the question of was
11   the price that they agreed upon a reasonable price, a
12   competitive price, a super competitive price.  The point --
13        THE COURT:  We do get to the price, why was this
14   mandated.  I don't see anything in these papers that -- in the
15   Chinese papers which said that this is mandated.  The only
16   thing that was mandated was they would get in a room and
17   agree.  I don't see even -- which I would ask the
18   Chinese -- the lawyer who came prepared, tell me where in the
19   Chinese law it says that they had a right to fix the price.  I
20   mean, the Chinese government.  Only these people had to agree.
21        There is a reason I think they keep on calling
22   it voluntary.  I am having a lot of trouble understanding,
23   quote, why this is mandated, even if you accept the Chinese
24   rule in reading their papers.
25        MR. BOWSE:  Well, I think if you accept -- if you

                Page 19

---

6-5-07 Hearing Transcript

                GR    OCR    CH    CRR    CSR

                                                        21

 1   accept what china said, they --
 2        THE COURT:  Remember, this is a motion to dismiss.
 3   You want me to accept these representations without any
 4   discovery, without any real understanding of what exactly
 5   happened here.  Now it came about, that these -- first of all,
 6   that the rules were changed, they had to in effect create this
 7   subcommittee, which then had to agree on the price.  It
 8   doesn't say who instigated this, how it came about.
 9        You keep on using these phrases, the profitability
10   of the industry.  The way you are describing it, it was
11   perfectly all right until one day somebody, and it is not
12   clear to me who decided well, it is better that we engage in
13   this, where you all agree on the price.  Somehow it coincides
14   with a time when they in effect get a dominant position in the
15   market after the collapse of the earlier cartel.
16        MR. BOWSE:  Assume all -- assume as we must that --
17        THE COURT:  All that is true?
18        MR. BOWSE:  That all of that is true, I would
19   suggest to Your Honor on two grounds that doesn't mean that
20   this case ought to go on.
21        Because what is required is that these companies
22   existed under a regime in which they were expected to behave
23   in certain ways that they did behave.  Those ways, if we
24   assume, as we again must, are contrary to American antitrust
25   law, means that they were between a rock and a hard place.

                GR    OCR    CH    CRR    CSR
                Page 20

6-5-07 Hearing Transcript

22

```
 1        THE COURT:  I am having trouble with that, just what
 2   you said, that they were expected.  You see.  I am having a lot
 3   of trouble understanding.  This, of course, I will go after
 4   the plaintiffs how they propose to go about all this, if they
 5   want to prove it, how would they, quote, expect it?
 6        In other words, was there a Chinese official sitting
 7   in the room telling them you will come up with a price that
 8   all of you can make a nice, handsome profit, a cartel price,
 9   or did they just decide among themselves and then got the
10   government to give it a veneer of sanction.
11        MR. BOWSE:  If we take the allegations in the
12   plaintiff's complaint, the association convened these
13   meetings.  The Chamber of Commerce convened these meetings in
14   order to get the price up.
15        I mean, yes, the --
16        THE COURT:  Why do they keep on referring to it as
17   voluntary?
18        MR. BOWSE:  It is voluntary --
19        THE COURT:  Why do they even have to use that term?
20   Was it a violation of some obligation that the Chinese
21   undertook under the World Trade Organization?
22        MR. BOWSE:  I have no idea why they used, quote, the
23   term voluntary.
24        If you go back to the Matsushita case, you will find
25   that the quotas that Japan had for the import of televisions
```

                    GR    OCR    CM    CRR    CSR

                    Page 21

6-5-07 Hearing Transcript

23

```
 1   and autos into the United States was a, quote, voluntary
 2   agreement.  It was no more voluntary than the agreement here
 3   in the sense that you could just ignore.  It was voluntary,
 4   they needed to put together.
 5        The phrase that really is used, Your Honor, is
 6   self-discipline.  The plaintiffs hit on that.  They say,
 7   self-discipline.
 8        Now, let's take a look, if we can, not at what we
 9   submitted, but at what the plaintiffs submitted.  It is their
10   Exhibit D.  It says --
11        THE COURT:  Excuse me.
12        MR. BOWSE:  It says down at the bottom of what is
13   the first page of the exhibit, in December 2001, through
14   efforts by the Vitamin C subcommittee of China Chamber of
15   Commerce of Medicines and Health Products Importers and
16   exporters, what we call the chamber, each domestic
17   manufacturers were able to reach a self-regulated agreement
18   successfully whereby they would, as you say, voluntarily
19   control the quantity and pace of exports to achieve the goal
20   of stabilization while raising export prices.
21        Now, yes, the word "voluntary" is in there, but it
22   is in the context of the efforts of the Vitamin C
23   subcommittee, and what the government has come here to tell
24   Your Honor is what that means.  They have said, this was not
25   voluntary.  That is where --
```

                    GR    OCR    CM    CRR    CSR

                    Page 22

                    24

6-5-07 Hearing Transcript

```
 1        THE COURT:  All right.  Maybe I didn't speak clearly
 2   enough.
 3        In reading Judge Haight's opinion, okay, which I
 4   thought was probably the strongest case for you, involving New
 5   Zealand Dairy, there was a statute which was quoted which
 6   directed the Dairy Board, or whatever it was called, to
 7   arrange -- to do what they were doing in order to -- that in
 8   effect New Zealand dairy industry would have in effect an
 9   ability to provide some muscle against American efforts to fix
10   the market for the benefit of the American dairy farmers.
11   They provided a clear standard, okay.  That is -- why they
12   did what they did, and to give them in effect a tool to meet
13   the challenge.
14        This all describes a wonderful process but I would
15   like to see where is the law that said that they should in
16   coming to this agreement in effect stabilize the market to
17   ensure the profit of the industry.  This sounds like this was
18   all created by the participants in this cartel and then just
19   got some government official to sanction it.  There is no
20   statute that I see, no guideline.  Even accepting your
21   proposition that I am bound to accept the Chinese law, I don't
22   see any, quote, Chinese law.
23        MR. BOWSE:  I would submit, Your Honor, now I am
24   turning to Mr. -- to exhibits to Mr. Witnick's declaration,
25   Exhibit D.  We start with Exhibit D.  I am basically going to
```

                    GR    OCR    CM    CRR    CSR

                    25

```
 1   go through from Exhibits D through Exhibit K and you --
```

                    Page 23

6-5-07 Hearing Transcript

```
 2        THE COURT:  Why don't you just point me to that
 3   portion you would rely on.  I don't need -- I understood how
 4   the whole thing works, but that what -- what these guys did or
 5   these companies did was mandated by Chinese law.
 6        MR. BOWSE:  Okay.
 7        THE COURT:  As opposed to them getting together to
 8   do what they thought would take advantage of their cartel
 9   pricing.
10        MR. BOWSE:  By the way, I don't want to suggest that
11   even if the facts were as Your Honor somewhat dismissively
12   refers to them, that that would not still qualify for act of
13   state treatment.
14        But holding now the foreign sovereign compulsion, in
15   Exhibit D you have the government's rules about how social
16   organizations operate.
17        THE COURT:  Okay.
18        MR. BOWSE:  That's the Chamber.  It says they are in
19   charge of regulating the operations.
20   We then go to Exhibit F.
21        THE COURT:  Right.
22        MR. BOWSE:  Establishing the vitamin subcommittee as
23   part of the Chamber.
24        THE COURT:  I note, look at the first line of it.
25        MR. BOWSE:  Yes.
```

                    GR    OCR    CM    CRR    CSR

                    26

```
 1        THE COURT:  We hereby acknowledge the receipt of the
 2   document entitled request for establishing the Vitamin C
 3   subcommittee.
```

                    Page 24

6-5-07 Hearing Transcript

```
 4        MR. BONSE:  Yes.
 5        THE COURT:  Who was that request for?
 6        MR. BONSE:  I think -- I am quite sure it was from
 7   the Chamber.  Not from -- mom, if you want to ask me, okay,
 8   are your clients members of the Chamber?  The answer is, they
 9   are members of the Chamber.
10        The Chamber also has its own operational full-time
11   staff and it is my understanding and belief that the request
12   was made by the Chamber.  The Chamber asked, we want to have a
13   Vitamin C subcommittee because they regulate lots of things.
14        They reply that the request is approved.
15        THE COURT:  What does it say?
16        MR. BONSE:  The major responsibilities of the VC
17   subcommittee are to be responsible for coordinating the
18   Vitamin C export market price.
19        THE COURT:  Where are you reading from now?
20        MR. BONSE:  Paragraph one on the first page of
21   Exhibit F, Your Honor.
22        THE COURT:  All right.  Paragraph one, Exhibit F.
23        MR. BONSE:  I am happy to give the --
24        THE COURT:  Where are you reading from?
25        MR. BONSE:  It's under number one there, request for
```

                    GR    OCR    CH    CRR    CSR

                                                    27

```
 1   establishing is approved.  The next sentence, the major
 2   responsibilities --
 3        THE COURT:  I see.  Coordinating the price?
 4        MR. BONSE:  Yes.
```

                    Page 25

6-5-07 Hearing Transcript

```
 5        THE COURT:  Export price?
 6        MR. BONSE:  Yes.
 7        THE COURT:  Okay.
 8        MR. BONSE:  Next I will go to G, which is the
 9   charter of this subcommittee, which has been approved.  It
10   talks about their functions.  It says, under Chapter Three, I
11   am now on page two of Exhibit G, that only the members of the
12   subcommittee have the right to export Vitamin C.
13        By the way, that is really a direct analog, I
14   believe, to what was before the Court in the New Zealand case.
15   That was the thing there that the judge found important, that
16   is, that there was a -- he said okay, it is not put in the
17   biblical command sense.  Here it is put in the biblical
18   command sense.
19        THE COURT:  Let's not get side tracked on the
20   voluntary.  Really to me the difference between your case and
21   this is that there was a rational explanation offered for why
22   New Zealand was doing what they were doing, in effect to deal
23   with the anticompetitive nature of the American market and
24   give them a tool with which to fight the American market.  I
25   think Judge Haight was right.
```

                    GR    OCR    CH    CRR    CSR

                                                    28

```
 1        But I don't see here what the rationale, and I don't
 2   see anything in the government's thing, other than this
 3   subcommittee decided at the behest of the parties here to go
 4   into the price fixing scheme here.  Maybe it is immune from
 5   liability.  But I find it very difficult to understand why it
 6   is that on a motion to dismiss I should assume that this was
```

                    Page 26

6-5-07 Hearing Transcript

```
 7   mandated by Chinese law.
 8        But go ahead.
 9        MR. BONSE:  I think the mandate, from what I am
10   reading, and I am happy to go on reading, is clear.  What you
11   were challenging me about is well, what is the rationale.  I
12   understand.
13        The rationale, it was to have a healthy domestic
14   Vitamin C industry.
15        THE COURT:  What evidence is there that there was no
16   healthy market before they put this committee together?
17        MR. BONSE:  I don't know if there was or wasn't.
18   That, with all respect, is not what a United States court
19   ought to be, in my view, inquiring into.
20        Let us say that in the New Zealand case, to make it
21   a little more neutral, what the resolution had been, in order
22   to charge a super competitive price and make as much money as
23   we can, we hereby do the things that they did.  Absolutely --
24        THE COURT:  That's not what New Zealand case was
25   about.
```

                    GR    OCR    CH    CRR    CSR

                                                    29

```
 1        MR. BONSE:  But what if it had been?  Should that
 2   affect --
 3        THE COURT:  Probably.
 4        MR. BONSE:  I would suggest to Your Honor, that that
 5   is exactly --
 6        THE COURT:  In the New Zealand case there was before
 7   Judge Haight.  I didn't -- I read it very carefully.  I didn't
```

                    Page 27

6-5-07 Hearing Transcript

```
 8   have any problem with that case.  It seemed to make a lot of
 9   good sense, that the government there deliberately got into
10   the business to provide their industry, which was being hurt
11   by America's anticompetitive rules, to protect their industry
12   and if they hadn't had the rule, there would only have been a
13   down side.
14        MR. BONSE:  I would say to Your Honor that --
15        THE COURT:  I don't see any evidence, and when I ask
16   the Chinese representative, I would like to know what was the
17   rationale for this law.  Where is there a document that tells
18   me this was Chinese law?  I understand the process that they
19   created.
20        MR. BONSE:  I am not -- I don't think any of us will
21   be able to do better than to say that MOFCOM is the Ministry
22   of Commerce.  It is the government.  It's like a cabinet
23   department.  You can't get any higher in terms of trade and
24   commerce.
25        MOFCOM said, we are establishing under our control
```

                    GR    OCR    CH    CRR    CSR

                                                    30

```
 1   this Chamber.  The Chamber has the Vitamin C subcommittee.
 2   That is the legal --
 3        THE COURT:  Where in Chinese law is that authorized
 4   to do what they did here?  What Chinese law authorized MOFCOM,
 5   as you put it, to establish this price fixing scheme?
 6        MR. BONSE:  I wouldn't -- I --
 7        THE COURT:  In the New Zealand case there was a
 8   statute, a plain statute, passed by the parliament of New
 9   Zealand, authorizing the board for the reasons set forth in
```

                    Page 28

6-5-07 Hearing Transcript

10 the statute and they carried it out.
11    I don't see where MOFCOM other than at the behest of
12 a group of price fixers did anything other than get them to in
13 effect sanction what if they -- if they had not in a room
14 without this label would clearly be a violation of American
15 law.
16    You are saying this was mandated by the government
17 of -- the Chinese government. I am having trouble, first of
18 all, seeing what Chinese law actually mandated it, and
19 secondly, I don't even understand what the rationale is, why
20 they were required to fix prices the way it was.
21    MR. BONSE: They --
22    THE COURT: Go ahead, I will give you plenty of
23 chance.
24    MR. BONSE: I can look in the Constitution of the
25 United States and I won't find the Department of Health and

GR    OCR    CM    CRR    CSR

31

1 Human Services referred to. I am sure we can provide Your
2 Honor --
3    THE COURT: I would like to see that.
4    MR. BONSE: -- with information as to what MOFCOM
5 is, if that's what -- if that's what Your Honor's concern is.
6    THE COURT: THAT MOFCOM was authorized by Chinese
7 law to establish this committee and that this committee was
8 authorized to fix prices in the way they did. I would like to
9 see -- that's what I would think that you would be required to
10 show other than some Ministry issued a rule. Maybe the

Page 29

6-5-07 Hearing Transcript

11 Ministry had no authority to do it. Maybe these guys got some
12 government official to create these committees and to make
13 it -- give it a veneer of legality when it wouldn't even be
14 legal under Chinese law.
15    MR. BONSE: The government of China is here saying
16 that this was --
17    THE COURT: I understand the representative.
18 Hopefully, he will be able to enlighten me when he gets up. I
19 don't understand why the plaintiffs oppose him standing up.
20 Maybe he will be sorry he stood up.
21    MR. BONSE: Maybe he will.
22    I think that -- we have leapt over a couple of what
23 I at least think are pretty important things in this, and I
24 think if we were to look at the transcript --
25    THE COURT: I took you off the track.

GR    OCR    CM    CRR    CSR

32

1    MR. BONSE: No, sir, you didn't.
2    THE COURT: You are entitled.
3    Go ahead.
4    MR. BONSE: One thing I know about, if there is
5 something important to you, it is important to me. So I want
6 to talk about that.
7    I want to talk about the fact that all of these
8 questions, which I can understand why you might think, why did
9 they do this, why did they want to fix the price? Why didn't
10 they want to just let these people compete? Did they really
11 want to do that?
12    Those are all fine questions to ask, but not in this

Page 30

6-5-07 Hearing Transcript

13 context. Because the rule, I believe -- and I am going to
14 stand by this -- is that at a minimum what the government
15 tells you is entitled to substantial deference as to what
16 Chinese law is.
17    More important -- much more important. Equally
18 important, if we were to look, Your Honor, at the transcript
19 of the last colloquy we have been having, when you are saying
20 why did they do this, what was their motivation, what was this
21 all about.
22    THE COURT: I was just contrasting this with the
23 New Zealand case.
24    MR. BONSE: Also because in one case you seem to
25 like what the motivation is.

GR    OCR    CM    CRR    CSR

33

1    THE COURT: Not that I like it, but I understood it.
2    MR. BONSE: I understand I'm fine.
3    Every company in the United States would love to be
4 able to be authorized by law to raise prices if it could. It
5 happens and got to be what usually is the rule, although sometimes
6 it is.
7    But the fact of the matter is, that the government
8 decided that in order to -- and they do say it in their brief.
9 They say that it is important in terms of protecting Chinese
10 trade, in terms of protecting employment, avoiding ruinous
11 competition. These are the things that they thought applying
12 Chinese standards.
13    Once -- it is not the case that however devoted you

Page 31

6-5-07 Hearing Transcript

14 and I might be to a capitalist economy because we think that
15 consumer welfare is increased by unfettered competition, not
16 everybody agrees.
17    In fact, in the OPEC case, which has been -- which
18 was a Ninth Circuit case out my way, but it has been cited
19 with approval a number of times here, there was a specific
20 discussion about the fact, you know, these people are engaged
21 in an out and out cartel to limit production and raise prices
22 so that American consumers pay too much for oil, and you know
23 what? That is immune from antitrust scrutiny.
24    The Court specifically said, and I am happy to get
25 the page and the quote if you need, said there is not an

GR    OCR    CM    CRR    CSR

34

1 international consensus that cartels are a bad thing.
2    So what I want to say to Your Honor is, while you
3 may think that with New Zealanders being defensive, we are
4 going to counterpunch, that that's good, and what the Chinese
5 perhaps were doing was we are going to protect our domestic
6 industry and get the prices up when there otherwise might be
7 ruinous competition, you are not so crazy about that.
8    Well, that's not a judgment, I submit, that Your
9 Honor or any other American court ought to be making, any more
10 than in the Sabbatino case thought Cuba nationalizing American
11 assets was a good thing. It's --
12    THE COURT: All right. Do you want to go now to
13 your act of state argument?
14    MR. BONSE: I do want to go to my act of state
15 argument, but only -- I am happy to go -- continue to walk

Page 32

6-5-07 Hearing Transcript

16   through those exhibits because I think they will show --
17        THE COURT: Go ahead.
18        MR. BOWSE: It's -- what I want to do is be helpful.
19        THE COURT: Okay.  I think I have laid out the
20   question.  Maybe your colleague will be able to explain to me
21   how this case falls like Judge Haight's New Zealand case,
22   which I think is your strongest case.
23        MR. BOWSE: Certainly I think it is --
24        THE COURT: What would be your other strongest case?
25        MR. BOWSE: InterAmerican.  I think in

GR   OCR   CM   CRR   CSR

35

1   InterAmerican, the Court was quite clear in that case, in
2   saying that the Court -- well, in that case, the plaintiffs
3   came in and said there was no compulsion.  They had an expert
4   as they had here.  The Court said I can't look at that.
5        This Court may not undertake such an inquiry, that's
6   the quote, quoting and citing Sabbatino.  For our courts to
7   look behind the acts of a foreign government would impinge
8   upon and perhaps impede the executive in that fashion.
9        Again, I think that fairly sets out the rule
10   here.  It is not the why, but the what that matters.  The what
11   is what I was beginning to go through in Exhibits E and F and
12   I can go through G, H, I, J and K.
13        THE COURT: I think I can do that.
14        MR. BOWSE: I think you can too.  They are set out
15   in the briefs, Your Honor.
16        THE COURT: Okay.

Page 33

6-5-07 Hearing Transcript

17        MR. BOWSE: Now let's turn to the act of state
18   doctrine because the act of state doctrine does not require
19   compulsion.  The act of state doctrine is based upon
20   separation of powers.  When I was saying that if we look back
21   at the transcript of the colloquy that you and I have been
22   having about why did they do that, I could not more --
23        THE COURT: I spent some time.  I really had a lot
24   of trouble figuring out -- the compulsion argument, let me put
25   it this way, has a lot of force to it.  Maybe even if I don't

GR   OCR   CM   CRR   CSR

36

1   grant it, I think they are going to have a lot of trouble on
2   summary judgment on the motion to dismiss.
3        I had a lot of trouble on your act of state
4   argument.  The act of state is talking about actions taken in
5   China involving -- in Cuba, involving taking of property,
6   government seizure with violation of international law,
7   whatever it is in there.  I never heard the act of state
8   really as applying to commercial kinds of arrangements where
9   the effect is here in the United States.
10        I don't even know where this contract was made for
11   the sale of goods.
12        MR. BOWSE: I don't --
13        THE COURT: In other words, how does act -- do you
14   have any case that would apply an act of state doctrine to
15   this kind of case?
16        MR. BOWSE: Yes.
17        THE COURT: Go ahead.  Give me one.
18        MR. BOWSE: OPEC.

Page 34

6-5-07 Hearing Transcript

19        THE COURT: OPEC? Anything else?
20        MR. BOWSE: I certainly think no.  GME Shipping,
21   Clayco, Hunt, Hunt against Mobile Oil in the Second Circuit.
22        THE COURT: All right.
23        MR. BOWSE: I think I mentioned Occidental
24   Petroleum, all act of state cases, all antitrust cases,
25   Your Honor, I --

GR   OCR   CM   CRR   CSR

37

1        THE COURT: Look, I understand the idea that the
2   state -- I just have a little trouble understanding that if
3   China did this itself, okay, and state control, I think that
4   there would be a basis of federal jurisdiction under the
5   antitrust law to which immunity would not apply and,
6   therefore, the act of state doctrine would not provide them a
7   defense.  But somehow because it is private companies it
8   provides a defense, I guess I am missing something.  Maybe I
9   am.
10        MR. BOWSE: There would not be a claim here if this
11   was done by the government of China.  It wouldn't operate
12   necessarily as an act of state principle.
13        THE COURT: What principle would be applicable?
14        MR. BOWSE: I want to go too fast.  I think it
15   could well be -- operate as an act of state principle.
16        THE COURT: We've already in the Foreign Sovereign
17   Immunities Act and international law already says it
18   doesn't -- the defense doesn't apply when the state gets into
19   a commercial kind of business.

Page 35

6-5-07 Hearing Transcript

20        MR. BOWSE: Your Honor, in OPEC you had foreign
21   governments agreeing with one another to enter a cartel.
22        THE COURT: The united states, if you read the case
23   carefully, I think it is pretty clear why it was treated
24   differently.  It did involve the foreign relations of the
25   United States in no way contradicts application of the act

GR   OCR   CM   CRR   CSR

38

1   and issues of foreign policy, all those concerns.  I don't see
2   the United States appearing here to defend your -- the conduct
3   here.
4        MR. BOWSE: The United States -- in effect, there
5   are several cases which discuss the fact that the absence of
6   the United States in no way contradicts application of the act
7   of state doctrine.
8        The only --
9        THE COURT: I just find it hard to understand, that
10   if they got into -- the government there got into a price
11   fixing scheme to fix the American market and the government
12   did it itself, that somehow that -- the act of state -- I am
13   only talking about the act of state doctrine.  I never heard
14   of it applied that way.
15        MR. BOWSE: As I.
16        I think this case is a lot narrower than OPEC.  In
17   OPEC you had a bunch of different countries getting together
18   to fix the price by limiting --
19        THE COURT: You don't see that is very different
20   here?
21        MR. BOWSE: Let me explain why I see it as

Page 36

6-5-07 Hearing Transcript

22   different. Here you have only Chinese domestic enterprises in
23   China being directed to behave in a certain way.  That is
24   quintessentially what an act of state amounts to.  That is,
25   domestic regulation.

GR   OCR   CH   CRR   CSR

39

1          There is no allegation here that the Chinese
2   companies got together with German or Japanese companies.
3          THE COURT:  I didn't have a chance to read
4   everything.  But -- because I was -- found it so
5   extraordinary, your position here, that you had me going back
6   to the books.
7          Okay.  The Section 415 of the Restatement, the
8   foreign relations law, okay, subsection two, any agreement in
9   restraint of United States trade that is made outside of the
10   United States, and any conduct or agreement in restraint of
11   such trade that is carried out predominantly outside the
12   United States, are subject to the jurisdiction to prescribe
13   the United States if a principal purpose of the conduct or
14   agreement is to interfere with the commerce of the United
15   States, an agreement or conduct that has some effect on that
16   commerce.
17          I realize that's an issue of jurisdiction to
18   prescribe, to declare it unlawful.  It seems to me awfully
19   strange that the Restatement would go to this extent if your
20   theory that an act of state always operates as a defense here
21   in this kind of situation.
22          MR. BONSE:  I am not --

Page 37

6-5-07 Hearing Transcript

23          THE COURT:  Maybe I am not -- maybe I am not making
24   myself clear.
25          MR. BONSE:  No.  I think you are.

GR   OCR   CH   CRR   CSR

40

1          THE COURT:  415.  What's the point of 415 if every
2   time you are in the situation that you are describing it is an
3   automatic defense of an act of state?  There never -- what's
4   the point of our attempt to prescribe when presumably the act
5   of state doctrine also in here would cover it?
6          MR. BONSE:  I don't think it -- it's either always
7   or never.  I think that --
8          THE COURT:  Can you give me a situation where it
9   wouldn't apply in your theory?
10          If this act of state -- if you are right and the act
11   of state, when could an antitrust action ever be brought in
12   the United States where the people claim that the government
13   there approved it?
14          MR. BONSE:  If it was not merely an internal
15   regulation, would seem to me to be one such situation.  That
16   is, if China said to its various companies, go out
17   and agree with the Germans and the Japanese and the Americans
18   to fix prices.  That would not, I don't believe, qualify for
19   act of state immunity.
20          This case is not that case.  There is no allegation
21   here, none, that there was any kind of extraterritorial cartel
22   arranged here.  The extraterritorial cartel was the one that
23   was the subject of the earlier borrowings that the United
24   States brought as criminal actions.

Page 38

6-5-07 Hearing Transcript

25          We do have, Your Honor, cases, not just OPEC.  As I

GR   OCR   CH   CRR   CSR

41

1   say, I think OPEC is a lot more egregious.  If the problem
2   there --
3          THE COURT:  It's both more egregious, but
4   nevertheless involving issues that go far beyond this one in
5   terms of international relations and our foreign relations of
6   the United States.
7          MR. BONSE:  Then that would have been -- that would
8   have been a situation for the application of comity, not the
9   act of state doctrine, I would suggest.  Yet, the decision is
10   based on -- and --
11          THE COURT:  Was it ultimately based on that?
12          MR. BONSE:  Yes, Your Honor.
13          THE COURT:  You may be right.
14          MR. BONSE:  The same thing is true of, as I
15   mentioned, Clayco and Hunt, which again, I mean, if -- if Your
16   Honor's point here is that the act of state doctrine is
17   limited to oil cases, it seems to me somebody should have said
18   that.  They speak in terms of legal principles.  They speak in
19   terms of not going behind.
20          THE COURT:  Yes, cases also are to be dealt with in
21   the factual context.  You are talking about the natural wealth
22   of each of those countries, that they want to maximize to
23   their benefit.  Maybe you are right, that these general
24   statements about protecting employment and preventing all the
25   arguments that were made in this country in the thirties about

Page 39

6-5-07 Hearing Transcript

GR   OCR   CH   CRR   CSR

42

1   competition, unfair competition leading to loss of jobs
2   because of lower prices, all that may be enough to provide a
3   defense that you are talking about.
4          MR. BONSE:  I --
5          THE COURT:  Okay.  I understand.  I just want to
6   make sure I understand your argument.
7          MR. BONSE:  I --
8          THE COURT:  Anything else?
9          MR. BONSE:  I think you do understand the argument.
10   But I do think that if we get to the point of looking at
11   whether or not the conditions of the argument are met, the one
12   thing that the separation of powers based doctrine, because
13   the act of state doctrine isn't an antitrust principle.  It is
14   a principle that has been applied in antitrust but it is much
15   broader.  It comes from the notion of separation of powers and
16   it says we might not to have courts looking into the
17   motivation of what foreign states do in terms of regulating
18   their own country.
19          THE COURT:  Even if it is designed to affect the
20   American market?
21          MR. BONSE:  It can -- yes.
22          In OPEC and Hunt, of course, there were effects.  If
23   Mr. Hunt --
24          THE COURT:  There were effects.  There were
25   worldwide effects, not just the American market.

GR   OCR   CH   CRR   CSR
Page 40

# A-610

6-5-07 Hearing Transcript

43

```
 1          All right.  I got your point.  Now we are getting
 2    repetitive.
 3          Is there anything else?
 4          MR. BOUSE:  I don't want to be repetitive, Your
 5    Honor.  But I do want to -- I want to stress, we do have,
 6    after all, have the Second Circuit's decision in Wont where
 7    the court went out of its way to say we should not as a Court
 8    here, it is beyond our competence, to get into the question of
 9    what the motivation is for activity that was taken.
10          THE COURT:  You characterize it as motivation.  All
11    I want to know is the statutory basis for it and the theory
12    behind it.  In the New Zealand case, on the reargument, it was
13    made very clear to Judge Haight.  Maybe the same --
14          MR. BOUSE:  The statutory basis I think I have given
15    you.  The motivation --
16          THE COURT:  You have given me the statutory basis
17    for what they believe?  You described the setting up of the
18    committee, the process, et cetera.  That --
19          MR. BOUSE:  We put --
20          THE COURT:  Maybe you --
21          MR. BOUSE:  We have put before you what the
22    regulations are that have governed these companies.
23          THE COURT:  As I read the regulation, at least
24    initially, maybe -- is that I don't see where their agreeing
25    on a price is necessarily one that would -- A price -- in
```

                        GR    OCR    CM    CRR    CSR

Page 41

6-5-07 Hearing Transcript

44

```
 1    other words, viewing this as a conflict of laws issue, I don't
 2    see what we would call a true conflict.  Namely, that the
 3    Chinese law mandates them to charge a price that would be
 4    viewed as, in our system, as anticompetitive cartel price.  I
 5    don't see that in the requirement.  All it says is they have
 6    to agree on a price.  They could agree on a market price.
 7          MR. BOUSE:  But the violation of the Sherman Act is
 8    in agreeing upon a price.
 9          Socony Vacuum tells us that it doesn't matter
10    whether the price was high, low or otherwise.
11          Your Honor, I can't -- again, I don't want to --
12          THE COURT:  Let me hear from the counsel for the
13    Chinese.  Maybe he will answer some of my questions.
14          MR. MITNICK:  Good morning, Your Honor.
15          Thank you.
16          I am Joel Mitnick and I represent the Ministry of
17    Commerce of the People's Republic of China.
18          I appreciate Your Honor's permission for us to
19    appear here today.
20          If I may begin by saying that perhaps the most
21    important point that I have to make today is simply being made
22    by my presence before I get to answering Your Honor's
23    questions.
24          The government of China, if there is any question,
25    views this case and these matters of sufficient national
```

                        GR    OCR    CM    CRR    CSR

45

Page 42

6-5-07 Hearing Transcript

```
 1    economic importance that for the first time ever they have
 2    sought to come before a United States Court as amicus to
 3    submit their views.  So to the extent there is any question
 4    about the national economic importance of this case to China,
 5    I would like to at the outset at least clarify that.
 6          Your Honor has asked a number of questions that
 7    perhaps it would be best served if I turned immediately to.
 8    Where is the source of law?
 9          If I may approach the bench and hand up, I have
10    prepared a one-page slide that takes us through the various
11    regulations that are exhibits here.
12          THE COURT:  Give a copy to my law clerk as well,
13    please.
14          MR. MITNICK:  Yes, Your Honor, I intend to do that.
15          What this does, Your Honor, is it takes us through
16    the history of the regulations.  But it is clear from some of
17    the questions that went on between Your Honor and the answers
18    of Mr. Bouse, that perhaps I ought to step back a moment
19    before we get to this.
20          Who is the Ministry of Commerce?  Where do they fit
21    in?  What's their authorization and so forth, before we get to
22    any questions of the theory of this particular regulation.
23          The government of China, as the court may be aware,
24    and certainly as the Ministry took pains to try to set out in
25    our amicus brief, is going through an extraordinary transition
```

                        GR    OCR    CM    CRR    CSR

46

```
 1    period.  It is an economic transition, I think it is fair to
```

Page 43

6-5-07 Hearing Transcript

```
 2    say, unlike ever that has been experienced in the United
 3    States.
 4          Until just a couple of decades ago, China was
 5    operated as a complete command economy.  China is in the
 6    process now of transitioning from a complete command economy
 7    to a free market economy, or largely free market economy.
 8          Some of the phrases in some of the regulations that
 9    I have submitted here speak of a socialist market
10    economy.  To be perfectly frank with the Court, I have no idea
11    what a socialist market economy is, but it is very clear that
12    the Chinese notions of a pure market economy may not be
13    exactly the same as what American businessmen or economists
14    might think.
15          Within this system, the laws of the government of
16    China do not have, shall I say, quite the same transparency as
17    the laws of the United States, in the sense that there are
18    statute books that are available, that there are lengthy
19    Congressional statements of intent, where you can read what
20    the debates were all about.
21          The way the Chinese system operates is that you have
22    the state council and the state council is then composed of a
23    number of key ministries.  The Ministry of Commerce is not
24    some backwater regulator in a small city in China, the
25    Ministry of Commerce is the preeminent regulator of the
```

                        GR    OCR    CM    CRR    CSR

47

```
 1    economy, export economy of the People's Republic.
 2          These then are the regulations established by
 3    MOFCOM.  Its predecessor was MOFTEC.  There was a name change
```

Page 44

# A-611

6-5-07 Hearing Transcript

4    somewhere in early 2000 and these were all done pursuant to
5    its authority, as the economic -- the supreme economic
6    regulator within the government of China.
7         The first document that I think is relevant here,
8    and it's one to which Mr. Bonse made reference, is the MOFTEC
9    Measures For Social Organization. I don't want to get out of
10   sequence. I want to address Your Honor's question about the
11   sources of law. But the very nane of this organization cries
12   out for just a very quick detour. If Your Honor would indulge
13   me, part of what the Ministry believes is its perhaps ability
14   to assist the Court here is in helping to clarify the
15   difference in the Chinese system versus our system of what
16   some of these words mean.
17         We hear, for example, the defendants and the Chinese
18   government using words like compulsion. We hear the
19   plaintiffs, on the other hand, using words like voluntary,
20   self-restraint, coordination.
21         It is not difficult to see that when documents with
22   those words were found by the plaintiffs on websites, it must
23   have been manna from heaven because those are precisely the
24   kinds of words that if on the website of an American company
25   would lead to very early settlement discussions and the

        GR    OCR    CM    CRR    CSR

                    48

1    disposition of a case.
2         The government of China is here specifically because
3    those words have totally different meanings within the Chinese
4    and Asian system. Notions of self-discipline, cooperation,

    Page 45

---

6-5-07 Hearing Transcript

5    voluntary, these are words that in the context of these
6    regulations. As Judge Haight observed in the New Zealand
7    case, what -- where he said, at --
8         THE COURT: Could we leave -- I appreciate your
9    going through the history. Leave the American cases out of
10   this for the moment.
11        MR. MITNICK: The only point I was going to make is
12   that things, words may appear permissive in our language as
13   they did in that case, where it's understood in the context
14   that it is not permissive. So let's get to the context.
15        Okay. So we have the establishment of the Chamber.
16   The social organization is established with --
17        THE COURT: Where are we now?
18        MR. MITNICK: The very first tab.
19        THE COURT: The overall group? Okay.
20        MR. MITNICK: 1991, MOFTEC Measures For Social
21   Organization.
22        What this does is it establishes the chamber system.
23   There are many, many chambers that govern many aspects of
24   regulation.
25        One of the things that the plaintiffs have said here

        GR    OCR    CM    CRR    CSR

                    49

1    is, Your Honor, if you dismiss this case, you will be creating
2    a rule of law that any Chinese industry that operates under a
3    chamber gets a free pass, because the chambers are all
4    identical. In fact, they cite in their papers to some
5    different industries, even some industries that may be
6    governed by this Chamber but in different industry context.

    Page 46

---

6-5-07 Hearing Transcript

7    They say, Your Honor, they all look the same.
8         In fact, Your Honor, that is not true. The reason
9    it is not true is the regulation cited in this very first
10   paragraph here. It is cited at page eight of the MOFCOM's
11   brief, the Ministry's brief, at the insistence of the
12   regulators, specifically, to dispel this point even before I
13   realized that plaintiffs would raise it.
14        What Article 14 says is that a social organization
15   established with coordination and industry regulation
16   functions are authorized by MOFTEC must implement those
17   regulations.
18        So from the Ministry's perspective, the critical
19   words there, why they wanted this specifically in the brief at
20   page eight, were the words "as authorized." This gets to Your
21   Honor's question of what's the sources of the compulsion,
22   what's the sources of the law.
23        The Ministry believes with this industry, the
24   Vitamin C industry, the --
25        THE COURT: Could you just -- before you go on,

        GR    OCR    CM    CRR    CSR

                    50

1    where did you say, "as authorized?"  I am sorry.
2        MR. MITNICK: If you look at the Ministry's brief.
3        THE COURT: Page eight?
4        MR. MITNICK: Page eight, towards the bottom, in the
5    parenthetical. It quotes Article 14, with emphasis added,
6    social organizations established with coordination and
7    industry regulation functions as authorized by the Ministry

    Page 47

---

6-5-07 Hearing Transcript

8    must implement the administrative rules. That is in
9    attachment to my papers, it is tab D and it is Article 14.
10        THE COURT: All right. I will look.
11        Go ahead.
12        MR. MITNICK: The question before this court and the
13   question that would then be before every other court in a
14   subsequent case, which we don't have yet, despite the fact
15   that the plaintiffs may look at other industries or other
16   chambers, is whether there are regulations here authorized by
17   MOFCOM, by the Ministry, that compel the conduct that we are
18   suggesting.
19        The rest of the one page takes us through where I
20   think the source of those provisions are.
21        THE COURT: I hate to go back. Where is this "as
22   authorized" that you just quoted? I am having trouble finding
23   it. on page eight?
24        MR. MITNICK: It's in the parenthetical. One, two,
25   three, four lines up, the italicized language.

        GR    OCR    CM    CRR    CSR

                    51

1        Are you looking at the brief of the Ministry, Your
2    Honor?
3        THE COURT: Yes. This is it?
4        MR. MITNICK: Yes.
5        On page eight, it is a one -- only one full
6    paragraph on the page.
7        THE COURT: Forth line from the bottom?
8        MR. MITNICK: Forth line from the bottom of the
9    paragraph. There is italicized language within a

    Page 48

6-5-07 Hearing Transcript

10  parenthetical.
11        THE COURT:  I am missing something here.  Page
12  eight?
13        I'm sorry.  I am looking at your footnote.  I'm
14  sorry.
15        MR. NETNICK:  My apologies for the lack of clarity.
16        THE COURT:  All right.  These chambers would be
17  deemed social organizations?
18        MR. NETNICK:  That's what they are called.
19        The point is, unless they are authorized to
20  regulate, they are not a regulator.  If authorized, they are
21  deemed to be an instrumentality of the Ministry and a
22  regulator.
23        The Ministry appears in this case for one reason
24  only.  Because the Ministry felt strongly that in this case,
25  with this industry, and this Chamber, there was authorization

                    GR    OCR    CM    CRR    CSR

                                                    52

1   and it was -- and the conduct complained of was conducted
2   pursuant to the explicit authorizations and requirements of
3   the Ministry.
4         THE COURT:  Okay.
5         MR. NETNICK:  That's where I believe the rest of the
6   page will take us.
7         THE COURT:  Okay.
8         MR. NETNICK:  So the next thing that happens is not
9   until 1996, where the Ministry issues interim regulations
10  which say -- this is tab 1 to my papers -- in Article Four, I

                    Page 49

6-5-07 Hearing Transcript

13        So the law says, the Chamber shall establish a
14  Vitamin C coordination group.  The main responsibilities of
15  this group are to coordinate with respect to Vitamin C export
16  market, price and customers, and to organize the enterprises
17  in contacting foreign entities.
18        Skipping down to the next bullet, paragraph ten,
19  quote, with respect to the export enterprises with violations
20  of relevant provisions hereof, if substantiated, penalties
21  shall be imposed, specifically, the Vitamin C export quota may
22  be reduced, in the worst case their Vitamin C export right
23  shall be revoked.
24        So beginning in 1997 you see the makings of a regime
25  where there is both compulsion and teeth to the compulsion,

                    GR    OCR    CM    CRR    CSR

                                                    54

1   which are the two elements that the antitrust division of the
2   United States looks to, as well as the case law.
3         Then in 1997, in response to the directive that the
4   Chamber shall establish a Vitamin C coordination group, you
5   then have a charter being drafted for that group.  The charter
6   says, quote -- rather, the charter says member must, quote,
7   strictly execute export coordinated price set by the Chamber
8   and keep it confidential.
9         That's at Article 15, paren six, close paren.
10        In Article 36, the charter says, for, quote, any
11  violation of the charter of the subcomittees, dot dot dot, the
12  subcommittee will suggest to the competent governmental
13  department, through the Chamber, to suspend and even cancel

                    Page 51

6-5-07 Hearing Transcript

11        am -- I won't read the ellipsis.  All export enterprises
12  shall, dot dot dot, follow the coordination by various
13  chambers of commerce for import and export trade, and set
14  export prices.
15        These are simply interim regulations.  This is where
16  the notion first comes into regulation of what the chambers
17  are going to be doing.
18        The year later, in 1997, both the MOFCOM -- the
19  Ministry as well as the state Drug Administration first
20  establishes the system where export licenses are going to be
21  required for any domestic Chinese company that wants to export
22  Vitamin C.
23        In paragraph six --
24        THE COURT:  Wait a minute.
25        What did 1997 add to the 1996?

                    GR    OCR    CM    CRR    CSR

                                                    53

1         MR. NETNICK:  1997 is what establishes the license.
2   So what you have in '96 is the beginning of a, "you shall,"
3   but there is no mechanism yet.  There is no hammer.  There is
4   no compulsion yet really.
5         THE COURT:  Okay.
6         MR. NETNICK:  In '97, you then begin, the regulatory
7   regime of issuing export licenses, without which you cannot
8   export a single pound of Vitamin C.
9         Paragraph six states, the chamber shall establish a
10  Vitamin C coordination group.
11        Reading out of the quote for a moment, it is this
12  group that later becomes the subcommittee.

                    Page 50

6-5-07 Hearing Transcript

14  the Vitamin C export right of such violating member, close
15  quote.
16        So, again, the penalty for violation is you lose all
17  right to export.
18        In 1998, several months -- just a few months later,
19  the Ministry approves the charter.  That's tab F.
20        That set of regime is in effect through the
21  beginning part of what the plaintiffs call the relevant period
22  in the complaint.  It stays in effect until 2002.  In 2002,
23  the regime is changed just procedurally.  In substance, it
24  remain exactly the same.  For administrative purposes,
25  they -- there is a change in how it is done.

                    GR    OCR    CM    CRR    CSR

                                                    55

1         The change establishes something called the Price
2   Verification and Chop system, by which the chamber had to
3   verify by an official seal each exporter's compliance with
4   coordinated export price as a requirement for the export
5   control authority to permit the export.
6         That quote isn't there, you don't get anything loaded
7   on to a container ship.
8         Paragraph three of that document, quote, chambers
9   must, dot dot dot, submit, open bracket, to export control
10  authorities, close bracket, dot dot dot, information on
11  industry-wide negotiated prices for those export products
12  subject to price review, open bracket, which includes
13  Vitamin C, close bracket, close quote.
14        THE COURT:  What does it mean, "subject to price
15  review?"

                    Page 52

6-5-07 Hearing Transcript

16      MR. MITNICK:  One of the changes in the 2002 system
17  is that not all recognition -- recognition that not all export
18  products are going to be subject to this system.
19      Specifically, why the Court need not have a fear that it is
20  establishing a blanket rule that every Chinese exporter gets
21  to take a pass on an antitrust case.
22      Paragraph four of that document, the
23  adoption -- quote, the adoption of the PVC, dot dot dot,
24  procedure shall be convenient for exporters while it is
25  conducive for chambers to coordinate export price and industry

                    GR    OCR    CH    CRR    CSR

                                                        56

1  self-discipline, close quote.
2      As I said before, withholding of the chop means a
3  complete denial by Customs of the ability to export.
4      In 2003, the last I think of the most relevant
5  documents, is an announcement by the Ministry that continues
6  the PVC system for certain industries.  Again, a narrowing of
7  the industries that are subject to this.  Vitamin C continues
8  as one of the industries.
9      I think, Your Honor, that there is no question under
10  the illustration in the antitrust division's International
11  Operations For Guidelines or in the cases, or in the leading
12  treatise, Areeda, and HovenKamp, there is absolutely no
13  question that this is the paradigmatic compulsion case.
14      I would suggest, Your Honor, that there are, in my
15  view, I think, three cases.  If I may switch to chat?  Unless
16  Your Honor has questions.

                    Page 53

6-5-07 Hearing Transcript

17      THE COURT:  I have a couple.  Then I want to get
18  your three, what you view as your three cases.
19      What happens under this new system?  Can the
20  ministry decide -- how does it work?  Suppose the Ministry
21  decides that they have made a price that's too high or too
22  low.  Can they overrule it or just tell them to go back and
23  renegotiate?
24      MR. MITNICK:  I can answer that question literally
25  and then I will answer the question more how it works in the

                    GR    OCR    CH    CRR    CSR

                                                        57

1  real world.
2      THE COURT:  Right.
3      MR. MITNICK:  Your Honor's literal question is, can
4  the Ministry overrule them.  The answer is, absolutely.  The
5  Ministry has plenary authority over all of this.  So the
6  Ministry can reject a price, accept a price or not.
7      In the real world, that is not really how it
8  happens.  What the Ministry is interested in are essentially
9  two things.  One is, it wants to avoid dumping actions.  So it
10  wants to make sure that we don't have prices too low.
11      In the late nineties, there was a slew of dumping
12  actions brought and essentially a lot of this regulation which
13  extends well beyond this industry was to make sure that that
14  stops.
15      Secondly, what the Ministry was interested in as the
16  country is moving to fractured independent companies is it
17  wanted to make sure that the companies themselves, the
18  industries, believed that they were achieving sufficient

                    Page 54

6-5-07 Hearing Transcript

19  profit margins, whatever those were the Ministry really didn't
20  care, that they were achieving sufficient profit margins, that
21  there would be a stable development of the industry, that
22  there would be full employment, or as much employment as was
23  needed.
24      So the interest of the Ministry was to make sure
25  that these industries in this transitional period could thrive

                    GR    OCR    CH    CRR    CSR

                                                        58

1  and grow.  The Ministry, frankly, didn't care what the effect
2  of higher export prices would be outside of China.  That was
3  not its purview.  Excuse me.  Not its purview.  That just
4  wasn't its concern.
5      Its concern was building a stable domestic industry.
6  So it created the Chamber, which was this interim government
7  regulatory agency, when authorized, as it was here, with the
8  directive that the Chamber needed to have members of the
9  Vitamin C industry, create this group and the framework, the
10  structure, was created by the Ministry and the Chamber.  But
11  the actual decisions within the parameters set, within that
12  structure, was left entirely to the industry members in the
13  group, to recommend to the Chamber.
14      The Chamber then had to approve all of this.  The
15  Ministry from time to time reviews what the Chamber does, and
16  the Ministry could certainly by its authority change things.
17      But in real life, do people at the Ministry level
18  look at each price point and price sheet that's proposed?
19  Probably not.  I can't tell you standing here today that I

                    Page 55

6-5-07 Hearing Transcript

20  really know the answer to that is no.  But I think probably
21  not.
22      What the Ministry was doing was setting up a
23  framework that assured it that it would have a stable industry
24  and that it would have pricing that would make those
25  industries profitable at levels the industry believed they

                    GR    OCR    CH    CRR    CSR

                                                        59

1  needed to be profitable and that it would avoid dumping
2  charges.  It's really as plain and simple as that.
3      THE COURT:  All right.  Go ahead.
4      You were saying your three cases?
5      MR. MITNICK:  I believe that there are really three
6  cases in the really blizzard of cases that have been cited to
7  the Court.  I think there are three that stand out, two of
8  them were already mentioned by Mr. Bomse, one of which raised
9  by the Court itself.  These are the three cases that I think
10  are either controlling, directly controlling on the court, or
11  else of the most persuasive status because they are of -- they
12  are of district courts within the second Circuit.
13      The one case that is absolutely controlling, I
14  believe, is one shipping, and one shipping came to the
15  district court on a 12(b)(6) motion.  So it was at this stage
16  of the proceeding.  It was not summary judgment.
17      There was no government intervention in that case.
18  It was an antitrust case alleging a boycott.  The district
19  court dismissed the case, went up to the Second Circuit.
20      The Second Circuit held that essentially there was a
21  conflict in that case between the Colombian law that mandated

                    Page 56

# A-614

6-5-07 Hearing Transcript

22    a Colombian company to act in a certain way and the US
23    antitrust laws.  Interestingly enough, to the questions your
24    Honor has raised this morning, the Colombian company was
25    actually owned by the Chinese -- by the Colombian government.

GR    OCR    CM    CRR    CSR

60

1     There was no question there.  It wasn't former state owned
2     entities where the state may still have a place.  It was owned
3     by the Colombian government.
4         There was no issue about if the Colombian government
5     couldn't do this on its own what would happen.  The only issue
6     for the Second Circuit was that there was a conflict between
7     the laws as they set for their domestic industry and our
8     antitrust laws.
9         What the Second Circuit said was that while act of
10    state, compulsion and comity are essentially doctrines of
11    abstention, it doesn't -- it is not a question of whether the
12    district court has subject matter jurisdiction, but they are
13    doctrines of abstention, that in that situation the district
14    court is foreclosed, Second Circuit's words, foreclosed from
15    looking at the motivations or the policies behind what the
16    foreign government did, and it dismissed the case, dismissed
17    the complaint, on the basis of act of state compulsion and
18    comity.  That was in 1987.
19        The following year, in the Southern District, in the
20    case McElderry versus Cathay Pacific --
21        THE COURT:  What's the date?  The Foreign Sovereign
22    Immunities Act became law?

Page 57

6-5-07 Hearing Transcript

23        MR. NITNECK:  I don't know, Your Honor.
24        The case was McElderry versus Cathay Pacific, 678 F.
25    Supp 1071, Southern District, New York 1988.  In that case,

GR    OCR    CM    CRR    CSR

61

1     Your Honor, also an antitrust case, it was alleged that
2     international airlines, including Cathay Pacific, were engaged
3     in a cartel to fix the price, the fees, at which baggage fees
4     were being assessed against people.
5         Judge Lasker took the case on a 12(b)(1), 12(b)(6)
6     basis and did say that because there were affidavits and
7     things relating to the national statutes and such, that it
8     could be treated either as a 12(b)(1) case or he could convert
9     it to rule 56.  It didn't matter to him.  So he didn't clarify
10    which it was, but he was at the motion to dismiss stage, and
11    he disposed of the case for lack of subject matter
12    jurisdiction, declining essentially to take jurisdiction on
13    the three doctrines following ONE Shipping, act of state,
14    compulsion and comity.
15        In that case, the UK government did appear before
16    the Court.  They did it through the device of a diplomatic
17    note in that case, but essentially saying things similar
18    before Judge Lasker that we are saying before this court.
19        And essentially the end of the case for Judge Lasker
20    was that there had been established a direct conflict between
21    the laws of -- there it was the UK and Hong Kong and the US
22    antitrust laws.
23        The third case, Your Honor, is the case Your Honor
24    already brought up, New Zealand Dairy Board case, where Judge

Page 58

6-5-07 Hearing Transcript

25    Haight used two phrases that I would say I didn't think

GR    OCR    CM    CRR    CSR

62

1     applied until I heard your questions this morning, but perhaps
2     applied more than I realized, which is one, while the statute,
3     meaning the New Zealand statute, is not a model of clarity,
4     dot dot dot, he was able to figure out what it meant.
5         Similarly, and I may have said this before, quote,
6     while this provision is politely cast in permissive terms, I
7     understand the statutory scheme to require that exporters
8     apply to the board for permission to export, period close
9     quote.
10        Having gone through that analysis, and as this court
11    is no doubt aware, on a motion for reconsideration because he
12    originally upheld the complaint, he found, quote, there is an
13    actual and material conflict between American antitrust law
14    and New Zealand law in respect of the marketing of dairy
15    export produce.  That conflict is sufficient to entitle
16    defendants to invoke the doctrines of act of state, foreign
17    sovereign compulsion, and international comity, period close
18    quote.
19        THE COURT:  Did that case ever go up?
20        MR. NITNECK:  I don't believe it did.
21        THE COURT:  I don't think so either.
22        Thank you very much.
23        Do you have anything else?  I don't want to cut you
24    off.
25        MR. NITNECK:  Only if the Court has questions.

Page 59

6-5-07 Hearing Transcript

GR    OCR    CM    CRR    CSR

63

1         THE COURT:  Right now, no.
2         You did a very nice job.
3         We will take a five-minute break and then I will
4     hear from the plaintiffs.
5         (Recess taken.)
6
7
8         (After recess.)
9         THE COURT:  Please.  Go ahead.
10        MR. ISAACSON:  Hello, Your Honor.  Good afternoon.
11    My name is Bill Isaacson.
12        We took the opportunity to prepare some slides of
13    our own.  I will speak from some of these, particularly the
14    ones that focus on the topics that you have been talking about
15    with counsel.
16        THE COURT:  Okay.
17        MR. ISAACSON:  If I can hand up a copy, and a copy
18    for you.
19        THE COURT:  Okay.
20        MR. ISAACSON:  A few brief points at the outset,
21    Your Honor.
22        On page two, we touch on a point that was discussed
23    earlier, the history of international cartel enforcement,
24    including with vitamins.
25        I don't think it is enough for the Ministry through

GR    OCR    CM    CRR    CSR

Page 60

6-5-07 Hearing Transcript
64

1   counsel to say that this case only replicates vitamin C .  The
2   United States Government and private plaintiffs have gone
3   through great efforts over decades to do anti cartel
4   enforcement against foreign companies in the United States and
5   if these companies got a pass based on the record that is
6   before you, it is going to be very easy for cartels, including
7   that the vitamins cartel, simply to move to China.
8          It also will -- while it may be unusual for the
9   government of China to appear in a US court as amicus or
10  through other means, it is not unusual for foreign governments
11  to appear in the US court.  In the past -- in the previous
12  vitamins case the government of Germany filed amicus briefs
13  objecting that US discovery conflicted with their laws.
14         International cartel enforcement can raise the ire
15  of foreign governments, such to the point that they make an
16  appearance in US court but these cases have proceeded because
17  they are important and they are important to US law.
18         A few things we know about this Chinese cartel even
19  before any discovery.  On page three we know that
20  concentration of the power of these four companies and that it
21  grew.  In the chart there, you will see that as of current
22  years, 85 to 90 percent of all vitamin C imported into the
23  United States comes from the manufacturers who are part of the
24  defendant group here, and that they crossed 50 percent of the
25  market in 2002.  Of course, it is December in 2001 when they

GR    OCR    CM    CRR    CSR

Page 61

---

6-5-07 Hearing Transcript
65

1   first form this cartel.
2          I will come back to this point and Your Honor
3   touched on it.  Many of the laws, regulations, in formal
4   documents that are made part of the record, go back to the
5   nineties.  But it is only once these companies cross into a
6   position where they are actually able to be effective at price
7   fixing that they actually adopt price fixing agreements.
8          We think it is a matter of factual dispute, and one
9   that we think we can prevail on, that these companies were not
10  required or obligated to enter into a price fixing agreement,
11  even if the government facilitated that agreement after the
12  fact.
13         On the next page, we also have information about
14  what happened to prices after the cartel was formed.  The
15  prices -- the prices were down to near the $3 level.  They
16  went rocketing up after the first cartel meeting.  They came
17  about halfway down.  There was an emergency cartel meeting
18  called.  Prices went back up.
19         I don't know if we can claim any credit, but the
20  prices have declined somewhat since the lawsuit was filed.
21         On the next -- the next thing that we have here is
22  what is Exhibit D to our papers and you have looked at this
23  document with Mr. Boose and the words -- and Your Honor
24  focused on the words "voluntarily control" in the last
25  paragraph.  It has been suggested that voluntarily doesn't

GR    OCR    CM    CRR    CSR

66

Page 62

---

6-5-07 Hearing Transcript
1   mean to the Chinese what it means to us, which I don't think
2   is an issue you can resolve at the motion to dismiss stage.
3          But the document goes on to not just say voluntarily
4   control.  It says, in the fourth line, there is a full
5   sentence that begins, such self-restraint -- such
6   self-restraint measures mainly based on restricting quantity
7   and adjust dynamically have been completely implemented by
8   each enterprise's own decision in self-restraint without any
9   government involvement.
10         It is that -- that's why we say they enter these
11  agreements voluntarily.
12         The next sentence then goes on to say that they then
13  receive some help by Chinese customs, by price reviews, and
14  preapproval by the China Chamber of Commerce, which again is
15  not a government -- is not a government agency.  That is a
16  social organization, a non-governmental organization.
17         Now, if I can turn forward --
18         THE COURT:  Can I ask you on what basis you make
19  that statement?
20         MR. ISAACSON:  It's in their documents.  It's in
21  their brief.
22         THE COURT:  That it is a non-governmental
23  organization?
24         MR. ISAACSON:  Yes.
25

GR    OCR    CM    CRR    CSR

67

1          They have testified -- other chambers have testified

Page 63

---

6-5-07 Hearing Transcript
1   to the United States that it is a non-governmental
2   organization.  There has been -- there is no document or
3   representation that it is a governmental organization.
4          THE COURT:  Go ahead.
5          MR. ISAACSON:  Now, if we turn forward to page six,
6   we talk about the issue of whether this is a proper 12(b)
7   motion.  The question was properly asked, are we here properly
8   under Rule 12.  Is this a proper motion to dismiss?
9          The defendants acknowledge that the Court has
10  subject matter jurisdiction and that leads us to the issue as
11  to whether there is a 12(b)(6) motion here or 12(b)(1) motion.
12         The motion is not proper under 12(b)(6) because the
13  defenses here, such as foreign sovereign compulsion, go beyond
14  the four corners of the complaint.  The defendants have
15  previously admitted to that.  The complaint itself is directed
16  at purely private conduct.  That's the way the complaint is
17  drafted and that's what we think took place here.
18         That brings us to -- to the issue --
19         THE COURT:  I really don't want to get stuck on
20  this.  There have been cases where, Judge Haight seems to have
21  done it, not on summary judgment.
22         MR. ISAACSON:  Let me talk about the four cases that
23  they raised, including the Delaware case, which are addressed
24  on the next page.
25

GR    OCR    CM    CRR    CSR

68

1          THE COURT:  All right.
2          MR. ISAACSON:  One of the cases that they mention,
3   the InterAmerican Refining Corporation case, is a summary

Page 64

6-5-07 Hearing Transcript

 4    judgment case that followed complete discovery.
 5         New Zealand Dairy Board case, which I think is the
 6    case you are referring to, is a case where he interpreted the
 7    law and the plaintiffs didn't question that that was the case.
 8    Everybody agreed, that that was what the law New Zealand
 9    required.
10         This is not that case, Your Honor, obviously.
11    They have not put before you a law that squarely
12    says, price fixing agreements are required, or any compulsion
13    of, or -- of price fixing.
14         But in addition to that, we actually have the
15    advantage of factual documents where they say we have done
16    this on our own. So in the absence -- this is not the
17    situation where the parties agree, this is what the law
18    requires and where the plaintiffs are saying, despite the fact
19    the law requires that, we still think we have a case.
20         The other case that has been mentioned was the One
21    Shipping Limited case. That case, as it says, was a direct
22    challenge to a law of Colombia that said 50 percent of your
23    cargo had to be from Colombia. The question was whether
24    contracts that fell under that law were an antitrust
25    violation. It was -- the Court said there, this is a direct

                    GR    OCR    CH    CRR    CSR

                                                          69

 1    challenge to that law.
 2         The other case that was mentioned by counsel for the
 3    Ministry was the McElderry versus Cathay Pacific case, a
 4    Southern District case. That case is primarily a case of

                         Page 65

6-5-07 Hearing Transcript

 5    extraterritorial jurisdiction because it involved baggage
 6    charges when you take Asian -- flight from one site in Asia to
 7    another cite in Asia.
 8         At the end, there is a discussion of comity and they
 9    say, by the way, British regulations, this is -- Cathay
10    Pacific is a British airline -- British regulations require
11    these charges and so Cathay Pacific would be in a position of
12    disobeying British law if it didn't do this.
13         So none of these cases are cases where on
14    a -- before discovery, before you know what the facts are,
15    where the plaintiffs get kicked out of court at a motion to
16    dismiss stage.
17         The arguments you heard emphasize this. I mean,
18    counsel for the defense said, sometimes the government is more
19    active and sometimes it is less active, in answer to your
20    question of what did they do.
21         Well, we need to -- when they are not active, what
22    have the defendants been doing? What if -- if their
23    contention is the government sometimes actively caused them to
24    do sometimes things and sometimes didn't, these facts need to
25    be sorted out.

                    GR    OCR    CH    CRR    CSR

                                                          70

 1         You asked what was the purpose of the chamber. The
 2    response was. I can't go into their minds. That's precisely
 3    why you can't decide this based on the record at this motion
 4    to dismiss stage.
 5         Now, I think what I would like to do here is advance
 6    ahead to page 11. Here I will mention two key cases, which

                         Page 66

6-5-07 Hearing Transcript

 7    are Supreme Court cases, not district court cases, that deal
 8    with the foreign sovereign compulsion issue, as well as the
 9    act of state issue.
10         These cases stand for the proposition that where you
11    have private conduct, even if it is facilitated by government
12    action, and even where it is facilitated by government action
13    that the cartel went out and obtained, that you are not immune
14    from antitrust liability.
15         In the Continental Ore case, which was a case that
16    went to a jury, it was a jury -- and it was dismissed
17    after -- there was a directed verdict. The Supreme Court
18    remanded that case for there to be another jury trial. It had
19    to do with a vanadium cartel. I am not sure what vanadium is.
20    It had to do with a cartel and evidence was excluded that the
21    market in Canada was controlled because the defendant's
22    Canadian corporation was appointed by the exclusive
23    agent -- as an exclusive agent by the Canadian government.
24         They said, when this agent appointed by the Canadian
25    government took its actions and closed down the Canadian

                    GR    OCR    CH    CRR    CSR

                                                          71

 1    government, that evidence was excluded and the Supreme Court
 2    reversed. The Supreme Court said that the defendant's acts
 3    were not compelled even if they were appointed by the Canadian
 4    government.
 5         Here, even if the Vitamin C subcommittee was
 6    approved or appointed, and I don't think they were appointed,
 7    by the Chinese government, under Continental Ore, they are

                         Page 67

6-5-07 Hearing Transcript

 8    voluntary acts of these defendants as members of the Chamber,
 9    or separate from the Chamber, would not be immune from
10    antitrust liability.
11         Continental Ore discussed the sisal case, which is a
12    type of fiber apparently that was -- for all I know, it is
13    still used in Mexico but it was used in Mexico at the time of
14    the case. There some American banks helped set up -- helped
15    set up a cartel and to -- to facilitate the cartel and its
16    establishment, they secured discriminatory legislation in
17    Mexico that helped them. The Supreme Court said, you are
18    still -- you are still subject to antitrust liability.
19         Here is how in a 1990 case, W. S. Kirkpatrick, which
20    is an important act of state case that says the act of state
21    does not come into play unless you are going to hold that an
22    action of a foreign government is invalid within its own
23    territory. In the W.S. Kirkpatrick case, here he is how the
24    supreme court described the sisal case.
25         In United States versus Sisal Sales Corporation,

                    GR    OCR    CH    CRR    CSR

                                                          72

 1    there we held that America Banana notwithstanding -- that's
 2    another case -- the defendant's actions in obtaining Mexico's
 3    enactment of discriminating legislation could form part of the
 4    basis for suit under the United States antitrust laws.
 5         The Supreme Court not only said that the fact that
 6    there was this legislation facilitating the cartel, was not a
 7    basis for immunity, it said that it could actually form part
 8    of the claim.
 9         The case -- and the Kirkpatrick case says at the

                         Page 68

6-5-07 Hearing Transcript

30   end -- this is the second to last sentence of the
31   decision -- the act of state doctrine does not establish an
32   exception for cases and controversies that may embarrass
13   foreign governments but merely requires that in the process of
14   deciding the acts of foreign sovereign taken within their own
15   jurisdiction shall be deemed valid.
16          I would point out here that the record also reflects
17   that the Chinese government has its position about the merits
18   of the case but, as expressly stated in an earlier hearing,
19   they did not have a position as to who -- about whether they
20   objected to discovery in this case. That's in essence what
21   this hearing is about today.
22          Now, we mention on page 32 that the issue of
23   compulsion is in essence a factual issue. Because if there
24   was compulsion, someone stands up and says, he was compelled,
25   or there is a document that says we do this because we were

GR      OCR      CM      CRR      CSR

73

1    compelled or there is a law that says you are compelled.
2           Now, what has been missing here is there is no
3    document, there is no witness, no specific price has been
4    identified as having been compelled. There is no agreement
5    that has been identified as having been compelled by the
6    government.
7           I want to show you a couple of documents about
8    compulsion that we have mentioned in our papers, and these
9    again I will separate, there is no requirement of an
10   agreement. If we look at page 15 and then after that, a

Page 69

6-5-07 Hearing Transcript

13   In the last sentence, which is on the next page, here is where
14   they explain that self-regulation and price fixing is
15   voluntary, while encouraged by the chamber. The last sentence
16   there says, establishing the mechanism for self-regulation is
17   a gradual process. It is not possible to reach the goal in
18   one giant step. First, the consensus for self-regulation has
19   to be established, followed by gradual acculturation of the
20   self-regulation. Fixing the lowest selling price in the
21   industry is just one of the methods. The key is how to push
22   up the effort with joint -- push up the price with joint
23   effort.
24          We have the advantage of another meeting, which is
25   on the next page, 15-C. This is again from the Chinese

GR      OCR      CM      CRR      CSR

75

1    Chamber of Commerce of Medicines and Health Products, which
2    governs Vitamin C. This is the report on an attempted price
3    fixing agreement where one of the members said we won't do
4    that. That is why you see the title is a report and there is
5    a company's name, on their refusal to comply with the
6    industry's self-regulation agreement.
7           If in the middle of the document. There is a
8    reflection that certain manufacturers signed a self-regulation
9    agreement, to do with penicillin salts, and on the next page,
10   at the top, after having signed the agreement, however, the
11   largest exporter, there is the name of the company, refused to
12   comply with the content of the agreement.
13          They say at the end, that we still hope this company

Page 71

6-5-07 Hearing Transcript

11   document at 15-A.
32          These are minutes of the Paracetamol subcommittee.
13   That's a raw material in the chemical term for Advil,
14   acetaminophen.
15          Here they are discussing what the Vitamin C people
16   are doing. This subcommittee is part of the China Chamber of
17   Commerce of Medicines and Health Products. It is subject to
18   all -- it is subject to all the same -- all the rules that you
19   have seen that have been applicable to the China Chamber of
20   Commerce of Medicines and Health Products.
21          THE COURT:  What page?
22          MR. ISAACSON:  15-A.
23          THE COURT:  All right.
24          MR. ISAACSON:  15-A.
25          The subcommittee -- Professor Feinerman from

GR      OCR      CM      CRR      CSR

74

1    Georgetown explained, there is a document approving the
2    subcommittee, explained that in China you have an approval of
3    an organization because if you don't have an approval, it is
4    not legal. It is not -- you have to have approval. This
5    subcommittee also you would expect to have an approval.
6           In the highlighted portion you see they are
7    discussing why can't we do what the Vitamin C people are
8    doing. The trade association represented a response that
9    vitamin c are leading to a dominant position in the
10   international market. You guys aren't. We can't do this yet.
11   They are saying we hope to do this but we can't do it yet.
12          They also explain a philosophy of the china chamber.

Page 70

6-5-07 Hearing Transcript

14   will consider the bigger picture, return to the path of
15   industry self-regulation as soon as possible and help realize
16   a win-win situation for all.
17          This is an example of where companies say we are not
18   going to do this.
19          We mention again on the next page what I have said
20   is that the subcommittee and the Chamber of Commerce are not
21   governmental organizations.
22          After discussing the amicus brief which I think I
23   will try and come back to, we then go through the laws and
24   regulations and notices that have been discussed.
25          If I can take the opportunity to go through those

GR      OCR      CM      CRR      CSR

76

1    beginning at page 19?
2           The first item here, and if you turn to page to
3    19-A is a document that -- we have a few pages --
4           THE COURT:  In dumping WTO proceedings, Chinese
5    companies and the Ministry of commerce deny compelling prices.
6           MR. ISAACSON:  Yes.
7           THE COURT:  Obviously -- maybe not obviously -- it
8    doesn't involve Vitamin C. Where are those documents in your
9    papers? I assume they are somewhere.
10          MR. ISAACSON:  In our brief we cite other -- that's
11   actually found in the Federal Register. We give you the
12   Federal Register cites. It is for US proceedings.
13          Then there is a document which is from a European
14   proceeding, which is not -- which would not be found in the
15   Federal Register, which is at 17-A.

Page 72

6-5-07 Hearing Transcript

16    THE COURT: Okay. Go ahead. I'm sorry.
17    Where were we now?
18    MR. ISAACSON: We have also pointed out in -- I
19    don't think the WTO has anything to do with this. The WTO
20    does not regulate price fixing. You can price fix without
21    violating the WTO. The --
22    THE COURT: No. I assume you cited it as in effect
23    contradicting the statements the Ministry of Commerce is
24    making to this court.
25    MR. ISAACSON: Right.

          GR    OCR    CM    CRR    CSR

                                                77

1    We have also cited in our papers in the WTO that
2    China has said we have three types of prices. Government
3    controlled prices, government guided prices, and free market
4    prices, or market prices.
5    They have attached a list of the government prices.
6    You can't find vitamin C on there. This is not --
7    THE COURT: What's the middle one?
8    MR. ISAACSON: The government guided prices, which
9    is defined in the document as they give you a boundary. It
10   has to be within -- ten percent is what comes to my mind, a
11   before and below. It doesn't correspond to
12   government -- government guidance to correspond to how they
13   are describing as to what happened here.
14   THE COURT: Is vitamin C listed on that list?
15   MR. ISAACSON: No.
16   THE COURT: Okay.

                    Page 73

6-5-07 Hearing Transcript

17    MR. ISAACSON: They say -- they list everybody on
18    the two lists so that it is called Annex Four of what they
19    provided. We actually noticed that while we cited this in our
20    original papers, it was omitted as an exhibit and that's what
21    was filed yesterday. A copy of it was filed yesterday.
22    THE COURT: All right. Go ahead.
23    MR. ISAACSON: If I could turn to page 19-A, Exhibit
24    D to Mr. Witnick's declaration, which you looked at before --
25    THE COURT: All right.

          GR    OCR    CM    CRR    CSR

                                                78

1    MR. ISAACSON: -- with him.
2    This again applies to all social organizations, not
3    just the Chamber of Medicines and Health or the Vitamin C
4    subcommittee. It's actually not -- so it certainly doesn't
5    explain why a cartel is not formed until December 2001.
6    It does -- this is actually not an official document
7    because it doesn't have the chop that is required for an
8    authoritative Chinese law. Professor Feinerman explains that
9    in his declaration. Even assuming that this is an accurate
10   document, it talks in terms of regulating.
11   Here is an example. It talks about operation
12   guidance you see on 19-C. They are going to do things like
13   inform periodically, solicit working reports, provide
14   comments.
15   On the next page, thee is Article 14 which you
16   looked at, and then Article 15, about daily management. Daily
17   management just use words like to examine over and over and to
18   summarize and organize. As Professor Feinerman, who is the

                    Page 74

6-5-07 Hearing Transcript

19    head of the Department of Asian Law at Georgetown Law School,
20    teaches in the area of Chinese law, says this doesn't
21    contemplate compulsion and it talks about -- and it
22    contemplates supervisory and inspection functions.
23    Looking back up to Article 14, Mr. Witnick puts
24    great emphasis on the words "As authorized." What is as
25    authorized must implement the administrative rules and

          GR    OCR    CM    CRR    CSR

                                                79

1    regulations relating to foreign trade and economy. That
2    simply doesn't say there has to be price fixing agreements.
3    Now turning to the next section here, at page 20,
4    the point here is that several of the exhibits reflect
5    agreements amongst the defendants and they are not actions of
6    governmental bodies.
7    So turning from page 20 to 20-A, the first thing we
8    see is a page from exhibit C to Mr. Witnick's declaration and
9    what this is I think some sort of pamphlet or brochure from
10   the China Chamber and there is -- it talks about how they are
11   a social body. Highlighted, for example, a social body formed
12   along business lines enjoying the status of legal person.
13   They guide, they coordinate, they supervise, they offer
14   consulting services.
15   There is a very interesting sentence here that we
16   have highlighted, the last sentence that we have highlighted
17   there, coordinating price, marketing clients of foreign trade
18   of medicinal products as authorized by the government or
19   agreements of member enterprises.

                    Page 75

6-5-07 Hearing Transcript

20    They are quite clear, but in some cases they are
21    facilitating agreements that are simply the result of their
22    members. There simply is no dissent or that says here
23    Vitamin C has -- agreement has not anything but an agreement
24    amongst the members. In fact, there is a document that says
25    we did this without government intervention.

          GR    OCR    CM    CRR    CSR

                                                80

1    The next document, turning to the next page, 20-B,
2    is Exhibit E to Mr. Witnick's declaration. This one didn't
3    even bear mention in his timeline so I won't spend any time on
4    it. It too is dated September 23, 1994. So it is quite old.
5    It simply concerns personnel management. There is no
6    reference to price fixing conduct.
7    Exhibit C is on the next page. This is the charter
8    of the vitamin C subcommittee. This is not a government
9    document. It is not a law. It is not a regulation. This is
10   not issued by the government. This is issued by
11   non-governmental organization. Even it dates back to
12   October 11, 1997.
13   It reflects on the next page at Article 37 the
14   members meeting is the highest authority of the subcommittee.
15   The members meeting are the defendants. They are the members.
16   Now turning to the next page, which discusses
17   Exhibit F to Mr. Witnick's declaration, the vitamin C
18   subcommittee approval. There is a copy at 21-A.
19   This is an approval back in 1998. It says the word
20   "approval" in the title. You asked about the terms we hereby
21   acknowledge the receipt of, who made that -- who made that

                    Page 76

6-5-07 Hearing Transcript

22 request.
23    But as stated in paragraph one, the request was
24 approved. As Professor Feinerman explains in his declaration,
25 this approval is necessary for the legal existence of an

GR   OCR   CH   CRR   CSR

81

1 entity in China. This is not an approval of any specific
2 action by that committee.
3    There may be also some significance to the words. I
4 am not sure, but it certainly doesn't -- it certainly doesn't
5 help the defendant's case. They point to -- in paragraph one,
6 they pointed to the next paragraph, the second sentence of the
7 paragraph. The major responsibilities of Vitamin C
8 subcommittee are to be responsible for coordinating the
9 vitamin C export market, price and customers of China.
10    Then -- so you have reference to their
11 responsibility to coordinate the price for the customers of
12 China but then it says, to improve the competitiveness of
13 Chinese vitamin C produce in the world market and promote the
14 healthy development of vitamin C export of China.
15    There is no requirement of price coordination for
16 export that's clear from that document, even from the
17 vitamin C subcommittee. In any event, it is just an approval
18 saying you are allowed to exist.
19    The next document is Exhibit H to the Mitnick
20 declaration and we have a PowerPoint slide and then the
21 document is at 22-A.
22    For reasons I still do not understand, everyone is

Page 77

6-5-07 Hearing Transcript

21 silent about the note at the top. This is cited in the reply
22 brief. It is cited in argument. This is the third item in
23 Mr. Mitnick's regulation timeline. It has been abolished,

GR   OCR   CH   CRR   CSR

82

1 abolished March 21, 2002. To the extent that this had any
2 significance in this case, it stopped having any legal
3 significance in March 21, 2002.
4    This is not an official document. It is downloaded
5 from the Internet. Any -- anybody could download this from
6 the Internet. It never actually required any specific price
7 agreement.
8    In fact, it said at the bottom, at paragraph six,
9 which is on the -- second page of this at the bottom, the
10 specific -- specific method for coordination shall be
11 formulated by the chamber and filed to MOFTEC for record.
12    That is not the only document that says if you are
13 going to have an agreement you should file it with MOFTEC or
14 later MOFCOM. But that record isn't before the Court. You
15 don't have records of even approvals of price fixing
16 agreements, much less that they were compelled.
17    The next document, which is the interim regulations,
18 which is Exhibit I to the amicus brief and the second point on
19 the timeline that you see handed on the defendants say look,
20 this is what requires price coordination. The document itself
21 is at 23-A. You will see it was promulgated back in
22 March 1986. So you have to ask, were these people disobeying
23 the law from 1996 to December 2001?
24    This regulation applies to specific conduct, lower

Page 78

6-5-07 Hearing Transcript

25 than normal price. There is no record before the court that

GR   OCR   CH   CRR   CSR

83

1 the conduct here was intended to achieve, to comply with the
2 standards of lower than normal price.
3    Lower than normal price is defined in Article Five
4 as the necessary price which shall be comprised of the cost
5 for the production of the export produce in China, the
6 expenses for storage, transportation and insurance and
7 management, which are needed in foreign trade and reasonable
8 profit.
9    This alone would allow us to put in a case saying
10 they went far beyond that and through private agreements were
11 attempting to profiteer.
12    Mr. Mitnick's timeline quotes Article Four of this
13 document. It leaves out the last clause. It quotes Article
14 four ending with the word "and set export prices" in the
15 second to last line. The document goes on to say, "which are
16 suitable in countries to which the goods are exported." So
17 discretionary language has been left out of the timeline.
18    The last sets of documents are --
19    THE COURT: You are talking about Article Four,
20 right?
21    MR. ISAACSON: Article Four, yes.
22    THE COURT: Okay.
23    MR. ISAACSON: Beginning with, "which are suitable?"
24    THE COURT: Okay.
25    MR. ISAACSON: The last documents are the

Page 79

6-5-07 Hearing Transcript

GR   OCR   CH   CRR   CSR

84

1 verification and chop documents, which are Exhibits J and K to
2 the amicus brief and are the last two documents discussed in
3 the timeline. The Exhibit J is at 24-A. It is titled a
4 notice. It has an effective date of May 1, 2005, according to
5 the document. Professor Feinerman has explained, it is not an
6 official document as presented. It is a website download.
7    All of this says is that the Chamber, which again is
8 the non-governmental organization, will put a chop on specific
9 documents and approve them.
10    It also says, in paragraph -- that's why you see in
11 paragraph one, subject to preverification and chop by the
12 chambers. They are no longer subject to supervision and
13 review by the customs. You have gone from a government agency
14 to a non-governmental agency.
15    In paragraph three, it says, the chambers are going
16 to submit industry-wide negotiated prices to an information
17 center. And who is responsible for the price review? None of
18 that record is before the court.
19    Paragraph four has some language in it that appears
20 to be helpful for than in the middle that we have highlighted.
21 The adoption of VC procedures shall be convenient for
22 exporters while it is conductive for the chambers to coordinate
23 export price and industry self-discipline.
24    That looks like strong facilitating conduct. I
25 still don't think it rises to the level of compulsion.

GR   OCR   CH   CRR   CSR
Page 80

6-5-07 Hearing Transcript

85

1 But as Professor Reinerman has said, that sentence
2 has not been correctly translated. It should be the adoption
3 of the PVC procedure should benefit the chamber, while being
4 conducive for the coordination of prices and enterprise
5 self-regulation.
6 This refers to the autonomy of the Chamber, not to
7 government compulsion, as Professor Reinerman explains.
8 It is interesting. At the bottom, counsel tries to
9 reassure you that this only applies to Vitamin C. We have
10 highlighted at the bottom, omitted but Vitamin C is included
11 herein. There is a catalog of export products. Okay. This
12 is not -- the phrase omitted but Vitamin C is included
13 therein, is a reassurance by someone, this -- that's a piece
14 of testimony. That's not translated from any document.
15 That's someone telling you they want you to know that.
16 Okay. I think the reason they want you to know that
17 is not just that -- I don't question that Vitamin C is in this
18 export catalog because I assume someone is telling you the
19 truth. They don't want you to see the export catalog. The
20 export -- everything they are saying here would be applicable
21 to this full export catalog. It is not reassuring to say that
22 this is -- only applied to Vitamin C based on this record.
23 The next document is 24-C. This is Exhibit K to the
24 amicus brief. This is something called an announcement as
25 opposed to a law or regulation. It says that -- it

GR    OCR    CM    CRR    CSR

Page 81

---

6-5-07 Hearing Transcript

86

1 specifically makes reference to, on the basis of the
2 coordination by relevant industrial associations starting from
3 January 1, 2004, and there you see the export of citric acid
4 and 35 other commodities. So I know one other product that
5 would be subject to this and there are 35 others that I don't
6 know.
7 All it says is, the exporters are going to declare
8 to the Customs, they are going to give them export contracts
9 that are affixed with the chop by the relevant chambers of
10 Commerce, which in this case is them. They are enforcing
11 their own agreements.
12 Then at 24-D, there is an Exhibit 2 to this document
13 and it has a Paragraph A. It says -- we have highlighted part
14 of this -- if it is verified that the contracts comply, and
15 then there is a bracket with the relevant regulations and
16 industry agreements, and then there is another bracket.
17 Professor Reinerman has explained that language is not in the
18 original. I don't know the basis of why someone wrote that
19 bracketed language in there.
20 It is for those reasons that we say that it is not
21 enough to decide this case based on an amicus brief at this
22 stage of the case. Because in any of the cases where the
23 words of a foreign government have been given great weight,
24 they have backed those up. They said if we did something
25 according to the law, here is the law. They were oftentimes

GR    OCR    CM    CRR    CSR

Page 82

87

---

6-5-07 Hearing Transcript

1 part of deals that were between the government.
2 The Matsushita case -- maybe it is better if I refer
3 to it as the Zenith case. In that case the Japanese
4 government said that the reason that they were undercutting
5 prices was because they had compelled that and in fact there
6 had been a representation by the Japanese ambassador and the
7 US Attorney General said, that is fine. There was an actual
8 discussion with the United States Attorney General approving
9 what the Japanese government did.
10 The Pink case, which is also relied -- which is also
11 relied on, that's a case having to do with recognition of the
12 Soviet Union for the first time. Once it became communist, I
13 guess there was a period where they didn't recognize that
14 government.
15 The United States sued the State of New York because
16 the New York was withholding some property that would properly
17 belong to the government of Russia if it was indeed a
18 recognized government. The Russian government gave proper
19 documents saying we own this property that's at issue.
20 These -- I think it was some funds. And this was all part of
21 a negotiated arrangement where the Soviet Union -- where it
22 was saying we are going to recognize you. You will do certain
23 things for us. We will do certain things for you and this
24 properties is yours.
25 Thee is no case where an amicus brief, without any

GR    OCR    CM    CRR    CSR

88

1 statements from foreign officials or diplomatic notes or

Page 83

---

6-5-07 Hearing Transcript

2 actual direct laws attached, where at a motion to dismiss
2 stage you say fine, as an article of faith, I may not be able
3 to see it now but we will let this case go now. Such a case
4 does not exist and I don't think has been cited to you.
5 I think your Honor has the sense of the act of state
6 correctly. I think the -- the act of state issue and the
7 government compulsion have actually merge because without
8 government compulsion I don't think there is an act of state.
9 The act of state they are referring to is the act of
10 government compulsion.
11 But the -- as I said, the W. S. Kirkpatrick case
12 says that as long as Your Honor does not rule that an act of
13 the Chinese government within -- as applicable within its own
14 territory is invalid, the act of state doesn't have any
15 application here.
16 And we have also the Second Circuit in the Allfed
17 case which we've cited to you also says that where a foreign
18 state does an act of state, that has an extraterritorial
19 effect on -- within the United States, then the act of state
20 doctrine is inapplicable.
21 It is for that reason we have also said that foreign
22 government compulsion would not be applicable because they are
23 selling product into the United states. It is one thing to
24 say they have private meetings in China and regulate their own

GR    OCR    CM    CRR    CSR

89

1 affairs as they wished there. And there isn't a record to
2 assure you that their meetings have been confined to China.
3 These are international companies that do travel. They come

Page 84

# A-621

6-5-07 Hearing Transcript

```
 4   to US trade shows.  They have joint ventures with their
 5   other -- other competitors who have 10 to 15 percent of the
 6   market who are in Europe.
 7        But setting that aside, they have contracts with
 8   companies in the United States to sell Vitamin C here.  So we
 9   don't think the act -- that even if there was foreign
10   government compulsion here, that is a defense to activity
11   within the United States.  And that's also a doctrine that in
12   addition to being reflected in the Restatement provision that
13   you said is expressly referenced in the Department of Justice
14   guidelines that both parties have cited to the court,
15        If -- I am happy to address other points.  I do have
16   some questions.
17        THE COURT:  We have a meeting of the judges at 3:00
18   o'clock.  I hope I am not imposing on you if you all could
19   come back at two?
20        MR. ISAACSON:  Happy to do that.
21        THE COURT:  We will go on for a little bit longer,
22   I have a couple of questions for you.  And I will give the
23   defendants a chance to talk.
24        All right.  I will see you then.
25        (Luncheon recess taken.)  (continued on next page.)
```

```
               GR   OCR   CH   CRR   CSR
```

```
                                                          90
```

```
 1        A F T E R N O O N      S E S S I O N
 2        THE COURT:  Go ahead.
 3        MR. ISAACSON:  That's where we left off, Your
 4   Honor, I would make myself available for questions.  I think
```

Page 85

6-5-07 Hearing Transcript

```
 5   we have covered the major points that I intended to cover.
 6        THE COURT:  I guess I wanted to get a little bit of
 7   a picture of what, if you did get fact discovery about the
 8   role of the defendants versus the role of the Ministry, how
 9   would you propose to verify or, let's say, contradict what has
10   been proposed as the story here?  I just want to have a sense
11   of what would be involved here.
12        MR. ISAACSON:  I think we would look to the same
13   type of discovery we would get in any cartel case, of taking
14   discovery from the defendants about what they did, the
15   documents about what they did; and if it turns out that they
16   have got documents saying the government -- here is the
17   government orders dictating that we do that, those would turn
18   up in the documents.  I suspect if there were a lot of those
19   documents, we would have seen them by now.
20        We would depose people who were at the meetings and
21   we would depose each company through 30(b)(6) about their
22   knowledge of what went on at the meetings.  If it turned out
23   there were government officials either at the meetings, which
24   I don't believe, or people who said I received a direction
25   from the government, they would be able to testify about that.
```

```
               GR   OCR   CH   CRR   CSR
```

```
                                                          91
```

```
 1        If there is -- if the issue of compulsion is
 2   only -- is to be presented as a matter of law, I would wait
 3   for them to come up with a new law because they don't have it
 4   here.
 5        THE COURT:  Let me put it this way.  I would be a
 6   little bit concerned if you started to try to depose
```

Page 86

6-5-07 Hearing Transcript

```
 7   government officials,
 8        MR. ISAACSON:  I wouldn't even know how to do that,
 9   Your Honor.
10        THE COURT:  I guess let them present it, if we go
11   that far.
12        All right.  That was my principal question.  Let me
13   just review my notes.
14        (Pause.)
15        I may have one or two others, but let me hear first
16   from the defendants.
17        MR. ISAACSON:  Thank you, Your Honor.
18        MR. NITNICK:  With permission, Your Honor, the
19   Ministry will go first.
20        THE COURT:  Yes.  Since his remarks were directed
21   principally to the Ministry.
22        MR. NITNICK:  That is what I thought.
23        It will assist my remarks, Your Honor, if Your Honor
24   has in front of him the handout that Mr. Isaacson prepared and
25   spoke from.
```

```
               GR   OCR   CH   CRR   CSR
```

```
                                                          92
```

```
 1        THE COURT:  This?
 2        MR. NITNICK:  Yes, Your Honor, as well as the
 3   timeline, the one sheet that I had.
 4        THE COURT:  All right.  It is right in front of me.
 5        MR. NITNICK:  I will try both to be brief and to
 6   spend the --
 7        THE COURT:  You don't have to be brief.  I have
```

Page 87

6-5-07 Hearing Transcript

```
 8   scheduled a lot of time for this.  I'd rather hear a real
 9   response to some of the points he made, as I think he tried to
10   respond to the points you made.
11        MR. NITNICK:  I appreciate that.  I will spend the
12   bulk of my time responding to his points on the record and I
13   will then briefly respond to his points on the cases that I
14   cited.
15        I would like to begin with plaintiff's slide 13,
16   entitled "Defendants have not submitted evidence meeting their
17   burden."
18        There has been an almost mantra-like repetition in
19   the plaintiff's briefs and in argument today as summarized in
20   the first bullet on this slide that no document has been
21   submitted to show compulsion by the government of a Vitamin C
22   cartel.  I take great exception to that statement, Your Honor.
23   That was the entire point of the summary that I prepared in
24   the one-pager.
25        It certainly is the position of the government of
```

```
               GR   OCR   CH   CRR   CSR
```

```
                                                          93
```

```
 1   China that we have in fact provided all of the regulations.
 2   It's not done by statute in China.  It is done by regulation.
 3   We have provided all of the documentary and any other type of
 4   evidence necessary by attaching the regulations that we
 5   believe show compulsion.
 6        While it is certainly true, as in these voluminous
 7   documents, that one could cite benign language from each of
 8   the documents, we have summarized very succinctly on this one
 9   page what we are pointing to as the language that we believe
```

Page 88

# A-622

6-5-07 Hearing Transcript

10  reflects what we -- excuse me -- what my client understands as
11  a regulatory regime imposed from the top down, that mandated
12  these entities, these enterprises, to collectively set prices.
13       We have explained, contrary to some of the bullets
14  on this page, that while it is true, that the government did
15  not establish a price point, the government nevertheless
16  created the framework with that purpose and intent, and indeed
17  the effect, which is why we're here today, of stabilizing,
18  fixing prices, at -- for export quantities.
19       The plaintiffs -- actually, I will just -- I will
20  move on.
21       The next slide that I would like to --
22       THE COURT: While we are on that slide, he didn't
23  make much of it. But I guess, what am I to do about the
24  plaintiff's expert testimony, the affidavit from the professor
25  about Chinese law?

                    GR    OCR    CM    CRR    CSR

                                              94

1       MR. MITNICK: I believe the proper disposition of
2  that testimony at this stage, Your Honor, simply is to ignore
3  it.
4       As the defendants have explained in their reply
5  brief, every single case cited by the plaintiffs in support of
6  the Rule 44 requirement of having an expert testify on law was
7  the ordinary case where you had private parties and you have a
8  battle of the experts.
9       In this situation, Your Honor, it is quite
10  different. You have the government of another country coming

                              Page 89

6-5-07 Hearing Transcript

13  and Chop system.
14       THE COURT: All right.
15       MR. MITNICK: Plaintiffs say yes, but look on the
16  face of the document, it was promulgated March 2002 and
17  effective May 2005.
18       This is an obvious typo in the translation. In the
19  body of the document itself, on the next page, it says,
20  May 1, 2002. I am happy to resubmit -- have this document
21  reauthenticated and --
22       THE COURT: Go ahead to the other presumed problems.
23       MR. MITNICK: If you turn to the next page, 24-B,
24  and you get to the bottom, I did not recognize this for what
25  it was until after these documents were submitted. Plaintiffs

                    GR    OCR    CM    CRR    CSR

                                              95

1  correctly point out the very end of this page has the
2  bracketed phrase, omitted, but vitamin C included therein. It
3  was bracketed, Your Honor, to indicate that it was not part of
4  the original document. It was bracketed to indicate it was an
5  insertion.
6       When the translation was made, since the
7  V and C -- as I was explaining before, when the government
8  imposed the V -- the verification and Chop system in 2002, it
9  decreased the number of products that were subject to this
10  joint price cooperative nature. this attaches thirty
11  categories of products.
12       When the Ministry translated this, they evidently
13  thought it was helpful, they put in brackets a note, clearly

                              Page 91

6-5-07 Hearing Transcript

11  into court to say what the law meant in their country. In
12  that situation, unless the court makes an affirmative finding
13  that it finds that presentation inherently non-believable, the
14  only proper disposition is to credit the government's finding
15  and to foreclose an inquiry into what the law says and other
16  findings. I believe that is the proper disposition.
17       THE COURT: I guess it is -- maybe you will get to
18  this. It is a little bit -- I have to tell you, I was a
19  little bit taken aback in looking at some of these documents,
20  where the professor -- it isn't a question of law. It is a
21  question of if I have been presented with the appropriate
22  document, says that things were added in or were not
23  translated properly, or references were made that were not in
24  the original documents.
25       Go ahead. You go through it I hope at some point --

                    GR    OCR    CM    CRR    CSR

                                              95

1       MR. MITNICK: Why don't I just turn to that? I had
2  reserved that actually at the end of my presentation under a
3  note that said "mea culpa." Perhaps we can simply --
4       THE COURT: I'd rather -- this is important to me.
5  Why don't you go through in your order and then we will come
6  back. I just want to make sure that that is covered.
7       MR. MITNICK: With the Court's permission, I'd
8  rather just get that one the way now.
9       THE COURT: Okay.
10       MR. MITNICK: If you turn to page or slide 24-A, the
11  document shows an effective date of May 1, 2005. This is the
12  2002 customs notice that established the Price Verification

                              Page 90

6-5-07 Hearing Transcript

14  identified with the brackets, that said, omitted, but
15  Vitamin C is included therein.
16       THE COURT: Can I get the list of thirty?
17       MR. MITNICK: Absolutely, Your Honor. There is no
18  problem. There was no intentionality in not including.
19       THE COURT: I am not accusing.
20       MR. MITNICK: The plaintiffs implied there was. I
21  believe the plaintiffs said it was obviously intended so the
22  court didn't get the list. That was not true.
23       THE COURT: All right. It does relate to the issue,
24  in effect, if you get a walk here, am I opening the door to
25  basically every industry in China getting together and

                    GR    OCR    CM    CRR    CSR

                                              97

1  putting -- getting some administrative official to stamp their
2  cartel price and get it -- and immunize them from antitrust
3  liability.
4       I have two questions. I would like to see that list
5  and see what industries are covered; and, B, are you telling
6  me that in no other industry would this system be operable?
7  In other words, price verification, whatever you want to call
8  it?
9       MR. MITNICK: No.
10       In fact, I was confused when I -- I understood
11  Mr. Isaacson to say that I had suggested that this 2002
12  regulation was unique to the vitamin C industry.
13       THE COURT: No. I didn't --
14       MR. MITNICK: It is clearly not true. It is
15  obviously relevant to thirty categories of industry.

                              Page 92

6-5-07 Hearing Transcript

16  THE COURT: Does that cover 99 percent of the
17  economy, or does it cover two percent of the economy?
18  MR. MITNICK: I don't purport to know what it
19  covers. But I know from discussions with the ministry that it
20  was limited. That it does not -- that there are major exports
21  going out that are not covered by this category.
22  THE COURT: I guess if I take a look at the list, I
23  could pick it out a little bit.
24  MR. MITNICK: I will get that for you, Your Honor.
25  THE COURT: All right.

GR    OCR    CH    CRR    CSR

98

1  Then I also said that -- the professor said that the
2  paragraph four was -- there is one sentence that was not
3  properly translated, the adoption of PVC procedure. In the
4  middle of paragraph four, do you see it?
5  MR. MITNICK: The middle of paragraph four?
6  THE COURT: The same page.
7  MR. MITNICK: I heard him say that.
8  I suppose it -- that could be a quibble with the
9  translation that was done by the ministry. Frankly, I would
10  accept his translation. It was of absolutely no consequence.
11  Any time you are going to be translating documents
12  from one language to another, you are clearly going to be able
13  to quibble about one or two words. That -- that particular
14  quibble really had absolutely no consequence to it. It was
15  not part of anything.
16  THE COURT: Okay. I think that -- I may be wrong.

Page 93

---

6-5-07 Hearing Transcript

17  I think that covered all the corrections, the references. Am
18  I right?
19  MR. MITNICK: I believe there was one more bracketed
20  correction on page 24-D. Again, this is the first time that I
21  have realized this.
22  But the brackets, again, evidently -- because it is
23  a sentence I've never even focused on. It evidently was
24  intended to signal a non-literal translation.
25  I will undertake to have this document retranslated

GR    OCR    CH    CRR    CSR

99

1  as well.
2  I believe those were the only instances, Your Honor.
3  THE COURT: Okay. Where is that? I'm sorry. I
4  missed that.
5  MR. MITNICK: Page 24-D.
6  THE COURT: D as in David?
7  MR. MITNICK: 24-D as in David, paragraph A, right
8  in the middle, it is a bracket and a bracket with an asterisk.
9  THE COURT: That shouldn't have been there?
10  MR. MITNICK: I believe that's right.
11  I am intuiting that, frankly, sitting here for the
12  first time today. I've never really looked at that before.
13  I think that's probably what that means. I will get those two
14  documents retranslated.
15  One last error of this type that we discovered
16  recently is that in our own amicus brief, where we cite to the
17  Department of Justice International Guidelines and we provide
18  you with an illustration X, I believe it is footnote 13 on

Page 94

---

6-5-07 Hearing Transcript

19  pages 15 to 16 of the Ministry's brief, illustration --
20  illustrative example X consists of two paragraphs. And in my
21  footnote 13 those paragraphs were inadvertently reversed. I
22  think it must have been a last minute word processing glitch
23  that I didn't --
24  THE COURT: "Greatly increase" should go before --
25  MR. MITNICK: That's right.

GR    OCR    CH    CRR    CSR

100

1  With permission, I will hand up a photocopy of the
2  international guidelines, the relevant --
3  THE COURT: Okay.
4  MR. MITNICK: I would then ask the Court to turn to
5  slide 19-A, which is again the first document also referred to
6  in my timeline.
7  THE COURT: All right.
8  MR. MITNICK: It is the 1991 document that
9  established the Chambers. Plaintiffs turned to page 19-D to
10  refer to Article 14 at the top, which was the article that I
11  had spent some time focusing on this morning. Where I focused
12  on the phrase, as authorized, to distinguish those social
13  organizations created by the Ministry which function as
14  essentially -- the Court doesn't have it?
15  THE COURT: I have.
16  MR. MITNICK: Okay. Which functions essentially as
17  an instrumentality of the government and those that don't.
18  Mr. Isaacson noted, correctly, that "as authorized" does not
19  compel price fixing. Just so there is no confusion, we

Page 95

---

6-5-07 Hearing Transcript

20  certainly would agree with that provision. That's in fact the
21  point. This article does not say every chamber is an
22  instrumentality that is acting in the nature of a regulatory
23  body. It is only in those instances where the Ministry later
24  imbues them through regulation with the power to regulate that
25  they become so.

GR    OCR    CH    CRR    CSR

101

1  So, for example, I think it is illustrative if we
2  turn to slides 15-A and B, where plaintiffs cite to
3  subcommittee meetings from the Paracetamol subcommittee. They
4  show that here is an example where a group of industry
5  participants tried to get together to form like a Vitamin C
6  committee, a self-regulatory body and was denied the authority
7  to do that. That I believe, Your Honor, proves the very point
8  that we are trying to make, that some subcommittee products
9  are authorized, some aren't, and sometimes the chamber itself
10  with authority will go forward with some self-regulation and
11  sometimes it won't.
12  It is only in the situation where there is a clear
13  regulatory record that the Chamber is authorized and that the
14  subcommittee is authorized can there be any situation where
15  the chamber and the subcommittee is acting as a state
16  instrumentality. Exactly the same, Your Honor, analogously,
17  to the Parker doctrine here with respect to states that
18  Mr. Bonse alluded to earlier.
19  THE COURT: It is fair to say that, as you describe
20  the powers of the ministry, in theory, they could require
21  price fixing for any industry.

Page 96

# A-624

6-5-07 Hearing Transcript

22      MR. MITNICK:  Yes, in theory they could require
23  price fixing for any industry.  That's correct.
24      THE COURT:  All right.  The other -- again, I don't
25  like to interrupt you because you are very helpful to me.

GR    OCR    CH    CRR    CSR

102

1   This point -- I am not sure it's very material, this reference
2   to social organization and how we characterize it as
3   governmental or non-governmental.  Can you enlighten me a
4   little bit about -- is it governmental?  Is it
5   non-governmental?  I don't know what it means.  I am not sure
6   it matters.  It might be helpful if I understood it a little
7   better.
8       MR. MITNICK:  I think it does matter, Your Honor.  I
9   think it -- in some sense it may be critical because if the
10  Chamber is not in any way an instrumentality of the Ministry
11  acting as -- in a regulatory capacity, then as the plaintiffs
12  suggest, you have private actors who are acting.
13      THE COURT:  That happens in the Parker doctrine.
14  They are not all governmental industries.  There is immunity
15  for private groups that get the government, state governments
16  to approve what they are up to.
17      MR. MITNICK:  That's true.  I am thinking of
18  agencies of the state.  But that's true.  There are other
19  situations where with active supervision of non-government
20  actors.
21      Here, the --
22      THE COURT:  Insurance industry might be a good

Page 97

6-5-07 Hearing Transcript

23  example.
24      MR. MITNICK:  okay.  Here perhaps the better way to
25  explain this would be by reference to that section of the

GR    OCR    CH    CRR    CSR

103

1   Ministry's brief where we describe on page nine how the
2   Ministry's authority over the Chamber is plenary.  Unlike the
3   other situation that Your Honor was just alluding to, here you
4   have an organization that was created specifically by --
5       THE COURT:  That's the vitamin c, you are talking
6   about?
7       MR. MITNICK:  I am talking about -- you are asking
8   about social organizations.
9       THE COURT:  They use this term.  I am just trying to
10  understand, he referred to it as in effect private,
11  non-governmental.
12      MR. MITNICK:  Right.
13      THE COURT:  I don't know what your position is.
14      MR. MITNICK:  My position is very much it is
15  governmental.
16      THE COURT:  All of these social organizations?
17      MR. MITNICK:  No.
18      THE COURT:  Okay.
19      MR. MITNICK:  The reason I think this is confusing,
20  Your Honor, again is because it is a different system than
21  ours.  The chambers are dual function bodies.
22      THE COURT:  Right.
23      MR. MITNICK:  That goes back to Article 14.
24  Article 14 is the key to all of this, from my perspective.

Page 98

6-5-07 Hearing Transcript

25  Article 14 talks about what the Chamber can do as

GR    OCR    CH    CRR    CSR

104

1   authorized by the Ministry.  Social organizations is just
2   a -- is just a name that they have for these organizations in
3   which the industries are members.
4       The key distinction from the Ministry's standpoint
5   though is that these organizations can act as what we would
6   understand as a trade association.
7       THE COURT:  Right.
8       MR. MITNICK:  Which would not be necessarily
9   governmental, or they can act as an extension of the Ministry,
10  as a deputy essentially of the Ministry, as a Ministry created
11  organization, that is acting with delegated authority.  So
12  they sometimes can act as a trade association.  They sometimes
13  when authorized --
14      THE COURT:  We have that.  That's analogous to our
15  law.  We have plenty of instances where the government has
16  allowed trade associations to get together for very specific
17  purposes in a way that would otherwise be a violation of the
18  antitrust laws.
19      MR. MITNICK:  The difference here, Your Honor, is
20  that this is an organization that's created by the government
21  as part of the government.  The leaders are appointed by the
22  Ministry.  The budget comes from the Ministry.
23      THE COURT:  For the trade association?
24      MR. MITNICK:  For the Chamber.  I don't want to use
25  the word "trade association" because --

Page 99

6-5-07 Hearing Transcript

GR    OCR    CH    CRR    CSR

105

1       THE COURT:  For the Chamber?
2       MR. MITNICK:  Yes.
3       The Chamber is created by the Ministry.  It's
4   chartered by the Ministry.  It is funded by the Ministry.  Its
5   budget is approved by the Ministry.  Its annual agendas are
6   approved and created in concert with the Ministry.
7       It is a regulatory body when given the authority to
8   regulate, much as a smaller agency like EPA.
9       THE COURT:  Your description which you just gave,
10  would it be applicable to those chambers that do not have the
11  authority?  In other words, this Paracetamol, I don't know how
12  you pronounce it, the one that's 35-A?  They don't have the
13  power to fix prices?
14      Would you describe them in the same way as being
15  governmental kind of thing, the people are appointed by the
16  government, their budget and everything else?
17      MR. MITNICK:  I hesitate to make a record on a part
18  of a Chamber with a product I know nothing about.  I saw the
19  document for the first time today and was responding that way.
20      THE COURT:  Okay.
21      MR. MITNICK:  There are certainly parts, products
22  and parts of the Chamber, where it is not acting as a
23  government instrumentality.  Though its budget is still funded
24  by the MOFCOM and its leaders are elected by the MOFCOM.
25      THE COURT:  You mean, appointed?

GR    OCR    CH    CRR    CSR

Page 100

6-5-07 Hearing Transcript

106

1    MR. MITNICK:  Appointed, yes.  I'm sorry.

2        The closest I think analogy I can make, and again

3    its dual use is that sometimes it operates as a trade

4    association.  But here where it is -- where it is completely

5    driven through Ministry regulation, it is much more akin to a

6    department or a division within a department.  So that the

7    Department of Agriculture, for example, may have a division of

8    Animal Husbandry.  I am making it up.  I have no idea.

9        But in the context of Vitamin C, that is how the

10   Chamber is viewed within the Chinese government system.  It is

11   viewed by the government as a government regulatory agency.

12       They view other Chambers, or even this Chamber when

13   not authorized, as not acting as a government agency, as not

14   being a government agency.  It is a dual use concept that we

15   simply don't have here.

16       But when authorized, it is viewed within the Chinese

17   system as akin to a division or an office or a department

18   within a cabinet level agency.  That is how it is treated and

19   understood.

20       THE COURT:  Okay.  Go ahead.

21       MR. MITNICK:  In slide 21-A, plaintiffs focused on

22   this exhibit, Your Honor, to again imply that because this is

23   a document where it says approval, that this document on which

24   I believe they rely somewhat heavily insinuates that this is a

25   situation where a group of industry members essentially got

GR    OCR    CM    CRR    CSR

Page 101

---

6-5-07 Hearing Transcript

107

1    together, cooked up the idea that let's go to the government

2    and get a rubber stamp for what we are doing and we will be

3    able to then have a shield of immunity based on that.  That's

4    really what this document is being used for.  From some of the

5    questions of the court earlier today, I think that implication

6    has found some resonance within the court, which is why it is

7    important to see the context of how that document came into

8    being from the timeline.

9        Where you have the third document, that is a document

10   not from the industry and having nothing to do specifically

11   with Vitamin C.  It is a document that came -- a regulation

12   jointly by the MOFCOM and the state Drug Administration

13   ordering --

14       THE COURT:  The third one?  1997?

15       MR. MITNICK:  1997, one, ordering in the language

16   that Chambers shall establish a vitamin C coordination group.

17   Later, in response to that, we have a charter being forced

18   because they were ordered to.  The Chamber was ordered to form

19   a subcommittee, initially called Coordination Group, later

20   called subcommittee.

21       They did that in 1997.  They presented it to the

22   Ministry as ordered to, and in 1998 --

23       THE COURT:  Who is "they?"

24       MR. MITNICK:  The Chamber.  The Chamber convened a

25   subcommittee.  The subcommittee proposed a charter, as a

GR    OCR    CM    CRR    CSR

108

Page 102

---

6-5-07 Hearing Transcript

1    subcommittee of the Chamber, and the Chamber proposed the

2    subcommittee's establishment and charter to the Ministry.  The

3    Ministry in 1998, in this document, approves it.

4        It would be the wildest misdescription of this

5    process to leave the court with the idea that these defendants

6    essentially cooked up a scheme to get immunity.  That simply

7    is not how it happened.

8        THE COURT:  You may be right.

9        Where is the record?

10       MR. MITNICK:  Your Honor, I would submit that this

11   is the record, the order of the government's regulations.

12       THE COURT:  I am reading what you are saying.  How

13   can you say that that would be inconsistent with this -- with

14   their characterization which you said finds some resonance

15   with me and not to say it does.  You may be a hundred percent

16   right, that the government saw that this is a -- government

17   official saw this as a major industry.  There could be

18   problems in terms of dumping, problems I think you also

19   characterized it in terms of unemployment, although if it is a

20   growing industry I find it a little hard to believe that that

21   would have been an issue, but I could see your -- the issue of

22   dumping, and there is even in one of these documents a

23   specific reference to that concern.

24       How do I know that -- how can I say that absolutely

25   this 1997 was not the product of what the -- I don't know what

GR    OCR    CM    CRR    CSR

109

1    you want to call it, but I will accept your characterization

Page 103

---

6-5-07 Hearing Transcript

2    as good as any.

3        MR. MITNICK:  I guess I would say there are only two

4    answers that I have today, Your Honor.

5        The first answer is, that the government is coming

6    in to tell you that, and you can either accept the

7    government's statement as a bona fide statement of a foreign

8    government, or you can, I suppose, enter a finding that you

9    reject it.

10       The second answer I would give --

11       THE COURT:  That's of course, you know, realize, it

12   is not a question of law.  It is just a question of fact.

13   Okay.

14       MR. MITNICK:  The second -- well, let me back up.  I

15   think it is a mixed question of law and fact because you have

16   a foreign government coming in to tell you how their

17   regulatory regime came to be and telling you that it was the

18   government that created this structure.

19       THE COURT:  Where in your papers, with all due

20   respect, do they describe exactly how this came into being?

21   You quote the documents, but they certainly don't describe the

22   process by which this came in, at least my reading of this and

23   your excellent -- otherwise very excellent brief here.

24       MR. MITNICK:  That may be the case.  I don't want to

25   overstate myself.

GR    OCR    CM    CRR    CSR

110

1        They may not have provided in the brief the sequence

2    that I have just explained.  They provided the documents that

3    were intended to show the sequence, and I -- I suppose it

Page 104

6-5-07 Hearing Transcript

4   is -- we believed it was implicit in providing the documents
5   with the sequence to explain that it came about in that way.
6   But that is to say more would probably be to overstate.
7            THE COURT:  Listen, you may be right, that even if
8   the characterization which you ascribed to them and we may
9   still be protected by the law.  If that is your argument,
10  maybe you are right and that's the end of the case.  Then
11  there would be no question of fact.
12            I could assume that this was concocted by the people
13  in the industry and they went and found some compliant
14  government official who went along with this and they made up
15  some story, although it is hard for me to understand why they
16  would be worried about employees being fired in an industry
17  that's growing and they are hiring people, but maybe this
18  is -- maybe that's enough.  They managed to persuade the
19  government officials and that's all that's required, whatever
20  their motives were.
21            MR. MITNICK:  I think that is in fact the second
22  point I was going to make, Your Honor, which is that I
23  believe --
24            THE COURT:  Really?  Or is that a third point?
25            MR. MITNICK:  I said I had two.  That was the second

GR   OCR   CM   CRR   CSR

111

1   one.  Under the ONE Shipping case, I think that inquiry is
2   precisely the inquiry that the Second Circuit says is
3   foreclosed, the inquiry into why the government was motivated
4   to pass this regulation, the inquiry of whether the defendants
Page 105

---

6-5-07 Hearing Transcript

5   came to the government or the reverse.  I believe under the
6   ONE case that is specifically what the Second Circuit said was
7   foreclosed.
8            I will get a little bit more to the law later on.
9            I would also say that I don't understand why it is,
10  if we are looking at this as a question of fact before I will
11  move on to the next point, I don't know why it is back in 1997
12  the defendants would have concocted such a scheme anyway if by
13  the plaintiff's own pleadings or arguments today in court they
14  didn't actually engage in price fixing until two years later.
15  I suggest, the facts are more consistent with the order of the
16  documents.
17            THE COURT:  Okay.
18            MR. MITNICK:  A small point but one raised vocally
19  on page 22-A, Mr. Isaacson says plaintiffs have repeatedly
20  raised that we keep relying on a document that was abolished,
21  as indicated by the note at the top of the page.
22            We correctly points out we've never responded to
23  this argument in any of our papers because I think we find it
24  somewhat bewildering.  This 1997 document was, in fact this
25  whole regulatory regime was in fact superseded by the 2002

GR   OCR   CM   CRR   CSR

112

1   Price Verification and Chop system.  In Chinese parlance, this
2   was abolished.  In American parlance, English parlance, it was
3   superseded.  There is nothing remarkable about that.
4            Page 23-A, I am told that when I quote from Article
5   four on this page in my timeline, I have left out apparently
6   some words at the very end of the sentence.  The words being,
Page 106

---

6-5-07 Hearing Transcript

7   "which are suitable in countries to which the goods are
8   exported."  Plaintiffs say, see, this shows that it was all
9   discretionary.
10            But to some extent, Your Honor, that is the point.
11  This is not a system where the government case in and said you
12  are compelled to export at price points A, B and C.  It was a
13  system where the government came in and said, you are
14  compelled to get together to set prices which you think are
15  suitable.
16            THE COURT:  I guess -- it doesn't want to retread old
17  ground.  Again, unlike the New Zealand case, there doesn't
18  seem to be, except on the dumping issue, anywhere in these
19  regs any guidelines in determining what is, quote, suitable.
20  I think that's a big difference between what happened with the
21  New Zealand case.
22            MR. MITNICK:  I think that may be a difference, Your
23  Honor.  I am not sure that I would --
24            THE COURT:  You don't have to answer me today.  This
25  isn't your last shot.  I am not going to be deciding this

GR   OCR   CM   CRR   CSR

113

1   today from the bench.
2            It would give me lot more comfort in your position,
3   it would make the -- Judge Haight's opinion more applicable
4   because it was very clear, transparent, if you want, what was
5   going on, and the guidelines that were the industry in
6   New Zealand was using and the reason for what they were doing.
7            The trouble with this is that, I forget where it
Page 107

---

6-5-07 Hearing Transcript

8   was, there is a clear reference of a concern about the dumping
9   issue.  It was a major problem, I assume, for the Chinese and
10  in the late 1990s, being the accusations, and even I guess
11  today.
12            But other than taking advantage of a market, there
13  is no guideline here, quote, to determine what is suitable.
14  Like concern about the profitability of the industry, concern
15  about unemployment.
16            You articulate, and I think you -- I am in no way
17  questioning your accuracy in reporting, that their main
18  concern was dumping and maybe stability in the sense of
19  avoiding unemployment for the workers and maybe -- and maybe
20  keeping, quote, the industry sound.  But they weren't focused
21  on extracting a monopoly price from the American market.  I
22  can sense all that.  But where are the guidelines here for
23  that?
24            MR. MITNICK:  Your Honor, I will review the
25  guidelines for more specificity.  But I am not sure if we

GR   OCR   CM   CRR   CSR

114

1   don't find any that specificity is required.  I agree, that in
2   the New Zealand case there may have been specificity.  I think
3   all that is --
4            THE COURT:  Yes.  But the problem then becomes, if
5   there is no such guidelines, why is this mandated?  They could
6   have fixed any price.  They could have fixed a fair market
7   price, in which case the plaintiff -- there are no damages, no
8   harm, no foul.
9            We have what I call in conflict of laws a false
Page 108

6-5-07 Hearing Transcript

10 conflict. What apparently appears to be two laws at each
11 other's throat, it turns out in the real world, reality, to
12 have no conflict. That's a concept very common in the area of
13 conflict of laws.
14     MR. NITNICK: I think in this situation, though,
15 Your Honor, the mandate was simply to coordinate prices.
16     THE COURT: For what purpose?
17     MR. NITNICK: For the purpose of --
18     THE COURT: Even if I accept the notion that I can't
19 question their motive, et cetera, at least I am entitled to
20 what the alleged motive, purpose is.
21     MR. NITNICK: I believe in the 2002 PVC regulations,
22 which is tab J --
23     THE COURT: Yes?
24     MR. NITNICK: Your Honor, I will have to look at
25 this. This is one of the points that references antidumping

    GR   OCR   CM   CRR   CSR

115

1 sanctions. I will look.
2     THE COURT: I read it here somewhere. There are a
3 lot of papers.
4     MR. NITNICK: There are.
5     I am quite sure we cited to some other factors that
6 the laws were intended to promote. I will look at that
7 separately.
8     I have very few other points.
9     One -- even again I will call it a quibble, that
10 plaintiffs have with the form of the documents we submitted,

Page 109

6-5-07 Hearing Transcript

11 was that these were printed from the internet.
12     The Chinese don't, as I was saying before, have the
13 same kind of statute books and law libraries and such. They
14 do have an excellent system of linking their regulations on
15 line. So it was most convenient for the Ministry and for our
16 lawyers in Beijing working with the Ministry to print these
17 out on line.
18     The Ministry, however, as the Court is aware, had
19 a -- had an officer of the Ministry certify that these were
20 true and accurate copies of the regulations. Again, I
21 apologize for those few areas that were bracketed.
22     That Ministry's signature was then authenticated on
23 up the chain through the US Embassy, all in accordance with
24 Federal Rules of Evidence.
25     There is also a quibble, I think, with the form of

    GR   OCR   CM   CRR   CSR

116

1 submission. We submitted an amicus brief because we
2 understand from the State Department documents that we have
3 provided that that is how a government is supposed to be
4 addressing the court.
5     THE COURT: Why did you cite a 1987 case? At first
6 I said, nothing more recent?
7     MR. NITNICK: That's where the -- the government
8 sets all of this out. There is nothing more recent.
9     THE COURT: Okay.
10     MR. NITNICK: The --
11     THE COURT: Okay. That's a minor thing.
12     MR. NITNICK: Plaintiffs suggest we should have done

Page 110

6-5-07 Hearing Transcript

13 this by diplomatic note. We can resubmit everything in a
14 diplomatic note.
15     THE COURT: No. You don't have to.
16     MR. NITNICK: Two last points before I turn very
17 briefly to the law.
18     Plaintiffs bring up the WTO and certain
19 representations made at the WTO. I am not prepared here today
20 to address those. I am not WTO counsel for the Ministry or
21 any other agency within China. I don't know who law.
22     I believe I am quoting accurately when Mr. Isaacson
23 said WTO has nothing to do with this. I couldn't agree more.
24 It is a very different regulatory regime. It has its own
25 standards.

    GR   OCR   CM   CRR   CSR

117

1     THE COURT: There is still the issue of whether on a
2 factual level, never mind the law, they are making
3 representations here that are inconsistent with
4 representations being made by the Ministry to other parties.
5 That would normally be called an admission.
6     MR. NITNICK: I understand that, Your Honor.
7     THE COURT: If you want to -- you can take time and
8 go check it. I think it requires an answer, even if the law
9 is irrelevant.
10     MR. NITNICK: Okay.
11     THE COURT: If they are representing the very -- one
12 fact to me and representing the WTO the exact opposite, it is
13 a question of concern. But it may be that the context in

Page 111

6-5-07 Hearing Transcript

14 which the statement is made is quite different.
15     MR. NITNICK: I will follow that up, Your Honor.
16     Lastly --
17     THE COURT: You dropped something. Something just
18 fell.
19     MR. NITNICK: Thank you.
20     Lastly, on one point that was just made a short
21 while ago, the issue of discovery. It is true, at a hearing
22 before Judge Ornstein, the Ministry said --
23     THE COURT: You are about to duck away from that?
24     MR. NITNICK: I am about to clarify, Your Honor.
25     The Ministry did say that it had no position on

    GR   OCR   CM   CRR   CSR

118

1 discovery. BUT the question was, do you have a position on
2 this issue of discovery that we have been talking about.
3     The issue that had been addressed was what is the
4 normal procedure when the defendants say that a dispositive
5 motion is about to be filed and there ought to be a stay. On
6 that issue, as a general matter of American procedural law,
7 the Ministry did not then and does not now take any position.
8     I come back to this in the context of the Court's
9 question to Mr. Isaacson, what discovery do you want. The
10 answer is, we want discovery of people who attended these
11 meetings.
12     It is very clear to me, that where Mr. Isaacson is
13 going, is that he is not talking about taking discovery simply
14 from the clients represented at this table. But he is also
15 planning to take discovery of the Chamber, because these

Page 112

6-5-07 Hearing Transcript

16    people had these meetings at the Chamber.  There are records
17    at the Chamber that are relevant and there were personnel at
18    the Chamber that were relevant.
19           the government very --
20           THE COURT:  What do you mean, personnel that were
21    relevant?  Government?
22           MR. NITNICK:  There were chamber personnel that were
23    present at those meetings.
24           Clearly, from the Ministry's perspective, those
25    meetings were conducted under the auspices of a government

                    GR    OCR    CH    CRR    CSR

                                                            119

1     instrumentality, as I explained before or argued before, and
2     so with respect to that kind of discovery, the government very
3     much has a position and very much would object to the Court
4     allowing it.
5            I believe that would be --
6            THE COURT:  Am I missing something?  I thought I
7     made it pretty clear, that I wasn't going to allow them to go
8     start in deposing people from the Ministry.
9            If you just depose the defendants about what went
10    on, what's the issue?
11           MR. NITNICK:  It loops back to your Honor's
12    question, is the Chamber the government or not.  They will
13    seek -- I believe they are setting up to seek discovery from
14    the Chamber on their argument that the Chamber is not the
15    government, whereas we believe, the government believes, that
16    the Chamber was acting in a governmental capacity.

                    Page 113

---

6-5-07 Hearing Transcript

17    so to the extent that Your Honor --
18           THE COURT:  Aren't you ultimately, of course, back
19    to saying that accepting my characterization or your
20    characterization of what you think I think, that the bottom
21    line of all this, it doesn't make a difference.  They are
22    immune, even if they did concoct this whole thing.
23           MR. NITNICK:  What I am saying is that the Chamber
24    should be immune from discovery.  In terms of --
25           THE COURT:  That doesn't answer the question.  Why

                    GR    OCR    CH    CRR    CSR

                                                            120

1     should they be immune about what went on and who was present?
2            Suppose there was a meeting in which no government
3     official was present.
4            MR. NITNICK:  Ultimately, while I think that the
5     defendants did not come to the ministry, I think it was the
6     opposite, ultimately I think it doesn't matter.  I think as
7     long as the government set up the regulation for whatever
8     reason, then I believe the Court is foreclosed from looking at
9     why it did that.
10           When I write the opinion, I would have
11    to say, there would -- I have to accept the plaintiff's
12    characterization that this was all put together by the
13    defendants and they agreed on the price, with no statutory
14    guidance of what the price should be other than their own
15    self-interest, no governmental real interests and then they
16    got some governmental official to approve it and then it is
17    clear that the government official did approve it and that's
18    the end of the case.

                    Page 114

---

6-5-07 Hearing Transcript

19           MR. NITNICK:  I think --
20           THE COURT:  That's the way I should write the
21    opinion?  Because I don't know how else -- you may be a
22    hundred percent right, at least my -- by this characterization
23    which I have just given, may be the correct one.  But once you
24    start backing away and saying well, government action, but
25    there are no guidelines, they could do anything they want,

                    GR    OCR    CH    CRR    CSR

                                                            121

1     then I find it a little bit difficult to understand why it is
2     mandated, what they did.
3            MR. NITNICK:  Again, your Honor, I think the reasons
4     of why they did it are not subject of what we can inquire as
5     long as they in fact did do it.
6            But I will get to Your Honor, because I'm sure in
7     the documents that we've already submitted, something which
8     points to some statements of why they did it beyond the
9     dumping.  I believe there were statements in some of these
10    documents referencing employment stability, referencing the
11    stability of the industry itself as the government was
12    transitioning.  Certainly that was the thrust of the
13    explanation from the Ministry.
14           THE COURT:  Okay.
15           MR. NITNICK:  I had no other points.  Before I turn
16    very briefly to just the law, unless the Court had some
17    questions.
18           This I -- this part I believe I can --
19           THE COURT:  Wait one second.

                    Page 115

---

6-5-07 Hearing Transcript

20           (Pause.)
21           Go ahead, counsel.
22           MR. NITNICK:  I just want to respond to some
23    characterizations of the cases that we had cited.
24           First of all, the plaintiffs say defendants cited
25    Second Circuit cases, ONE, Hunt, but we have the Supreme

                    GR    OCR    CH    CRR    CSR

                                                            122

1     Court.  They cite two cases from the Supreme Court,
2     Continental Ore and Sisal.
3            But in the Ore shipping case, the second circuit
4     said explicitly, in footnote four, referring to those two
5     cases, the Continental Ore case and United States versus Sisal
6     Sales, quote, both related to alleged conspiracies entered
7     into in the United States by United States citizens which
8     sought to monopolize trade in the United States.
9            Those cases simply don't apply, didn't apply in ONE
10    Shipping and they don't apply here.
11           In the New Zealand case, the court has obviously
12    suggested a possible distinction.  We have discussed that.
13           The plaintiff's only distinction of the case was
14    that the plaintiffs in New Zealand didn't dispute what the
15    regulatory regime was and here that's apparently hotly
16    disputed by the plaintiffs.
17           Again, we believe that dispute is not a real dispute
18    because once the government comes in to explain its laws, we
19    believe that should be the explanation.
20           In the McElderry case, Judge Lasker's case, it was
21    distinguished on the novel basis that the discussion of act of

                    Page 116

6-5-07 Hearing Transcript

22    state, compulsory requirements, and comity came at the end of
23    the decision. It was the only basis on which it was
24    distinguished.
25              I would submit, as I did earlier --

                    GR    OCR    CH    CRR    CSR

                                                            123

1              THE COURT: Judges fight a lot about what's holding
2    and what's dicta.
3              MR. NITNICK: I don't think there was a suggestion
4    that it was dicta, other than that it came last. There were
5    alternative holdings.
6              THE COURT: Okay.
7              MR. NITNICK: the only other point I meant to make
8    this morning was just in response to the Court's reference to
9    Section 415, I believe it was, of the Restatement, which I
10   hadn't -- hadn't had in front of me, but I heard what the
11   court read.
12             I just wanted to point out that my understanding is
13   that that states the unremarkable and irrefutable proposition
14   that where there is a conspiracy entirely abroad, if there are
15   effects in the United States, there is jurisdiction, there is
16   subject matter jurisdiction.
17             That is --
18             THE COURT: U.S. to regulate. I understand
19   distinction between jurisdiction to prescribe, but it seems to
20   me that -- I am a member of the ALI. They spend a lot of time
21   debating. It's awfully strange that they would spend a lot of
22   time on the section when in fact it essentially is negated

                    Page 117

6-5-07 Hearing Transcript

23   under this theory by sovereign immunity. I mean, act of state
24   or compulsory --
25             MR. NITNICK: I think I will stop, Your Honor.

                    GR    OCR    CH    CRR    CSR

                                                            124

1              THE COURT: No. Go ahead.
2              What were you saying? It struck me that just -- I
3    understand analytically how you can write it. But it ends up
4    making it meaningless.
5              MR. NITNICK: I thought from having listened to it,
6    and maybe I misheard it, but I thought it simply was talking
7    about the conspiracy being abroad with an effect here.
8              THE COURT: That's what they are essentially
9    charging here.
10             MR. NITNICK: which is pure subject matter
11   jurisdiction. The act of state, which was not in Restatement
12   415 is an abstention doctrine, completely separate from 415.
13   415 applies in the ordinary situation. Nobody is contesting
14   that this Court has subject jurisdiction.
15             There are other different reasons why the Court
16   should abstain from exercising jurisdiction.
17             THE COURT: Isn't it a little odd that we should
18   abstain to protect one guy from being forced to do something
19   against the law in the other country, even if he brought it
20   about, whereas, I may be wrong, but I think under the
21   commercial exception to the foreign sovereign immunity Act,
22   the state, if it engaged in it, would not have that as a
23   defense and would not be able to -- it's not an abstention.
24   They would be able to be sued right here.

                    Page 118

6-5-07 Hearing Transcript

25             MR. NITNICK: That's true in every case where

                    GR    OCR    CH    CRR    CSR

                                                            125

1    compulsion is found.
2              THE COURT: Yes. But it is awfully hard to see what
3    the compulsion here was. But you may be right.
4              Thank you for an excellent presentation.
5              MR. NITNICK: Thank you, Your Honor.
6              THE COURT: Yes.
7              MR. BOWSE: If the Court please, at one level I was
8    much relieved that Your Honor was willing to hear from
9    Mr. Nitnick first, having observed that most of what
10   Mr. Isaacson had said was addressed to him. But from the
11   standpoint of the defendants, of course, it is both the good
12   news and the bad news, in the following very important sense.
13             I think it goes back to another part of the
14   proceedings today that I was jealous, which was Mr. Isaacson,
15   who was able to go through his presentation and then had only
16   one question at the end, which was about discovery.
17             Because these reason these things come together and
18   the reason that they are terribly important to what we are
19   doing right here now is that we are in a situation where if
20   Your Honor mere to say that discovery would go forward and to
21   try to answer the questions that you put to Mr. Nitnick, how
22   did it come about, for what purpose, those aren't questions
23   that quintessentially are questions addressed to the
24   government. They are not questions that in the ordinary
25   scheme of things one would either expect nor probably --

                    Page 119

6-5-07 Hearing Transcript

                    GR    OCR    CH    CRR    CSR

                                                            326

1              THE COURT: Under their theory it would be very
2    easy. If they are wrong, if it was an act of the government,
3    government officials, fine. But if it was, as cocounsel
4    characterized my perception of this, why would that be a
5    problem?
6              MR. BOWSE: Because we have -- we have before us --
7              THE COURT: If your clients sat down and figured,
8    you know, we have the monopoly now. Our lawyers are -- our
9    American lawyers tell us if we make an agreement here, it
10   would be a clear violation of American antitrust law. So
11   let's -- one, there is this defense called act of state and
12   also compulsion and what we will do is speak to our friends in
13   the Ministry and get them to okay what we are doing. The
14   Ministry being, this is important growing industry, sure, why
15   not.
16             MR. BOWSE: Well, you have been told here in the
17   clearest possible terms, from --
18             THE COURT: I have been told what the position of
19   the Chinese government is. But that -- reading their brief,
20   they don't address this issue. Maybe they don't have to.
21   That's the end of it.
22             MR. BOWSE: I guess that would be --
23             THE COURT: But it really -- you may be right. This
24   really -- I really don't understand how the American market,
25   and maybe this is where act of state does come in, it is

                    GR    OCR    CH    CRR    CSR

                    Page 120

6-5-07 Hearing Transcript

127

1   something for the executive and the Congress to worry about,
2   but basically I don't see how they can't fix every market
3   here, every industry, and do it and just get some government
4   official to put a stamp of approval on it.
5        MR. BONSE:  What you have been told in
6   the brief -- your Honor, I don't want to prolong this.  I
7   really am compelled to quote, if I may, what you have been
8   told.  This is what the government of China says.
9        It says, that the price coordination, or so-called
10  voluntary restraint the Ministry facilitated, is a government
11  mandated price and output control regime.
12       You have been told that what the complaint describes
13  as a cartel and an ongoing combination and conspiracy to
14  suppress competition through price fixing is a regulatory
15  pricing regime mandated by the government of China.  It is a
16  regime instituted to ensure orderly markets during China's
17  transition to a market driven economy and to promote in this
18  transition period the profitability of the industry through
19  coordination of pricing and control of export volumes.
20       THE COURT:  That's all very nice, you say that.
21  Show me where in this brief or in the documents that says any
22  of that.  Other than in their statement now in -- where in the
23  government documents, and that starts where we started
24  earlier, what is the law?
25       The Australian -- I mean, New Zealand case, it was

GR   OCR   CM   CRR   CSR

Page 121

---

6-5-07 Hearing Transcript

128

1   brought to the Court's clear attention what the statute was
2   and the reasoning for it.  How do I know and wouldn't know,
3   and maybe I can't do anything about it, that this lawsuit
4   having been brought, are the same people got together, the
5   administration, to okay the price fixing here.  Now we will
6   write a brief telling the government approved it.
7        MR. BONSE:  Just so -- just so we are clear because
8   I -- this is important.
9        What I have just quoted to you is what the
10  government has said in its brief, not what we say in our
11  brief.
12       THE COURT:  I understand.
13       I am not bound, I may accept it, but I am not bound
14  to accept a document which really just is a conclusory, that
15  it is the government's position although examining the
16  supporting documents doesn't seem to provide a single basis
17  for these statements.  Other than the dumping issue.
18  Somewhere in there there was a reference to the dumping issue.
19       MR. BONSE:  Your Honor, if I may?
20       THE COURT:  In the New Zealand -- really, counsel, I
21  think I've heard you.  I think I understand your position.
22  Maybe you are right.
23       But it's really troublesome that unlike New Zealand
24  case, where the government clearly set forth its rationale for
25  its antitrust conduct, and made a clear case to Judge Haight,

GR   OCR   CM   CRR   CSR

Page 122

---

6-5-07 Hearing Transcript

129

1   all I have is representations that this is the act of the
2   government.  But it makes no sense why, to the extent there is
3   no statement of the direct policy or what was to guide this
4   committee in fixing the price, why these prices are, quote,
5   mandated, the particular prices.
6        MR. BONSE:  Your Honor, I didn't come here to
7   irritate the Court.  I came here to explain where we are.
8        THE COURT:  I think your cocounsel did a good job of
9   explaining.
10       Anything else?
11       All right.
12       MR. BONSE:  Just that I am not entirely sure how we
13  would, without the government, be able to then come in and
14  prove those facts which you say may or may not be true.
15       THE COURT:  You come in and say the government came
16  down.  We never had this get-together, where we asked the
17  government to approve it.  The government decided this was an
18  important industry and that it needed to be stabilized or
19  regulated.  You guys, we don't want to see competition that
20  leads to dumping on prices because that will cause us problems
21  with the Americans.  I don't know where all this came from.
22  But you want me to decide this without having an ounce of
23  discovery and maybe you are right.
24       Okay.  I have another calendar.
25       MR. BONSE:  Thank you, Your Honor.

GR   OCR   CM   CRR   CSR

130

1        MR. MASON:  Your Honor, Dan Mason for the defendant.

Page 123

---

6-5-07 Hearing Transcript

2   there is another motion.
3        THE COURT:  That silly motion?  Come on.
4        Who represents the plaintiff in that case?
5        MR. SOTHWICK:  I do, Your Honor.  James Sothwick.
6        THE COURT:  Why don't you just file another
7   complaint today and then I will decide later, assuming this
8   case goes forward, whether it's retroactive.  That will take
9   care of this silly argument.
10       MR. SOTHWICK:  We filed another complaint in
11  January and I think that complaint moots the brief.
12       THE COURT:  Excuse me?
13       MR. SOTHWICK:  We filed an amended complaint in
14  January of this year, after the briefing, and I think that
15  complaint that's already on time moots that.
16       MR. MASON:  I don't want to push water up hill, Your
17  Honor.  But may we at least have leave to file a short memo on
18  Monday?  Because they submitted another assignment in their
19  surreply that we've had no opportunity to comment on.  There
20  are two assignments that they have given the Court.
21       THE COURT:  Look, I have to deal with a big issue.
22  I will get to yours in due course.
23       Thank you.
24       (Matter concludes.)
25

GR   OCR   CM   CRR   CSR

Page 124

**A-631**

# EXHIBIT MM

Circular of the General Office of the State Council on the Reiteration of the Provisions Concerning the Promulgation of National Regulations and Policies on Foreign Economic Relations and Trade

*(State Council, General Office, Issue <1993> No. 63)*

To the People's Government of all provinces, autonomous regions and municipalities under the administration of the Central Government, as well as ministries and agencies under the State Council:

With a view to unifying the policies and schemes of our country on foreign economic relations and trade, and enhancing the transparency of administrative schemes on foreign economic relations and trade of our country, the General Office of the State Council issued the Circular on Restating the Provisions Concerning the Formulation and Promulgation of National Regulations and Policies on Foreign Economic Relations and Trade on March 16, 1992. The following are hereby restated once again:

1. The Ministry of Foreign Trade and Economic Cooperation shall be the functional department under the State Council responsible for the comprehensive administration for the national work of foreign economic relations and trade. From now on, all national rules, regulations and policies on foreign economic relations and trade shall be reviewed and promulgated to the public by the Ministry of Foreign Trade and Economic Cooperation (with the exception of those which need to be worked out in the form of legislation or to be promulgated by the State Council).

2. When the Ministry of Foreign Trade and Economic Cooperation formulates national regulations and policies on foreign economic relations and trade relating to the sphere of functions and powers of other relevant departments, it shall solicit opinions from the relevant departments or consult with the relevant departments for joint signatures and issuing; if it needs to ask the State Council for instructions, it shall submit reports to the State Council for approval.

Without authorization of the State Council, all localities and departments shall not formulate and promulgate national regulations and policies (which include lists of goods under import and export prohibition or restriction). When the relevant regulations and policies relating to foreign economic relations and trade are formulated by various localities and departments within their respective sphere of functions and powers, they must base on, and shall not conflict with the national laws and regulations on foreign economic relations and trade.

From the date of October 10, 1993, only the promulgated laws, provisions, regulations, decrees, administrative directives and policies on foreign economic relations and trade shall be implemented.

The General Office of the State Council

September 23, 1993

# A-633

国务院办公厅关于再次重申发布全国性对外经贸法规、政策有关规定的通知
（国办发＜1993＞63 号）

各省、自治区、直辖市人民政府，国务院各部委、各直属机构：

为了统一我国的对外经济贸易政策和制度，增加我国对外经济贸易管理制度的透明度，国务院办公厅曾于一九九二年三月十六日发出《关于重申制定、发布全国性对外经贸法规、政策有关规定的通知》。现再次重申如下：

一、对外贸易经济合作部是国务院综合管理全国对外经济贸易工作的职能部门。今后，全国性的对外经贸法规、政策均由对外贸易经济合作部审核并统一对外发布（需立法或需由国务院发布的除外）。

二、对外贸易经济合作部在制定全国性对外经贸法规、政策时，涉及其他有关部门职权范围的，应当征求有关部门的意见或者商请有关部门会签；需请示国务院的，应报请国务院批准。

三、各地方、各部门未经国务院授权，不得制定、发布全国性对外经贸法规、政策（包括禁止或限制进出口商品的目录）。各地方、各部门在各自职权范围内制定有关法规、政策涉及对外经贸问题时，必须以国家的对外经贸法规为依据，不得与其相抵触。

自一九九三年十月十日起，只实施业已公布的对外经济贸易法律、规定、条例、法令、行政指导及政策。

国务院办公厅
一九九三年九月二十三日

Circular of General Office of State Council on Reiteration of Provisions Re Promulgation of National Regulations and Policies on Foreign Economic Relations and Trade _ CN

Page 1

<u>Certificate of Accuracy</u>

This is to certify that the document listed below was translated from Chinese to English.

*Circular of the General Office of the State Council on the Reiteration of the Provisions Concerning the Promulgation of National Regulations and Policies on Foreign Economic Relations and Trade*

I am a certified translator, qualified to provide such translation services.


Signature: ___*Tara Hu Phillips*___

{Original Signature on File}

Date:        October 8, 2009

# EXHIBIT YY

James B. Speta - 5/1/2009
CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2          FOR THE EASTERN DISTRICT OF NEW YORK
 3
 4   IN RE:  VITAMIN C ANTITRUST      )
     LITIGATION                       )   1:06-MD-01738
 5                                    )   (DGT) (JO)
     ------------------------------)
 6
 7   THIS DOCUMENT RELATES TO:        )
                                      )
 8   ANIMAL SCIENCE PRODUCTS,         )
     INCORPORATED, et al.,            )
 9                                    )
                        Plaintiffs,   )
10                                    )
                  -vs-                )   No. CV-05-453
11                                    )
     HEBEI WELCOME PHARMACEUTICAL     )
12   COMPANY, LTD., et al.,           )
                                      )
13                     Defendants.    )
14
15
16          CONFIDENTIAL - ATTORNEYS' EYES ONLY
17
18
19          Deposition of JAMES B. SPETA, taken before
20   KAREN KOSTAS, CSR, RMR, CRR, RDR and Notary Public,
21   pursuant to the Federal Rules of Civil Procedure for the
22   United States District Courts pertaining to the taking
23   of depositions, at 77 West Wacker Drive, Suite 3100, in
24   the City of Chicago, Cook County, Illinois, at 8:30 a.m.
25   on the 1st day of May, 2009.
```

**A-637**

Page 10

```
1        A  Of course.
2        Q  And when I use the term professional work, I'm
3   referring to that body of qualifications that you are
4   bringing to the table to present yourself as an expert.
5        Do you follow?
6        A  I do follow.
7        Q  Okay.  So with that understanding of
8   professional work, it would be fair to say, would it
9   not, sir, that you spent about 80 percent of the time
10  that you have spent on this project learning about the
11  nature of the Chinese system and how it works because
12  before this case you had done no such professional work;
13  correct?
14       A  No, I don't agree with that.
15       Q  Okay.  Before working on this case, what
16  professional work had you done on China-related issues?
17       A  Okay.  So here's the problem I'm having with the
18  question, which is it's broad enough to encompass the
19  assertion that I never read anything about China or
20  Chinese law or Chinese antitrust before I started
21  working on this case.  So if you want to ask narrower
22  questions about what I might have done or what I might
23  have run into concerning China before this case, we can
24  do that.  But the question itself, you know, this is not
25  the first time I've run into Chinese antitrust law in
```

Page 11

```
1   all the reading that I do.
2        Q  What prior experiences would you point the Court
3   to as the basis for telling the Court that you have
4   expertise on China-related issues as they pertain to
5   this case?
6        A  Well, I'm not sure what you mean by
7   China-related issues.  And I'm not trying to -- I'm not
8   trying, for example, to give an expert opinion on
9   particular questions of Chinese law except as they
10  relate to my opinion that the system of regulation for
11  Vitamin C export in China exhibits the hallmarks of a
12  regulated industry as we use that term in the
13  United States.
14       Q  Before working on this case had you ever
15  published any papers on this subject?
16       A  On the subject of the Vitamin C export industry,
17  no.
18       Q  On any Chinese law-related subjects.
19       A  No.
20       Q  Had you ever taught any courses on any Chinese
21  law-related subjects before working on this case?
22       A  No.
23       Q  Had you presented any papers at any workshops
24  that are not published on China-related economic issues
25  or legal issues?
```

Page 12

```
1        A  No.
2        MR. AGRAWAL:  Let me mark Exhibit 236 which is a
3   copy of the report you have submitted in this case.
4
5        (Deposition Exhibit 236 marked.)
6
7        MR. AGRAWAL:  Q  Is Exhibit 236 a copy of your
8   February 20, 2009 report?
9        A  It appears to be.
10       Q  And I notice that you have another copy of your
11  report in front of you that you brought with you.
12       Does that copy that you brought with you have
13  any notes or markings on it?
14       A  No.
15       Q  May I take a look at it?
16       A  Yes.
17       Q  Does Exhibit 236 reflect a complete statement of
18  all the opinions you intend to offer in this case?
19       A  I believe so.
20       Q  Does Exhibit 236 contain all of the reasons for
21  your opinions?
22       A  In the expert report I've set out my reasons for
23  the opinions that I offer in the case.
24       Q  Are there any reasons that you intend to offer
25  at trial for any of the opinions that you've offered
```

Page 13

```
1   that are not stated in Exhibit 236?
2        A  Not that I've intentionally planned.  It depends
3   on the questions or tertiary supporting statements that
4   I might make.  But no, I've attempted to set out my
5   reasoning as fully as I can in this report.
6        Q  Have you prepared any supplements or addendums
7   or revisions to your report?
8        A  No.
9        Q  In Paragraph 6 of your report you state that you
10  retain the right to modify any of the opinions on the
11  basis of new information that may come to your
12  attention.
13       Are there any opinions or is there anything
14  else in your report that you want to modify?
15       A  No.
16       Q  You stand by your report as a complete statement
17  of all your opinions and the reasons for them, correct?
18       A  I stand by my report.
19       Q  Did anybody assist you in preparing the report?
20       A  I wrote the report myself.
21       Q  But did anybody assist you in the process of
22  preparing the report?
23       A  I had conversations with other people, counsel,
24  about the report.  But I did the research, I did the
25  drafting, I did the revisions.  So I believe that I
```

4 (Pages 10 to 13)

**A-638**

Page 18

1    Q   The forthcoming book pertains to network
2  industries, correct?
3    A   That's our focus.
4    Q   You would not describe the Vitamin C export
5  industry as a network industry, true?
6    A   Yes, that's true.
7    Q   Are there any other works in progress that you
8  have that relate to any of the issues reflected in your
9  report in this case?
10    A   Other than being in the general area of
11  regulated industries, no.
12    Q   Have you ever served as an expert in any
13  capacity in any legal proceeding involving a dispute
14  between two or more parties?
15        Let me ask it a different way.  I see you're
16  struggling with the question.
17    A   Okay.
18    Q   I understand that you offered expert testimony
19  before Congress and other regulatory bodies, correct?
20    A   Yes, that's correct.
21    Q   So for purposes of this particular question, I'm
22  excluding those instances in which you have served as an
23  expert and I'm asking you whether you've ever served as
24  an expert testifying or consulting with respect to any
25  disputed matter.

Page 19

1    A   The answer is no, under the conditions that you
2  stated.  The Federal Communications Commission
3  proceeding in which I submitted the comments on behalf
4  of AT&T Corporation was a contested proceeding in the
5  sense that parties were advocating different outcomes,
6  and it was actually quite contentious, but it wasn't an
7  adjudicatory or litigation proceeding, which I think is
8  what you have in mind.
9    Q   And in a nutshell, can you tell us what the
10  essence of the argument that you made on behalf of AT&T
11  was.
12    A   The essence of the argument was that the
13  economic incentives for Internet providers is to offer
14  the greatest degree of variety of content and
15  applications, and therefore, the FCC should not impose
16  what were then called open access rules allowing
17  non facilities-based Internet service providers to have
18  access on a wholesale basis to the wires or spectrum of
19  the facilities-based providers.
20    Q   An essential facilities issue, correct?
21    A   Some parties attempted to describe it as an
22  essential facilities issue.  I don't think it's an
23  essential facilities issue alone, but that's one aspect
24  of the question.
25    Q   And in a nutshell, when you use the term

Page 20

1  essential facilities, can you tell us what you mean by
2  that?
3    A   Well, in the sentences that I -- that I just
4  said, what I meant by essential facilities was only the
5  colloquial idea that the infrastructure may be important
6  to providing a particular kind of service.  That's all I
7  meant.
8    Q   And you would agree that the Vitamin C export
9  industry does not fall within an essential facilities
10  type of arrangement, correct?
11    MR. LAPATINE:  Object as to form.
12    A   Well, now I'm not sure whether you're using
13  essential facilities as colloquially or a term of art.
14    MR. AGRAWAL:  Q   Let me use it as you used it
15  colloquially.
16        Do you think that the Vitamin C export industry
17  falls within that definition of an essential facilities
18  industry?
19    MR. LAPATINE:  Object as to form.
20    A   Here's the piece of the Vitamin C export
21  industry which is interesting from the colloquial
22  question of essential facilities.
23        It is absolutely clear to me that the Chinese
24  government limits who may be involved in the industry.
25  Right.  That's one of the hallmarks of a regulated

Page 21

1  industry is licensing of those participants who may be
2  in the industry.  And therefore, there is a sense in
3  which the participants in the industry are the
4  facilities through -- the exclusive facilities through
5  which you can participate in that particular industry.
6    MR. AGRAWAL:  Q   Any other aspect of the Vitamin C
7  export industry as you understand it that would fall
8  within what is recognized colloquially, as you put it,
9  as an essential facilities issue?
10    MR. LAPATINE:  Object as to form.
11    A   I think we're probably going to spend a lot of
12  the day talking about that.  But I think for now, what I
13  meant by essential facilities earlier is reflected in
14  the legal aspect of the Vitamin C industry and its
15  licensing component.
16    MR. AGRAWAL:  Q   Are there any opinions that you
17  are offering in this case in which you contend that the
18  Vitamin C export industry should be treated as a legal
19  or policy matter as an essential facilities?
20    MR. LAPATINE:  Object as to form.
21    A   I'm not sure what you mean by as a legal or
22  policy matter.
23    MR. AGRAWAL:  Q   Why don't we come back to this.
24        So just so I'm clear, before working on this
25  case had you ever served as an expert in any antitrust

6 (Pages 18 to 21)

**A-639**

James B. Speta - 5/1/2009

Page 22

1 case?
2    A    No.
3    Q    Never provided a written report?
4    A    No.
5    Q    Never submitted to a deposition?
6    A    No.
7    Q    Have you ever testified before Congress or
8 another governmental agency on any antitrust matters?
9    A    The testimony that I gave before Congress, once
10 in writing and once in person, was on the market
11 structure and competitive landscape of the Internet
12 markets. I would describe that as broadly involving
13 competition law. Competition law has aspects of
14 antitrust and of sector specific regulation when we're
15 talking about telecommunications and Internet.
16    Q    So both the written testimony and the oral
17 testimony you gave was on the landscape of Internet
18 markets?
19    A    Yes.
20    Q    The basic purpose of your engagement in this
21 case, Professor Speta, was to consider the system
22 governing the Vitamin C export industry in China and to
23 determine whether that system is a regulated industry;
24 correct?
25    A    That's close. I think I state it a little bit

Page 23

1 differently in the report.
2    Q    In your report you say that you're determining
3 whether the Chinese system is a system of regulation as
4 that term is used in the United States, right?
5    A    Whether the Vitamin C export industry has the
6 characteristics of a regulated industry as we use that
7 term in the United States.
8    Q    And can you explain to us, when you use the
9 expression as that term is used in the United States,
10 what exactly you mean by that?
11    A    Well, I've described it in my report. A
12 regulated industry has three overall characteristics.
13    Q    And let me interrupt you there.
14        Is there a statutory definition to which you
15 are referring when you use this three-part criteria for
16 defining what's a regulated industry?
17    A    I'm not aware of a statutory provision that
18 offers a definition of the term regulated industries.
19 There are, of course, a number of very important
20 statutes that define the regulation of industries that
21 we understand to be regulated industries statutes.
22    Q    All right. Is there any case law that you are
23 referring to or you are relying upon for articulating
24 this three-part criteria that you have proffered for
25 what constitutes a regulated industry?

Page 24

1    A    The definition doesn't come out of any
2 particular case law, it comes out of a combination of
3 sources. Regulated industries is a well-recognized area
4 of law. If you look in the Directory of Law Professors
5 published by the, I don't know, the American Association
6 of Law Schools, there's a category for people who teach
7 regulated industries.
8    Q    Different industries, obviously, have differing
9 degrees of regulation; correct?
10    MR. LAPATINE: Object as to form.
11    A    There are a variety of different kinds and
12 degrees of regulation in a variety of different
13 industries.
14    MR. AGRAWAL: Q    And even the term regulated
15 industry in the United States encompasses numerous
16 sectors, each of which has its own unique set of
17 regulatory characteristics; true?
18    A    It depends on the level of uniqueness. I
19 maintain that there are a body of industries that share
20 regulatory characteristics that we can define as
21 regulated industries.
22    Q    But within what is broadly defined as a
23 regulated industry, each particular sector has its own
24 statutory framework, its own regulatory body of law, a
25 body of case law surrounding it and a set of practices

Page 25

1 within it; correct?
2    A    Sure.
3    Q    For example, the securities industry is a
4 regulated industry as you use that term; correct?
5    A    I'm not sure I would adopt that. There are
6 certainly regulation in the securities industry. The
7 regulation that characterizes a regulated industry as
8 I'm using this term is essentially economic regulation.
9 Okay. So health and safety regulation of an industry,
10 for example, is not enough to constitute a regulated
11 industry as we use the term regulated industry.
12    Q    As you use the term regulated industry is it
13 your opinion that the securities industry is not a
14 regulated industry?
15    A    I'm not offering an opinion on the securities
16 industry.
17    Q    I understand that, sir. But you've used the
18 term regulated industry in your report and you contend
19 that as that term is used it has certain
20 characteristics. I'm asking you whether based on your
21 framework for what constitutes a regulated industry, you
22 would acknowledge and recognize the securities industry
23 as such a regulated industry?
24    MR. LAPATINE: Object, asked and answered.
25    A    I'm not sure exactly what you mean by the

7 (Pages 22 to 25)

Page 26

```
1   securities industry.
2        Let me say this:  There are particular
3   practices in the securities industry that I would
4   describe as being regulated in a regulated industry
5   sense.  The securities industry as a whole is not sort
6   of subject to an uniform set of regulations.
7        MR. AGRAWAL:  Q   Let's talk about the specific part
8   of the securities industry by which particular
9   individuals on the street purchase stocks in the open
10  market.
11       A   I'm not sure who you're referring to by
12  individuals on the street.
13       Q   Let's say you, Professor Speta, were to purchase
14  IBM stock on the market.  Would the process by which you
15  would buy IBM stock on the market be subject to a
16  regulated industry as you use that term?
17       MR. LAPATINE:  Object as to form.
18       A   You still really need to be more specific.
19  Where I buy the stock may determine whether the process
20  is regulated by the 33 Act, by the 34 Act, by the
21  40 Act, by any number of the other federal statutes and
22  possibly state statutes that apply to transactions in
23  securities.
24       MR. AGRAWAL:  Q   Your opinion in this case with
25  respect to the Chinese Vitamin C export industry is
```

Page 27

```
1   about the export industry falling within the definition
2   of a regulated industry, quote, unquote, in a general
3   sense; correct?
4        MR. LAPATINE:  Object as to form.
5        A   I've defined what I mean by regulated industry.
6   And I've offered the opinion that based on my definition
7   of a regulated industry, which I believe comes from
8   statutory precedent, case law, academic writing going
9   back more than a century in this country, that the
10  Chinese Vitamin C export industry satisfies that
11  definition.
12       MR. AGRAWAL:  Q   Okay.  What about the airline
13  industry, is the airline industry a regulated industry
14  as you use that term in your opinion?
15       A   Not today.  It has in the past been a regulated
16  industry, but the series of changes in the seventies and
17  the eighties and nineties have largely rendered the
18  airline industry not a regulated industry today in the
19  United States.
20       Q   What about the insurance industry?
21       MR. LAPATINE:  Object as to form.
22       MR. AGRAWAL:  Q   In your view is the insurance
23  industry a regulated industry?
24       A   I'm having the same trouble with the question
25  about the insurance industry that I had with the
```

Page 28

```
1   question about the securities industry because the
2   insurance industry has so many moving pieces to it.
3   There are certainly state regulatory systems of the
4   insurance industry that make aspects of the insurance
5   industry to meet my definition of a regulated industry.
6        Q   Let's talk about the methodology that you have
7   used to reach your opinions in this case.
8        As I understand it, what you do in your report
9   is you understand the structure of how the Vitamin C
10  export industry works in China and then you cast it
11  within the framework of what you consider a quote
12  "regulated industry"; is that fair?
13       MR. LAPATINE:  Object as to form.
14       A   Am I allowed to say that my report speaks for
15  itself?
16       I mean I start the report by defining what the
17  characteristics are of a regulated industry, I step
18  through each of those characteristics, and based on what
19  I've learned about the Vitamin C export industry in
20  China, I conclude that the Vitamin C export industry in
21  China meets this definition of a regulated industry.
22       MR. AGRAWAL:  Q   So you're taking a foreign system
23  and placing it within the framework of what you contend
24  constitutes a regulated industry as that term is used in
25  the States, right?
```

Page 29

```
1        MR. LAPATINE:  Object to form.
2        A   I don't understand the question.  I'm not taking
3   the industry, I'm examining the information that I have,
4   have been able to develop, that I've been provided about
5   the Vitamin C export industry to offer the opinion that
6   the Vitamin C export industry meets this definition of a
7   regulated industry.
8        It's a fairly standard comparative law project
9   of the kind that I've done a number of times in the past
10  to compare regulatory systems.  It's a very standard
11  comparative law project that's done in the literature
12  all the time.
13       MR. AGRAWAL:  Q   In what prior instances have you
14  engaged in this comparative law project of looking at a
15  foreign system and placing it within the context or
16  definition of a regulated industry?
17       MR. LAPATINE:  Object as to form.
18       A   Can you try the question again?  I'm sorry.
19       MR. AGRAWAL:  Q   Sure.
20       You testified that the process that you engaged
21  in here was a fairly standard comparative law project of
22  the kind you've done a number of times in the past,
23  correct?
24       A   Yes.  And if you want me to talk about my
25  comparative projects, that's easy to do.
```

8 (Pages 26 to 29)

**Page 30**

1    Q   Right. So tell me which industry in which
2  countries you have previously engaged in this exercise.
3    MR. LAPATINE: Object as to form.
4    A   I haven't engaged in the particular exercise I
5  think as you've narrowly defined it. Why don't we just
6  talk about the comparative work that I've done. You
7  know, we can go through my curriculum vitae or some
8  other source and talk about the comparative projects
9  I've worked on.
10   MR. AGRAWAL: Q   Well, why don't you tell me which
11 of your prior experiences you would contend is a
12 standard comparative law project of the kind that you've
13 done on a number of times in the past.
14   A   Okay. I've written articles on Korean broadband
15 regulation. I've recently published an article on
16 Korean broadcast regulation. I've done work in several
17 of my articles on the regulatory system for
18 communications and network industries in the
19 European Union. I presented at a fairly interesting
20 conference in Cologne, Germany and as part of that
21 presentation worked on issues of comparing U.S.
22 regulation in the communications area to German and
23 European regulation. As part of my teaching I've
24 attended to regulation in corporate and communications
25 law in France. And those are the highlights.

**Page 31**

1    Q   In your work on the Korean broadband regulation,
2  were you determining whether the Korean broadband
3  regulatory scheme meets within the definition of a
4  regulated industry as you use that term, was that the
5  nature of your project?
6    A   That wasn't the specific conclusion of the
7  project. The project was broader, to compare the system
8  of Korean broadband regulation to the U.S. system of
9  Korean broadband regulation and to make some
10 observations about how our policy system compared to and
11 might learn from how Korea regulated broadband.
12   Q   Were you determining whether the Korean
13 broadband regulatory system meets those three criteria
14 that you have articulated in your report?
15   A   No. That wasn't the thrust of the project.
16   Q   In your work on the Korean broadcast regulations
17 were you determining whether that regulatory scheme met
18 the criteria that you contend defines a regulated
19 industry?
20   A   No. Again, that wasn't the thrust of the
21 project.
22   Q   In your work on the regulatory system for --
23 what was it -- network industries -- Where was that?
24   A   The European Union.
25   Q   -- in the European Union were you looking at

**Page 32**

1  that regulatory scheme or those regulatory schemes to
2  determine whether they fit this definition of a
3  regulated industry as that term is used in your report?
4    A   No, that wasn't the thrust of the project.
5    Q   With respect to the work that you did in
6  Cologne, Germany comparing U.S. regulations to German
7  regulations were you determining whether the German
8  regulatory scheme fit the definition of a regulated
9  industry as that term is used in your report?
10   A   No. That wasn't the thrust of the project
11 either.
12   Q   And with regard to your study of French
13 corporate regulatory schemes, were you determining
14 whether any of those French regulations met this
15 criteria for a regulated industry?
16   A   Nope.
17   Q   Are there any articles that you can point us to
18 in which the author engages in this exercise that you
19 have engaged in in your report by looking at a foreign
20 regulatory scheme and determining whether it meets this
21 three-part definition of a regulated industry?
22   A   As you've narrowly defined it, no, I'm not going
23 to point to any particular article. Point to a number
24 of articles that discuss the regulatory features of
25 different regulatory systems and those articles would

**Page 33**

1  provide the information about the extent of regulation.
2  Those articles would provide the basis for determining
3  whether there is a system of regulated industries in
4  those areas. I can point to dozens of articles talking
5  about the issue of the interaction between sector
6  specific regulation and competition law broadly. But
7  academic, no, I'm not going to point to a single
8  academic article that has as its purpose and conclusion
9  simply the issue as you've defined it.
10   Q   In your report you're not simply discussing the
11 regulatory features of the Chinese Vitamin C export
12 industry, are you; it's not just a discussion of those
13 features, is it?
14   MR. LAPATINE: Object as to form.
15    Can you read it back, please.
16   MR. AGRAWAL: Q   In your report you're not simply
17 discussing the features of the Chinese Vitamin C export
18 industry, are you?
19    A   I discuss the features of the Chinese export
20 industry and I conclude that those features exhibit the
21 principal characteristics of a regulated industry.
22   Q   So you examine the features and then based on
23 those features you are drawing the conclusion that the
24 Chinese Vitamin C export industry features the principal
25 characteristics of a regulated industry, true?

9 (Pages 30 to 33)

**A-642**

James B. Speta - 5/1/2009

Page 34

1    A  I conclude that the Chinese Vitamin C export
2  industry is a regulated industry.
3    Q  Okay. In your report -- Well, let's -- let's be
4  clear about what you're not an expert on.
5        You're not an expert on Chinese law, correct?
6    A  No.
7    Q  You're not an expert on Chinese competition
8  policy, correct?
9    A  I'm not sure what you mean by Chinese
10  competition policy. But I'm not offering an opinion on
11  the Chinese antimonopoly law or the Chinese competition
12  law.
13    Q  You're not an expert on the history of Chinese
14  economic regulatory policy, correct?
15    A  I'm not offering an opinion on any aspect of
16  Chinese regulation except as it relates to my opinion on
17  the Vitamin C export industry.
18    Q  Insofar as the information that you have used to
19  determine whether the Vitamin C export industry is a
20  regulated industry, that is information that you're
21  relying upon other sources for, correct, not based on
22  your own personal expertise?
23    MR. LAPATINE:  Object as to form.
24    A  I'm not sure that's entirely true. I've done
25  research in order to develop my report. So I'm not sure

Page 35

1  what you mean by relying on other sources.
2    MR. AGRAWAL:  Q  Okay. Before working on this
3  project did you have any knowledge or familiarity of the
4  Chinese chambers of commerce?
5    A  No.
6    Q  Had you ever written any published papers on
7  Chinese laws, economic policies or business rules?
8    A  No.
9    Q  Have you ever taught any courses on those
10  subjects?
11    MR. LAPATINE:  Object as to form.
12    A  On what subjects?
13    MR. AGRAWAL:  Q  Chinese laws, Chinese economic
14  policies or Chinese rules governing their businesses.
15    A  No.
16    Q  What were the sources that you looked to to
17  determine whether the Chinese Vitamin C export industry
18  is a quote, unquote, regulated industry?
19    MR. LAPATINE:  With respect to Vitamin C?
20    MR. AGRAWAL:  Yes.
21    MR. LAPATINE:  Could we have an understanding, since
22  you've used that term now on a number of occasions
23  without limiting it to Vitamin C, that when you use that
24  term you're referring to Vitamin C? Because the expert
25  is not offering an opinion with respect to the

Page 36

1  regulatory scheme with respect to any other product.
2    MR. AGRAWAL:  If there's some confusion, I don't
3  mind you speaking up and making sure. I'm trying to be
4  precise in my questions.
5    MR. LAPATINE:  But you've asked questions concerning
6  the regulatory scheme in general with respect to export
7  product.
8    MR. AGRAWAL:  And I understand that. I will try to
9  ask more precise questions.
10    MR. LAPATINE:  Okay.
11    MR. AGRAWAL:  But when I ask, for example, whether
12  the Professor has taught any courses on Chinese exports,
13  for example, I'm referring to all Chinese exports.
14    MR. LAPATINE:  Okay. I understood that.
15    MR. AGRAWAL:  Let's just do it question by question
16  rather than a blanket definition.
17    Q  So maybe it will be better this way.
18        The sources that you looked for determining
19  whether the Chinese Vitamin C export industry is a
20  quote, unquote, regulated industry were
21  Professor Shen's report; correct?
22    A  I believe that -- Yes, I've looked at
23  Professor Shen's report. It's certainly not the
24  exclusive thing that I have looked at.
25    Q  Okay. We will go through a list and then you

Page 37

1  can tell me if there is anything other than the items I
2  identify in my list. Fair enough?
3    A  Beautiful.
4    Q  Okay. Professor Shen's report, right?
5    A  I have looked at Professor Shen's report.
6    Q  Okay. And when you looked at it, that's a
7  source that you are relying upon?
8    A  Absolutely.
9    Q  Okay. You're relying on the information that
10  the defendants through their lawyers provided to you,
11  correct?
12    A  Much of the information that I relied upon,
13  certainly not all of it, came to me through counsel.
14    Q  For the defendants?
15    A  Yes.
16    Q  You're relying upon the Ministry of Commerce's
17  amicus papers before the District Court, correct?
18    A  That's correct.
19    Q  Let's look at Page 3 and 4 of Exhibit 237,
20  Appendix B.
21    A  Page 3 and 4?
22    Q  Yes, sir.
23    A  Yes.
24        Sorry. Yes.
25    Q  Under the heading Chinese Laws, Regulations and

10 (Pages 34 to 37)

**A-643**

Page 38

1   Interpretations, there are a number of items; correct?
2       A   That's true.
3       Q   These items on Pages 3 and 4 under that heading
4   are the principal sources, principal legal authority
5   that you examined, separate and apart from what you read
6   in the other documents, but in terms of the firsthand
7   reading of Chinese law, this is that list; right?
8       MR. LAPATINE:  Object as to form.
9       A   I've read all the documents that are listed
10  here. I rely on these documents in my report. It's by
11  no means the entire set of laws or regulations that I
12  have looked at in preparing my opinions in this case.
13  But these are documents that I have read and these are
14  documents that I rely on.
15      MR. AGRAWAL:  Q   Where did you get the laws and
16  regulations that you examined in forming your opinions
17  in this case?
18          And, again, I just want to be clear, I want to
19  first talk about the specific firsthand sources of
20  Chinese law, because you've told us you're not an expert
21  on Chinese law; right?
22      A   I'm offering an expert opinion on the Vitamin C
23  export law in China.
24      Q   Right.
25      A   Whether it demonstrates the characteristics of a

Page 39

1   regulated industry and that's the only opinion on
2   Chinese law that I'm offering.
3       Q   I understand. But you're not, standing alone
4   apart from your expertise in regulated industries,
5   you're not a stand-alone expert on Chinese law; correct?
6       A   No.
7       MR. LAPATINE:  Object, asked and answered.
8       A   Yeah. No.
9       MR. AGRAWAL:  Q   And so can you tell us where you
10  got the specific regulations, laws and other legal
11  authority that you're relying upon in examining the
12  Chinese Vitamin C export industry?
13      A   For the most part, the documents that are cited
14  here were provided to me by counsel for the defendants.
15      Q   I'd like to ask you to go through that list and
16  identify any of those Chinese laws, regulations or
17  interpretations that you got from some source other than
18  counsel for the defendants.
19      A   All of them came to me from counsel for the
20  defendants. The Chinese antimonopoly law, I've also
21  found on the Internet myself at one point when I needed
22  to find another copy of it. But other than that, all of
23  the documents -- all of the pieces of paper that I read
24  that contain these statutes and other laws came to me
25  initially from counsel for the defendants.

Page 40

1       Q   Did you request these items from the defendants
2   or did they provide them to you without a request?
3       A   I would say both are true in the sense that some
4   were provided to me on the basis of my having asked for
5   general categories of information.
6       Q   Are there any laws, regulations or
7   interpretative documents that you went out, other than
8   the antimonopoly law, and located on your own?
9       A   No.
10      Q   Would you even know how to go about researching
11  Chinese law?
12      A   Yes.
13      Q   Okay. And on what basis do you -- What
14  experience do you have with researching Chinese law that
15  would qualify you to go out and research it on your own?
16      MR. LAPATINE:  Object as to form.
17      A   I don't understand the question.
18      MR. AGRAWAL:  Q   I asked you whether you would even
19  know how to go about researching Chinese law and your
20  answer was yes, correct?
21      A   That's right.
22      Q   Based on what experience would you know how to
23  go about researching Chinese law?
24      A   I've looked at the materials on the
25  Northwestern University Law Library Web site that are a

Page 41

1   primer on how to find information on Chinese law. And I
2   looked at that Web page on the one occasion where I was
3   looking for an additional copy of the antimonopoly law.
4   And that page was quite impressive. We have a great
5   group of librarians at Northwestern. And it provided me
6   the kind of information about researching Chinese law
7   that provide me the same kind of start that I needed for
8   doing my other comparative law projects. So, you
9   know...
10      Q   You would agree that the laws of China aren't as
11  transparent as those of the United States or other
12  parliamentary governments, correct?
13      MR. LAPATINE:  Object to form.
14      A   I'm sure I don't know what you mean by
15  transparent.
16      MR. AGRAWAL:  Q   Did you read the Court's decision
17  on the defendants' motion to dismiss?
18      A   I did.
19      Q   Okay. And in that decision the Court
20  recognized -- Strike that.
21          And in that decision the Court stated that the
22  Ministry of Commerce acknowledged that the laws of China
23  aren't as transparent as that of the United States or
24  other parliamentary governments.
25          Do you recall that?

11 (Pages 38 to 41)

# A-644

James B. Speta - 5/1/2009

Page 42

1    MR. LAPATINE: Object as to form.
2    MR. CRITCHLOW: Objection to form.
3    A  No, I don't recall that passage from the
4  District Court's opinion.
5    MR. AGRAWAL: Q  Okay. Sir, I'm handing you a copy
6  of the Court's November, 2008 motion to dismiss ruling.
7      Would you read the passage that I've
8  highlighted for you.
9    MR. LAPATINE: Do you want to mark that?
10    MR. AGRAWAL: I'm not going mark the Court's
11  decision.
12    MR. CRITCHLOW: Can you identify the page?
13    MR. AGRAWAL: Page 29. I apologize.
14    A  The portion that you've highlighted on Page 29
15  begins in the middle of the paragraph, it starts: The
16  Ministry has been forthright in its admission that
17  Chinese law is not as transparent as that of the
18  United States or other constitutional or parliamentary
19  governments.
20      Do you want me to read the footnote?
21    MR. AGRAWAL: Q  We'll get to the footnote.
22    A  Okay.
23    Q  Did you read that part of the Court's order?
24    A  I just did.
25    Q  Did you read that part of the Court's order

Page 43

1  before providing your opinion in this case?
2    A  Oh, I'm sure I did. Sure.
3    Q  And did that affect your confidence in your
4  ability to research Chinese law independently?
5    A  It did not and does not affect my confidence
6  that I understand the system of regulation governing
7  Vitamin C export in China.
8    Q  We were going through the list of sources that
9  you used to obtain information about how the Chinese
10  Vitamin C export industry is regulated and we talked
11  about Professor Shen's report, right?
12    A  I have seen Professor Shen's report, yes.
13    Q  And I want to be clear here. I'm not talking
14  about just something you've seen, but something you're
15  relying upon?
16    A  I rely upon Professor Shen's report.
17    Q  Information you received from the defendants
18  through their lawyers, correct?
19    A  I've received information from defendants'
20  counsel and I've relied on some of the information that
21  I've received from them.
22    Q  The Ministry of Commerce's amicus papers on the
23  motion to dismiss, you relied on that?
24    A  I've read and relied upon those.
25    Q  And we've gone through the list of laws,

Page 44

1  regulations and interpretations on Page 3 and 4 to
2  Exhibit 237 and identified those as sources of law that
3  you're relying upon; correct?
4    A  That's correct. I rely upon the things that are
5  cited there on Pages 3 and 4 of Appendix B.
6    Q  Are there any other sources about the laws and
7  regulations governing the Chinese Vitamin C export
8  industry that you are relying upon to form your opinion?
9    A  Well, all of the material on Appendix B that
10  comes after the first three categories that begins on
11  the bottom of Page 1 with deposition testimony through
12  the end of the document are materials that I rely upon.
13  And some of those materials including the deposition
14  testimony and the documents reflect the regulatory
15  regime for Vitamin C export in China.
16    Q  Have you spoken with anybody at the Ministry of
17  Commerce about how the -- about the nature -- Well, let
18  me ask it broadly.
19      Have you spoken with anybody at the Ministry of
20  Commerce about any of the matters related to your
21  opinion in this case?
22    MR. LAPATINE: I assume you mean the Ministry of
23  Commerce in China?
24    MR. AGRAWAL: Yes.
25    A  No, I have not.

Page 45

1    MR. AGRAWAL: Q  Have you spoken to anybody at the
2  chamber of commerce with respect to any of the issues on
3  which you're offering opinions in this case?
4    A  The Vitamin C Chamber of Commerce, no, I have
5  not.
6    Q  Have you ever spoken to anybody from any other
7  chamber of commerce?
8    A  Any other Chinese chamber of commerce?
9    Q  Yes.
10    A  No.
11    Q  Have you spoken to anybody from the Vitamin C
12  Subcommittee of the Chinese Chamber of Commerce?
13    A  I have not.
14    Q  Other than in this case, have you ever advised
15  anyone professionally with respect to structure, process
16  or compliance with any Chinese law or regulation?
17    A  No.
18    Q  Have you ever offered any testimony before
19  Congress or any other governmental agency with respect
20  to any Chinese legal or regulatory issue?
21    A  No.
22    Q  Your work on regulated industries outside the
23  United States, and you mentioned some of those, those
24  are projects that are largely limited to communications
25  industries; is that fair?

12 (Pages 42 to 45)

# A-645

Page 46

1  A  I think that's basically fair.  My emphasis on
2  comparative regulated industries has resulted in
3  projects on the communications industry.  The reason I
4  say it that way is because the history of communications
5  regulation in the United States and in other countries
6  is tied up with the history of regulated industries
7  generally.
8       And so, for example, in other countries, we
9  describe the communications industry as being on the
10  post telegraph and telephone model, the PTT model.  And
11  that is a regulated industries model that applies in
12  those other countries much more broadly than just in the
13  communications industry.
14       So I'll adopt that my academic writings have
15  led to conclusions or policy arguments about
16  communications industries in the main, but the history
17  of those regulated industries in other countries is
18  tied -- or the history of the communications industries
19  in those other countries and the regulatory schemes is
20  tied up with their regulation and views towards
21  regulated industries generally to some extent.
22  Q  The history of the United States is part of the
23  history of the world?
24  A  Well, I don't know what that means, but...
25  Q  I mean your work with regard to communications

Page 47

1  industries is part of the general framework of --
2  general nature of regulatory industries which is part of
3  the nature of law.  I mean --
4  MR. LAPATINE:  Are you asking a question?
5  MR. AGRAWAL:  I'm going to ask a question, Ken.
6  All right.
7  MR. LAPATINE:  Well, right now, all I'm hearing is
8  your opinion.
9  MR. AGRAWAL:  And what I'm not hearing is an
10  objection to form, so if you have an objection to form,
11  please state it.
12  MR. LAPATINE:  I object as to form.
13  MR. AGRAWAL:  Okay.  Thank you.
14  Q  Professor Speta, your work, your academic work
15  and professional work with respect to regulated
16  industries, in instances where you've worked on projects
17  looking at -- Strike that.
18       Your work on regulated industries outside the
19  United States is limited to the communications industry,
20  true?
21  A  It is focused on the communications industry.
22  Q  You have not worked on the vitamins industry
23  anywhere else outside the United States before, correct?
24  A  I've not worked on the vitamins industry in any
25  other country, no.

Page 48

1  Q  You've not worked on foods or drugs?
2  A  I've not worked on foods or drugs in other
3  countries, no.
4  Q  You've not worked on chemicals outside the
5  United States?
6  A  I have no academic writings on chemicals outside
7  the United States.
8  Q  Other than academic writings, you have no
9  substantial professional experience that you would bring
10  to bear on the chemical industry as a regulated
11  industry; correct?
12  MR. LAPATINE:  Object as to form.
13  A  Well, are we talking about outside the
14  United States?
15  MR. AGRAWAL:  Q  Outside the United States.
16  A  No, I have not worked on matters or academic
17  writings involving the chemical industry outside the
18  United States.
19  Q  You worked on matters or academic writings
20  involving the transportation industry outside the
21  United States?
22  A  Yes.  Some of my academic writings talk about
23  transportation regulation outside the United States.
24  Q  Okay.  It's not a trick question.
25  A  I'm not treating it as a trick question.

Page 49

1  Q  Have you worked on any matters or academic
2  writings involving the energy industry outside the
3  United States?
4  A  Yes.  I've done some work on energy, academic
5  work on energy regulation outside of the United States.
6  Q  With respect to your work on the transportation
7  industry outside the United States, to what work are you
8  referring?
9  A  I'm referring to work on the history of common
10  carrier regulation in principally the English system as
11  it relates to -- as it relates to regulated industries.
12  I'll just leave it there.
13  Q  Any others in transportation outside the States?
14  A  No.
15  Q  With respect to your work on the energy industry
16  outside of the United States, to what matters are you
17  referring?
18  A  I'm referring to research that I've done on the
19  network industry -- or the network industry economics of
20  energy regulation in Europe.
21  MR. AGRAWAL:  All right.  This would be a good time
22  for a break.
23  MR. LAPATINE:  Sure.
24
25       (RECESS)

13 (Pages 46 to 49)

**Page 58**

1    A  So we talked about a number of my projects
2  before.  Do you have a particular project in mind?
3    Q  No.  In any of those prior comparative projects,
4  had you looked at deposition testimony and documents to
5  determine whether a foreign system was a regulated
6  industry as you've used that term?
7    A  I certainly have looked at documents.  I don't
8  recall looking at any deposition testimony.
9    Q  And of the documents that you looked at in the
10  prior instances, were they documents of the kind that
11  you looked at in this case?
12    A  Yes.
13    Q  Okay.  Were they --
14    A  Wait.  Hold on.  We've talked about two things
15  here, we've talked about news articles and speeches.
16  And the answer is yes, I've in the past looked at news
17  articles and speeches that concern foreign regulatory
18  systems.
19    Q  Setting aside articles and speeches, I'm
20  referring specifically to the documents produced in this
21  litigation, the meeting notes -- Let me ask you -- Let's
22  confine it to meeting notes.
23    You reviewed a number of meeting notes that you
24  have cited in Exhibit B -- or Appendix B to your report
25  as supporting your opinion that the Vitamin C export

**Page 59**

1  industry in China is a regulated industry, true?
2    A  Yes.  I cite a number of meeting notes at
3  various place.
4    Q  Okay.  Before your work on this case, in your
5  other comparative projects, had you ever reviewed those
6  kinds of meeting notes?
7    MR. LAPATINE:  Object as to form.
8    A  I've not reviewed in particular meeting notes.
9  I believe the meeting notes are reflective of the
10  industry participants' understanding of the regulatory
11  system that they're operating under.  And I have
12  certainly had conversations and other interactions with
13  members of regulated industries in doing my comparative
14  work in Europe and in Korea.
15    MR. AGRAWAL:  Q  When you say that you believe the
16  meeting notes are reflective of the industry
17  participants' understanding of the regulatory system,
18  did you have any assistance for determining whether
19  certain terms that were used in those notes had a
20  specialized meaning apart from their literal
21  translations?
22    A  I didn't have any other person assist me.  The
23  understanding that I have of what I've read in documents
24  and in deposition testimony is, of course, informed by
25  other materials that I've relied upon in offering my

**Page 60**

1  opinions.  And including secondary sources, including
2  other documents, including official laws and
3  regulations, including basically all of the materials
4  that I've relied upon, they add up to a whole that
5  informs each of the other parts.
6    Q  Let's take the term self-discipline, for
7  example.  You're of the opinion that the term
8  self-discipline has a particular meaning as it's used in
9  those documents, correct?
10    A  Right.  I discuss that at, I don't know, in the
11  latter paragraphs of my report.
12    Q  Okay.  Now, again, before your work on this
13  particular case did you have any prior knowledge or
14  expertise with respect to what the term self-discipline
15  as used in this context would mean?
16    A  I have read the term self-discipline before I
17  was engaged to work on this case and I read it in
18  secondary materials.
19    Q  I understand you read it.  My question to you,
20  though, sir, is before your work on this case did you
21  have any expertise with respect to what the term
22  self-discipline meant in this context?
23    MR. BOMSE:  Object to form.
24    A  In what context?
25    MR. AGRAWAL:  Q  In the context as it's used in

**Page 61**

1  your report and in this case.
2    A  I had not, before this case, formed an opinion
3  as to what I thought self-discipline meant when used in
4  the context of the Vitamin C export industry, how it's
5  regulated and how companies in that industry are
6  expected to be behave, because I didn't work on the
7  Vitamin C export industry before being engaged in this
8  case.
9    The term self-discipline, I have seen before I
10  engaged in this case, I believe I understood it as it
11  was used in the particular context, although I can't
12  reconstruct that at this time.
13    Q  Can you recall any of the places where before
14  working on this case you had read the term
15  self-discipline as it relates to the practice of Chinese
16  enterprises?
17    A  I'm going to narrow that and say the term
18  self-discipline, I know that I've read the term
19  self-discipline in a short, general article, I can't
20  recall what journal it was from, on the Chinese
21  antimonopoly law.  That was the context in which I
22  encountered the term self-discipline before I began to
23  work on this case.
24    Q  Let's turn to Paragraph 8 of your report.
25    A  Okay.

16 (Pages 58 to 61)

Page 62

1    Q   You note in your report that some regulated
2  industries in the U.S. have been exempted from the
3  application of federal antitrust laws, correct?
4    A   That's correct.
5    Q   And you recognize that there are express
6  exemptions and implied exemptions, correct?
7    A   Yes.  That's the general categories in which we
8  try to sort exemptions.
9    Q   Okay.  And, in fact, you refer to this
10 Antitrust Modernization Commission Report from 2007.
11   A   I cite that report, yes.
12   Q   Did you read that report?
13   A   I've read that report.
14   Q   It's a long report, isn't it?
15   A   It's 380 or more pages.  Yes.
16   Q   It's 540 pages.
17   A   Okay.
18   Q   I'm not going to mark the whole thing, but
19 specifically in your report you refer to Chapter 4;
20 correct?
21   A   That's what's cited in Footnote 1.
22
23        (Deposition Exhibit 238 marked.)
24
25   MR. AGRAWAL:  Q   Okay.  I'm handing you what is

Page 63

1  Exhibit 238 which I will represent to you is
2  Chapter IV.B -- that's I-V B -- of the April, 2007
3  Antitrust Modernization Commission, Report and
4  Recommendations.
5        Does this look familiar to you, sir?
6    A   Yes.
7    Q   And you cite the report as cataloging 31, at
8  least 31 continuing express and implied exemptions to
9  the federal antitrust laws; right?
10   A   That's right.
11   Q   And let's turn to Annex A of Exhibit 238.
12   A   Okay.
13   Q   Are you there?  Page 378.
14   A   I'm looking at Page 378.
15   Q   Page 378 of Exhibit 238 is the list of
16 31 continuing express and implied exemptions that you
17 reference in your report, correct?
18   A   That's what I'm citing in Footnote 2, yes.
19   Q   Okay.  And 20 of the exemptions are expressed
20 statutory exemptions that stand alone apart from a
21 regulatory regime, correct?
22   MR. LAPATINE:  Object as to form.
23   A   I'm not sure what you mean by stand apart from a
24 regulatory regime.  I will say that they categorize, it
25 looks like, about 20 statutory schemes as statutory

Page 64

1  exemptions from the antitrust laws.
2    MR. AGRAWAL:  Q   And then there are another six
3  that are exemptions created as part of a regulatory
4  regime as that term is used?
5    A   That's what it says here.  That's how they
6  categorize six statutory regimes.
7    Q   In each of these 26 cases, Congress made an
8  express decision that certain activity would not be
9  subject to antitrust liability; right?
10   A   I don't necessarily agree with that, no.
11   Q   Okay.  Why not?
12   A   Because of the word express.  The scope of an
13 exemption in any particular case is a matter of
14 statutory construction, but in many cases, the degree of
15 the exemption is not express in the text of the statute.
16   Q   All right.  I understand that the scope of the
17 exemption or the degree of the exemption may not be
18 express in the statute.  But for each of the first 26 of
19 these exemptions, the source for any exemption from
20 antitrust liability begins with some text that Congress
21 has passed, correct?
22   A   I'm not sure I would adopt that either.  Because
23 in some cases, the statutory provision followed case law
24 which recognized an exemption before the particular
25 statutory provision was adopted and so the statutory

Page 65

1  provision was confirming or narrowing or expanding prior
2  understandings of the scope of an exemption.
3    Q   For each of these first 26 exemptions, there is
4  a statutory provision that creates the exemption itself;
5  correct?
6    A   No.  I'm just having the same problem with the
7  word creates.  As to these first 20, there is a
8  statutory provision that is cited in this appendix.
9    Q   In your report you say the
10 Antitrust Modernization Commission cataloged at least
11 31 continuing express and implied exemptions, correct?
12   A   Right.  That's the last sentence of Paragraph 8.
13   Q   And when you use the term express exemption,
14 26 of those exemptions on Annex A are such an express
15 exemption; right?
16   A   I don't know.
17   Q   At the bottom of Annex A, we see two exemptions,
18 the State Action Doctrine and a reference to quote
19 "Various implied immunities created in specific
20 regulatory settings".
21        Do you see that?
22   A   I see those entries.
23   Q   And you are not offering any opinions in this
24 case with respect to whether the Vitamin C export
25 industry in China falls within the State Action

17 (Pages 62 to 65)

Case 13-4791, Document 157-1, 07/28/2014, 1280888, Page63 of 165

A-648

James B. Speta - 5/1/2009
Case 1:06-md-01738-BMC-JO CONFIDENTIAL - ATTORNEYS' EYES ONLY Page 39 of 40 PageID #:
Document 307-9 Filed 07/08/09 10425

Page 66

1  Doctrine, are you?
2      A  I'm not offering an opinion as to the legal
3  effect of the State Action Doctrine in this litigation.
4      Q  Okay.  And you're not offering an opinion with
5  respect to whether any of the various implied immunities
6  applies to the Vitamin C antitrust export industry in
7  China?
8      A  I'm not offering the legal conclusion about
9  whether the quote "various implied immunities created in
10  specific regulatory settings" applies in this
11  litigation.
12      Q  I have a couple of questions about other parts
13  of this report, Exhibit 238.
14          Page 334 in the middle of the page, below the
15  heading Statutory Exemptions from the Antitrust Laws,
16  1, Competitive Effects and Claimed Justifications.
17          Are you with me?
18      A  I see that heading.
19      Q  Okay.  The first couple of sentences there
20  state:  The antitrust laws stand as a bulwark to protect
21  free market competition.  They prohibit anticompetitive
22  restraints on consumer welfare.
23      MR. LAPATINE:  That harm consumer welfare.
24      MR. AGRAWAL:  Q  The antitrust laws stand as a
25  bulwark to protect free market competition.  They

Page 67

1  protect anticompetitive restraints that harm consumer
2  welfare.
3          Do you read that?
4      A  They prohibit anticompetitive restraints that
5  harm consumer welfare.
6      Q  Have I lost my ability to speak the English
7  language today?  Let me try this one more time.
8      A  I'm not offering an opinion.
9      Q  On Page 334 of Exhibit 238 -- Well, let me ask
10  you, what do you do when one of your students misspeaks
11  that way?
12      A  Oh, three or four more questions, they're on
13  call for the rest of the hour.
14      Q  Do you engage in the Socratic method when you
15  teach your students?
16      A  Absolutely.
17      Q  It's a shame you didn't go to the University of
18  Chicago.
19          Let me start over.
20          On Page 334 under the heading A. 1, it
21  reads:  The antitrust laws stand as a bulwark to protect
22  free market competition.  They prohibit anticompetitive
23  restraints that harm consumer welfare.
24          Do you see that?
25      A  I see that.

Page 68

1      Q  Okay.  As a general proposition, do you agree
2  with that?
3      MR. LAPATINE:  Object as to form.
4      A  As a general proposition, this is a story that
5  is often told to justify the antitrust laws.
6      MR. AGRAWAL:  Q  As a general proposition, do you
7  agree with that?
8      MR. LAPATINE:  Objection.
9          Are you asking him whether he has an opinion
10  with respect to whether it's a good policy?
11      MR. AGRAWAL:  Yes.
12      A  The answer is that I really don't understand the
13  question.
14          The antitrust laws are a good thing except when
15  they are not a good thing.  They are not a good thing
16  quite frequently.
17      MR. AGRAWAL:  Q  That statement is too general a
18  proposition for me to accept.
19      A  But it's more specific than yours.
20      Q  Okay.  Do you agree that statutory immunities
21  from antitrust law should be disfavored?
22      MR. LAPATINE:  Object to form.
23      A  Are you asking for my personal opinion or are
24  asking me what this report says?
25      MR. AGRAWAL:  Q  I'm asking you for your opinion.

Page 69

1      MR. LAPATINE:  What relevance does it have to his
2  report?  He's not opining on the antitrust laws.
3      MR. AGRAWAL:  I disagree.
4      MR. LAPATINE:  He's opining on whether the
5  regulatory scheme in China fits the characteristics of a
6  regulatory scheme in the United States with respect to
7  Vitamin C.  He's not opining as to what should happen as
8  a result of that.  That will be up to the Court.
9      MR. AGRAWAL:  And in his opinion, he discusses
10  various exemptions, implied and expressed, to the
11  antitrust laws.
12      MR. LAPATINE:  He states they exist, he doesn't
13  state whether or not he thinks it's a good idea for them
14  to exist.
15      MR. AGRAWAL:  Q  Okay.  All right.  So let me see
16  if I have this absolutely clear.
17          With respect to exemptions from the antitrust
18  laws, you are not offering any opinion on whether or not
19  any of those exemptions, express or implied, does apply
20  or should apply to the Vitamin C export industry?
21      A  I am not offering a legal conclusion about
22  whether an antitrust exemption ought to apply to the
23  Vitamin C export industry in China.
24      Q  Are you offering a policy conclusion with regard
25  to whether an antitrust exemption ought to apply to the

18 (Pages 66 to 69)

James B. Speta - 5/1/2009

Page 70

1   Vitamin C export industry in China?
2       MR. LAPATINE:  Object to form.
3       A   I'm not sure what you mean by a policy
4   conclusion.
5       MR. AGRAWAL:  Q   As opposed to a current state of
6   the law, an opinion with respect to what you think
7   should be the state of the law.
8       A   Look, I'm offering an opinion that the anti --
9   I'm sorry.  Let me start over.
10      I'm offering an opinion that the Vitamin C
11  export industry in China exhibits the characteristics of
12  regulated industries as we understand that term.  I hope
13  that opinion will be helpful to the Court and to others
14  in addressing the issues in this case.
15      Q   So you are not offering a policy opinion with
16  regard to whether an antitrust exemption should apply?
17      MR. BOMSE:  Object as to form.
18      A   I don't understand the question about -- or I
19  don't understand the term policy opinion in this
20  context.
21      When we talk about, in my classes, for example,
22  whether the law ought to be something, right, as opposed
23  to what the law is, we ask about doctrinal
24  considerations, we ask about economic considerations, we
25  ask about psychology and history, and all of that data

Page 71

1   ought to be used by somebody trying to decide what the
2   law is.  I hope my report will be helpful as a piece of
3   data in this litigation.  If that's a policy input or
4   not, that's why I don't understand your question.
5       MR. AGRAWAL:  Q   I'm just trying to make sure that
6   it's absolutely clear that you are not offering an
7   opinion about what the law ought to be with respect to
8   whether the Vitamin C antitrust industry, export
9   antitrust -- Strike that.
10      I'm just trying to be absolutely clear that
11  you're not offering an opinion about what the law ought
12  to be with respect to whether an exemption should be
13  recognized for the Chinese Vitamin C export industry.
14      A   I think I've answered this as best I can.  I'm
15  not offering a legal conclusion on the scope of the
16  application of an antitrust immunity in this litigation.
17      Q   As it may exist or as it might exist?
18      MR. LAPATINE:  Object as to form.
19      A   I don't understand the difference.
20      MR. AGRAWAL:  Q   I don't think this is that hard,
21  but perhaps it is.
22      In your prior answer you distinguished between
23  what the law ought to be as opposed to what the law is.
24  You made that distinction, right?
25      A   Yes, I did.

Page 72

1       Q   Okay.  And I'm just trying to make sure that I
2   understand your opinion that you are not offering an
3   opinion with respect to what the law is or offering an
4   opinion with respect to what the law ought to be as it
5   pertains to whether an exemption to the Vitamin C -- to
6   the antitrust laws should apply to the Vitamin C export
7   industry.
8       MR. CRITCHLOW:  Objection as to form.
9       A   With respect to raises the problem we've been
10  having.  I'm offering an opinion that the Vitamin C
11  export industry as it is practiced in China meets the
12  characteristics of a regulated industry:  That opinion,
13  I hope, will be helpful in this litigation.  I don't
14  know how else I can say it.
15      MR. AGRAWAL:  Q   You're not taking the further step
16  of saying therefore, an exemption is or should be
17  recognized?
18      A   That's what I mean when I say -- Let me -- Let
19  me -- Let me start over.
20      I'm not offering the legal conclusion of what
21  my opinion means for whether there is an antitrust
22  exemption in this particular litigation.
23      Q   Okay.  One of the characteristics that you look
24  at to determine whether an industry is a regulated
25  industry as you use that term is whether there's an

Page 73

1   articulated government rationale or basis for taking
2   that industry out of the normal vicissitudes of market
3   competition, right, you look for government rationale?
4       A   The first of my three principal characteristics
5   of a regulated industry is that the government has
6   articulated a justification for treating this industry
7   differently, and by differently, in a regulated fashion.
8       Q   And if you turn to Paragraph 18 of your report,
9   you state that:  At the most general level, the Chinese
10  government has expressed concern for ensuring that its
11  relatively nascent industries, particularly those that
12  it considers "strategic" (meaning important to national
13  policy interests), develop in a profitable manner and
14  aid Chinese economic development.
15      Did I read that correctly?
16      A   Yes.
17      Q   Do you have an opinion one way or another with
18  respect to whether the Vitamin C export industry is a
19  nascent industry as you use that term in Paragraph 18 of
20  your report?
21      A   I've seen statements from the Chinese government
22  that describe the Vitamin C export industry over time as
23  a relatively nascent industry.
24      Q   But you are not offering an opinion one way or
25  another as to whether the industry is, in fact, such a

19 (Pages 70 to 73)

# A-650

Authorized Translation

# 中 华 人 民 共 和 国 商 务 部

## MINISTRY OF COMMERCE OF THE PEOPLE'S REPUBLIC OF CHINA
## 2, DONG CHANG'AN STREET, BEIJING, CHINA 100731

Statement In *In Re Vitamin C Antitrust Litigation*, 06-MD-1738 (DGT)

**August 31, 2009**

*Amicus* The Ministry of Commerce of the People's Republic of China (the "Ministry") authorizes its Department of Treaty and Law to respectfully submit this Statement (together with an authorized English translation).

    1.   The Ministry has attached great importance to the antirust litigation in the United States brought against Chinese vitamin C exporters. The Ministry submitted to this Court *the Brief of Amicus Curiae of the Ministry of Commerce of the People's Republic of China in support of the Defendants' Motion to Dismiss the Complaint* in June 2006 and its *Statement In Re Vitamin C Antitrust Litigation* in June 2008. Taking notice of the comments and views made by Your Honor, the plaintiffs, plaintiffs' counsels and the experts, and the relevant documents, the Ministry would like to draw the Court's attention to the positions taken by the Ministry in the above-mentioned two documents, and would like to reiterate here that the alleged conduct by the defendant Chinese vitamin C exporters is the result of the defendants' performing their obligations to comply with Chinese laws, rather than conduct on their own initiative.

    2.   In order to prevent self-destructive competition through distorted pricing by Chinese exporters caught unprepared for the drastic change of China's export policies, and to mitigate potential exposures to antidumping investigations in other countries against Chinese exporters, the Ministry took active measures by exerting export regulation over certain commodities that might encounter or have encountered such problems. Although different regulatory measures may have been implemented in line with changes of circumstances at different times, enterprises in regulated

industries were nevertheless compelled to comply with relevant rules and regulations, or they would otherwise be subject to penalties.

3.     The actual specific measures taken by China to effect its regulatory policies include what is referred to as a "system of self-discipline".  This system has a long history in China and has been well known to, and complied with by, Chinese companies.  Self-discipline does not mean complete voluntariness or self-conduct. In effect, self-discipline refers to a system of regulation under the supervision of a designated agency acting on behalf of the Chinese government.  Under this regulatory system, the parties involved consult with each other to reach consensus on coordinated activities for the purpose of reaching the objectives and serving the interest as set forth under Chinese laws and policies.  Persons engaged in such required self-discipline are well aware that they are subject to penalties for failure to participate in such coordination, or for non-compliance with self-discipline, including forfeiting their export right.

4.     Vitamin C falls into the category of products subject to the above-mentioned regulation.  During the relevant period in the present case, the Ministry required vitamin C exporting companies to coordinate among themselves on export price and production volume in compliance with China's relevant rules and regulations in order to maintain orderly export, safeguard the interests of the country as a whole and avoid self-destructive competition.

5.     The Ministry authorized and instructed the China Chamber of Commerce of Medicines & Health Products Importers & Exporters (the "Chamber") and its Vitamin C Subcommittee to implement relevant policies related to the export of vitamin C products.  Embodied in the Ministry's delegation of authority to the Chamber were industry regulatory functions and powers as well as necessary enforcement measures.  Vitamin C exporters were thus subject to the regulation by the Chamber, including compliance with the Chamber's requirements of self-discipline, the very purpose of which was to coordinate each exporter's behavior. No vitamin C exporter could ignore these policies, nor could they abstain from such coordination with regard to export price and production volume when asked to by the

Chamber.

6.    The self-disciplinary system of export coordination also includes meetings and discussions between and among the parties subject to the Chamber's direction and supervision, and reaching agreements among themselves on taking appropriate actions in the interest of the country as a whole.    Participation in such discussions, taking a vote and conducting other similar activities to reach their final consensus constitutes an integral part of the self-discipline process.    Vitamin C exporters must comply with the above procedures and the agreements reached in compliance with such procedures; otherwise, the Chamber would be required to exercise its power to penalize those who were in violation of such procedures and agreements.

7.    The Ministry has read the report issued by plaintiffs' expert, Dr. Paula Stern.    The Ministry believes that statements of representatives of the Ministry and other government agencies, with regard to China's market economy status, and remarks regarding Chinese companies setting price and production volume according to the principle of market demand, quoted by Dr. Stern were made in a different context – one that had nothing to do with export price regulations -- and were *general descriptions* of the current status of China's market economy presented in a special context.    These general descriptions are irrelevant to the present case and should not be deemed as explicit or implicit statements of China's abandonment of its limited regulatory policies over certain designated industries including the vitamin C industry, or of China's waiver of its power to continue to regulate according to Chinese and international law.    The Ministry believes that maintaining its regulation in a limited manner (such as its regulation over vitamin C export) is consistent with China's national goal of establishing a socialist market economy.    As stated under Point 2 above, the adoption of government regulations over certain commodities (such as vitamin C) at a given stage in history serves the specific interests of China and is consistent with the trade policies of importing countries to protect and regulate relevant domestic industries.    The regulations are implemented in a manner consistent with international law and custom and, during the process of implementation, have not been subject to challenge from the government of other

3

countries or regions.   China understands and believes that virtually all sovereign nations and regions (including the United States), proceeding from their own interests, have exercised various forms of government regulations over part of their private sector and certain industries.   China's export regulations of vitamin C at issue in this case are no different.

Respectfully submitted,

Department of Treaty and Law

Ministry of Commerce of the

People's Republic of China

[affixed seal]

# 中 华 人 民 共 和 国 商 务 部

## MINISTRY OF COMMERCE OF THE PEOPLE'S REPUBLIC OF CHINA
## 2, DONG CHANG'AN STREET, BEIJING, CHINA 100731

## 关于维生素 C 诉讼案 06-MD-1738（DGT）的声明

　　本案法庭之友中华人民共和国商务部（以下简称"商务部"）授权条约法律司在此敬呈本声明（经认可的英文译文一并呈递）。

　　一、商务部高度重视中国维生素 C 出口企业在美国遭遇的反垄断诉讼事宜，并以"法庭之友"身份，于 2006 年 6 月向贵法院提交了《中华人民共和国商务部支持被告驳回原告起诉的动议之法庭之友信函》，于 2008 年 6 月向贵法院提交了《关于维生素 C 反垄断诉讼案之声明》。商务部注意到本案法官及原告、原告律师、法律专家们及相关文件的表态，通过本信函提请贵法院注意商务部在上述两份文件中所表达的观点，并再次声明：本案中所指控的被告中国维生素 C 出口企业所采取的行为是它们遵守中国法律义务的结果，而非自主的行为。

　　二、为避免出现企业因不适应中国出口政策的剧烈变化，而在出口领域出现价格上扭曲贸易的恶性竞争，减少企业在海外遭遇反倾销调查的隐患，商务部对某些可能出现或已经出现上述问题的商品予以了积极的出口监管，虽然监管

1

方法随不同时期的情况变化而有所不同，但受监管行业的企业必须遵守相关监管，否则将受到处罚。

三、中国选择实施其监管政策的具体方式包括被称作"自律"的监管机制，这种"自律"概念在中国由来已久并为企业所熟知、遵守。自律并不意味着完全自愿或个人行为。实际上，自律指的是一种由政府指定的一个代表机构监督实施的监管机制，在这个监管机制下，当事人为了就协调行为达成一致意见而进行相互协商，以实现中国法律和政策的目标和利益。被要求自律者在进行自律时，都知道不参与协调过程或者不执行自律将受到不同形式的处罚，包括丧失从事出口业务的权利。

四、维生素 C 是上述受监管产品之一。在本案起诉书所涉年份期间，商务部要求维生素 C 出口企业按中国相关法律、法规维持出口秩序，维护国家的整体利益，协调出口价格和产量，避免恶性竞争。

五、商务部授权并指示中国医药保健品进出口商会（以下简称"医保商会"）及其维生素 C 分会执行维生素 C 出口相关政策。商务部赋予其行业监管功能和职权以及必要的手段。维生素 C 出口企业接受医保商会的监管，包括遵守医保商会提出的关于实行自律的要求，其目的就是协调各自的行为。参与维生素 C 出口的企业不能忽视这些政策，也不得在其被商会要求对价格和产量进行协调时不参与协调。

六、出口协调自律制度包括接受商会监督的当事方在医保商会的指导和监督下会面、讨论，并就为实现国家整体利益而采取适当的行动达成协议。参与讨论，采用投票以及其他类似行为，最终达成一致意见，都是自律过程的一部分。维生素 C 出口企业必须遵守上述程序以及根据上述程序达成的协议，医保商会必须行使其职权对违背者予以处罚。

七、商务部已经阅读了原告聘请的法律专家斯特恩博士的报告。商务部相信，斯特恩博士引用的商务部和其他部门的代表在与出口价格监管毫无关联的其它背景下发表的关于中国市场经济地位，以及中国企业按照市场原则确定产量和价格的言论，是在特定场合下对中国市场经济现状所做的总体性描述，既与本案无关，也无明示或暗示中国对于包括维 C 行业在内的部分特定行业放弃有限的监管政策或放弃自己继续根据中国法和国际法行使监管的权利。商务部认为它所维持的形式有限的监管（诸如对维生素 C 出口所实施的监管）与建立社会主义市场经济的国家目标是相一致的。正如商务部在本声明第二条中所言，在特殊历史背景下对某些商品（如维生素 C）实施出口监管，既符合中国的特定利益，也符合进口国保护和监管其国内相关产业的贸易政策，且其管理模式是符合国际法和国际惯例的，在实施过程中未受到其他国家或地区政府的质疑。中国理解和确信，事实上所有主权国家或地区（包括美国）都对部分私有个体和产业实

3

**A-657**

施符合其利益的各种形式的政府监管，而本案所涉及的中国政府对维生素 C 实施的出口监管也别无二致。



中华人民共和国商务部条约法律司敬呈

二〇〇九年八月三十一日

4

**A-658**

### UNITED STATES JUDICIAL PANEL
#### on
### MULTIDISTRICT LITIGATION

**IN RE: VITAMIN C ANTITRUST LITIGATION**                                    MDL No. 1738

### ORDER REASSIGNING LITIGATION

Due to the death of the Honorable David G. Trager, the Honorable Raymond Dearie, Chief Judge of the Eastern District of New York, has recommended reassigning this litigation to the Honorable Brian Cogan of that district.

IT IS THEREFORE ORDERED that this litigation is reassigned to the Honorable Brian Cogan for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

FOR THE PANEL

John G. Heyburn II
Chairman

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

IN RE
VITAMIN C ANTITRUST LITIGATION

This Document Relates To:

MASTER FILE 1:06-MD-1738
(DGT)(JO)

---------------------------------------------------------------x

ANIMAL SCIENCE PRODUCTS, INC., *et al.,*

                        Plaintiffs,

            vs.

HEBEI WELCOME PHARMACEUTICAL
CO., LTD., *et al.,*

                      Defendants.

Case No. 1:05-CV-00453(DGT)(JO)

---------------------------------------------------------------x

**NORTHEAST PHARMACEUTICAL GROUP CO., LTD.'S OBJECTION TO**
**MAGISTRATE ORENSTEIN'S JANUARY 20, 2011**
**MEMORANDUM AND ORDER**

GREENBERG TRAURIG, LLP
*Attorneys for Defendant Northeast*
   *Pharmaceutical Group Co., Ltd.*
The MetLife Building
200 Park Avenue
New York, NY 10166
Tel:  (212) 801-9200

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

INTRODUCTION ......................................................................................................................... 1

STATEMENT OF THE ISSUES.................................................................................................... 3

I.      MOFCOM'S COMMENTS ON SIDLEY AUSTIN'S DRAFT BRIEF, SHARED
        WITH THE CHAMBER, A SIGNATORY TO A JOINT DEFENSE
        AGREEMENT PREPARED FOR THIS CASE, IS CLASSIC WORK PRODUCT
        WHICH HAS NOT BEEN WAIVED .................................................................................. 6

II.     SHARING MOFCOM'S WORK PRODUCT PREPARED FOR THIS
        LITIGATION WITH PARTIES TO A JOINT DEFENSE AGREEMENT THAT
        SHARE A COMMON LEGAL INTEREST WITH MOFCOM DOES NOT
        CONSTITUTE IMPROPERLY "EXTEND[ING] [WORK PRODUCT] FAR
        BEYOND ITS INTENDED PURPOSE." .......................................................................... 8

III.    AS REFLECTED IN THE DOCUMENTS THAT ARE THE SUBJECT OF
        PLAINTIFFS' MOTION TO COMPEL, MOFCOM AND THE CHAMBER
        ARE DIRECTLY INVOLVED IN FORMULATING LEGAL STRATEGIES IN
        THIS LITIGATION SUCH THAT SHARING PRIVILEGED
        COMMUNICATIONS BETWEEN MOFCOM, THE CHAMBER AND NEPG
        DOES NOT EFFECT A WAIVER OF WORK PRODUCT PROTECTION.................. 10

IV.     THE MAGISTRATE'S RATIONALE FOR PRESERVING NEPG'S CLAIMS
        OF WORK PRODUCT PROTECTION FOR ONE DOCUMENT SENT BY
        NEPG TO MOFCOM APPLIES WITH FULL FORCE FOR THE OTHER
        DOCUMENTS NEPG SENT TO MOFCOM AND THE TWO OTHER
        GOVERNMENT BODIES OF THE PEOPLE'S REPUBLIC OF CHINA IN
        WHICH NEPG SOLICITS THE GOVERNMENT'S SUPPORT AND ADVISES
        ABOUT THE NATURE OF THIS LITIGATION, INCLUDING NEPG'S
        ATTORNEYS' LITIGATION STRATEGY................................................................... 12

CONCLUSION............................................................................................................................ 17

## TABLE OF AUTHORITIES

**Cases**

*Bank of Am. v. Terra Nova Ins. Co.,*
   212 F.R.D. 166 (S.D.N.Y. 2002) ............................................................. 13

*Costabile v. County of Westchester,*
   254 F.R.D. 160 (S.D.N.Y. 2008) ............................................................. 13

*Granite Partners v. Bear Stearns & Co. Inc.,*
   184 F.R.D. 49 (S.D.N.Y. 1999) ............................................................... 13

*Hickman v. Taylor,*
   329 U.S. 495 (1947) ............................................................................. 2, 6

*In re Cardinal Health, Inc. Sec. Litig.,*
   2007 WL 295150 (S.D.N.Y. Jan. 26, 2007) ............................................ 10

*In re Steinhardt Partners, L.P.,*
   9 F.3d 230 (2d Cir. 1993) ........................................................................ 13

*In re Visa Check/Master Money Antitrust Litig.,*
   190 F.R.D. 309 (E.D.N.Y. 2000) ............................................................ 13

*Lugosch v. Congel,*
   219 F.R.D. 220 (N.D.N.Y. 2003) .............................................................. 9

*U.S. v. Schwimmer,*
   892 F.2d 237 (2d Cir. 1989) .................................................................. 8, 9

*U.S. v. Weissman,*
   195 F.3d 96 (2d Cir. 1999) ....................................................................... 9

*United States v. Adlman,*
   134 F.3d 1194 (2nd Cir. 1998) ........................................................... 2, 13

*United States v. Am. Tel. & Tel. Co.,*
   642 F.2d 1285 (D.C. Cir. 1980) ................................................... 9, 10, 13

**Federal Rules**

Fed. R. Civ. P. 26(b)(3)(A) ............................................................................ 2

Fed. R. Civ. P. 26(b)(3)(B) ............................................................................ 6

Fed. R. Civ. P. 72(a) ..................................................................................... 1

**A-662**

Defendant Northeast Pharmaceutical Group Co., Ltd. ("NEPG") , pursuant to Federal Rule of Civil Procedure 72(a), hereby submits its Objection to Magistrate Judge James' Orenstein's January 20, 2011 Memorandum and Order ("Mem. Op.") (D.E. 424)(the "Order").

## <u>INTRODUCTION</u>

NEPG respectfully appeals from the Order to the extent that it directs the production of eight documents which include counsel's analysis of the issues in this litigation and/or reflect internal discussions of litigation strategy among defendants and various instrumentalities of the Chinese government, including the Ministry of Commerce, a Cabinet-level entity within the national government commonly known as "MOFCOM" (referred to by the Magistrate as the "Commerce Ministry") as well as a "subsidiary agency within the Ministry," the China Chamber of Commerce of Medicines & Health Products Importers & Exporters (the "Chamber").

Specifically at issue are two documents reflecting communications from MOFCOM to the Chamber and MOFCOM's counsel regarding a draft brief to be submitted in this case, and six documents reflecting communications between NEPG and MOFCOM or two other governmental agencies of the People's Republic of China ("PRC")  memorializing NEPG's counsel's confidential legal advice and strategies and soliciting governmental assistance in facilitating NEPG's defense of this litigation.   The Magistrate determined that these eight documents[1] were not entitled to work product protection, notwithstanding his conclusion that another communication from NEPG to MOFCOM concerning counsel's advice and strategies for the defense of this litigation *was* entitled to protection and that MOFCOM was

---

[1] These documents are contained in the Appendix submitted herewith to the Court *ex parte* for *in camera* review. All references to "Document Numbers" herein correspond to the entry numbers on NEPG's Revised Privilege Log, which is annexed to the Declaration of Philip H. Cohen as Exhibit B.  All references to "Exhibit" numbers refer to the exhibit tab number in the Appendix that has been submitted *ex parte* to the Court for *in camera* review.

# A-663

likely to treat the communication as confidential in light of a joint defense agreement executed

between the Chamber, NEPG and the other Defendants.

Insofar as  substance  is concerned, the contents of the documents in question are either

wholly mundane or -- to a substantial extent -- strongly support the central assertion made by the

defendants in this litigation, that the actions that are challenged here by plaintiffs were carried

out under the authority and direction of the Chinese government and, for that reason, may not be

held to violate the Sherman Act.[2]  In that sense, the documents at issue reveal that the parties and

the government were saying internally precisely what they have said in their filings with the

Court and are only helpful to the defense.

However, there is a broader principle at stake here and that is why NEPG objects to the

Magistrate's Order.  Parties to pending litigation should be free to communicate regarding

matters of legal strategy amongst themselves and those aligned with them. Specifically, the work

product doctrine is intended to shield from discovery documents "that are prepared in

anticipation of litigation or for trial by or for another party or its representative."  Fed. R. Civ. P.

26(b)(3)(A).  Its purpose is to "preserve a zone of privacy in which a lawyer can prepare and

develop legal theories  and strategy 'with an eye toward litigation,' free from unnecessary

intrusion by his adversaries."  *United States v. Adlman*, 134 F.3d 1194, 1996 (2nd Cir. 1998)

(quoting *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947)).

Accordingly, NEPG respectfully objects to the Magistrate's ruling to the extent that it

determines that classic opinion work product prepared for the defense of this litigation is not

protected from discovery because the communications were shared with certain governmental

---

[2] *See* D.E. 393 (Defendants' Memorandum in Support of Motion), D.E. 398 (Defendants' Reply Memorandum in further Support), D.E. 400 (Letter enclosing Statement of MOFCOM), and D.E. 419 (Defendants' Response to Sur-Reply).

**A-664**

agencies of the People's Republic of China ("PRC"), when the PRC has made submissions in

this action expressly aligning the PRC with NEPG and the Defendants.  NEPG respectfully

submits that the Magistrate erred when concluding that defense counsel's confidential strategies

and anticipated defenses in this litigation are not protected by the work product doctrine because

they were shared with the Government of the People's Republic of China, and those conclusions,

therefore, should be reversed.

## STATEMENT OF THE ISSUES

With respect to the communications from MOFCOM commenting on a draft brief to be

submitted on its behalf in this litigation[3]:

A.      Whether the Magistrate erred in finding that MOFCOM's comments on its U.S. counsel's

        (Sidley Austin) draft brief to be filed in this action are not subject to claims of work

        product protection because MOFCOM's comments were addressed to the Chamber, a

        non-party in the litigation, but a party to a joint defense agreement with NEPG and the

        Defendants prepared for the defense of this litigation ("the Joint Defense Agreement" or

        the "JDA")[4].  NEPG and the defendants entered into that JDA with the Chamber as they

        operate subject to the legal oversight and regulation of the Chamber, as MOFCOM's

        delegate -- or, as the Magistrate described the Chamber -- a "subsidiary agency" of

        MOFCOM. Mem. Op. at 7.

B.      Whether the Magistrate erred by disregarding the Joint Defense Agreement, when the

        Magistrate ruled not to extend work product protection to MOFCOM's comments on its

---

[3] Documents 3 and 4 submitted for *in camera* review as Exhibits 2 and 3 respectively.

[4] A copy of the Joint Defense Agreement is submitted *in camera* as Exhibit A to the Cohen Decl.

3

**A-665**

US Counsel's draft brief provided by MOFCOM to the Chamber, a party to the Joint

Defense Agreement.

C.    Whether the Magistrate erred in declining to extend work product protection to the

Chamber, a non-party, but a party to a joint defense agreement with NEPG for the

purposes of defending this litigation, when the Magistrate found that recognizing such an

extension of the work product doctrine "would extend the coverage far beyond its

intended purpose."

With respect to the communications between NEPG and MOFCOM or two other governmental

entities of the People's Republic of China memorializing NEPG's counsel's confidential legal

advice and strategies and soliciting governmental assistance in facilitating NEPG's defense of

this litigation[5]:

D.    Whether the Magistrate erred in failing to recognize NEPG's legitimate interest in

sharing its counsel's opinions and analyses of this litigation with MOFCOM and two

other bodies of the Government of the People's Republic of China, when NEPG solicited

their support to defend Plaintiffs' claims in this action that affect the Government of the

People's Republic of China.  Despite ruling that NEPG's defense of this litigation

"promote[s] an interest that was then, and apparently continues to be, aligned with the

interests of the Commerce Ministry"[6], the Magistrate mistakenly found a waiver for three

other documents that NEPG addressed to the Commerce Ministry, one document NEPG

sent the Ministry of Foreign Affairs and one to the Shenyang Municipal Bureau of

Foreign Trade and Economic Cooperation Bureau, despite the People's Republic of

---

[5] Documents 1, 6, 7, 8, 13 and 43 are submitted for *in camera* review as Exhibits 1, 4, 5, 6, 7 and 9, respectively.

[6] Mem. Op. at 8.

**A-666**

China's expressed common interest in opposing this action                REDACTED

REDACTED                            , including seeking the dismissal of this

action.  (A portion of the prior sentence has been redacted from the service copy.)

E.      Whether the Magistrate erred in disregarding the evidence before the Court that the

Government shared a common legal interest with Defendants in the defense of this

litigation and that the Government of the PRC would, thus, treat NEPG's work product as

confidential.

5

I.   **MOFCOM'S COMMENTS ON SIDLEY AUSTIN'S DRAFT BRIEF, SHARED WITH THE CHAMBER, A SIGNATORY TO A JOINT DEFENSE AGREEMENT PREPARED FOR THIS CASE, IS CLASSIC WORK PRODUCT WHICH HAS NOT BEEN WAIVED**

MOFCOM's comments on its US counsel's draft arguments reflect Sidley Austin's client's comments on draft arguments to be considered in support of Defendants' Motion to Dismiss.  MOFCOM drafted these comments on September 9, 2005 for the review of its counsel for the brief that Sidley Austin ultimately filed for MOFCOM on September 22, 2006.[7]

There is no question that a client can provide its attorney with confidential comments on a draft pleading to be filed in a lawsuit and that those communications would be protected by the work product doctrine. Fed. R. Civ. P. 26(b)(3)(B) (providing absolute protection for an attorney's "mental impressions, conclusions, opinions, or legal theories"); *see Adlman*, 134 F.3d at 1996 (work product doctrine "preserve[s] a zone of privacy in which a lawyer can prepare and develop legal theories an strategy 'with an eye toward litigation'") (quoting *Hickman*, 329 U.S. at 510-11 (1947)).  Here, however, the Magistrate found that because the comments on draft arguments were shared with the Chamber, the work product doctrine does not apply because it was not "prepared by or for a party, or by his representative [citation omitted]."  Mem. Op. at 4. The Magistrate also concluded the Chamber is "neither a party nor a representative" of a party to this litigation.  <u>Id</u>. at 4-5.  However, while the Magistrate acknowledged and considered "that NEPG and the Chamber (a subsidiary agency within the Commerce Ministry) had entered into a written Joint Defense Agreement ("JDA"),"[8] when assessing Document 17, the Magistrate failed to take the JDA into account when considering the effect of sharing Documents 3 and 4 with the Chamber.  This is clear error.

---

[7] *See* D.E. 69, attached to the Cohen Decl. as Exhibit C.

[8] Mem. Op. at 7

When considering the JDA to assess waiver considerations for NEPG's analysis and strategy for the ongoing defense of this litigation, shared with MOFCOM on August 29, 2005, the Magistrate found that:

> The JDA requires its signatories to adhere to certain confidentiality obligations with respect to documents pertaining to this litigation. Although the JDA does not bind the Commerce Ministry itself, but only one of its components [the Chamber], it largely substantiates NEPG's assertion that disclosure of its legal analysis to the Commerce Minister did not substantially increase the opportunities for potential adversaries to obtain such information.  I therefore conclude that NEPG has not waived the work product privilege with respect to Document 17.

Mem. Op. at 7-8.

While it was appropriate and entirely correct for the Magistrate to find that the terms of the JDA support the finding of non-waiver for communications between MOFCOM and NEPG, the Magistrate's rationale is equally compelling -- if not more so -- when considering confidential work product communications shared between MOFCOM, the Chamber and NEPG.

> *First*, the Chamber, along with defendants, *is an actual signatory* to the JDA dated March 30, 2005, executed approximately five months before Documents 3 and 4 were written and shared with the Chamber.  *See* Cohen Decl., Exh. A.

> *Second*, the Magistrate recognized that the Chamber, which received MOFCOM's confidential comments on its US counsel's draft brief, was a "subsidiary agency within" MOFCOM.  Mem. Op. at 7.

> *Third*, the terms of the JDA, as recognized by the Magistrate, provide that the parties would share privileged and confidential

7

**A-669**

communications pursuant to the JDA to avoid any suggestion of waiver of confidentiality, including any waiver of work product protection. *See* Cohen Decl., Ex. A at 1-2. The JDA's terms further expressly restrict the parties from voluntarily disclosing shared confidential communications related to this litigation with any third party to the privilege. *Id.* at 2-3.

Given the clear terms of the JDA, that NEPG, the Defendants, and the Chamber executed five months before Documents 3 and 4 were written, which JDA was intended to guard, *inter alia*, against claims of waiver for work product shared between Defendants and the Chamber, it was error for the Magistrate to fail to take into account the terms of the JDA and to disregard the intent of the parties that entered into the JDA when determining whether MOFCOM's comments on a draft brief shared with the Chamber and Defendants remain protected by the work product doctrine.[9]

## II. AFFORDING WORK PRODUCT PROTECTION TO MOFCOM'S COMMUNICATIONS PREPARED IN DEFENSE OF THIS ACTION WITH PARTIES TO THE JOINT DEFENSE AGREEMENT DOES NOT CONSTITUTE IMPROPERLY "EXTEND[ING] [WORK PRODUCT] FAR BEYOND ITS INTENDED PURPOSE."

The Second Circuit recognizes the validity of joint defense agreements to allow parties with common legal interests to collaborate and efficiently cooperate and collaborate as part of a common defense. *U.S. v. Schwimmer*, 892 F.2d 237, 244 (2d Cir. 1989) (the joint defense

---

[9]     This is especially so where the Magistrate found that MOFCOM and NEPG can share privileged communications concerning strategy and the defense of this litigation without a waiver concerning the very same draft brief that is the subject of Documents 3 and 4. *See* Document 17, submitted for *in camera* review as Ex. 8 at III); Mem. Op. at 7-8. Where the JDA is central to Magistrate's analysis for finding a non-waiver for these communications between MOFCOM and NEPG on August 25, 2005, it is clear error for the Magistrate to fail to consider the JDA for these communications between MOFCOM, the Chamber and NEPG written a mere two weeks later, on September 9, 2005.

privilege "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel"); *U.S. v. Weissman*, 195 F.3d 96, 99 (2d Cir. 1999) (existence of joint defense agreement precludes admission of discussions with party to the agreement). Indeed, parties to joint defense agreements expect such contracts to be enforceable and draft them to be implemented by the Courts if disputes under the agreements arise. Even in the absence of a written joint defense agreement, federal courts have recognized the validity of oral joint defense agreements. *Schwimmer*, 892 F.2d at 244; *Lugosch v. Congel*, 219 F.R.D. 220, 237 (N.D.N.Y. 2003) ("In order [] for documents and communications shared amongst [parties to a joint defense agreement] to be considered confidential, there must exist an agreement, *though not necessarily in writing*, embodying a cooperative and common enterprise towards an identical legal strategy.") (emphasis added). A non-party to a litigation can join a joint defense agreement, and its communications with other parties pursuant to that agreement are protected by the joint defense privilege. *Lugosch*, 219 F.R.D at 238; *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285 (D.C. Cir. 1980).

Indeed, to extend the work product doctrine to non-parties who are members of a joint defense agreement with parties to a litigation is consistent with federal law and in no way "beyond the intended purpose" of the work product doctrine. To the contrary, not extending the protection to a non-party undermines the intended purpose of the joint defense agreement and frustrates the legitimate expectations of its signatories. Here, the Magistrate has recognized the common legal interest between NEPG and MOFCOM in the defense of this litigation.[10] For this

---

[10] The Magistrate cited the Second Circuit's explicit findings in *In re Steinhardt*, 9 F.3d at 234 that a waiver of the work product doctrine by disclosing counsel's analysis to a government agency "might not be appropriate where the disclosure advances the common interests of the party making the disclosure and the government agency. *Id.*; *see*

**A-671**

Court to fail to recognize or even consider a joint defense agreement that was entered into by the non-party who received attorney work product, when considering whether that non-party's relationship with Defendant NEPG was sufficient for the work product doctrine to apply, is error that would have the effect of chilling parties' legitimate interest in entering into joint defense agreements which promote the public interest of efficiently litigating disputes before the Court. For this reason, too, the Magistrate erred in denying privilege protection to Documents 3 and 4.

### III.   AS REFLECTED IN THE DOCUMENTS THAT ARE THE SUBJECT OF PLAINTIFFS' MOTION TO COMPEL, MOFCOM AND THE CHAMBER ARE DIRECTLY INVOLVED IN FORMULATING LEGAL STRATEGIES IN THIS LITIGATION SUCH THAT SHARING PRIVILEGED COMMUNICATIONS BETWEEN MOFCOM, THE CHAMBER AND NEPG DOES NOT EFFECT A WAIVER OF WORK PRODUCT PROTECTION

As noted above, the Magistrate recommended that the Court sustain NEPG's claim of work product in Document 17.[11]  Document 17 reflects, in a confidential, privileged communication,                              REDACTED

.

(The prior sentence has been redacted from the service copy.)  Separate and apart from the JDA between the Chamber and NEPG, described *supra*, at Section II, Document 17 describes

REDACTED

---

*also In re Cardinal Health, Inc. Sec. Litig.*, 2007 WL 295150 at *9 (S.D.N.Y. Jan. 26, 2007)." Mem. Op. at 8. Relying on the JDA and the other evidence submitted by NEPG, the Magistrate concluded that "the evidence suffices to allow the inference that NEPG provided document 17 to the Minister of Commerce to promote an interest that was then, and apparently continues to be, aligned with the interests of the Commerce Ministry, I conclude that the disclosure [to MOFCOM] did not significantly increase the risk that NEPG's attorney work product would be disclosed to NEPG's potential adversaries."  Mem. Op. at 8.

[11] Document 17 is submitted to for the Court's *in camera* review at Exhibit 8.

10

REDACTED

Document 17 at 1 (emphasis added).  (The prior two paragraphs and the two preceding sentences are redacted from the service copy and filed *in camera*.)

In conjunction with the JDA that expressly articulates the Chamber's and NEPG's common legal interests in the litigation,[12]  Document 17 reflects far more than "*ipse dixit* assertions" of common legal interests, as asserted by the Magistrate,[13] providing a real evidentiary basis for NEPG's assertion that the Chamber, MOFCOM, and NEPG -- with the other Defendants -- are working in close coordination in defending this litigation and have a real common interest in the pending litigation before this Court.  NEPG's evidentiary submission satisfies NEPG's burden of demonstrating the likelihood that Documents 3 and 4 were to be treated as confidential and not shared with third parties to the attorney-client relationship.

---

[12] *See* JDA at Cohen Decl., Exhibit A.

[13] Mem. Op. at 6.

11

IV.   **THE MAGISTRATE'S RATIONALE FOR PRESERVING NEPG'S CLAIMS OF WORK PRODUCT PROTECTION FOR ONE DOCUMENT SENT BY NEPG TO MOFCOM APPLIES WITH FULL FORCE FOR THE OTHER DOCUMENTS NEPG SENT TO MOFCOM AND THE TWO OTHER GOVERNMENT BODIES OF THE PEOPLE'S REPUBLIC OF CHINA IN WHICH NEPG SOLICITS THE GOVERNMENT'S SUPPORT, ADVISES ABOUT THE NATURE OF THIS LITIGATION, AND SHARES NEPG'S ATTORNEYS' LITIGATION STRATEGIES**

On February 7, 2005 and February 8, 2005, two weeks after plaintiffs filed this action, NEPG sent a series letters to Ministers of MOFCOM,[14] the Ministers of the Ministry of Foreign Affairs of the People's Republic of China,[15] and MOFCOM's local subsidiary where NEPG is headquartered, the Shenyang Foreign Trade and Economic Cooperation Bureau.[16]  These letters inform the government about the nature of the recently filed lawsuit, describe NEPG's "Analysis by the legal experts" and expressly seek the active assistance, participation and litigation support of MOFCOM and the two other governmental bodies.  In fact, MOFCOM has actively participated in the defense of this litigation,                                         REDACTED

and inter alia, submitted to the Court an statement articulating, "the official views of the People's Republic of China" in support of Defendants' Motion to Dismiss this action.[17]  (A portion of the prior sentence is redacted from the filed copy.)

---

[14] See Documents 1, 6, 7 and 8, submitted for *in camera* review at Exhibits 1, 4, 5, and 6, respectively.  Documents 1 and 6 are duplicates of each other.

[15] See Document 13, submitted for *in camera* review at Exhibit 7.

[16] See Document 43, submitted for *in camera* review at Exhibit 9.

[17] *See* Cohen Decl., Exhibit D, MOFCOM's Statement in *In re Vitamin C Antitrust Litigation* dated June 9, 2008. (MOFCOM "followed the procedures advised by the U.S. State Department with respect to the preferred method by which a foreign government should make its views known to a U.S. Court, the Ministry wants the Court to know that it participated entirely in the drafting of that brief [MOFCOM's amicus filing in support Defendants' Motion to Dismiss], which was reviewed and edited word-for-word in Beijing by officials of the Ministry and the U.S. counsel engaged by the Ministry.  That brief accurately sets forth to views and understanding of certain PRC government agencies, serving as an official view on behalf of the Ministry.")

**A-674**

Unlike the rule for waiver of attorney-client privilege, work product protection is not automatically waived when documents are shared outside the attorney-client relationship. Rather, the protection is waived only if the party shares its work product in a manner that is "inconsistent with the protection," *Granite Partners v. Bear Stearns & Co. Inc.*, 184 F.R.D. 49, 55 (S.D.N.Y. 1999), such that its disclosure "substantially increased the opportunities for potential adversaries to obtain this information." *In re Visa Check/Master Money Antitrust Litig.*, 190 F.R.D. 309, 314 (E.D.N.Y. 2000).   This is so because "there may be legitimate reasons to disclose attorney work product to persons outside the attorney-client relationship." *Bank of Am. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 169 (S.D.N.Y. 2002); *see also Adlman*, 134 F.3d 1194, 1200 n.4 (2d Cir. 1998) (*Hickman* protects documents that "may have been shown to others *simply because there was some good reason to show it*" ) (emphasis added).  For example, a party has a "good reason" to disclose work product to third parties where the party has a "common interest with the person to whom the material is disclosed."  *Bank of Am.*, 212 F.R.D. at 169; *see also AT&T*, 642 F.2d at 1298-99.

The Second Circuit has extended this rule to the sharing of work product with the government, recognizing that there would not be waiver where "the disclosing party and the government … share a common interest in developing legal theories and analyzing information." *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 236 (2d Cir. 1993); *see also Costabile v. County of Westchester*, 254 F.R.D. 160, 166 (S.D.N.Y. 2008) (concluding that work product protection was not waived where plaintiff shared a report with the EEOC while it was investigating the same defendant because "plaintiffs and the EEOC were aligned in their common interest to analyze the facts of the incident and prevent alleged discriminatory practices by or on behalf of defendants"). That is precisely what occurred in this case.  Here, NEPG shared its legal analysis of Plaintiffs'

13

claims and its anticipated defenses, and sought the litigation support of the Government of the PRC, which support the Government of the PRC provided Defendants.[18]   It was error for the Magistrate to disregard the evidence before the Court that the Government of the PRC is aligned with Defendants in this action and to conclude that sharing work product prepared for the defense of this litigation was not likely to be maintained as confidential by the Government of the PRC.[19]

As described *supra* at Section III, the Magistrate correctly determined that MOFCOM, by virtue of the JDA entered into by the Chamber, could reasonably be expected to treat as confidential privileged and confidential communications provided by NEPG concerning the pending litigation.  *See* Mem. Op. at 7-8.  Consistent with the Magistrate's ruling for Document 17, these 6 challenged documents shine additional light on MOFCOM's common legal interests with NEPG in this litigation, and provide an evidentiary basis for these claims of non-waiver. Specifically, as reflected in Document 1 at pages 1-2, NEPG describes the Ministry of Commerce's interests in this litigation:

REDACTED

---

[18] *See* Cohen Decl., Exs. C, D.

[19] *See e.g.*, MOFCOM's submissions to the Court in support of Defendants at D.E. 30, D.E. 241, D.E. 306-2, and D.E. 400.

14

(Emphasis added) (The prior sentences are redacted from the filed copy, and are submitted *ex parte* for *in camera* review.)

A similar description of the common legal interest between MOFCOM, the Chamber and NEPG appears in Document 8 written by NEPG's Chairman and General Manager Chen Gang in correspondence addressed to Minster Bo Xilai of MOFCOM.  There, NEPG's Chairman writes as follows:

REDACTED

(The preceding paragraph has been redacted from the filed copy and has been submitted *ex parte* for *in camera* review.)   Similar expressions regarding the background of this litigation, planned legal strategy and the common interests shared by Defendants and the PRC are made to the Ministry of Foreign Affairs and the Shenyang Municipal Bureau of Foreign Trade and Economic Cooperation appear in NEPG's correspondence to those Governmental bodies of the PRC.[20]

Considering the letters addressed to the Ministry of Foreign Affairs and the Shenyang Bureau, the Magistrate wrote "I do not mean to suggest that there is any affirmative reason to believe that NEPG placed its attorney work product at risk by sharing it with the Foreign Ministry on the Sheyang [sic] Bureau."  Mem. Op. at 7.  However, the Magistrate found an "absence of evidence" of whether NEPG's "disclosures to the Foreign Ministry and the Sheyang [sic] Bureau substantially increased the risk of disclosure to movants." In coming to this

---

[20] *See* Documents 13 and 43, submitted for *in camera* review as Exhibits 7 and 9 respectively.

conclusion, the Magistrate improperly disregarded the evidence submitted that MOFCOM's submissions represent "to the Court the *official views of the People's Republic of China*." *See* Cohen Decl., Exhibit D at 1, MOFCOM's June 9, 2008 Statement *In Re Vitamin C Antitrust Litigation* (emphasis added), D.E. 400. *See also* n. 20, *supra*. Where the "official views" of the Government of the PRC are expressed to the Court in support of Defendants in this litigation, it was error for the Magistrate to conclude that there was an "absence of evidence" on the question of whether sharing Defendants' work product with the Government of the PRC substantially increased the risk of disclosure to third parties. In fact, there was direct and compelling evidence to the contrary.

In sum, just as the Magistrate found that common legal interests between MOFCOM and NEPG prevent the disclosure of Document 17[21], the Magistrate should have found Document 1, Document 6 (a copy of document 1), Document 7, Document 8, Document 13 and Document 43[22] to be properly protected from discovery by the work product doctrine and that those protections were not waived when they were shared with governmental agencies of the PRC because the Government's interests were, and are, aligned with Defendants' interests, and that the evidence marshaled before the Court establish the likelihood that the PRC would treat as confidential NEPG's attorney work product prepared for this litigation.

---

[21] *See* Exhibit 8 submitted for *in camera* review.

[22] S*ee* Exhibits 1, 4, 5, 6, 7 and 9, respectively, submitted for *in camera* review.

**<u>CONCLUSION</u>**

For the reasons and based upon the authorities set forth herein, the Court should modify and set aside the portion of the Order that found that eight documents were not protected from discovery and further find that they are properly subject to claims of work product protection that have not been waived.

Dated:  New York, New York                    Respectfully Submitted,
       February 3, 2011

                                    GREENBERG TRAURIG, LLP

                                 /s/ Philip H. Cohen
                                James I. Serota, Esq. (JS-6802)
                                Philip H. Cohen (PC-5171)
                                The MetLife Building
                                200 Park Avenue
                                New York, NY 10166
                                Tel:  (212) 801-9200
                                Fax:  (212) 801-6400

                                *Attorneys for Defendant Northeast*
                                *Pharmaceutical Group Co., Ltd.*

17



**ORRICK**

ORRICK, HERRINGTON & SUTCLIFFE LLP
51 WEST 52ND STREET
NEW YORK, NEW YORK 10019-6142

tel +1-212-506-5000
fax +1-212-506-5151

WWW.ORRICK.COM

February 9, 2012

Richard S. Goldstein
(212) 506-5325
rgoldstein@orrick.com

*BY HAND DELIVERY AND ECF (AS REDACTED)*

The Honorable James Orenstein
United States District Court for the
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:   In re Vitamin C Antitrust Litig., 06-MD-1738 (BMC) (JO)

Dear Judge Orenstein:

Defendant Aland (Jiangsu) Nutraceutical Co., Ltd. ("Aland") opposes the motion by plaintiffs Animal Science Products, Inc. and The Ranis Company to compel production of the May 20, 2005 litigation analysis and strategy memorandum authored by Sidley Austin Brown & Wood LLP ("Sidley") and addressed to the China Chamber of Commerce of Medicines & Health Products Importers & Exporters (the "Chamber") and "All Defendants."

**Relevant Facts**

Plaintiffs filed their first complaint in this litigation on January 26, 2005. In early February 2005, Wang Qiang, Deputy General Manager of Jiangsu Jiangshan Pharmaceutical Co., Ltd., (now called Aland), attended two meetings concerning the litigation, along with representatives of the other Defendants, the Chamber and the Ministry of Commerce of the People's Republic of China (the "Ministry"). Lawyers from Sidley attended the second of those meetings, and all present orally agreed that, in light of their common interest, they would share litigation-related information with each other. (Ex. 1, Wang Qiang Dec. ("WQ Dec.") ¶ 6; 9/11/08 Lapatine Ltr., DE 327.) Soon after the early February meetings, the Chamber (which, as this Court found, is an arm of the Ministry (1/20/11 Order at 7, DE 424; *see also* Judge Cogan's 9/6/11 Order at 45 and n.37, DE 440)) retained Sidley to provide the Chamber *and Defendants* with preliminary advice and recommendations about grounds for defending the lawsuits. (WQ Dec. ¶ 7.) Sidley was to provide this legal advice based upon its analysis of the complaints, and through an assessment of facts that they obtained by interviewing Defendants' employees and reviewing documents from Defendants' files. (*Id.* ¶¶ 7, 8.) The Chamber also engaged Sidley to advise Defendants with respect to document retention, and to make a recommendation as to whether each Defendant ought to have its own, separate counsel. (*See id.* ¶¶ 12, 13.) REDACTED
REDACTED                                        (*Id.* Ex. A at ¶ 11.)



ORRICK

The Honorable James Orenstein
February 9, 2012
Page 2

On or about March 30, 2005, what previously had been an oral common interest agreement was reduced to writing and signed by Defendants and the Chamber. (*Id.* ¶ 9 & Ex. A.) The Ministry subscribed to that agreement orally. (*Id.* ¶ 10; 8/29/08 Mitnick Ltr., DE 322.) Subsequently, lawyers from Sidley interviewed Aland employees and reviewed documents from Aland's files. Aland did not have its own counsel at this point, and Wang Qiang understood that Aland's discussions with Sidley would be considered confidential under U.S. law. (*Id.* ¶¶ 7, 9, 11.) During the course of Sidley's preliminary analysis of the lawsuit, and based in part on Sidley's findings, Aland decided to retain its own counsel, which it did on or about May 8, 2005. (*Id.* ¶ 13.)

Aland received the Sidley memo, which was addressed to the Chamber and to "All Defendants," on May 20, 2005. The first paragraph states that the Chamber retained Sidley "to collect and analyze facts relevant to these actions and to make preliminary case strategy recommendations to the Chamber and the Defendants based on that analysis." (*Id.* ¶ 14.) Sidley did not act as counsel to Aland after it circulated the May 20, 2005 memorandum. (*Id.* ¶ 16.)

### The Sidley Memo Is Protected Work Product

The Sidley memo contains extensive factual and legal analysis of the issues in the case based on the work that Sidley did, and Sidley's impressions and evaluation of the issues relating to potential defense strategies. (*Id.* ¶ 15.) It is paradigmatic attorney work product. Fed. R. Civ. P. 26(b)(3)(A); *United States v. Adlman*, 134 F.3d 1194, 1198 (2d Cir. 1994) (materials prepared "'because of' existing or expected litigation" protected by work product doctrine). Plaintiffs, however, argue that this Court's January 20, 2011 Memorandum and Order, and Judge Cogan's December 8, 2011 Order, establish that the work product doctrine "does not apply to documents prepared by the Ministry, because it is a non-party." (Mot. at 3.) That argument is an incomplete statement of this Court's holding as to the Ministry report that NEPG objected to producing, which was based on the Court's finding that the document was not prepared "by *or for* a party, or by his representative." (1/20/11 Order at 4, DE 424 (emphasis added.)) This Court considered the Ministry report to be a document prepared by a non-party for another non-party, whereas the Sidley memo, on its face, shows that it was prepared for Defendants. Further, the memo was prepared by lawyers who, at the time, were acting as counsel to Defendants. That the Ministry and the Chamber also received the memo does not diminish its status as protected work product, because the Chamber is a party to a written joint defense agreement with Defendants that predates the memo, and the Ministry subscribed orally to that agreement.[1] As Judge Cogan recognized, the Chamber and the Ministry share a common interest with Defendants such that neither is likely to disclose attorney work product to Plaintiffs. (12/8/11 Order at 6-7, DE 449.)

---

[1] The common interest rule can apply to a non-litigant, and a non-litigant can be party to a joint defense agreement. *See Am. Eagle Outfitters v. Payless Shoe Source, Inc.*, No. CV 07-1675, 2009 WL 3786210, at*2 (E.D.N.Y. Nov. 12, 2009).



ORRICK

The Honorable James Orenstein
February 9, 2012
Page 3

Plaintiffs misread Judge Cogan's holding with respect to the Ministry report. Although Judge Cogan stated that this Court "rightly rejected" NEPG's argument that the Ministry report is work product because it was prepared for a party, Judge Cogan's ruling was based dispositively on this Court's finding that the Ministry report was not, in fact, prepared for a party – Judge Cogan did not hold that if the report had been prepared for NEPG, rather than prepared for the Chamber and simply sent to NEPG, it would fall outside the definition of work product.

Plaintiffs' argument that the Sidley memo "is the only source of information" about the authenticity and admissibility of a particular document that Aland produced is a red herring. (Mot. at 2.) That document itself contains information that can be used to determine its authenticity and admissibility and, in any event, Aland will not object to its admissibility into evidence at trial.

### The Sidley Memo Also Is Protected By The Attorney-Client Privilege and As A Joint Defense Communication

An attorney-client relationship is formed based "upon the client's reasonable belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice. No special formality is required to demonstrate the establishment of the relationship." *Protostorm, LLC v. Antonelli, Terry, Stout & Kraus, LLP*, No. 08-CV-931, 2011 WL 5975896, at *10 (E.D.N.Y. Nov. 29, 2011), *quoting Merck Eprova AG v. Prothera, Inc.*, 670 F. Supp. 2d 201, 210 (S.D.N.Y. 2009) (citations omitted). The facts set forth above and in the declaration submitted by Wang Qiang leave no doubt that Aland reasonably believed that it was consulting Sidley for legal advice in the time period up to May 20, 2005, and that it believed that its communications with Sidley were and would remain confidential. Thus, the attorney-client privilege protects the Sidley memo from disclosure, and the joint defense agreement and common interest rule preserves the privilege even though the Chamber and the Ministry received the memo.[2]

Even if the Court were to find no attorney-client relationship between Sidley and Aland, because there unquestionably was an attorney-client relationship between Sidley and the Chamber, and because the Chamber, the Ministry and Defendants had a common legal interest (which, as explained above, was documented by a joint defense agreement among the Chamber and Defendants, to which the Ministry orally subscribed), the common interest rule preserves the privileged nature of the Sidley memo even though it was shared with Defendants and the Ministry. *See United States v. Schwimmer*, 892 F.2d 237, 243-44 (2d Cir. 1989); *see also Fox News Network, LLC v. U.S. Dep't of Treasury*, 739 F. Supp. 2d 515, 563 (S.D.N.Y. 2010).

---

[2] Although Plaintiffs contend that they were unaware until now of an attorney-client relationship between Sidley and Defendants, the very statement that they quote from Wang Qiang's deposition transcript shows otherwise. Mr. Wang testified that Sidley was instructed to "make an analysis of the case to the Chamber of Commerce and to the various – *and the various defendants.*" (Wang Qiang Dep. Tr. at 91 (emphasis added).)



ORRICK

The Honorable James Orenstein
February 9, 2012
Page 4

Respectfully submitted,

Richard S. Goldstein

Attachments

cc:     Counsel of Record

A-683

# EXHIBIT B

**A-684**

TRANSLATION

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE**<br>**VITAMIN C ANTITRUST LITIGATION**<br><br>This Document Relates To:<br><br>*Animal Science Products, Inc., et al. v.*<br>*Hebei Welcome Pharmaceutical Co., Ltd., et*<br>*al.*, Case No. 1:05-CV-00453(BMC)(JO)<br>(E.D.N.Y.) | **MASTER FILE 1:06-MDL-1738**<br>**(BMC)(JO)**<br><br><br>**AFFIDAVIT OF QIAO HAILI**<br>**PURSUANT TO THE COURT**<br>**ORDER OF JULY 11, 2012** |

I, QIAO HAILI, hereby state as follows:

1.      I am a citizen of People's Republic of China and a retired officer of the China

Chamber of Commerce of Medicines and Health Products Importers & Exporters ("Chamber"),

where I held the position of Director of its Western Medicine Department from 1992 through

March 2007.  From October 1997 through my retirement I also served as Secretary General of

the Chamber's Vitamin C Sub-Committee, created at the direction of the Chinese government to

regulate and coordinate the export of vitamin C.  I reside in Beijing, China and submit this

affidavit pursuant to the Court's Order of July 11, 2012.

**Educational History and Employment Summary**

2.      Prior to 1992, I served as a mid-level officer in the People's Liberation Army

holding the rank of Vice Regimental Commander.  In July 1983, while still serving in the army, I

received a three year college degree in Chinese Literature from The Open University of China

(formerly the China Central Radio and TV University).

3.      In 1992, I retired from the army service and reported to China's Ministry of

Foreign Trade and Economic Cooperation ("MOFTEC" or the "Ministry") for a position with the

Government.  On May 1, 1992, the Ministry assigned me to work for the Chamber and appointed

me as the Vice Director of the Chamber's Second Coordination Department.  In 1993, following

the retirement of the Director of the Second Coordination Department, I became the highest level

officer at the Chamber responsible for industry coordination of pharmaceutical products and

medical equipment. The Second Coordination Department changed its named to Western

Medicine Department in 1995.  In 2004, the Department changed its name to Industry

Coordination Department and administered and coordinated export regulation of pharmaceutical

products (including vitamin C) and a few traditional Chinese medicines.  In 2006, the

Department was no longer responsible for administering export regulation of Chinese traditional

medicines and changed its name back to Western Medicine Department.

4.      In 1998, I was designated by the Ministry and appointed by the Chamber as

Director of the Chamber's Western Medicine Department.  In that capacity, I was responsible for

supervising and administering the industry coordination of pharmaceutical exports, including

vitamin C.  Until my retirement I was the highest level official at the Chamber responsible for

administering export regulation of vitamin C as well as other pharmaceutical products.  I

reported to the Chairman of the Chamber, who was appointed by the Ministry and who in turn

reported to the Ministry.

**The Chamber's Creation and Mission**

5.      The Chamber was established in May 1989 by the Chinese government as part of

an effort to reform its foreign trade regime.  Prior to that time, China's export trading was

controlled by a few designated state-owned import and export trading companies in accordance

**A-686**

TRANSLATION

with mandatory State trading plans designed to achieve economic objectives set by the central government.

6.       In the 1980's, China decided to open foreign trading rights to all categories of companies greatly increasing the number of companies engaged in foreign trade transactions, and companies began to engage in aggressive forms of competition with each other without appreciation of the adverse consequences of their conduct on both industries and China's economy.  Frequently, the Chinese companies raced to expand their production capacity, competed with each other in relatively small markets for greater market share and more customers by cutting prices, regardless of the industry interest.  Perceiving that this would endanger Chinese domestic industries' overall profitability and sustainable growth, the Chinese government as part of the foreign trade reform created various chambers to oversee and regulate its industries' export activities so that they would act in unison when competing with foreign companies.  The Government transferred some former government officials to the chambers' staffs and vested the chambers with regulatory authority.

7.       A number of MOFTEC regulations formalized this structure and re-enforced the Chinese government's direct control and supervision of our activities on its behalf.  Thus, for example, a 1991 MOFTEC regulation declared that MOFTEC was in charge of regulating the operations of the foreign trade and economic chambers (Art. 2), directed that chambers established with government regulatory functions had to implement MOFTEC's rules (Art. 14), and ordered that all foreign trade and social organizations had to accept the daily supervision and inspection of MOFTEC (Art. 19).  This regulation, entitled "Measures for Administration over Foreign Trade and Economic Social Organizations" (February 6, 1991), is attached as Exhibit 1.

3

**A-687**

TRANSLATION

It was in place throughout my period of employment and governed my activities.  As such, I am personally familiar with its provisions.

8.      A 1994 MOFTEC regulation directed that chamber staff be drawn primarily from the chamber's members and government authorities (Art. III-8), but top management was to be "recommended" by MOFTEC (Art. IV-13).  MOFTEC's "recommendations" were in effect the same as directives since the Ministry would designate only one person who was invariably "approved."  This regulation further mandated that chamber employee compensation and salary be implemented under state regulations under the control and supervision of MOFTEC's Personnel Department, which was to verify and approve the total salary of the Chamber (Art. V-16, 17).  A copy of this regulation, entitled "Notice of Ministry of Foreign Trade and Economic Cooperation regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters," dated September 23, 1994, Wai Jing Mao Ren Fa No. 540, is attached as Exhibit 2.  It, too, was in place when I joined the Chamber, was in effect throughout my period of employment governing my activities while I was at the Chamber, and I am personally familiar with its provisions.

9.      The Chairman and Vice Chairman of the Chamber, to whom I reported, were appointed by MOFTEC.  We were all dependent upon MOFTEC for the approval of our salary and compensation, and we all directly reported to, and received instruction from the Ministry on a regular basis.  Effectively, the top management of the Chamber served at the Ministry's pleasure and were subject to dismissal if it was dissatisfied with our performance.  The Ministry was the highest level of Chinese government administrative authority for foreign trade.

10.     While I have a general awareness that many chambers were supervising many products on behalf of the Chinese Government under this general framework, my specific

4

personal knowledge of regulation is mainly confined to regulation by the China Chamber of

Commerce of Medicines and Health Products Importers & Exporters, and the matters set forth in

this affidavit are based on my personal knowledge of that Chamber's regulation of vitamin C.

11.      Over the period of time while I was at the Chamber, the State Council and

MOFTEC promulgated a variety of regulations under which we were delegated authority to

regulate the foreign trade of our members in order to achieve the Chinese government's

economic goals.  In addition to the written directives and regulations I will discuss below, my

Chamber colleagues and I also received from Ministry officials on a regular basis oral

instructions and directives on specific issues and matters.

**Establishment of Vitamin C Regulation and Vitamin C Sub-Committee's Formation**

12.      Since at least the 1990's, China's vitamin C industry (as an industry of great

importance to China's national economy) has been under direct regulation and coordination,

mandated by the Chinese government, with authority for such regulation directly vested with the

Chamber pursuant to governmental regulation.

13.      In 1992, when I joined the Chamber, vitamin C was as one of 38 products

designated as subject to export quota administration because of its important position in China's

export, with administrative responsibility assigned to MOFTEC and its local subordinate

regulatory agencies.  *See* MOFTEC, Interim Regulation of Export Goods, Order. No. 4,

December 29, 1992, attached as <u>Exhibit 3</u>.  Under section 4 of that regulation, with which I was

personally familiar, such exports were "uniformly regulated and coordinated by the respective

Import and Export Chambers of Commerce."  Companies engaged in the producing and selling

of these products were required to join the relevant Chambers, and the Chambers were required

to adopt "specific coordination and regulation methods," which were to be "strictly implemented

after discussion and approval by the member meeting."  Pursuant to this general delegation of authority, the Chamber regulated and coordinated the efforts of the Chinese vitamin C industry and I directly participated in this regulation.

14.     In 1996, the Ministry issued a regulation, providing that export enterprises could not export at lower than "normal prices," defined as cost plus a reasonable profit.  This regulation provided that exporters had to follow the coordination of the chambers, and as such directly governed the performance of my duties.  It further declared that failure to comply would be subject to strict penalties including fines or loss of the right to export.  A copy of this regulation, entitled "Interim Regulations of the Ministry of Foreign Trade and Economic Cooperation on Punishment for Conduct of Exporting at Lower-than-Normal Price" (March 20, 1996), is attached as <u>Exhibit 4</u>.

15.     In 1996, the Ministry issued a report to the Chinese State Council, distributed to the Chamber and received by me in the regular course of my business. That report was partly based on a report of mine to the Ministry about the issues in the vitamin C industry, which I drafted and submitted during the regular course of business at the Chamber.  The Ministry reported to the State Council its dissatisfaction with the activities of Chinese vitamin C companies in export and the dangers that low prices posed to Chinese national economic interests.  *See* Wu Yi, MOFTEC's Report to State Council Concerning Current Vitamin C Export Issues and Suggestions for Solutions, [1996] Waijingmao Guanfa No. 185, p.3, attached as <u>Exhibit 5</u>.

16.     In 1997, Vice Premier Li Lanqing directed MOFTEC to address the issues identified in the 1996 MOFTEC report through further regulation and the creation of a Chamber Sub-Committee to coordinate vitamin C exports.  Soon thereafter a number of regulations were

TRANSLATION

promulgated by the Ministry to further tighten the direct authority, control and coordination of

chambers generally pursuant to their government-delegated authority, and to improve the

authority and coordination of the China Chamber of Commerce of Medicines and Health

Products Importers & Exports in respect of vitamin C in particular.  These regulations were sent

to me in the regular course of the Chamber's business to follow and implement.

17.     Specifically, in 1997, the Ministry and the State Drug Administration, acting

jointly, then promulgated a regulation "related to strengthening the Chamber's administration of

vitamin C production and export."  As the officer administering vitamin C industry regulations, I

participated in the Ministry's drafting of this regulation.  This measure, which governed my daily

activities, included mandates to strictly control vitamin C production scale.  It imposed

qualification requirements for conducting vitamin C exports, limiting vitamin C exporting rights

to 30 companies.  The regulation also specified the standard for allocating export quotas, and

required the Chamber to strengthen the coordination of vitamin C exports.  *See* MOFTEC &

State Drug Administration, Notice Relating to Strengthening the Administration of Vitamin C

Production and Export, (1997) MOFTEC Guan Fa No. 664 (November 27, 1997), attached as

Exhibit 6.  This regulation, with which I am personally familiar, was in effect in November and

December of 2001.

18.     Article 6 of this Ministry regulation directed the Chamber to establish a "Vitamin

C Export Coordination Group," which we would refer to as the Vitamin C Sub-Committee., for

the purpose of conducting the industry coordination of vitamin C exports.  The Chamber was

directed to formulate specific coordination methods and report these back to the Ministry.  Under

Article 7, the vitamin C manufacturers were required to strictly implement industry coordination

measures under the Chamber's supervision, with penalties imposed for any attempts at

circumvention.  Under Article 8, the government agencies responsible for issuing export licenses were required to strictly review export contracts and issue export licenses only in accordance with the government mandated volume and price as coordinated and set by the Chamber. Companies who failed to comply with the industry coordination were subject to sanctions, including export quota reduction or even revocation of exporting right. (See Article 10).

19.    As noted above, I became Secretary General of the Chamber's Vitamin C Sub-Committee, and as such I had direct responsibility to administer these directives and mandates from the Ministry.  Early on, even before formal promulgation of the 1997 regulation, I was informed by the Ministry of the new Sub-Committee it would require the Chamber to create.  I was the person at the Chamber who was in charge of that Sub-Committee's formation and I prepared and submitted a request to the Ministry to formally establish the Sub-Committee as per the Ministry's directive.  In March 1998, the Ministry formally approved that request, and that approval document was delivered to me.  "Approval for Establishing VC Sub-Committee of China Chamber of Commerce of Medicines & Health Products Importers & Exporters"  (March 23, 1998) (the "1998 Approval Directive"), attached as Exhibit 7.

20.    Under this Ministry directive the Sub-Committee became a branch of the Chamber and subject to the Chamber's leadership and administration.  Its personnel were drawn from the Chamber and its members were vitamin C exporting companies who were members of the Chamber. The Sub-Committee's major responsibility and regulatory function, also set out in the Ministry's approval, was to coordinate the vitamin C export market, price and customers of China.  Its stated mission was both to improve the competitiveness of the Chinese vitamin C industry in the global market and to promote the healthy development of China's vitamin C export through industry coordination.

8

21.    The 1998 Approval Directive remained in effect throughout my employment at the Chamber and was never revoked.  As such, throughout this period the Sub-Committee remained responsible for coordinating vitamin C exports as directed by the Ministry.  Although the designated mechanisms of regulation given to the Sub-Committee by the Ministry as tools to discharge this delegated responsibility were to change and evolve in response to China's assumption of membership in the global market, the Chamber's Government-delegated responsibility to coordinate vitamin C exports through the Sub-Committee never changed and there were always mechanisms through which we could effect that control.

22.    In 1997, with guidance of the Ministry, I drafted a Charter to govern the activities of the Sub-Committee.  The document which resulted, the Charter of Vitamin C Sub-Committee of China Chamber of Commerce of Medicines and Health Products Importers & Exporters, (October 11, 1997), (the "1997 Charter"), attached as Exhibit 8,  was designed by me to set forth the plenary authority of the Chamber over its members, and the requirement that they participate in the Sub-Committee's activities and follow the directives of the Chamber.  The Charter was one of the documents submitted to the Ministry for request for approval of the establishment of the Sub-Committee.

23.    The 1997 Charter, which was in effect in November and December 2001 and governed the Sub-Committee's functions at that time, states:

- "The Sub-Committee has the following tenets:  implementing and executing the state policies and regulations on foreign trade; maintaining orderly export of vitamin C products; … and serving for an orderly and highly efficient development of vitamin C foreign trade on the basis of unified coordination." *Id.,* Art. 3.

9

- "The Sub-Committee performs coordination, direction … and supervision & inspection functions over its members." *Id.,* Art. 5.

- "Only the members of the Sub-Committee have the right to export vitamin C and are simultaneously qualified to have vitamin C export quota." *Id.,* Art. 12.

- Members were required to "comply with various directives, policies and regulations with respect to foreign trade, comply with the Charter and regulations of Vitamin C Sub-Committee and implement Sub-Committee's resolution" and "strictly execute export coordinated price *set by the Chamber*…" *Id.,* Art. 15.

- "Any violation of the Charter of the Sub-Committee, failure to implement any resolution or regulation of the Sub-Committee and failure to perform any member's obligation shall be punished by the Sub-Committee by means of, according to gravity of circumstances, warning, open criticism and even revocation of its membership.  The Sub-Committee will suggest to the competent government department, through the Chamber, to suspend and even cancel the vitamin C export right of such violating member." *Id.*, Art. 16.

24.     Pursuant to the mandate of the 1997 Charter, all four Chinese vitamin C manufacturers – Northeast Pharmaceutical Group Co., Ltd. ("NEPG"), Hebei Welcome Pharmaceutical Co., Ltd. ("Hebei"), Weisheng Pharmaceutical Co. Ltd. ("Weisheng") and Jiangsu Jiangshan Pharmaceutical Co., Ltd. ("Jiangsu") – became Sub-Committee members, and all four of these companies remained Sub-Committee members throughout the period of time of my employment at the Chamber and participated in the Sub-Committee meetings that I called. None of the other companies named as defendants in this case (China Pharmaceutical Group Ltd., Shijiazhuang Pharmaceutical (USA) Inc., North China Pharmaceutical Group Corporation,

North China Pharmaceutical Co., Ltd. and North China Pharmaceutical Group Import & Export

Trade Co., Ltd.) ever participated in any of the Government-mandated industry coordination

meetings conducted under the Chamber's supervision and direction.

**Operation of the Sub-Committee**

25.     As part of my responsibilities at the Chamber, and under the authority delegated

by the Ministry, I served as the Secretary General of the Sub-Committee throughout my tenure at

the Chamber. I also served as the Vice President from 1998 through 2001 and President since

2002.  (Prior to 2002, a Vice Chairman of the Chamber served as the President.) As the

authorized representative of the Chamber, I was required to administer industry coordination

based on market changes.  I organized and presided over meetings with Chinese vitamin C

manufacturers, sometimes calling them myself and on other occasions directing that a member

call and organize them.  I caused notices to be sent to Sub-Committee members of scheduled

meetings (usually at the Chamber's offices), identified export issues to be addressed by industry

coordination, and required members to discuss and to agree upon appropriate solutions at these

meetings.

26.     Whether or not the members of the Sub-Committee agreed with the Chamber's

agendas, they were all required to participate in this process and to reach agreement on industry

coordination measures.  These measures included developing export quota amounts for

MOFTEC approval and insertion in its annual export plan which all exporters were required to

follow, and the periodic setting of minimum prices which all exporters were required to charge. I

regularly reported the Sub-Committee's administration of industry coordination to the Ministry

for its approval and review and oversaw the Chamber's efforts at monitoring compliance.

**A-695**

TRANSLATION

27.     This overall process of mandated meetings, discussion and coordination was conducted in accordance with an overall policy directive of the Chinese Government; and we regularly reminded the Chinese vitamin C industry of this requirement on many occasions.  For example, the Chairman of the Chamber at a December 4, 2000 Sub-Committee meeting which I chaired stated to the exporting manufacturers that they needed to be united together and to act in unison to face foreign parties.

28.     In a meeting held by the Chamber on April 13, 2001, a MOFTEC officer in my presence reminded the vitamin C manufacturers that their product had been strictly regulated since 1997, and reminded them of the importance of the Chamber in this process.  The officer further told them that the Sub-Committee was required to act proactively and that the industry had to obey this coordination and the industry rules.  A few days later, I issued a notice again telling all manufacturers of their responsibility to adhere to the price set by the Chamber and that non-qualifying exports would result in the cancellation of quotas.

29.     On many occasions we were told by MOFTEC, and we reminded the vitamin C producers, of the importance of exercising self discipline.  Basically this meant that members of an industry are required to act in ways consistent with the economic interests of the State, and are required to discipline their activities so as to achieve the economic objectives directed by the Government.  The Chamber, and the Vitamin C Sub-Committee which I chaired, were the Chinese government-delegated organizations responsible for coordinating and achieving this self-discipline.

30.     As employees beholden to the Government for our position and approval of salaries, and reporting to the Ministry, we at the Chamber were responsible to direct and regulate our members and MOFTEC delegated us the authority to do so.  As industries with significant

12

**A-696**

TRANSLATION

government ownership, with their management from the Communist Party and government agencies, our members were expected and required to attend our meetings, and to follow our direction.

**November and December 2001 Chamber Meetings**

31.     In late 2001 the Chamber called and I presided over Vitamin C Sub-Committee coordination meetings held under the Ministry's direct order to address potential foreign antidumping investigations.  These meetings were prompted by warnings from the Chinese Embassies in Brussels and Berlin about a threatened antidumping investigation against Chinese vitamin C exports, and directions by the Ministry to us at the Chamber to call a Sub-Committee meeting and develop a coordinated plan to address the situation.

32.     Specifically, it was part of our normal business to receive communications and instructions from the Ministry regarding economic policy.  In September 2001, the Ministry sent to the Chamber a Chinese embassy report from Brussels warning of a possible dumping suit.  A copy of this report, which I received in the normal course of business, is attached as Exhibit 9.

33.     Then, in early November, the Ministry sent a situation report from China's embassy in Berlin to the Chamber's liaison officer, with the written directive that we convene a meeting of the Chinese Vitamin C producers to address the situation.[1]  This report and that directive were given to me by the Chamber's liaison officer in the normal course of our business. A copy is attached as Exhibit 10.  Following that directive, I convened a meeting of the vitamin C manufacturers.

---

[1] There is a handwritten note on this situation report from Xiao Xia, an official of MOFTEC's Fair Trade Bureau, to Vice Liaison Officer Guan stating "Is there a need to convene a meeting to analyze our future export situation?" which was the Ministry's typical way of directing us to take action and convene a meeting.

34.     This meeting, over which I presided as Secretary General of the Sub-Committee, was held at the Chamber's offices on November 16, 2001.  In attendance were the representatives of the four vitamin C manufacturers: NEPG, Hebei, Weisheng and Jiangsu.  Also in attendance were the President of the Chamber, the Vice Chairman of the Chamber and the Liaison Director of the Chamber.

35.     The meeting began with reminders from me and the Chairman of the Chamber of the principles under which the Sub-Committee operated and their obligation to follow the direction of the Chamber. I summarized the threats of anti-dumping proceedings as had been reported to us by MOFTEC, as well as MOFTEC's direction that the Chamber address the situation.  I also advised them that industry coordination enforcement regulations were going to change, and that the Chamber would be empowered to review contracts and would refuse to give its approval to any export contract which did not comply with the coordination measures the Chamber would require them to adopt.  This is the so-called "Verification & Chop."

36.     Under my supervision and at my direction there was then extended discussion among the manufacturers to reach agreement to increase the minimum export coordination price to $3/kg from $2.8 and to export only at certain allocated volumes.  Because there was some disagreement among the manufacturers as to volumes that could be exported,  I told them the volumes they would be required to accept, exercising the power I had under the existing 1997 regulations, the ongoing 1998 Approval Directive, and the verification & chop powers in preparation.  At the conclusion of the discussion,  and as directed by the Chamber, the attendees by hand-voting, unanimously passed the required resolution, and I so reported to MOFTEC.

37.     In December 2001, I held another meeting with the manufacturers regarding the coordination measures agreed to at the November 2001 meeting.  I reviewed the contemplated

changes to the form of regulation, told them that industry coordination would continue to be required, and that I would not stamp approval on any contracts which did not comply.

**Changes in Mechanisms due to WTO**

38.     China's accession to the World Trade Organization ("WTO") in December 2001 led to changes in the organizational format of the Vitamin C Sub-Committee and the mechanisms utilized by the Chamber in its review and coordination of vitamin C exports.  But this did not change the delegation of responsibility of the Sub-Committee members to exercise self-discipline under the direction and auspices of the Chamber as had been formally delegated in 1998 and which remained unchanged.  As matter of practical fact and effect it did not change the fact that the Chinese vitamin C industry had to attend Sub-Committee meetings which the Chamber called, follow our agendas for discussion, and had to reach agreement by consensus at those meetings on self discipline and coordination.  The Chamber continued to have power and the duty, delegated by the government, to enforce these agreements.

39.     To explain, prior to China's accession to the WTO, Chinese vitamin C exports were subject to a quota licensing system administered by the State where each exporter was required to apply for an export license for each of its export transactions.  Only companies identified in the 1997 MOFTEC & Customs Notice were permitted to engage in Vitamin C exporting.  By the end of 2001, 21 companies remained in the vitamin C export business, of which four were manufacturers and the remainder were trading companies. To receive a vitamin C export license, an exporter had to observe volume limitations set by the Ministry and minimum price restrictions set through industry coordination mandated, directed and administered by the Sub-Committee.  A local or central MOFTEC export licensing office would issue an export license only when the export price and quantity stated in the export contract satisfied the volume

15

**A-699**

TRANSLATION

and price requirements.  The Chinese Government, through its Customs, was directly involved in the administration of vitamin C exports.  *See* 1997 MOFTEC & Customs Notice, discussed above.

40.     In March 2002, as part of its accession to the WTO, the 1997 regulation was repealed. List of the Fourth Branch of Departmental Decisions Abolished by the Ministry of Foreign Trade and Economic Cooperation, Order No. 24 (March 21, 2002) item 11, attached as Exhibit 11.  In its place, the Ministry instituted a new mechanism "in order to accommodate the new situations since China's entry into the WTO, *maintain* the order of market competition, [and] *promote industry self-discipline.*"  Notice Issued by the Ministry of Foreign Trade and Economic Cooperation and the General Administration of Customs for the Adjustment of the Catalogue of Products Subject to Price Review by Customs, MOFTEC MAO FA [2002] No. 187 (March 29, 2002) (the "2002 Regulation"), attached as Exhibit 12.  This regulation directly governed the performance of my duties and as such I am personally familiar with its contents.

41.     In this regulation, we were instructed that the new mechanism, known as "verification and chop," would be "conducive for the chambers to coordinate export price and industry self discipline."  Specifically, all contracts covering export of vitamin C by anyone, regardless whether or not they were made by a Sub-committee member, would now be administered by the Chamber under authority delegated by the Government and before being submitted to Customs.  Instead, the contracts were to be submitted to me and my staff for review to ensure they were consistent with the self discipline agreements reached under our supervision and direction.  If we verified that the contracts were consistent with those mandated agreements, we would affix the Chamber's "chop," and the shipment could proceed.  The Chinese Customs

16

# A-700

TRANSLATION

would not review the contracts, but they would look for our "chop": if our chop was not on the contract, Customs would not accept the application for export and the export would not proceed.

42.     Although the Verification & Chop regulation explicitly mentioned only review of price, our mandate to effect general coordination of the vitamin C export business under the 1998 Approval Directive continued.  As such, the Chamber decided to use this review tool to review both prices and quantities and for certain periods of time would set export quotas applicable to products manufactured by China's vitamin C producers.

43.     In 2003, the Ministry and Customs issued a more detailed regulation.  *See* Announcement of Ministry of Commerce of the People's Republic of China and General Administration of Customs of the People's Republic of China, No. 36, 2003 (November 29, 2003) (the "2003 Regulation"), attached as Exhibit 13. This Announcement expressly detailed that all vitamin C exporters were to submit their contracts to the Chamber, and that we would verify them based on the "industry agreements" adopted under our direction.  It specifically provided, consistent with the practice that we had already adopted, that the Chamber would not affix its chop to non-conforming contracts.

44.     A new Sub-Committee Charter drafted by me was adopted June 7, 2002, and contained several statements to be consistent with the changes in the vitamin C regulation provisions.  However, the new Charter continued the fundamental principle that the Sub-Committee was required to accept "guidance and supervision from the Chamber." (Art. 4).  The Sub-Committee's mandate to coordinate the vitamin C market continued under the 1998 Approval Directive; and consistent with that directive, the new Charter directed that the Sub-Committee "shall coordinate and guide vitamin C import and export business activities, promote self-discipline in the industry, maintain the normal order for vitamin C import and export

17

operations, and protect the interests of the state, the industry and its members." (Art. 8).

Members continued to be obliged to accept the coordination of the Sub-Committee (Art. 17).

45.     With these acknowledgments, and the power over the verification and chop delegated to us by the Government, the Chamber as a practical matter retained the ability to direct and coordinate agreements, to threaten to withhold its chop unless satisfactory agreements were reached, and retained the power to prohibit exports that were inconsistent with the agreements reached under our supervision.  Although the new Charter provided that the Sub-Committee became a "self-disciplinary industry organization jointly established on a voluntary basis" (Art. 3), as a practical matter, no manufacturer could abandon participation in the Sub-Committee or the meetings that the Chamber called.

46.     This is because those meetings, under the Chamber's guidance and direction, were to establish the prices and volumes which would meet with our approval and chop.  Anyone not participating in those meetings was still subject to verification and chop monitoring to ensure compliance with the Chamber's coordination decisions.  ("For V&C applications made by non-member exporters, the Chambers shall give them the same treatment as to member exporters." 2003 Regulation, Exhibit 2, item F.)  Those trading companies which did not join the Sub-Committee nevertheless had their export volumes charged against the export quotas of the manufacturer who sold them the product, and their contracts were nevertheless subject to our price review.  As such, the trading companies' export sales remained under the control of the Chamber.

47.     My colleagues and I at the Chamber continued to be employed and compensated under MOFTEC's supervision, and were now delegated new "verification and approval" powers which kept us a position where we could compel all exporters to comply with industry

18

**A-702**

TRANSLATION

coordination directions resulting from the self discipline mandated by the government.  Exports of vitamin C, while no longer under the direct administration of the Chinese Government, continued to be subject to self-discipline under the direction and coordination of the Chamber, subject to the verification and chop enforcement powers delegated to us by the Chinese government.  We continued the regulation of vitamin C exports, which remained subject to the verification and chop system.

48.     I am aware that the Ministry and Chinese Customs' 2002 verification and chop regulation contains a provision, which provides: "[g]iven the drastically changing international market, the customs and chambers may suspend export price review for certain products with the approvals of the general members' meetings of the sub-chamber (coordination group) and filing with [Customs and MOFTEC]."  However, this provision did not give the Sub-Committee the unilateral power to suspend the verification and chop system because as clearly stated in the Sub-Committee's Charter, the Sub-Committee was supervised and guided by the Chamber.  *See* Sub-Committee's 2002 Charter Article 5.  The manufacturers did not have the authority to discard the verification and chop system and during my tenure as the Secretary General of the Sub-Committee, there was never any discussion about even the possibility of discarding the verification and chop system with respect to vitamin C exports.  Hypothetically, if any manufacturer had ever proposed abolishing the verification and chop system concerning vitamin C exports, I would report such proposal to the Ministry as part of my responsibilities and it would be a matter for the Ministry's review and determination.  The manufacturers had no authority to effectuate such a proposal on their own. Indeed in the 2003 regulation the verification & chop regulation was forcefully re-promulgated by the Ministry.

19

49.     The verification and chop system provided the Chamber with an effective tool to enforce industry self discipline and coordination, and the Chamber on a website page added in mid-2002 so publicly reported, stating "Beginning on May 1, 2002, vitamin C was listed as a product requiring price reviews by China Customs and a seal of pre-approval by the China Chamber of Commerce, which has provided powerful oversight and safeguards for the implementation of self-discipline agreements among domestic manufacturers." The webpage, added several months after the November-December 2001 meetings, also contained statements reflecting the Chamber's sensitivity to China's new WTO obligations, but clearly described the work of the Chamber's vitamin C Sub-Committee and the verification & chop mechanism.

50.     Under verification and chop, as before, China's vitamin C manufacturers did not have the option of ignoring or not participating in the self-discipline process itself or the duty to coordinate which it entailed, nor could anyone familiar with the Chinese Government's self-discipline policy, the organization of the Chamber or the delegation of verification and chop authority within that policy, reasonably draw any such conclusion. The Government's Ministries themselves did not determine specific prices or quantities, and the Government itself did not intervene in those discussions. But the Government created the Chamber, designated its officials, delegated us powers, and reviewed our actions and required the Chamber to coordinate. Industry members, subject to the ongoing self discipline mandate and the verification & chop oversight tool given to us by the government, had to attend the meetings that were called, and they had to discuss and reach agreement at those meetings under our supervision.

51.     The Chamber was never relieved by the Government of its coordination responsibilities, the Sub-Committee's authorizing mandate continued in effect, and we continued our process of mandatory coordination as before. Throughout my entire tenure at the Chamber, I

have warned the manufacturers, on numerous occasions, that I would exercise the Chamber's powers not to provide the chop on their export contracts unless they were compliant, and on several occasions I did exercise these powers.

52.     The meeting held in late 2001 in response to threatened dumping action, which I have described above, was one such example.

53.     During mid-2002 through early 2003, each of the manufacturers on occasion presented contracts which would exceed their quota. In such circumstances my staff denied them a chop and forced them to wait until the following month.

54.     In late 2003, after a period of significant price decline subsequent to the SARS epidemic where the vitamin C export price sharply dropped from an average of $9.20 in the summer of 2003 to around $4 in three months, I called several meetings and ultimately at my direction the manufacturers agreed to limit production during the first half of 2004.

55.     In 2004, I told the companies that a mechanism had to be found to limit exports and thereafter I directed that they implement a proposal to create and stock a warehouse in Shanghai.

56.     Subsequently, to compel Weisheng to comply with the coordinated shutdown schedule, I delayed stamping on its export contracts with the Chamber's chop.

57.     In December 2005, I presided over a Subcommittee meeting where I required vitamin C manufacturers to implement the industry coordination measures of suspending production in April and May of 2006.  To ensure the implementation of the measures, I warned manufacturers that if any company quoted a lower price than the minimum export price or did not stop production as mandated, the Chamber would not issue export verification approvals to that company until it became compliant.

**A-705**

TRANSLATION

58.     In June of 2006, while the Chamber acceded to requests from NEPG to postpone its production suspension until July, I made a telephone call to Du Chengxiang of NEPG to force NEPG to avoid further delay.  I reminded Mr. Du of NEPG's obligation to follow industry coordination and told him that if there was any continued delay the Chamber would impose a series of sanctions on NEPG, including denying verification approval.

59.     This is not to say that the administration of mandated coordination and self-discipline was perfect.  The Chamber could not force self discipline in ways contrary to market realities or the basic laws of supply and demand.  At some meetings agreement was possible, while at others as matter of overriding economics it was not.  Often these matters required extended discussion and I listened to and considered points made by the industry before formulating decisions.  In some circumstances, the Chamber later had to consider modifying the coordination measures to address the market conditions with more practical measures in light of economic circumstances.

60.     While I enforced the coordination measures within the bounds of the Chamber's authority, as with any other regulatory measures there was no guarantee that circumvention would not be attempted. While all contracts were inspected before affixing our chop and we refused to affix our chop to non-conforming contracts, our ability to investigate whether the export price was compliant beyond the face of the contracts was limited.

61.     In addition, the Chamber had no control over pricing once the product left China. In a falling market, buyers and brokers were able to obtain post chop price concessions and rebates which were beyond the ability of the Chamber to stop. Sometimes this came to our attention via requests from China's Foreign Exchange Authority to give a statement to it so that proceeds collections in foreign currency which were less than contract prices could be remitted.

**A-706**

TRANSLATION

There were occasions where we refused to give such a statement, such as in mid-2003, and this in turn presented exporters with payment delays and risks of penalties under exchange procedures; but customers and brokers continued to exert their power to exact price concessions from Chinese manufacturers.

62.     Also, there were several instances of basic changes in market dynamics, such as the withdrawal of vitamin C producers in other countries, the SARS outbreak in late 2002 through the middle of 2003, and a second epidemic in late 2003-2004, where prices rose significantly on their own.

63.     By way of example regarding the imperfections in our administration and the need to respond to basic economic situations, at the November and December 2001 meetings discussed above, the manufacturers under our mandate reached self-discipline agreements on minimum export prices and export volume as the Chamber required.  At that time, these agreements had been expected to be implemented in early 2002, but the government did not actually promulgate the 2002 verification and chop regulation until May.  At that time, I received a report from the Customs showing that there had been an excess of more than 1,000 tons in the vitamin C export since January 1, 2002.  Because the market demand and supply were out of balance, the companies were unable to implement the agreement and they seized opportunities to make more sales when they could.  I devoted significant time and effort to investigate and determined who made the excessive export, criticized them in a Subcommittee meeting, and deducted from the excessive amount from their remaining annual export allocation.

64.     As another example, during the first SARS epidemic in late 2002-early 2003, vitamin C prices rose significantly.  However, as the vitamin C price increased, almost all Chinese manufacturers expanded their production capacity.  While the Chamber was authorized

**A-707**

TRANSLATION

to make recommendations to other Government agencies on new capacity additions by Chinese manufacturers, this was something the Chamber was given no authority to regulate. Consequently, in mid-2003, as the SARS outbreak subsided, there was excessive supply of vitamin C in the market and prices started falling.

65.    At this point the Chinese manufacturers started a "price war" by making great price cuts in order to secure more export sales, and it was anticipated that the price would fall continuously in the second half of the year.  In June 2003, I held a meeting with manufacturers and required manufacturers to develop industry coordination measures to stop the price war.  As I required, the manufacturers discussed market conditions and agreed to set a floor price of $9.20. However, that measure was simply unrealistic in light of the market conditions. As a result, in July 2003, I held another meeting with manufacturers and during that meeting the $9.20 price was cancelled.

66.    As the price continued to fall, I continued to invoke the self-discipline mechanism to search for a solution.  I called for and held another meeting in September 2003 to discuss industry coordination measures.  At my direction, manufacturers discussed potential measures including export volume and price restrictions, but neither appeared practical in view of economic circumstances and no solution was found at that meeting.  Finally, as I discussed above, in December 2003, I held another meeting again to address the industry coordination measure and the manufacturers agreed, at my direction, to suspend production in the first half of 2004. The other manufacturers subsequently complained that Weisheng failed to suspend production; but, as noted above, I was ultimately able to compel Weisheng to resume compliance.

24

TRANSLATION

67.      Sometimes self discipline was effective and sometimes it was not. However, whether the industry coordination measures adopted under our mandate were effective or not, the Chinese vitamin C manufacturers were required at all times to participate in industry coordination discussions, following the agenda the Chamber set.   There may have been circumstances where economic conditions negated the agreements we directed be made, but that does not mean they had a choice not to participate in the industry coordination process, or a choice not to reach agreements under my direction as dictated by economic conditions.

68.      I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

In witness whereof, I have executed this declaration on this 5 day of August 2012.


_____/s/_____
                        Qiao Haili

**A-709**

### Certificate of Accuracy

I, Jiangxiao Hou, am fluent in Chinese and English and certify that the attached translation which I have made is a true and correct translation of the original document.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 8, 2008.

# EXHIBIT 1

## A-711

[Translation]

MOFTEC Measures for Social Organizations

## Measures for Administration over Foreign Trade and Economic Social Organizations

Promulgation Date: February 26, 1991;  Effective Date: February 26, 1991; [tr.]

Issued By: Ministry of Foreign Trade and Economic Cooperation ("MOFTEC")

CHAPTER I     GENERAL PRINCIPLES

CHAPTER II    SCOPE AND CATEGORIES

CHAPTER III   ESTABLISHMENT AND CHANGE

CHAPTER IV    OPERATION GUIDANCE

CHAPTER V     DAILY MANAGEMENT

CHAPTER VI    SUPERVISION AND INSPECTION

CHAPTER VII   MISCELLANEOUS

### Chapter I     General Principles

Article 1     These Measures are formulated on the basis of the *Administrative Regulations for Social Organizations* issued by the State Council and relevant regulations with a view to protect the healthy development of foreign trade and economic social organizations and enhance their active role in China's foreign trade and economic affairs.

Article 2     Ministry of Foreign Trade and Economic Cooperation of the People's Republic of China (hereinafter "MOFTEC") shall be in charge of regulating the operation of foreign trade and economic chambers, associations, institutions, unions, research institutes, foundations, friendship organizations and promotion associations organized nationwide and across provinces, autonomous regions and municipalities directly under the central government within China.

**A-712**

Article 3    The administration by MOFTEC over the operation of various foreign trade and economic social organizations shall include examination and approval for their establishment, providing operation guidance, daily management, supervision and inspection.

Article 4    MOFTEC may directly administer or authorize relevant departments to administer the foreign trade and economic social organizations, as their establishment and nature, and standing may vary.

## Chapter II    Scope and Categories

Article 5    Foreign trade and economic social organizations refer to social organizations organized in the areas of foreign trade, foreign investment utilization, international economic and technological cooperation (including international project contracting and labor service cooperation), foreign economic and technological aid, as well as international freight forwarding.

Article 6    Foreign trade and economic social organizations include the following categories:

> a.    academic organizations engaging in the research of foreign trade and economy, international trade and international economic cooperation;

> b.    friendship organizations set up to develop foreign trade and economy and to strengthen the connection between domestic and foreign enterprises and businessmen;

> c.    all types of chamber of commerce and associations established for the purpose of coordinating and promoting China's foreign trade and economic developments;

> d.    other social organizations possessing industry specific or professional nature relating to foreign trade and economy.

## Chapter III    Establishment and Change

Article 7    The establishment of foreign trade and economic social organizations shall comply with the following principles:

2

a. The missions of foreign trade and economic social organizations shall comply with the Constitution, laws and regulations of the People's Republic of China and protect the unity of the nation, and shall not harm the interests of the state, society and group, nor the freedom and interests of other citizens and legal persons.

b. The establishment of foreign trade and economic social organizations must be conducive to the development of foreign trade and economy, the enhancement of the relationship between domestic and foreign enterprises and relevant organizations, and the order of foreign trade and economy.

c. foreign trade and economic social organizations across the nation, provinces, autonomous regions and municipalities directly under the central government shall be highly representative, and reflect the common will of the legal persons and citizens of the social organizations.

d. there shall not be any identical or similar social organizations within the administration of MOFTEC.

Article 8    The sponsors for the establishment of foreign trade and economic social organizations shall report to MOFTEC before sponsoring such establishment, and prepare relevant establishment documentation for MOFTEC to examine after adequate number of members from the business fields of such social organizations respond to the establishment.

Article 9    The following documentation is required for MOFTEC's examination and approval for the establishment of such organizations:

a. opinions of the sponsor and the report signed by the responsible person of the sponsors relating to the preparation of such social organizations;

b. draft articles of association of the social organizations which shall comply with the requirements of the *Administrative Regulations for Social Organizations*;

c. addresses of the operating offices or contact addresses;

3

**A-714**

Case 1:06-cv-01738-DGT-DO Document 76 Filed 08/22/2006 Page 5 of 33 Page ID #: 14216

    d.    names, ages, addresses, occupations and resumes of the responsible persons of the sponsors;

    e.    proposed members of the social organizations and their executed comments.

**Article 10**    Upon approval after examination, MOFTEC will issue a written document to the sponsor approving the establishment of the social organizations. The sponsors shall then apply for registration with the authority in charge of the registration of social organizations (the "Registration Authority"). No entity or individual may conduct activities in the name of social organizations without ratification and registration.

**Article 11**    The change of mission, name, legal representative or responsible person, or winding up of foreign trade and economic social organizations shall be examined and approved by MOFTEC, and such change or deregistration shall be registered with the Registration Authority.

## Chapter IV    Operation Guidance

**Article 12**    MOFTEC shall be in charge of guiding the operation of the ratified and registered foreign trade and economic social organizations.

**Article 13**    Operation guidance shall include:

    a.    to inform the development of foreign trade and economy and relevant policies and regulations;

    b.    to, periodically or otherwise, solicit working reports of such social organizations made by relevant responsible persons in accordance with the need and requests of foreign trade and economic social organizations;

    c.    to provide comments and proposals to the activities of social organizations according to the need of foreign trade and economic activities; and

    d.    to forward or distribute relevant documents relating to foreign trade and economy pursuant to relevant regulations.

**A-715**

Case 1:06-cr-01738-DGT-Document 467-7 Filed 08/09/22/2006 33 Page 6 of 3Page ID #: 14217

Article 14    Social organizations established with coordination and industry regulation functions as authorized by MOFTEC must implement the administrative rules and regulations relating to foreign trade and economy.

## Chapter V    Daily Management

Article 15    All types of foreign trade and economic social organizations must accept the daily management by MOFTEC or its authorized departments.

Article 16    Daily management shall include:

a.    to examine the establishment of permanent organs of social organizations and the personnel structure thereof;

b.    to examine the candidates of the leaders and internal personnel management systems of social organizations;

c.    to examine the budget and final account systems;

d.    to summarize, formulate and circulate the salary and benefit plans for permanent organs of social organizations;

e.    to organize voluntary blood donations, trees planting and such other social activities; and

f.    others matters.

Article 17    MOFTEC shall be directly responsible for the daily management of social organizations established with coordination and industry regulation functions.

Article 18    The daily management of social organizations without coordination and industry regulation functions and those established across provinces, autonomous regions and municipalities directly under the central government shall be the responsibilities of the sponsors authorized by MOFTEC or the competent authorities for foreign trade and economy in the cities where the permanent organs of such organizations are located. The relevant

**A-716**

Case 1:06-md-01738-DGT-DO Document 467-7 Filed 08/22/2008 Page 7 of 36 PageID #: 14218

authorities shall submit matters relating to daily management under its charge to MOFTEC for filing.

## Chapter VI   Supervision and Inspection

**Article 19**   The foreign trade and economic social organizations shall accept the supervision and inspection by the Registration Authority and MOFTEC or its authorized departments.

**Article 20**   Matters subject to supervision and inspection include:

    a.    whether the Constitution, laws and regulations are implemented;

    b.    whether the operations are conducted according to social organizations' mission and articles of association;

    c.    revenue and expenditure of funds; and

    d.    others.

**Article 21**   The following matters of foreign trade and economic social organizations shall be reported or submitted for filing to MOFTEC:

    a.    annual working plan and arrangements of major events;

    b.    meetings of representatives, general meetings of representatives or meetings of all members and other important meetings and activities;

    c.    annual budget and final accounting report;

    d.    statistics of personnel and salaries of permanent organs of social organizations; and

    e.    others matters.

**A-717**

Article 22    Authorized departments in charge of the daily management of foreign trade and economic social organizations shall strengthen the supervision and inspection of the social organizations and make regular reports to MOFTEC.

Article 23    MOFTEC has the right to order foreign trade and economic social organizations to correct its violations of Constitution, laws and regulations, and assist the relevant department to investigate and punish such violations.

## Chapter VII  Miscellaneous

Article 24    These Measures do not apply to foreign chambers of commerce established within the People's Republic of China.

Article 25    These Measures shall be interpreted by MOFTEC.

Article 26    These Measures shall take effect from the date of promulgation.

**A-718**

## CERTIFICATE OF AUTHENTICITY OF RECORDS

City of Beijing                                    )
People's Republic of China                         )

### STATEMENT OF AUTHENTICITY

I, JIANG TAO, am an Officer with official duties in the Department of Law & Treaty in the Ministry of Commerce of the People's Republic of China (the "Ministry"). I certify that the authentication of documents in the Ministry's custody is within the scope of my authority and official duties. I also certify that I have compared the document attached to this Certificate and that it is, in all respects, a true and correct copy of a document on file in my office.

In proof of the facts set out in this Certificate, I have signed this Certificate on May 26, 2006, at Beijing, the People's Republic of China.

Senior Officer, Department of Law & Treaty,
Ministry of Commerce, People's Republic of China

JIANG TAO

BJI 38316v.1

**A-721**

# NOTARIAL CERTIFICATE

2006C.Z.J.Zi,No.893

This is to certify that Jiang Tao (male, born on August 2, 1977, I.D.Card: 370702197708022616), the Authorized Representative of the Ministry of Commerce of the People's Republic of China, affixed his signature to the English document attached hereto before me in this office on May 26, 2006.

Notary:Wu Jun

Changan Notary Public Office

The People's Republic of China

May 26, 2006

XIV 15502904

**A-723**

# NOTARIAL CERTIFICATE

2006C.Z.J.Zi,No.894

This is to certify that the English translation of the Notarial Certificate (2006)C.Z.J.Zi,No.893 attached hereto is in conformity with the Chinese original.

Notary:Wu Jun

Changan Notary Public Office

The People's Republic of China

May 26, 2006

XIV 15502906

Case 1:06-md-01738-DGT-JO Document 270 Filed 09/22/2006 Page 1 of 36 PageID #: 14226

认字第 0 6 0 9 0 8 6 8 - 0 0 1 号

兹证明前面文书上公证处的印章和

公证员 武军 的签名（印章）

属实。

中华人民共和国外交部

一等秘书 陈佩仪

2006年06月15日

1350494

---

People's Republic of China )
Municipality of Beijing ) ss:
Embassy of the United )
States of America )

     Anu Prattipati
     Vice Consul

I, _____, Consul/Vice Consul of the United States of America at Beijing, People's Republic of China, duly commissioned and qualified, do hereby certify that _____Chen Beiliang_____, whose true signature and official seal are, respectively, subscribed and affixed to the foregoing document, was on the _____15_____ day of _____June_____, 200 6 , the date thereof, an officer of the Ministry of Foreign Affairs of the People's Republic of China, duly commissioned and qualified, to whose official acts faith and credit are due.

IN WITNESS WHEREOF I have hereunto set my hand and affixed the seal of the Embassy of the United States of America at Beijing, People's Republic of China this _____16_____ day of _____June_____, 200 6 .

_Anu Prattipati_
Anu Prattipati
Vice Consul

# A-727

## 对外经济贸易社会团体管理办法

（１９９１年２月２６日对外经济贸易部发布）

### 第一章 总则

第一条 为保障对外经济贸易社会团体的健康发展，并发挥其在我国对外经济贸易事业中的积极作用，根据国务院发布的《社会团体登记管理条例》及有关规定，特制定本办法。

第二条 在中华人民共和国境内组织的全国性和跨省、自治区、直辖市的对外经济贸易商会、协会、学会、联合会、研究会、基金会、联谊会、促进会等社会团体，均根据本办法由中华人民共和国对外经济贸易部（以下简称对外经济贸易部）负责业务管理。

第三条 对外经济贸易部对各类对外经济贸易社会团体的业务管理包括成立审查、业务指导、日常管理、监督检查。

第四条 对外经济贸易部对各类对外经济贸易社会团体的管理，根据其组成和性质、地位的不同，实行直接或授权有关单位负责的办法。

### 第二章 范围与分类

第五条 对外经济贸易社会团体是指在对外贸易、利用外资、国际经济技术合作（包括国际承包工程和劳务合作）、对外经济技术援助以及国际货运代理等领域内组织的社会团体。

第六条 对外经济贸易社会团体包括以下各类：

（一）从事对外经济贸易、国际贸易和国际经济合作研究的学术性组织；

（二）为发展对外经济贸易、促进国内外企业和经营者联系建立的联谊性组织；

（三）以协调、促进我国对外经济贸易发展为宗旨的各类商会、协会组织；

（四）具有对外经济贸易行业或专业特点的其他社会团体组织。

### 第三章 成立和变更

第七条 成立对外经济贸易社会团体必须符合以下原则：

（一）对外经济贸易社会团体的宗旨，必须符合中华人民共和国的宪法和法律、法规，必须维护国家的统一和民族的团结，不得损害国家的、社会的、集体的利益和其他公民、法人的自由和权利；

（二）成立对外经济贸易社会团体，必须有利于促进对外经济贸易的发展，有利于促进国内企业和有关组织的联系，有利于维护和保障对外经济贸易的正常秩序；

（三）全国性或跨省、自治区、直辖市的对外经济贸易社会团体，必须具有广泛的代表性，必须反映参加社会团体组织的法人、公民的共同意志；

（四）在对外经济贸易部业务管理的范围内，不得成立相同或相似的社会团体。

第八条 发起成立对外经济贸易社会团体的发起人，应在发起成立之前向对外经济贸易部报告，在有该社会团体业务范围内的足够成员响应后，拟定有关成立文件报对外经济贸易部审查。

第九条 成立审查须提交下列材料：

（一）发起单位的意见和发起负责人签署的有关该社会团体筹建情况的报告；

（二）符合《社会团体登记管理条例》规定的社会团体章程草案；

（三）办事机构地址或联系地址；

（四）发起负责人的姓名、年龄、住址、职业及简历；

（五）拟参加的成员及其书面签署的意见。

第十条 对外经济贸易部审查同意后，向发起人签发同意成立的书面文件。由发起人向社会团体登记管理机关申请登记。未经核准登记，任何单位和个人一律不得以社会团体的名义开展活动。

Case 1:06-md-01738-DGT-JO Document 270 Filed 09/22/2006 Page 9 of 36 PageID #: 14230

第十一条 对外经济贸易社会团体改变宗旨在变更名称、法定代表人或负责人、自行解散等，须经对外经济贸易部审查同意，并向登记管理机关申请变更登记或注销登记。

## 第四章 业务指导

第十二条 经核准登记的对外经济贸易社会团体由对外经济贸易部负责业务指导。

第十三条 业务指导的一般内容是：

（一）通报对外经济贸易的形势和有关政策、规章；

（二）根据需要向对外经济贸易社会团体的要求，由有关负责人定期或不定期听取社会团体的工作报告；

（三）根据对外经济贸易工作的需要，对社会团体的活动提出意见和建议；

（四）按有关规定，转发或发送有关对外经济贸易的文件。

第十四条 经对外经济贸易部授权，具有业务协调和部分行业管理职能的社会团体，必须执行有关对外经济贸易管理的行政法规和规章。

## 第五章 日常管理

第十五条 各类对外经济贸易社会团体必须接受对外经济贸易部或其授权单位的日常管理。

第十六条 日常管理的主要事项包括：

（一）审查社会团体常设机构的设立和人员编制；

（二）审查其领导人的人选和内部人事制度；

（三）审查其经费预、决算制度；

（四）汇总编报和下达社会团体常设机构的劳动工资计划；

（五）布置和安排义务献血、义务绿化等社会工作；

（六）其它。

第十七条 具有业务协调和部分行业管理职能的社会团体，其日常管理由对外经济贸易部直接负责。

第十八条 不具有业务协调和行业管理职能的社会团体和跨省、自治区、直辖市的社会团体，其日常管理由对外经济贸易部授权有关发起单位或常设办事机构所在地的对外经济贸易业务主管部门负责。各有关单位应将其负责的日常管理事项报对外经济贸易部备案。

## 第六章 监督检查

第十九条 各类对外经济贸易社会团体必须接受登记管理机关和对外经济贸易部或其授权单位的监督检查。

第二十条 监督检查的事项包括：

（一）贯彻执行国家宪法和法律、法规的情况；

（二）按其宗旨和组织章程开展业务活动的情况；

（三）经费收支情况；

（四）其他。

第二十一条 各类对外经济贸易社会团体的下列事项须向对外经济贸易部报告或呈请备案：

（一）年度工作计划和重大活动安排；

（二）代表会议、代表大会或全体会议以及其他重要会议和活动；

（三）年度的经费预算和决算报告；

（四）常设机构的人事和劳动工资统计；

（五）其他。

第二十二条 经授权负责对外经济贸易社会团体日常管理的单位，应加强有关的监督检查工作，并定期向对外经济贸易部报告。

第二十三条 对外经济贸易部对各类对外经济贸易社会团体违反宪法和法律、法规的行为，

有权责令其纠正并协助有关部门予以查处。

## 第七章 附则

第二十四条 本办法不适用于在中华人民共和国境内组建的外国商会。

第二十五条 本办法的解释权属于对外经济贸易部。

第二十六条 本办法自发布之日起施行。

-法律之星提供-

Case 1:06-md-01738-DGT-JO Document 270 Filed 09/22/2006 Page 21 PageID #: 14232

**A-731**

# 公 证 书

(2006)长证经字第893号

　　兹证明中华人民共和国商务部的授权代表蒋涛（男，一九七七年八月二日出生，身份证号码：370702197708022616）于二〇〇六年五月二十六日来到我处，在我的面前，在前面的英文文件上签字。

中华人民共和国长安公证处

公 证 员 

二〇〇六年五月二十六日

XIV 15502903

# 公　证　书

（2006）长证经字第894号

　　兹证明前面（2006）长证经字第893号《公证书》的英文译本与该公证书中文原本内容相符。

中华人民共和国长安公证处

公　证　员　

二〇〇六年五月六日

XW 15502905

Case 1:06-md-01738-DGT-JO   Document 270   Filed 09/22/2006   Page 25 of 36 PageID #: 14236

**A-735**

## NOTARIAL CERTIFICATE

2006C.Z.J.Zi,No.1026

This is to certify that the English translation of the document attached hereto is identical with the Chinese original.

Notary:Wu Jun

Changan Notary Public Office

The People's Republic of China

June 2, 2006

X Ⅳ 15505787

**A-737**

# NOTARIAL CERTIFICATE

2006C.Z.J.Zi,No.1027

This is to certify that the English translation of the Notarial Certificate (2006)C.Z.J.Zi,No.1026 attached hereto is in conformity with the Chinese original.

Notary:Wu Jun

Changan Notary Public Office

The People's Republic of China

June 2, 2006

XIV 15505789

A-738

## 对外经济贸易社会团体管理办法

（１９９１年２月２６日对外经济贸易部发布）

### 第一章 总则

第一条 为保障对外经济贸易社会团体的健康发展，并发挥其在我国对外经济贸易事业中的积极作用，根据国务院发布的《社会团体登记管理条例》及有关规定，特制定本办法。

第二条 在中华人民共和国境内组织的全国性和跨省、自治区、直辖市的对外经济贸易商会、协会、学会、联合会、研究会、基金会、联谊会、促进会等社会团体，均根据本办法由中华人民共和国对外经济贸易部（以下简称对外经济贸易部）负责业务管理。

第三条 对外经济贸易部对各类对外经济贸易社会团体的业务管理包括成立审查、业务指导、日常管理、监督检查。

第四条 对外经济贸易部对各类对外经济贸易社会团体的管理，根据其组成和性质、地位的不同，实行直接或授权有关单位负责的办法。

### 第二章 范围与分类

第五条 对外经济贸易社会团体是指在对外贸易、利用外资、国际经济技术合作（包括国际承包工程和劳务合作）、对外经济技术援助以及国际货运代理等领域内组织的社会团体。

第六条 对外经济贸易社会团体包括以下各类：

（一）从事对外经济贸易、国际贸易和国际经济合作研究的学术性组织；

（二）为发展对外经济贸易、促进国内外企业和经营者联系建立的联谊性组织；

（三）以协调、促进我国对外经济贸易发展为宗旨的各类商会、协会组织；

（四）具有对外经济贸易行业或专业特点的其他社会团体组织。

### 第三章 成立和变更

第七条 成立对外经济贸易社会团体必须符合以下原则：

（一）对外经济贸易社会团体的宗旨，必须符合中华人民共和国的宪法和法律、法规，必须维护国家的统一和民族的团结，不得损害国家的、社会的、集体的利益和其他公民、法人的自由和权利。

（二）成立对外经济贸易社会团体，必须有利于促进对外经济贸易的发展，有利于促进国内外企业和有关组织的联系，有利于维护和保障对外经济贸易的正常秩序；

（三）全国性或跨省、自治区、直辖市的对外经济贸易社会团体，必须具有广泛的代表性，必须反映参加社会团体组织的法人、公民的共同意志；

（四）在对外经济贸易部业务管理的范围内，不得成立相同或相似的社会团体。

第八条 发起成立对外经济贸易社会团体的发起人，应在发起成立之前向对外经济贸易部报告，在有该社会团体业务范围内的足够成员响应后，拟定有关成立文件报对外经济贸易部审查。

第九条 成立审查须提交下列材料：

（一）发起单位的意见和发起负责人签署的有关该社会团体筹建情况的报告；

（二）符合《社会团体登记管理条例》规定的社会团体章程草案；

（三）办事机构地址或联系地址；

（四）发起负责人的姓名、年龄、住址、职业及简历；

（五）拟参加的成员及其书面签署的意见。

第十条 对外经济贸易部审查同意后，向发起人签发同意成立的书面文件，由发起人向社会团体登记管理机关申请登记。未经核准登记，任何单位和个人一律不得以社会团体的名义开展活动。

第十一条 对外经济贸易社会团体改变宗旨在变更名称、法定代表人或负责人、自行解散等，须经对外经济贸易部审查同意，并向登记管理机关申请变更登记或注销登记。

### 第四章 业务指导

第十二条 经核准登记的对外经济贸易社会团体由对外经济贸易部负责业务指导。

第十三条 业务指导的一般内容是：

（一）通报对外经济贸易的形势和有关政策、规章；

（二）根据需要对对外经济贸易社会团体的要求，由有关负责人定期或不定期听取社会团体的工作报告；

（三）根据对外经济贸易工作的需要，对社会团体的活动提出意见和建议；

（四）按有关规定，转发或发送有关对外经济贸易的文件。

第十四条 经对外经济贸易部授权，具有业务协调和部分行业管理职能的社会团体，必须执行有关对外经济贸易管理的行政法规和规章。

### 第五章 日常管理

第十五条 各类对外经济贸易社会团体必须接受对外经济贸易部或其授权单位的日常管理。

第十六条 日常管理的主要事项包括：

（一）审查社会团体常设机构的设立和人员编制；

（二）审查其领导人的人选和内部人事制度；

（三）审查其经费预算、决算制度；

（四）汇总编报和下送社会团体常设机构的劳动工资计划；

（五）布置和安排义务献血、义务绿化等社会工作；

（六）其它。

第十七条 具有业务协调和部分行业管理职能的社会团体，其日常管理由对外经济贸易部直接负责。

第十八条 不具有业务协调和行业管理职能的社会团体和跨省、自治区、直辖市的社会团体，其日常管理由对外经济贸易部授权有关发起单位或常设办事机构所在地的对外经济贸易业务主管部门负责。各有关单位应将其负责的日常管理事项报对外经济贸易部备案。

### 第六章 监督检查

第十九条 各类对外经济贸易社会团体必须接受登记管理机关和对外经济贸易部或其授权单位的监督检查。

第二十条 监督检查的事项包括：

（一）贯彻执行国家宪法和法律、法规的情况；

（二）按其宗旨和组织章程开展业务活动的情况；

（三）经费收支情况；

（四）其他。

第二十一条 各类对外经济贸易社会团体的下列事项须向对外经济贸易部报告或呈请备案：

（一）年度工作计划和重大活动安排；

（二）代表会议、代表大会或全体会议以及其他重要会议和活动；

（三）年度的经费预算和决算报告；

（四）常设机构的人事和劳动工资统计；

（五）其他。

第二十二条 经授权负责对外经济贸易社会团体日常管理的单位，应加强有关的监督检查工作，并定期向对外经济贸易部报告。

第二十三条 对外经济贸易部对各类对外经济贸易社会团体违反宪法和法律、法规的行为，

-法律之星提供-

6-9

有权责令其纠正并协助有关部门予以查处。

第七章 附则

第二十四条 本办法不适用于在中华人民共和国境内组建的外国商会。
第二十五条 本办法的解释权属于对外经济贸易部。
第二十六条 本办法自发布之日起施行。

A-743

# 公　证　书

(2006)长证经字第1026号

兹证明前面的文件后所附的英文译本与中文原本内容相符。

中华人民共和国长安公证处

公　证　员

二〇〇六年六月



X Ⅳ 5505786

**A-744**

**A-745**

# 公 证 书

（2006）长证经字第1027号

　　兹证明前面（2006）长证经字第1026号《公证书》的英文译本与该公证书中文原本内容相符。

中华人民共和国长安公证处

公 证 员 

二○○六年六月二日

XIV 15505788

# EXHIBIT 2

**A-747**

[TRANSLATION]

### Notice of Ministry of Foreign Trade and Economic Cooperation regarding Printing and Distribution of Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters

(Dated Sept. 23, 1994 [1994] Wai Jing Mao Ren Fa No. 540)

Each chamber of commerce for importers and exporters:

Pursuant to the Foreign Trade Law of the People's Republic of China and the relevant regulations of the State Council, this Ministry has stipulated the Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters, which is hereon printed and distributed. Please implement accordingly.

This Notice is hereby issued.

Annex: Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters

Annex:

### Several Regulations for Personnel Management of Chambers of Commerce for Importers and Exporters

This Regulation is stipulated in accordance with the Foreign Trade Law of the People's Republic of China and the relevant regulations of the State Council for the purposes of meeting the requests of the foreign trade system reform, improving the organizational structure of chambers of commerce for importers and exporters (hereinafter as "chambers"), enhancing their viability and allowing them to effectively play the role in coordinating and service providing.

I.    General Principles of Management

1.    Chambers are social organizations of legal person status, which shall be managed by reference to the laws, regulations and rules stipulated by the state and the Ministry of Foreign Trade and Cooperation (hereinafter as "MOFTEC") regarding the personnel management of public institutions.

2.    Chambers shall, based on their own characteristics, establish and improve various rules and systems so as to enhance their internal management.

3.    MOFTEC shall maintain and ensure the discretion of chambers in personnel employment, enhance its macro management, guardianship and service, and promote the healthy development of chambers.

II.    Organizational Structure and Personnel Authorization

1

# A-748

Case 1:06-mc-00164-DAB Document Filed 09/12/2008 Page 3 of 21 ID #:

principle of simplified administration, higher efficiency and in view of the request by work, propose their authorized numbers of personnel, which will, upon verification and approval by MOFTEC, be approved by the Ministry of Civil Affairs.

5.     Within the authorized numbers for personnel and internal departments, Chambers are entitled to establish, adjust (change the name of) or abolish their internal departments and make a decision on their personnel authorization, provided that they will file such information with MOFTEC.

6.     In general, senior positions and the number of each of such positions within a chamber shall be 1 President , several Vice-Presidents (among which, 2 to 3 are full-time Vice-Presidents and several others are part-time), 1 Secretary-General, 1 to 2 Vice Secretary-General. The responsibilities and mandate of the President, Vice-Presidents and Secretary-General shall be stipulated by the articles of association of the chamber.

7.     The leading positions at various departments of permanent administrative offices established by chambers shall be formulated in accordance with the principle of simplified administration and higher efficiency, and the number of each position shall be decided according to the standard of one person for the principal position and one for the deputy position.

## III.     Sources and Management of Employees

8.     The general working staff of the permanent administrative offices of chambers shall be chosen primarily from the employees in service of their membership organizations or the competent authorities in charge of foreign trade and economics and the public institutions directly under their leadership. With the approval of the members general meeting, a small group of personnel can also be temporarily transferred from the member companies of the chamber. The insufficient part of personnel may be made up by recruiting from the general public.

9.     The personal file and payment record of any personnel who have been transferred to work with the chamber shall be whereupon removed to the chamber concerned.

10.     Personnel transferred from member companies shall be rotated periodically, and their personal file and payment (including bonus and compensation) record  may be kept at their original working units.

11.     In principle, personnel recruited from social entities and unemployed people shall be subject to the employment contract signed between the chamber and the employed person in accordance with the relevant regulations of the state. Specific measures and standards shall be implemented according to the relevant regulations of MOFTEC.

12.     As needed, chambers may temporarily engage retired people for certain special projects.

## IV.     Selection and Management of Senior Officials

13.     The candidates for the senior positions of the chamber are recommended by MOFTEC (or recommended by over 1/3 of the chamber's member companies and approved by MOFTEC) and then elected or dismissed by the general meeting of members.

2

**A-749**

14.    President, full-time Vice-President, Secretary-General and Vice Secretary-General of the chamber shall be full-time employees in service, and the part-time Vice-President of the chamber may maintain their positions at his/her original working unit on a continuos basis.

15.    In principle, the heads of the various departments of permanent offices established by chambers shall be appointed to their positions by the President of the chamber in accordance with the prescribed procedures.

V.    Compensation and Bonus for Employees

16.    The compensation and bonus for the employees of chambers shall be implemented according to the regulations of the state regarding public institutions, except that the compensation and bonus for the employees recruited from the general public will be according to the relevant regulations stipulated by the labor authority and the employment contract.

17.    Within the total authorized number of personnel, the Personnel Department of MOFTEC will, based on the actual number of employees and the annual plan for employment, verify and approve the total amount of salary of the chamber and implement the verification and approval system as stipulated in the Handbook of Salary Fund Management.

18.    Part-time officials of the chamber shall not be entitled to payment, allowance or insurance and welfare treatment.

19.    The retirement conditions and treatment for the employees of the chamber shall be implemented according to the regulations of the state on retirement and be paid by the chamber, except that such conditions and treatments for the employees recruited from the general public will be subject to the contract.

VI.    Others

20.    This Regulation is also applicable to chambers and associations authorized by MOFTEC to have a coordinating function within their respective industries. Other organizations engaged in foreign trade and economic shall, based on their own characteristics, implement this Regulation *mutatis mutandis*.

21.    This Regulation shall be construed by the Personnel, Education and Labor Department [of MOFTEC].

22.    This Regulation shall become effective upon the date of promulgation.

3

A-750

Case 1:06-md-01738-DGT-DO Document 176 Filed 08/09/22/2008 Page 65 of 27 PageID #: 14252