# In the
# United States Court of Appeals
## for the Second Circuit

---

August Term, 2020
No. 13-4791-cv

ANIMAL SCIENCE PRODUCTS, INC., THE RANIS COMPANY, INC.,
*Plaintiffs-Appellees*,

*v.*

HEBEI WELCOME PHARMACEUTICAL CO. LTD., NORTH CHINA PHARMACEUTICAL GROUP CORPORATION,
*Defendants-Appellants*.

---

Appeal from the United States District Court
for the Southern District of New York.
No. 1:06-md-1738 — Brian M. Cogan, *Judge*.

---

ARGUED: MARCH 17, 2021
DECIDED: AUGUST 10, 2021

Before: CABRANES, WESLEY, and NARDINI, *Circuit Judges*.

---

Animal Science Products, Inc. and The Ranis Company, Inc. (the "plaintiffs"), American purchasers of bulk Vitamin C, brought this class action

alleging that four Chinese exporters of Vitamin C conspired to inflate prices and restrict supply in violation of the Sherman Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. §§ 4, 16. The United States District Court for the Southern District of New York (Trager, *J.*) denied the defendants' motion to dismiss on the basis of the act of state doctrine, foreign sovereign compulsion, and international comity. The district court (Cogan, *J.*) subsequently denied the defendants' motion for summary judgment on the same grounds, and the case proceeded to trial. All defendants settled other than Hebei Welcome Pharmaceutical Co. Ltd. ("Hebei") and its parent company North China Pharmaceutical Group Corp ("NCPG"). Following a jury verdict of liability, the district court entered a trebled damages award of $147,831,471.03, plus interest, and permanently enjoined Hebei and NCPG from future anti-competitive behavior. The district court then denied Hebei and NCPG's renewed motion for judgment as a matter of law.

In this case's first trip to our Court, we reversed. We held that the district court was bound to defer to the facially reasonable explanation of Chinese law submitted by the Ministry of Commerce of the People's Republic of China (the "Ministry"). According to the Ministry's explanation, Chinese law required the defendants to undertake the anticompetitive conduct at issue, and—accepting this explanation as reasonable under the circumstances—we concluded that such a "true conflict" between China's regulatory scheme and U.S. antitrust laws, in combination with other international comity factors, mandated dismissal of the plaintiffs' suit. The Supreme Court reversed, holding that we afforded too much deference to the Ministry's submissions, and remanded for us to carefully consider but not conclusively defer to the Ministry's views pursuant to Rule 44.1 of the Federal Rules of Civil Procedure.

Applying the Supreme Court's instructions, we conclude once again that this case should be dismissed on international comity grounds. Giving careful consideration but not conclusive deference to the Ministry's views, we read the relevant Chinese regulations—as illuminated by contemporaneous administrative documents and industry reports—to have required the defendants to collude on Vitamin C export prices and quantities as part and parcel of China's export regime for Vitamin C. Balancing this true conflict between U.S. and Chinese law together

with other established principles of international comity, we decline to construe U.S. antitrust law to reach the defendants' conduct. Accordingly, we **REVERSE** and **REMAND** with instructions to dismiss the case. Judge WESLEY dissents in a separate opinion.

---

WILLIAM A. ISAACSON (Michael D. Hausfeld, Brian A. Ratner, Melinda R. Coolidge, James T. Southwick, Shawn L. Raymond, Katherine Kunz, Brent W. Landau, *on the brief*), BOIES, SCHILLER & FLEXNER LLP, Washington, DC, *for Plaintiffs-Appellees*.

JONATHAN M. JACOBSON (Daniel P. Weick, Justin A. Cohen, Scott A. Sher, Bradley T. Tennis, *on the brief*), WILSON SONSINI GOODRICH & ROSATI, P.C., New York, New York, *for Defendants-Appellants.*

CARTER G. PHILLIPS (Joel M. Mitnick, Kwaku A. Akowuah, *on the brief*), SIDLEY AUSTIN LLP, Washington, DC, *for Amicus Curiae* Ministry of Commerce of the People's Republic of China.

WILLIAM J. NARDINI, *Circuit Judge*:

We consider this appeal, which arises from an antitrust action brought against Defendants-Appellants Hebei Welcome Pharmaceutical Co. Ltd. ("Hebei"), North China Pharmaceutical Group Corporation ("NCPG"), and other entities incorporated under the laws of the People's Republic of China ("PRC" or

"China") (together, "Defendants-Appellants"), on remand from the Supreme Court. *See Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co*., 138 S. Ct. 1865 (2018). Plaintiffs-Appellees Animal Science Products, Inc. and The Ranis Company, Inc. (together, "plaintiffs"), are U.S. purchasers of Vitamin C that allege Defendants-Appellants and others conspired to fix the price and supply of Vitamin C sold to U.S. companies on the international market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 4, 16.

This antitrust case is unusual in that the parties before us generally agree that the alleged anticompetitive conduct occurred. The dispute centers instead on "whether Chinese law required the Chinese sellers' conduct." *Animal Sci. Prods.*, 138 S. Ct. at 1875. Thus, we must decide whether Chinese law made it impossible for the Defendants-Appellants to comply with U.S. antitrust law, such that a so-called "true conflict" exists. This determination is critical because the existence of a true conflict, balanced in combination with other principles of international comity, may weigh against construing U.S. antitrust law to reach anticompetitive conduct occurring abroad.

We ultimately conclude that Chinese law required Defendants-Appellants to engage in price-fixing of Vitamin C sold on the international market. Defendants-Appellants thus could not comply with both Chinese law and U.S. antitrust law. In light of this true conflict, we apply the remaining principles of international comity to balance the United States' interest in the enforcement of its antitrust laws abroad against the international comity concerns implicated when those laws conflict with the laws of China. We conclude that principles of international comity required the district court to dismiss this action. We therefore **REVERSE** the judgment and **REMAND** with instructions to **DISMISS** the complaint with prejudice.

## I. BACKGROUND

For more than half a century, China has been a leading producer and exporter of Vitamin C.[1] In the 1970s, as China began to move into the competitive international economy under the general direction of the Communist Party of

[1] We set forth here only those facts necessary to resolve the issues on appeal.

China, the Chinese government implemented various export controls to gain a competitive edge over other producers of Vitamin C on the international market. In the intervening years, the Chinese government continued to develop policies to retain its domestic producers' competitive advantage. In the 1990s, for example, following a price war between producers in China, the Chinese government facilitated industry-wide consolidation and implemented regulations to control the prices of Vitamin C exports. By 2001, Chinese suppliers had captured 60% of the global Vitamin C market.

Several years later, in 2005, plaintiffs filed this antitrust action. The original complaint named four defendants, all of which are entities incorporated under the laws of China: Hebei, Jiangsu Jiangshan Pharmaceutical Co. Ltd. ("Jiangshan"), Northeast Pharmaceutical Group Co. Ltd. ("Northeast"), and Weisheng

Pharmaceutical Co. Ltd. ("Weisheng") (together, "defendants").[2] The plaintiffs later added as a defendant Hebei's holding company, NCPG.[3]

In the district court, the defendants moved to dismiss based on the foreign sovereign compulsion doctrine, the act of state doctrine, and principles of international comity. In an historic act—the first official appearance by the Chinese government in a U.S. court—China's Ministry of Commerce (the "Ministry") filed an *amicus curiae* brief and several other submissions in support of the motion to dismiss.[4] The district court rejected all three grounds for dismissal and denied the motion so as to permit discovery with respect to the defendants' assertion that the Chinese government compelled the actions constituting the basis of the antitrust violations. *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546, 552 (E.D.N.Y. 2008)

---

[2] The complaint also named Weisheng's affiliates Shijiazhuang Pharmaceutical (USA) Inc. and China Pharmaceutical Group, Ltd.

[3] As explained below, the other defendants settled before or during trial, and therefore only Hebei and NCPG brought this appeal.

[4] We discuss in detail the Ministry's submissions, four in total, later in our analysis. *See* Section III.C.3, *infra*.

(David G. Trager, *Judge*). The district court subsequently denied the defendants' motion for summary judgment, or, alternatively, a motion for a determination of foreign law under Federal Rule of Civil Procedure 44.1. *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522 (E.D.N.Y. 2011) (Brian M. Cogan, *Judge*).

In denying the defendants' motion for summary judgment, the district court again rejected application of the act of state doctrine and the foreign sovereign compulsion doctrine, *id.* at 548–49,[5] which it appeared to equate with the true conflict inquiry under an international comity analysis, *id.* at 543. The district court also concluded that there was no bar to the exercise of its jurisdiction due to international comity principles. *Id.* at 542–44.

After the district court denied the defendants' motion for summary judgment, Jiangshan settled the claims against it for $10.5 million. Jury trial began

[5] The district court determined that there had been no foreign sovereign compulsion because the defendants' anticompetitive conduct was voluntary, not compelled, and the defendants had not shown that they faced a risk of severe sanctions for noncompliance. *Id*. at 554–58. Further, even if Chinese law did involve some compulsion, it "assuredly did not compel all of defendants' illegal conduct," and therefore the defense did not extend to anticompetitive measures affirmatively adopted by the defendants. *Id.* at 554.

on February 25, 2013. On the eve of the jury's deliberations, Weisheng settled for $22.5 million and Northeast for $500,000. On March 14, 2013, the jury returned its verdict, finding the remaining defendants—Hebei and NCPG—liable in the amount of $54.1 million. After accounting for the settlement amounts and attorneys' fees, the district court entered a trebled damages award of $147,831,471.03 plus interest from the date of judgment, as well as a permanent injunction against future anticompetitive behavior.

The district court denied Hebei and NCPG's renewed motion for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. *In re Vitamin C Antitrust Litig.*, 1:06-md-1738, 2013 WL 6191945 (E.D.N.Y. Nov. 26, 2013). In that ruling, the district court stated that it "stands by and reaffirms its prior rulings that Chinese law did not compel defendants to engage in antitrust violations, [and] that the doctrines of act of state and international comity do not bar plaintiffs' suit." *Id*. at *1.

This Court reversed, finding that the district court erred, or "abused its discretion,"[6] by failing to abstain on international comity grounds in light of the Ministry's submissions showing a true conflict between U.S. antitrust law and Chinese export regulations for Vitamin C. *In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 189 (2d Cir. 2016). In doing so, we held that when a foreign government directly participates in U.S. court proceedings by providing an official representation regarding the proper interpretation of its laws, the U.S. court is bound to defer to that interpretation so long as it is reasonable under the circumstances. *Id.* The Supreme Court then reversed, holding that our Court gave too much deference to the Ministry's submissions, and remanded for us to carefully consider the Ministry's views without giving them dispositive effect. *Animal Sci. Prods.*, 138 S. Ct. at 1873.

---

[6] *See United States v. Park*, 758 F.3d 193, 199–200 (2d Cir. 2014) (explaining that "abuse of discretion" is a "distinctive term of art that is not meant as a derogatory statement about the district judge whose decision is found wanting").

## II. STANDARD OF REVIEW

We review the district court's denial of a Rule 50 motion *de novo*, *see Legg v. Ulster Cty.*, 979 F.3d 101, 114 (2d Cir. 2020), including its determination of foreign law under Rule 44.1, *see Animal Sci. Prods.*, 138 S. Ct. at 1873. As to whether the district court erroneously declined to dismiss this action on international comity grounds, we review relevant questions of statutory interpretation *de novo*. *See In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 101 (2d Cir. 2019), *cert. denied sub nom. HSBC Holdings PLC v. Picard*, 140 S. Ct. 2824 (2020).[7]

---

[7] As explained below, *see* Section III.A n.8, *infra*, we understand international comity to apply here as a form of prescriptive comity: "a canon of [statutory] construction" that may serve to "shorten the reach of a statute." *In re Picard, Tr.*, 917 F.3d at 100 (internal quotation marks omitted). In other contexts, international comity functions instead as a type of "adjudicative comity," "the so-called comity among courts," which "may be viewed as a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *Id*. (internal quotation marks omitted). Even were we to consider this case under the rubric of adjudicative comity—which principally applies when a district court has declined to exercise jurisdiction in deference to ongoing proceedings in a foreign court—we would in any event review that decision under an unusually rigorous abuse-of-discretion standard that leaves "little practical distinction between review for abuse of discretion and review *de novo*." *Id.* at 102 (quoting *Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir. 1998)).

## III. DISCUSSION

The central issue we address is whether the district court should have dismissed this antitrust action for reasons of international comity. As required by *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 799 (1993), our comity analysis begins by asking whether Chinese law required defendants to engage in anticompetitive conduct that violated U.S. antitrust laws, such that a true conflict exists. As part of that inquiry, and pursuant to the Supreme Court's direction to us on remand, we carefully consider the statements from the Chinese government as to the proper interpretation of its laws and what requirements those laws imposed on the defendants.

We conclude that Chinese law required the defendants to engage in price-fixing of Vitamin C sold on the international market. Because defendants could not comply with both Chinese law and U.S. antitrust law, there is a true conflict for international comity purposes. After balancing the United States' interest in adjudicating antitrust violations alleged to have harmed those within its jurisdiction with the PRC's interest in regulating its economy within its borders,

we hold that principles of international comity required the district court to dismiss this action.

We start with the doctrine of international comity, paying particular attention to the true conflict standard established in *Hartford Fire*, 509 U.S. at 799.

### A. International Comity

Defendants principally argue that the district court erred, at multiple intervals, in declining to dismiss this action under principles of international comity. Comity is both a principle guiding relations between foreign governments and a legal doctrine by which U.S. courts recognize an individual's acts under foreign law. *See In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1046 (2d Cir. 1996).[8] It

---

[8] As noted above, our application of international comity in this case involves "prescriptive comity"—a form of statutory interpretation—rather than the abstention-based doctrine of "adjudicatory comity." These are "two district legal doctrines," *In re Maxwell*, 93 F.3d at 1047, and although they "sometimes demand similar analysis, each asks a different question and is rooted in a different legal theory," *In re Picard*, 917 F.3d at 101 (internal quotation marks omitted).

In *Hartford Fire*, the Supreme Court seemed to assume that international comity should be treated as an abstention doctrine. *See* 509 U.S. at 798 (considering, but not deciding, "whether a court with Sherman Act jurisdiction should ever *decline to exercise such jurisdiction* on grounds of international comity." (emphasis added)). In dissent, Justice Scalia proposed an alternative analysis based on prescriptive comity: "Congress is generally presumed not to have exceeded . . . customary international-law limits" and therefore "statutes should not be interpreted to regulate foreign persons or conduct if that regulation would conflict with principles of international law." 509 U.S. at 815 (Scalia, *J.*, dissenting). The Supreme Court's

is the "recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). As a general matter, international comity "takes into account the interests of the United States, the interests of the foreign state, and those mutual interests the family of nations have in just and efficiently functioning rules of international law." *In re Maxwell*, 93 F.3d at 1048. To determine whether international comity principles require dismissal of a lawsuit, we apply a multi–factor balancing test as set forth

---

subsequent decision in *F. Hoffmann-La Roche Ltd. v. Empagran S.A.,* cited Justice Scalia's dissent in *Hartford Fire* with approval, and it relied on this rule of prescriptive comity, based in statutory construction, which "cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws [and] thereby helps the potentially conflicting laws of different nations work together in harmony." 542 U.S. 155, 164 (2004).

In keeping with *F. Hoffman-La Roche*, we consider how Congress presumably intended courts to construe U.S. antitrust law "to avoid unreasonable interference with the sovereign authority of other nations." *Id*; *see also In re Maxwell*, 93 F.3d at 1047 ("When construing a statute, the doctrine of international comity is best understood as a guide where the issues to be resolved are entangled in international relations."). That approach to understanding statutes is not of recent vintage—indeed, it has been here all along. As Chief Justice Marshall explained long ago in the case of the *Charming Betsy*, "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804).

by the Ninth Circuit in *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 614–15 (9th Cir. 1976), and then revised by the Third Circuit in *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1297–98 (3d Cir. 1979). *See O.N.E. Shipping*, 830 F.2d at 451 ("The comity balancing test has been explicitly used [by the Second Circuit].").[9]

---

[9] In *Timberlane*, the Ninth Circuit identified seven factors for courts to balance when considering when an extraterritorial assertion of jurisdiction is justified. 549 F.2d at 614. In *Mannington Mills*, the Third Circuit expressed "substantial agreement" with *Timberlane*'s balancing test. 595 F.2d at 1297. The court noted that "foreign policy, reciprocity, comity, and limitations of judicial power are considerations that should have a bearing on the decision to exercise or decline jurisdiction" when foreign nations are involved. *Id.* at 1296. It then distilled those concerns into ten factors:

> (1) Degree of conflict with foreign law or policy;
> (2) Nationality of the parties;
> (3) Relative importance of the alleged violation of conduct here compared to that abroad;
> (4) Availability of a remedy abroad and the pendency of litigation there;
> (5) Existence of intent to harm or affect American commerce and its foreseeability;
> (6) Possible effect upon foreign relations if the court exercises jurisdiction and grants relief;
> (7) If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries;
> (8) Whether the court can make its order effective;
> (9) Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; [and]
> (10) Whether a treaty with the affected nations has addressed the issue.

*Id*. at 1297–98 (internal footnote omitted).

In applying this multi-factor balancing test, we are mindful of the Supreme Court's explanation in *Hartford Fire* that, to warrant dismissal on the basis of international comity, the two countries' legal demands must be irreconcilable. 509 U.S. at 799 (explaining that "[n]o conflict exists . . . where a person subject to regulation by two states can comply with the laws of both." (internal quotation marks omitted).[10] In other words, there must be a "true conflict" between U.S. law and that of the foreign nation to warrant dismissal of a claim pursuant to international comity.

---

[10] In *Hartford Fire*, certain American insurance companies and their London-based reinsurers allegedly conspired to restrict the sale of reinsurance to the American insurance market unless designated terms more favorable to insurers were incorporated into standard insurance contracts. *Id.* at 775–76. The London reinsurers argued that holding them liable under U.S. antitrust law would "conflict significantly with British law," and the British Government, appearing as *amicus curiae*, concurred, asserting that "Parliament ha[d] established a comprehensive regulatory regime over the London reinsurance market and that the conduct alleged . . . was perfectly consistent with British law and policy." *Id.* at 798–99. The Court said this was insufficient to create a true conflict: "The fact that conduct is lawful in the state in which it took place will not, of itself, bar application of the United States antitrust laws, even where the foreign state has a strong policy to permit or encourage such conduct." *Id.* at 799 (internal quotation marks and alteration omitted).

Our analysis centers on the existence of a true conflict, but other international comity factors remain relevant. While the Supreme Court in *Hartford Fire* found "no need . . . to address other considerations" respecting international comity," 509 U.S. at 799, our Circuit has favored the view that *Hartford Fire* did not mean to thereby extinguish the remaining comity factors *sub silentio*.[11] It is for this reason that we have described the "conflict between domestic and foreign law" as merely "an important criterion for a comity dismissal." *Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011).

---

[11] In *In re Maxwell*, we noted that "*Hartford Fire* recognized that other concerns might be implicated if the context were different." 93 F.3d at 1050 (internal quotation marks omitted). We then concluded that a dispute over the applicability of the avoidance provision of the Bankruptcy Code was "significantly different from the circumstances confronting the Supreme Court in *Hartford Fire*" such that a full comity analysis was appropriate, even after finding a true conflict. *Id*.

In our prior opinion, we read *Hartford Fire* "narrowly," limiting its singular focus on the existence of a true conflict to that case's facts and considering the "remaining factors in the comity balancing test" even after concluding that a true conflict existed. *In re Vitamin C Antitrust Litig*., 837 F.3d at 185. The Supreme Court did not disturb this portion of our decision, and we maintain that approach here. *Accord In re Sealed Case*, 932 F.3d 915, 931–32 (D.C. Cir. 2019); *see also United States v. Brodie*, 174 F. Supp. 2d 294, 305 (E.D. Pa. 2001) ("The Supreme Court did not purport [in *Hartford Fire*] to replace the multi-factor analysis of *Mannington Mills* and other cases.").

## B. Distinguishing True Conflicts from Foreign Sovereign Compulsion

The true conflict requirement of *Hartford Fire* shares much in common with the foreign sovereign compulsion ("FSC") doctrine, and some courts (including the district court) have treated the two alike.[12] But we detect important distinctions between the FSC doctrine and the true conflict inquiry for international comity purposes. A defendant invoking FSC must show that a "foreign government's order . . . compelled [its] business to violate American antitrust law." *Mannington Mills*, 595 F.2d at 1293.[13] In probing for bona fide compulsion, courts have required

---

[12] *See, e.g.*, *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d at 546 ("[A]bsent compulsion, dismissal on comity grounds is not warranted."); *Trugman-Nash, Inc. v. New Zealand Dairy Bd., Milk Prods. Holdings (N. Am.) Inc.*, 954 F. Supp. 733, 736 (S.D.N.Y. 1997) ("[T]here is an actual and material conflict between American antitrust law and New Zealand law . . . sufficient to entitle defendants to invoke . . . foreign sovereign compulsion[] and international comity.").

[13] Courts have consistently declined to apply FSC absent genuine compulsion by the foreign sovereign. For example, the FSC defense was unavailable to American banks that induced Mexican officials in 1919 to grant them tax preferences and a commercial monopoly over sisal because, while the restraints on trade were "aided by discriminating legislation," the conspirators "by their own deliberate acts . . . brought about forbidden results within the United States." *United States v. Sisal Sales Corp.*, 274 U.S. 268, 276 (1927). Similarly, FSC did not shield from antitrust liability companies who monopolized vanadium supply and fixed prices in Canada and the United States from 1933 to 1949 where there was "no indication that the [Canadian Government Metals] Controller or any other official within the structure of the Canadian Government approved or would have approved of joint efforts to monopolize the production and sale of vanadium or directed that purchases from [the plaintiff] be stopped." *Cont'l Ore Co.*, 370 U.S. at 706. The fact that one defendant, appointed by the Canadian government to be exclusive wartime purchasing agent

defendants asserting FSC to show that non-compliance with foreign law portends a significant risk of substantial sanctions.[14] Some courts have also required the party asserting the defense to act in good faith by "mak[ing] all efforts to comply with U.S. law," *Brodie*, 174 F. Supp. at 300 & n.5, on the grounds that the foreign party is in the best position to "plead with its own sovereign for relaxation of penal laws or for adoption of plans which will at the least achieve a significant measure of compliance" with U.S. law, *Société Internationale*, 357 U.S. at 205.[15]

---

for vanadium, "was acting in a manner permitted by Canadian law" did not establish a basis for FSC, as there was "nothing to indicate that such law in any way compelled discriminatory purchasing." *Id*. at 707.

[14] *See, e.g., Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 211 (1958) (excusing Swiss party's "failure to satisfy fully the requirements of [a] production order . . . because production of documents in Switzerland pursuant to the order of a United States court might violate Swiss laws" and thus subject the party to "criminal sanctions"); *United States v. First Nat. City Bank*, 396 F.2d 897, 905 (2d Cir. 1968) (refusing to excuse compliance with a grand jury subpoena when "risk of civil damages was slight and speculative"); *Brodie*, 174 F. Supp. at 301 (rejecting FSC defense based on foreign "blocking statutes" designed to counteract U.S. Cuban Assets Control Regulations because it "would be very difficult for the Canadian or U.K. government to mount a prosecution under the blocking statutes" and there was no evidence of past enforcement); *Interamerican Ref. Corp. v. Texaco Maracaibo, Inc.*, 307 F. Supp. 1291, 1294 (D. Del. 1970) (granting FSC defense where Venezuelan oil ministry "supervised concessionaires rigorously and conducted regular reviews of their sales policies," "promulgated rules regarding the sale of oil extracted there," and imposed "[s]anctions for violation of the rules includ[ing] suspension of the right to ship oil out of the country").

[15] *See also In re Sealed Case*, 932 F.3d at 940 (affirming district court's civil contempt citation of Chinese banks for failure to comply with discovery order—notwithstanding Chinese law forbidding

In its discussion of international comity, the Court in *Hartford Fire* made no mention of sovereign compulsion or the coercive nature of sanctions available under foreign law, instead focusing entirely on whether foreign law, taken at face value, "requires [the defendants] to act in some fashion prohibited by the law of the United States." 509 U.S. at 799. Exclusive attention to what foreign law facially requires makes sense in the context of international comity for several reasons. As a matter of first principles, "comity" is characterized by respect for another country's sovereign authority within its borders, not by examination of whether such authority exerts duress-like pressure that leaves defendants little or no choice but to engage in the prohibited conduct.[16] In focusing on the foreign state rather than the defendants, we consider primarily what the state as sovereign legislates—not the severity of the penalties the state imposes on non-compliance. Second, a

disclosure—because the banks had "not demonstrated good faith" and "the requested records [we]re essential to an investigation into a matter of national security" (internal quotation marks omitted)).

[16] *See F. Hoffmann-La Roche*, 542 U.S. at 165 (recognizing that the application of U.S. antitrust law to foreign conduct "creates a serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs").

true conflict is present even where the foreign government grants the defendants some discretion in choosing how to carry out the legally mandated conduct, so long as "compliance with the laws of both countries is . . . impossible." *Hartford Fire*, 509 U.S. at 799. FSC, by contrast, applies only to the scope of conduct actually compelled under threat of severe sanctions. *See Continental Ore*, 370 U.S. at 706–07. Third, whereas FSC is a standalone basis for abstention, the finding of a true conflict is only one step—albeit a critical one—in a comity analysis. A false equivalency of FSC and true conflict analysis would convert the "degree of conflict with foreign law" factor into the be-all and end-all of the international comity analysis, rendering mere surplusage much of that longstanding doctrine. Accordingly, our discussion of international comity does not feature consideration of the threat of compulsive sanctions. Instead, we look to the laws of each country in turn to determine whether, taking those laws at face value, a true conflict exists.

**C. True Conflict Analysis**

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. While this language has been interpreted to outlaw only unreasonable restraints

on trade, *see, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997), certain types of anticompetitive conduct are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality," *Nat. Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). "Price–fixing agreements between two or more competitors, otherwise known as horizontal price–fixing agreements, fall into the category of arrangements that are per se unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Thus, if Chinese law required defendants to enter into horizontal price–fixing agreements, "compliance with the laws of both countries [would be] impossible," *Hartford Fire*, 509 U.S. at 799, and there would be a true conflict.

We follow the Supreme Court's approach in *Hartford Fire* and begin our inquiry by asking whether Chinese law governing the Vitamin C industry, on its face, required defendants to engage in conduct that violates U.S. antitrust laws. We therefore scrutinize whether defendants *could have* sold and distributed Vitamin C while in compliance with both Chinese and U.S. antitrust law or "whether Chinese law required the Chinese sellers' conduct" in violation of U.S. antitrust law. *Animal Sci. Prods.*, 138 S. Ct. at 1875. As we explain below, it did. To

determine what Chinese law required, we consider the "relevant material" and "source[s]." *See* Fed. R. Civ. P. 44.1; *Animal Sci. Prods.*, 138 S. Ct. at 1873.[17]

1. Chinese Law Facially Required Vitamin C Price-Fixing

China's regulations for its Vitamin C industry evolved considerably between the founding of the Chamber of Commerce of Medicines & Health Products Importers & Exporters (the "Chamber") in 1989 and the filing of this antitrust action in 2005. In the early 1990s, the Ministry of Foreign Trade and Economic Cooperation (which is now known as the Ministry of Commerce, or the "Ministry") exercised near-total control over the "foreign trade and economic social organizations," also known as "chambers," which were responsible for the

[17] Rule 44.1 provides that "[i]n determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." As the Supreme Court noted, "Rule 44.1 frees courts 'to reexamine and amplify material . . . presented by counsel in partisan fashion or in insufficient detail.'" *Animal Sci. Prods.*, 138 S. Ct. at 1873 (quoting the Advisory Committee's Note on Rule 44.1's adoption in 1966). The Rule 44.1 materials relevant to this case—which we explore in detail in the remainder of this Section—include the Chinese regulations at issue, the charters of the Chinese agencies responsible for overseeing the export regime, internal industry records and trial testimony describing how that regime actually functioned, the Ministry's statements interpreting Chinese law, and China's representations to the World Trade Organization concerning its export controls on Vitamin C.

administration of export controls.[18] Once the Ministry ratified and registered each chamber, it provided "operation guidance" on matters such as the "development of foreign trade." App'x 3715. The 1991 Regime provided that the chambers "must accept the daily management by [the Ministry] or its authorized departments," and thus, that the Ministry was "directly responsible" for managing each chamber's daily activities and inspecting its records, including leadership candidates, personnel structure, budget, salaries, and meetings of representatives. App'x 3716-17. The Chamber, in its own right a governmental entity with the power to act with the force and effect of law, was one such entity under the Ministry's direct and active supervision.

Beginning in 1996, a price war among Chinese Vitamin C exporters led to industry consolidation among four major manufacturers, the original defendants

---

[18] Pursuant to the Measures for Administration over Foreign Trade and Economic Social Organizations promulgated in 1991 (the "1991 Regime"), the Ministry oversaw the establishment of chambers dedicated to protecting Chinese national interests, including "the development of foreign trade and economy, the enhancement of the relationship between domestic and foreign enterprises and relevant organizations, and the order of foreign trade and economy." App'x 3713-14.

in this action. *See In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 548. In 1997, the Ministry and the PRC's State Drug Administration promulgated a "Notice Relating to Strengthening the Administration of Vitamin C Production and Export by Ministry of Foreign Trade and Economic Cooperation and State Drug Administration" (the "1997 Notice"). A primary objective of the 1997 Notice was to "promote the healthy development of Vitamin C export and maintain the interest[s] of [China] and [exporting] enterprises." Sp. App'x 298. Accordingly, the 1997 Notice provided that the "scale of Vitamin C production shall be strictly controlled." *Id.* These controls included production quotas set by the Ministry, a licensing system for all exporters, and, within the Chamber, the creation of a "Vitamin C Coordination Group"—later known as the Vitamin C Sub-Committee (the "Sub-Committee")—which was formally established in March 1998.[19]

[19] Pursuant to the 1997 Notice, the Sub-Committee would hold regular meetings at which the Vitamin C firms would be expected to "timely formulate and adjust export coordination price" using a "specific method for coordination . . . formulated by the Chamber, and filed to [the Ministry] for record." Sp. App'x 299. All licensed Vitamin C exporters would be required to participate in the Sub-Committee and "strictly implement" its "coordination" of "Vitamin C export market, price and customers." *Id*. Any

The Sub-Committee's function was to "coordinate and administrate market, price, customer and operation order of Vitamin C export." Sp. App'x 318. The Sub-Committee was also required to "hold, periodically or otherwise, working meetings for Vitamin C export to exchange information, summarize and communicate experience, analyze and work out coordinated prices for Vitamin C export, [and] to supervise and inspect the implementation of such coordinated export prices set by the Sub-Committee and relevant business activities related to the enterprises." Sp. App'x 319. At these meetings, members would "discuss and set export coordinated price." Sp. App'x 320. Only Sub-Committee members were entitled to export Vitamin C. Members were obligated to comply with all regulations from the Ministry and the Sub-Committee, to "voluntarily adjust their production outputs according to changes of supplies and demands on international market" and to "[s]trictly execute export coordinate price set by the

exporter selling Vitamin C at a below-coordination price would be penalized by reduction of its export quota or revocation of its export rights.

Chamber and keep it confidential." Sp. App'x 319-20. Violations of these obligations subjected a firm to "warning, open criticism[20] and even revocation of its membership." Sp. App'x 320. Members could withdraw only "subject to approval by the Sub-Committee's Council." Sp. App'x 319. And the "Council," an executive body created within the Sub-Committee composed of the four original defendants, was responsible for proposing annual quotas and coordinating prices under "urgent circumstances." Sp. App'x 321.

Beginning in 2000, another price war flattened Chinese Vitamin C export prices, and by 2001, the defendants succeeded in capturing about 60% of the global market for Vitamin C. *See In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 548. In late 2001, after importing countries threatened anti-dumping lawsuits against China, the Chamber held a meeting with the Sub-Committee's Council and procured an agreement that "[t]he committed export volume as part of the

[20] "Open criticism" was a serious penalty in the Maoist system of governance. *See generally* JONATHAN SPENCE, THE SEARCH FOR MODERN CHINA (2001).

industry self-discipline shall be strictly implemented." App'x 3880. To further "the self-discipline for Vitamin C export industry in 2002," total export volumes for each manufacturer would be recorded and "export enterprises that [we]re not in strict compliance with this requirement w[ould] be punished by [the] Sub-Committee." *Id*. Violations of "disguised low prices or exporting beyond given volume" would be punishable by a deduction of "five times of the export volume that is in violation . . . from the total allocated export volume of the violating manufacturer." App'x 3881.

In December 2001, China acceded to, or became a member of, the World Trade Organization ("WTO"). Both before and after its WTO accession, China "systematically overhauled existing laws, administrative regulations and department rules to comply with WTO rules and accession commitments."[21] In

[21] App'x 468 (quoting World Trade Organization, *Trade Policy Review Report by the People's Republic of China,* WT/TPR/G/161 at 12 (2006)).

particular, China represented to the WTO that, beginning in January 2002, it "gave up export administration of . . . vitamin C."[22]

Thus, in 2002, to "adapt to the new situation of [China's] opening-up to the outside world" and to "earnestly perform the promises of [China's] entry to the WTO," the Ministry abolished the 1997 Notice. App'x 3886. In its place, the Ministry and the PRC's General Administration of Customs ("Customs") together promulgated a "Notice for the Adjustment of the Catalogue of Export Products Subject to Price Review by the Customs" (the "2002 Notice"). Sp. App'x 301. The stated purpose of the 2002 Notice, in replacing the 1997 Notice, was to "maintain the order of market competition, make active efforts to avoid anti-dumping sanctions imposed by foreign countries on China's exports, promote industry self-discipline and facilitate the healthy development of exports." *Id*.

---

[22] *Id*. (quoting World Trade Organization, *Statement by the Head of the Chinese Delegation on the Transitional Review of China by the Council for Trade and Goods,* G/C/W/441 (2002)).

The 2002 Notice implemented a Price Verification and Chop[23] ("PVC") system that made certain export products, including Vitamin C, subject to price review by each import and export chamber rather than Customs.[24] Under this PVC regime, each chamber was required to submit "industry-wide negotiated prices" to Customs and the Ministry. Sp. App'x 302. This would make it "conducive for the chambers to coordinate export price and industry self-discipline," thereby "maintaining good export order" and "promoting the development of the industries and exports." *Id*. And, if required by the "drastically changing international market," Customs and the chambers could suspend PVC review for

---

[23] A **"**chop" is a seal recognized by Chinese customs officials indicating that an export contract or shipment conforms to the relevant rules and regulations.

[24] Later, in a 2003 Announcement, the Ministry explained that the PVC system involved three steps:

1. Exporters deliver contracts to the chambers for verification.
2. The chambers verify based on (i) industry-wide price agreements (filed with the Ministry) and (ii) relevant regulations of the Ministry and Customs. The chambers must affix a chop only to conforming export contracts.
3. Exporters declare to Customs with a chop on export forms and contracts.

**SPA. 310-11.** According to the 2003 Announcement, the chambers would treat PVC applications from exporters who were not members of the relevant chamber the same as PVC applications from those of chamber members. **SPA. 311.**

certain products "with the approvals of the [Sub-Committee] and filing with [Customs] and [the Ministry]." *Id.*

The Chamber amended its charter in March 2002. Under the new charter, members could "freely quit" the Chamber by written application, with no specified consequence. Sp. App'x 313. To punish violations of its charter or export regulations, the Chamber was authorized to "circulate a notice of criticism, issue a warning or suspend the membership of this member, or in case of fairly serious violation in nature, . . . with the approval of the board of directors or the standing board of directors, deprive this member of its membership." Sp. App'x 313.

In June 2002, the Chamber delegated authority by administrative rule to the Sub-Committee to "coordinate and guide vitamin C import and export business as well as relevant activities" and "promote healthy development of vitamin C import and export trade" in compliance with all laws and regulations of the Ministry, Customs and the Chamber. Sp. App'x 325. The Sub-Committee also revised its charter, adding 11 non-manufacturer export trading companies and smaller manufacturers as member enterprises and recognizing its members'

"[f]reedom to withdraw from the Subcommittee." Sp. App'x 326. The Council continued to serve as the "executive body" of the Sub-Committee, with members of the Council elected to four-year terms. Sp. App'x 328.

In 2003, the Chamber published a notice informing members that "industry agreed export prices [for Vitamin C]. . . have been revised" and that the "agreed prices are the minimum prices." 1:06-md-1738, Doc. 397-22 at 12 (the "2003 Notice"). The Chamber explained: "We put the limit on the floor prices but not the ceiling prices." *Id.*

Taken at face value, the applicable Chinese law during the relevant period—including both the PVC regime and the Chamber's 2002 delegation of price-coordination authority to the Sub-Committee—required the defendants, as Vitamin C manufacturers and exporters, to fix the price of Vitamin C sold on the international market.[25]

---

[25] While the district court reached the opposite conclusion based on (1) the apparent spottiness of enforcement during a specific period; (2) its surmise that the available sanctions were not sufficiently severe; and (3) the inference that the defendants were acting in their economic interest and thus did not need to be compelled, we find these issues largely beside the point because, as explained in Section III.B,

2. <u>Other Records Corroborate Chinese Law's Price-Fixing Requirement</u>

This understanding—that Chinese law on its face required the defendants to fix the price of Vitamin C exports—is consistent with other information in the record, such as materials that showcase the Chamber's role in coordinating the Chinese Vitamin C industry. Indeed, from its inception, the Chinese government created the Chamber to promote "the order of foreign trade and economy." App'x 3713-14. The 1997 Notice and original charter of the "Vitamin C Coordination Group" within the Chamber (which became the Sub-Committee) made explicit what sort of "order" the Chamber served to ensure: the "coordination" of "Vitamin C export . . . price" through regular meetings at which members would "discuss and set export coordinated price." Sp. App'x 299, 320. While the 2002 Notice delegated the Ministry's reviewing authority to the Chamber, its stated goal remained "maintaining good export order." Sp. App'x 302. How did the 2002

---

*infra*, our decision is based on the *prima facie* conflict between U.S. law and Chinese law rather than the degree of compulsion defendants faced.

Notice accomplish that objective? By requiring the defendants "to coordinate export price and industry self-discipline" under the Chamber's auspices. *Id*. The Chamber then had to report these "industry-wide negotiated prices" to Customs and the Ministry. *Id*. Finally, the Chamber was authorized to affix a chop only to contracts that conformed to such "industry wide price agreements." *Id*. at 310-11. The ubiquitous references to "price coordination" in these regulations leave little doubt that the 2002 Notice instituted by the Ministry required the defendants to engage in price-fixing through the Chamber and Sub-Committee.

Administrative documents from the period corroborate this understanding of the Chamber's price-coordination role with respect to the Vitamin C industry. As described in a 2003 administrative publication, one of the Chamber's principal tasks was "[c]oordinating price." App'x 412. In the same publication, the Chamber noted that "the government and charter members" entrusted it with responsibility "to help the government manage the import and export of . . . Vitamin[] C." *Id*. at 418. Indeed, shortly after the promulgation of the 2002 Notice, the Chamber enacted an administrative rule tapping the Sub-Committee to "coordinate and

guide Vitamin C import and export business as well as relevant activities." Sp. App'x 325. Then, as noted above, the Chamber published the 2003 Notice, informing member enterprises that "industry agreed export prices . . . have been revised" and that the "agreed prices are the minimum prices." 1:06-md-1738, Doc. 397-22 at 12.

Contemporaneous industry records also strongly suggest that Chinese law, as established by the 2002 Notice and overseen by the Chamber, required price-fixing.[26] The Chamber kept track of each firm's export volume, revenue, and average price, and reminded its members that "agreements reached . . . during the [Vitamin C] coordination meeting . . . still have to be carried out strictly." *Id.*, Doc. 397-23 at 3.[27] The Chamber set minimum prices and deterred members from

[26] We note that the U.S. Trade Representative reported similar findings to Congress in December 2003, concluding that "China maintains price controls on several products and services . . . in the form of either absolute mandated prices or specific pricing policy guidelines as directed by the government." App'x 1427. The Trade Representative reached the same conclusions in 2004 and 2006.

[27] The 2003 Notice from the Chamber did not include an agreed price for Vitamin C. But the Chamber clearly established minimum prices to which its members adhered. If a contract price term fell below the minimum price, the 2003 Notice instructed firms to "voluntarily convert the price term to be consistent with the agreed price term." 1:06-md-1738, Doc. 397-22 at 13.

undercutting those prices with the threat of discipline via chop disqualification or, *in extremis*, loss of membership rights. This system maintained order by preventing price wars, which had devastated the export industry in the past. As Qiao Haili, director of the Chamber's Western Medicine Department and Secretary General of the Sub-Committee, wrote to the Ministry in 2003, the Chamber's "coordination of [Vitamin C] has yielded notable results: through industry self-regulation, prices of [Vitamin C] exports have increased significantly and thus have recovered economic losses for the country." App'x 2173. This success avoided the ills of "severe low-priced competition in order to sell" and "anti-dumping law suits." *Id*.

Sub-Committee meeting records from 2003 and 2004 also show that Vitamin C exporters recognized the minimum prices set by the Chamber as being non-negotiable, even as the Sub-Committee members were able to exercise some discretion in determining actual market prices by consensus. The firms' efforts to "set the floor price" for the market significantly higher—such as $9.20 per kilogram—were not always successful, but market prices generally remained well above the minimum export price of $3.35 per kilogram. *See id.*, Doc. 299-8 at 1-2;

Doc. 397-2 at 106. These records also document the Chamber's coordination of export quotas, and internal reports from Jiangshan show that, under the Chamber's direction, representatives from the "four major [Vitamin C] manufacturers in Beijing" agreed to "limit production during the first half of 2004 in order to stabilize the market." App'x 2100.

Our dissenting colleague correctly observes that the Chinese government appears to have been less preoccupied with orchestrating the defendants' coordination of market prices as opposed to minimum prices. *See* Dissent at 5-7. It is true that the Chamber "put the limit on the floor prices but not the ceiling prices," 1:06-md-1738, Doc. 397-22 at 12; that is, the Chinese governmental agencies involved expressly mandated only the minimum price and did not set the actual market price for Vitamin C exports. Yet Chinese law further required the defendants to coordinate—that is, to fix—market prices for Vitamin C exports. The Chamber specifically delegated responsibility to the Sub-Committee to "coordinate and guide Vitamin C . . . export business" such that the Chamber could report "industry-wide negotiated prices" to Customs and the Ministry. Sp.

App’x 302, 325.[28] Since the Sub-Committee’s establishment, its members—the defendants—had been expected to “discuss and set export coordinated price,” *id*. at 320, and now they were tapped to “monitor the implementation of self-disciplinary agreements within the industry,” including “coordination plans,” *id*. at 331. Thus, contrary to the dissent’s conjecture, the defendants could not have complied with Chinese law simply by “independently setting their prices at or above the industry-coordinated minimum price . . . .” Dissent at 3. Coordination of *market* prices as well as *minimum* prices was fundamental to the PRC’s Vitamin C export system.

[28] One of Jiangshan’s executives, Wang Qi, testified that his company was “free to decide about prices above $3.35 [per kilogram] when that was the minimum price,” and that “no one outside” the company “ordered” them to “charge prices higher than $3.35.” App’x 1709-10. The dissent concludes from this evidence that colluding on prices above $3.35 per kilogram “was the defendants’ choice, not their legal obligation.” Dissent at 7. But Qi testified unambiguously that, throughout the relevant period, his company “communicated with other Chinese Vitamin C companies about increasing Vitamin C prices.” App’x 1687. No one had to *order* Qi or Jiangshan to charge higher prices. The Chinese government’s legal mandate was for Jiangshan and the other defendants, operating through the Chamber and its Sub-Committee, “to coordinate export price.” Sp. App’x 302.

In practice, that system appears to have not always worked smoothly. As one defense expert explained, there were "occasions where agreements were not reached" on a market price because defendants "were mandated to engage in self-discipline to achieve basic policies, but had freedom in deciding the manner in which coordination was to be achieved consistent with national goals." App'x 325. For example, when the Chamber met with the four original defendants in November 2002, "[n]o consensus was reached about price at the meeting," such that while the "minimum price for export remain[ed] unchanged," each company was permitted to "provide price quote[s] based on its own judgment." 1:06-md-1738, Doc. 397-22 at 3. Even when consensus prices were reached, they were not always stable. According to an internal Jiangshan report, the Chamber met in June 2003 with six domestic manufacturers who "all agreed to set the floor price at 9.20 USD/kg, hoping to slow down the speed of market price falling." *Id.*, Doc. 299-8 at 1–2. Yet a few weeks later, "every manufacturer quoted prices lower than the floor price." *Id*. at 2. Future meetings returned to the question of a "[t]argeted price level" that would not "give[] profit room for western producers." *Id.*, Doc. 397-22

at 18. Nevertheless, while implementation may have imperfect, the instructions were clear: the Chinese government expected the defendants to agree on a profit-maximizing market price.

These marching orders came directly from the top. In his 2003 memo to the Ministry, Sub-Committee Secretary General Haili—directly appointed by the Ministry to be the "highest level official at the Chamber responsible for administering export regulation of vitamin C," App'x 685—requested "legislation to define the legal status of the chambers" and "support from relevant government departments to assist chambers of commerce in asserting their authority." App'x 2174. Haili apparently hoped these clarifying changes would ensure that the Chamber's "rules and regulations" for members not "simply become formality and only honest fellows will follow." *Id.* (internal quotation marks omitted). We understand this report and request to reflect Haili's understanding that the Ministry expected the Chamber to corral its members into participating in and adhering to the legally required coordination of market prices, to an extent not directly, or perhaps adequately, enforced through the PVC regime.

Consideration of all these records therefore supports our conclusion that the defendants faced a true conflict between U.S. antitrust law and the Chinese export regime's twin requirements of maintaining minimum prices and coordinating actual market price.

3. The Ministry's Submissions Regarding Chinese Law

To confirm our understanding about what Chinese law, taken at face value, required of the defendants, we "carefully consider" but do not defer conclusively to the Ministry's statement on the meaning of Chinese law. *Animal Sci. Prods.*, 138 S. Ct. at 1873. In particular, we weigh that explanation's "clarity, thoroughness, and support; its context and purpose; the transparency of the foreign legal system; the role and authority of the entity or official offering the statement; and the statement's consistency with the foreign government's past positions." *Id*. at 1873–74. We first discuss the contents of the Ministry's submissions, then address the extent of our deference to their articulation of Chinese law under the standards supplied by the Supreme Court.

*a. The Ministry's Submissions*

The Ministry made four submissions in the district court.[29] The first was an *amicus curiae* brief in support of the defendants' motion to dismiss, submitted in June 2006 (the "Amicus Brief"). The Ministry submitted a subsequent statement in June 2008 (the "2008 Statement") in response to the plaintiff's briefing on the motion to dismiss. During discovery in 2008, the Ministry submitted a letter (the "2008 Letter") opposing a production request for confidential documents one defendant (Northeast) had exchanged with the Ministry and other governmental agencies. Finally, the Ministry submitted a statement in 2009 (the "2009 Statement") responding to statements made in the report issued by the plaintiffs' expert.

---

[29] China's embassy in Washington, DC, also sent a diplomatic note to the U.S. Department of State on April 9, 2014, requesting that it be permitted to join the Ministry in filing an amicus brief in our Court. *See* Diplomatic Note No. CE027/14 from the Embassy of the People's Republic of China to the State Department, Supreme Court J. App'x 782-83. "Diplomatic notes are used for correspondence between the U.S. Government and a foreign government. The Secretary of State corresponds with the diplomatic representatives of foreign governments at Washington, DC, U.S. embassies abroad, and foreign offices or ministries." United States Department of State, 5 Foreign Affairs Handbook 1 H–611(a). The Ministry filed its amicus brief in our Court on April 14, 2014. The Department of State has not filed a corresponding amicus brief.

The Amicus Brief took the position that Chinese law required the defendants' conduct, such that both foreign sovereign compulsion and principles of international comity mandated dismissal of the antitrust action.[30] In explicating Chinese law, the Amicus Brief noted that "China's ongoing transformation from a state-run command economy to a market-driven economy" gave rise to terms and concepts such as "coordination" and "voluntary self-restraint" that a U.S. court would likely misunderstand. App'x 153. One such potential misunderstanding, fostered by the plaintiffs' allegations, was that the Chamber functioned within China's export economy as a mere "trade association" facilitating "the collusive actions of a cartel." App'x 155 (internal quotation marks omitted). Instead, the brief explained that the Chamber served "under the authority and direction of the Ministry and . . . Customs" as part of "a regulatory pricing regime mandated by

---

[30] The Amicus Brief argued that dismissal was warranted under the foreign sovereign compulsion doctrine because the anticompetitive conduct was compelled and under principles of international comity because of the "irreconcilable conflict between the requirements of U.S. antitrust law and the laws and policies of China." App'x 167–71, 173–75.

the government of China" to stabilize its export market, promote profitability, and protect national interests. App'x 156-57.[31]

The 2008 Statement ratified the Amicus Brief as an accurate representation of the Ministry's official views, which the Ministry had actively participated in drafting and reviewing.[32] The 2008 Letter reiterated this position and explained

[31] To explain how such price coordination worked in practice, the Amicus Brief canvassed the evolution of China's system of export controls, beginning with the 1991 Regime and concluding with the 2003 Announcement. The brief noted that the defendants were compelled to become participating members of the Sub-Committee and to implement its price coordination responsibilities. In describing previous regulatory phases such as the 1991 Regime and the 1997 Notice, the Amicus Brief sometimes used the present tense in ways that conveyed the impression that defunct regulations were still in effect. *See, e.g.*, App'x at 159 ("The Ministry's authority over the Chamber is plenary . . . ." (citing regulation from the 1991 Regime)); *id.* at 159-60 ("The Sub-Committee . . . is responsible for 'coordinating the Vitamin C export market, price and customers . . . .'" (quoting the Sub-Committee's 1998 Notice of Establishment)); *id.* at 167 ("Government entities policed defendants' compliance with the resulting prices and volume limits, and non-compliance would subject defendants to severe penalties . . . .") (citing the 1997 Notice and the 1998 Sub-Committee Charter alongside the 2002 Notice)). Yet the Amicus Brief stated clearly that the 2002 Notice "changed the way in which compliance with the Chamber's 'coordination' was confirmed by abolishing the [1997 Notice] and establishing a [PVC] system," which the brief identified as governing "throughout the Relevant Period." *Id.* at 164-65.

[32] In particular, the 2008 Statement emphasized that the Ministry authorized and supervised the Chamber in performing the governmental function of "regulating, through consultation, the price of Vitamin C manufactured for export from China so as to maintain an orderly export." *Id*. The 2008 Statement contended that the plaintiffs' claims—which implicated the Ministry's direct administration of Vitamin C exports—should be addressed through diplomatic engagement rather than litigation.

that the Ministry, the Chamber and the defendants had entered into a written common interest agreement in the class action litigation.

The 2009 Statement recapitulated the Ministry's view that the defendants were "performing their obligations to comply with Chinese laws, rather than conduct on their own initiative." App'x at 650. The 2009 Statement acknowledged that "different regulatory measures may have been implemented in line with changes of circumstances at different times," but maintained that "[d]uring the relevant period . . . the Ministry required Vitamin C exporting companies to coordinate among themselves on export price and production volume." *Id.* at 650–51. The 2009 Statement further explained that the Chamber exercised delegated governmental authority over Chinese exporters of Vitamin C, who could neither "ignore these policies" nor "abstain from [mandated] coordination," which constituted "an integral part of the self-discipline process." *Id.* at 651–52. Finally, the 2009 Statement argued that China's statements to the WTO concerning the loosening of price controls on exports including Vitamin C were "irrelevant" because they were "made in a different context" and were "*general descriptions* . . .

presented in [that] special context." *Id.* at 652. The 2009 Statement reasserted China's right as a sovereign nation to enact limited export regulations in furtherance of its "national goal of establishing a socialist market economy." *Id*. at 652–53.

*b. Deference to the Ministry's Submissions*

We carefully consider the Ministry's statement on the meaning of Chinese law as articulated in its submissions, in accord with the Supreme Court's instructions. As to the submissions' "clarity, thoroughness, and support," 138 S. Ct. at 1873, each submission articulated a coherent view of Chinese law based on the relevant supporting regulations. Although in several places the Amicus Brief failed to clearly distinguish between China's prior regulatory regimes and its post-reform export controls under the 2002 Notice, this conflation weakens only the brief's argument for *compulsion* based on licensing restrictions and sanctions that were no longer applicable after 2001.[33] It does not undermine the Amicus Brief's

[33] In particular, the Ministry's position on compulsion appears vulnerable with respect to the framework for the defendants' arrangement of actual market prices, often considerably in excess of the

otherwise reasoned explication of mandatory price coordination, and we find the Ministry's explanation of that aspect of the governing export regime helpful in locating an "irreconcilable conflict between the requirements of U.S. antitrust law and the laws and policies of China." App'x 173.

Next, the submissions' "context and purpose" give us some "cause for caution" in evaluating the picture painted of Chinese law. 138 S. Ct. at 1873. All four submissions "offer[] an account in the context of litigation," *id*., and the Ministry has unambiguously staked out a common interest with defendants. Indeed, the Amicus Brief candidly portrays one of China's objectives in designing export controls as promoting "the profitability of the industry"—a goal that would be severely hampered by enforcement of an approximately $148 million judgment. App'x 156. Yet it is significant that this litigation represents the

---

Chamber-mandated minimum price of $3.35 per kilogram. As we have explained, the PVC regime's enforcement scheme appears to have required only the latter price, whereas a consultative process among Chinese exporters yielded the additional price and volume coordination. Such coordination, while still clearly mandated by the Chinese government, does not appear to have been enforced with the "chop" in the same manner as the minimum price.

first official appearance by the Chinese government in a U.S. court, and the Ministry's submissions bespeak broader principles of international comity informing China's interest in this litigation.[34] While we take the Ministry's account of compulsive regulation with more than a grain of salt due to China's interest in avoiding the imposition of U.S. antitrust penalties on Chinese companies operating in a "socialist market economy" under the vanguard direction of the Communist Party of China,[35] we nevertheless think it appropriate to give some weight to these invocations of international comity.

---

[34] *See* App'x 175 ("Insofar as China's sovereign policy decisions about how best to manage its economic transformation conflict with the policies embodied in U.S. antitrust laws, that conflict should be addressed 'through diplomatic channels,' and not through 'the unnecessary irritant of a private antitrust action.'" (quoting *O.N.E. Shipping*, 830 F.2d at 454)); *id*. at 206 ("[T]he Chinese government respectfully submits that, to the extent the plaintiffs take issue with the Chinese government's sovereign actions over the conduct solely of its own citizens, that issue should not be addressed in the courts of the United States but rather through bilateral trade negotiations conducted by the executive branches of the respective sovereign nations involved consistent with recognized norms of international law and diplomacy."); *id*. at 653 ("China understands and believes that virtually all sovereign nations and regions (including the United States), proceeding from their own interests, have exercised various forms of government regulations over part of their private sector and certain industries. China's export regulations of Vitamin C at issue in this case are no different.").

[35] *See* ELIZABETH C. ECONOMY, THE THIRD REVOLUTION (2018); RICHARD MACGREGOR, THE PARTY (2d ed. 2013); *see generally* JOHN K. FAIRBANK & MERLE GOLDMAN, CHINA: A NEW HISTORY (2d ed. 2006).

Third, we are especially mindful of the Ministry's presentation of China's official views given its "role and authority" in the Chinese legal system. 138 S. Ct. at 1873. The plaintiffs have not challenged the Amicus Brief's identification of the Ministry as "a component of the State Council (the central Chinese government) and . . . the highest administrative authority in China authorized to regulate foreign trade, including export commerce," such that it is the equivalent of "a cabinet level department in the U.S. governmental system." App'x 151. As such, the Ministry was able to convey "the views and understandings of certain PRC government agencies" with the benefit of active participation and line editing by officials in Beijing. App'x 205. We find it significant that a governmental agency in the Ministry's position has "attached great importance" to this litigation, as evident in its unprecedented appearance on behalf of the Chinese government and repeated filings as an amicus in the district court, this Court, and the Supreme Court. App'x 650. In considering the implications for international comity of applying U.S. antitrust law to conduct by Chinese companies forming an integral part of the Chinese export regime, we give considerable weight to this consistently

salient presentation of official views by China's highest administrative authority on export commerce.

We find inconclusive "the transparency of the foreign legal system" factor, the next factor the Supreme Court has instructed us to consider. 138 S. Ct. at 1873. While China's legal system is "something of a departure from the concept of 'law' as we know it in this country—that is, a published series of specific conduct-dictating prohibitions or compulsions with an identified sanctions system," *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d at 550, this ambiguity cuts both ways. On the one hand, a reasonable interpretation offered by the responsible governmental authority is especially helpful in understanding a system that would be difficult for a U.S. court—unversed in Chinese law—to piece together on its own. On the other hand, we are less inclined to trust the representations of a regime lacking transparency or democratic accountability, especially when the opaque nature of the regulations in question frustrates our ability to check the Ministry's account against an objective standard. We are nonplussed by what we perceive to be a double-edged sword of transparency, so—having addressed why

it cuts in both directions—we do not assign it significant weight among the relevant factors when considering the deference due to the Ministry's submissions.

Finally, we are mindful of the Supreme Court's instruction that we consider the Ministry's "statement's consistency with [China's] past positions," given "the submissions made by the U.S. purchasers casting doubt on the Ministry's account of Chinese law." 138 S. Ct. at 1872–74. In particular, we must assess the credibility of the Ministry's account of the 2002 Notice as compulsory in light of China's representation to the WTO in 2002 that it "gave up export administration of vitamin C." *Id*. at 1871 (ellipsis omitted).

As an initial matter, we find that China's statement to the WTO and others like it adduced by plaintiffs—when read alongside the 2002 Notice and 2003 Announcement—are consistent with the notion that China was *loosening* price controls by delegating regulatory authority *from* the Ministry and Customs *to* the Chamber and Sub-Committee, not abandoning export regulations altogether. Thus, we cannot be confident whether China has in fact "ma[de] conflicting statements." *Id.* at 1873. But even assuming a material contradiction, we find it

entirely plausible that China sought to exaggerate to the WTO its compliance with that organization's accession principles in becoming a WTO member. So too, we must consider the prospect that, in this litigation, the Ministry may have an incentive to exaggerate the compulsory nature of its Vitamin C export regime in avoiding application of U.S. antitrust law to the defendants' conduct. After all, the Ministry's 2009 Statement appears to invite such an interpretation by insisting that China's earlier representations to the WTO belonged to an entirely different, "special context." App'x 652.

Yet to the extent there is any contradiction in China's representations, that contradiction undercuts only the Ministry's argument that the 2002 Notice subjected *all* of the defendants' conduct to the kind of coercive control that would potentially implicate considerations of the FSC doctrine. But, as we explained above, our international comity analysis focuses on whether Chinese law, taken at face value, requires the defendants to act in a way that violates U.S. law. We think the persuasiveness of the Ministry's submissions regarding the specific requirement that Chinese export firms coordinate market prices as well as adhere

to minimum prices remains intact. Thus, while the Chinese government may not have compelled market price coordination in the same fashion that it enforced minimum prices, our conclusion that the price-fixing feature of the 2002 Notice was nonetheless mandatory remains in place.

We therefore conclude that the Ministry's submissions, when afforded careful consideration, support our determination that Chinese law required the defendants—as members of the executive Council within the Sub-Committee charged with "coordinat[ing] and guid[ing] vitamin C import and export business," Sp. App'x 325—to be directly responsible for implementing price controls.

*c. Chinese Law Required the Defendants to Price-Fix, Making It Impossible for Them to Comply with U.S. Antitrust Law*

Taking Chinese law at face value, and having given careful consideration to the Ministry's statements about what the applicable laws required, we conclude that defendants were required to engage in price-fixing conduct violative of U.S. antitrust law. Furthermore, because Chinese law "require[d]" the defendants "to act in [a] fashion prohibited by the law of the United States"

in their role as leading Vitamin C export firms, it was impossible for them to "comply with the laws of both" countries. *Hartford Fire*, 509 U.S. at 799.[36]

The dissent contends, nevertheless, that the defendants could have exercised their "legal right" to "freely resign" from the Sub-Committee, relieving them of their obligation under Chinese law to fix prices, in violation of U.S. antitrust law. Dissent at 4. Affording some deference to the Ministry's

---

[36] Our prior opinion deferred to the Ministry's submissions in finding that (1) vitamin C exporters were required to negotiate and agree upon an "industry-wide negotiated" price; (2) terms like "industry self-discipline" and "voluntary restraint" referred to the Chinese government's expectation that private firms engage in self-regulation with respect to agreed prices and quotas; and (3) such participation was mandatory even for non-members of the Sub-Committee. 837 F.3d at 190 & n.9.

On remand, we have reached the first conclusion on the basis of the regulations themselves, as illuminated by contemporaneous industry records and trial testimony concerning the PVC regime. Because our analysis turns on the existence of a true conflict, we reach this conclusion in light of what Chinese law facially required rather than the Chinese regulatory program's track record of enforcement. Thus, we find a true conflict even though the defendants did not always reach or adhere to a coordinated market price.

On the second point, we find the Ministry's submissions worthy of deference, after careful consideration, insofar as they explain terms of art that are otherwise vague. *See, e.g.*, Sp. App'x 302 (Sub-Committee expected to "coordinate export price and industry self-discipline" to "assist in maintaining good export order"); 1:06-md-1738, Doc. 397-22 at 12 (an entity with contract price term below the minimum agreed export price is expected to "voluntarily convert the price term to be consistent with the agreed price term").

We address the third point next, in the text.

submissions, however, we conclude that the 2002 Notice mandated the defendants to engage in price-fixing regardless of whether they remained Sub-Committee members. As the Amicus Brief explained, "while the [Chinese] Government did not, itself, determine specific prices or quantities, it most emphatically did insist on those matters being determined *through industry coordination*." App'x 168. The Ministry originally appointed the defendants to the Sub-Committee as industry leaders responsible for overseeing that coordination. Although the revised Sub-Committee Charter provided its newly expanded membership with the right to "freely resign" through a "formal membership resignation process," App'x 2182-83, as China's only Vitamin C manufacturers[37] the defendants were key players in an industry which the Chinese government required to engage in "industry-wide" negotiations to further "industry self-discipline," Sp. App'x 302. As such, the defendants could check out of the Sub-Committee any time they liked, but—vis-

[37] *See* App'x 698 ("By the end of 2001, 21 companies remained in the vitamin C export business, of which four were manufacturers and the remainder were trading companies.").

à-vis the more general obligation to exchange information and coordinate on price and volume—they could never leave.[38] In short, as industry leaders tapped for key roles in China's vitamin C export regime, the defendants had no exit from the irreconcilable conflict between Chinese law and U.S. antitrust law.

### D. Additional Relevant International Comity Factors

Having found a true conflict between Chinese and U.S. antitrust law, we weigh that factor in combination with the other comity factors. *See Mannington Mills*, 595 F.2d at 1297–98.[39]

#### 1. Nationality of the Parties and Site of the Anticompetitive Conduct

The defendants are companies owned by Chinese nationals, located and headquartered in China and primarily doing business there. The anticompetitive conduct at issue took place among these companies in China. The international

[38] *See* THE EAGLES, HOTEL CALIFORNIA (Asylum Records, 1976); *see also* App'x 685, 701 (Sub-Committee Secretary General Haili described in his affidavit how, even after the 2002 reforms, "as a practical matter, no manufacturer could abandon participation in the Sub-Committee or the meetings that the Chamber called.").

[39] We have condensed these factors somewhat and have omitted one factor—regarding the existence of an international treaty on point—which is not relevant here.

comity concerns attending extraterritorial enforcement of U.S. antitrust law therefore apply fully in this context. *See In re Maxwell*, 93 F.3d at 1051–52; *Bi v. Union Carbide Chemicals & Plastics Co.*, 984 F.2d 582, 586 (2d Cir. 1993); *Timberlane*, 549 F.2d at 615. Accordingly, that the nationalities of the parties and the location of the anticompetitive conduct are foreign weigh in favor of dismissal under international comity principles.

2. Effectiveness of Enforcement and Alternative Remedies

The judgment entered below would require collection from foreign defendants and enforcement of a permanent injunction abroad, which China may not tolerate.[40] If enforced, the trebled damage award and threat of future sanctions from violating a permanent injunction would be likely to deter defendants from

[40] Notably, Article 276 of the Civil Procedure Law of the People's Republic of China (2017) provides that "[i]f any matter in which a foreign court requests assistance would harm the sovereignty, security or public interest of the People's Republic of China, the [Chinese] court shall refuse to comply with the request." Similarly, Article 282 forbids Chinese courts from executing any foreign judgment which "contradicts the basic principles of the law of the People's Republic of China or violates State sovereignty, security or the public interest."

future anticompetitive behavior. Yet it also seems likely that China will continue to set minimum prices. The consequences of enforcing the judgment are therefore uncertain.

As to alternative remedies, the parties have not brought to our attention any pending litigation in an international forum related to this case.[41] Recourse to the WTO or another international forum remains available to the United States.

Accordingly, these aspects of the comity inquiry do not weigh heavily either in favor of or against dismissal.

3. Foreseeable Harms to American Commerce

We find that harm to American commerce from China's export controls was foreseeable. The Ministry's Amicus Brief concedes that one goal of the 2002 Notice was to maximize "the profitability of the industry." App'x 156. The Chambers set price levels so as to "neither incur an anti-dumping lawsuit" nor concede "profit

---

[41] There was litigation of a similar case in the Third Circuit, but that Court of Appeals did not have occasion to reach the issues we address in today's decision. *See Animal Sci. Prods., Inc. v. China Nat. Metals & Mins. Imp. & Exp. Corp.*, 702 F. Supp. 2d 320 (D.N.J. 2010), *vacated and remanded sub nom. Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011), *as amended* (Oct. 7, 2011).

room for western producers." 1:06-md-1738, Doc. 397-22 at 18. Notably, the Chamber assumed that "[d]omestic anti-trust laws generally do not get involved in the foreign trade area." *Id*. Thus, the defendants actively sought to avoid U.S. liability while inflating profits at the expense of consumers, foreseeably including Americans such as the plaintiffs here. Yet the Ministry set that priority for the Chamber; the defendants did not act independently. Thus, because we find that harm to American commerce was foreseeable, even if we do not impute to the defendants any specific intent to harm American consumers, this factor likely weighs against dismissal for reasons of international comity.

4. Reciprocity

The parties have not brought to our attention any circumstances under which the U.S. Government mandates price-fixing by American export companies. Nonetheless, if U.S. companies fixed prices in the United States pursuant to such a policy and a Chinese party sued in China for a violation of Chinese law, the U.S. Government would undoubtedly expect the Chinese court to recognize as a valid defense that U.S. law required the American exporter's conduct. A Chinese court's refusal to consider that irreconcilable legal conflict as a basis for dismissing a civil

action would be an affront to the United States, both because of the Chinese court's second-guessing of U.S. sovereignty over the American export industry and because that decision would set a precedent for foreign judgments against American companies acting in accord with requirements of the U.S. Government. This factor, therefore, weighs heavily in favor of dismissal on comity grounds.

5. Possible Effect upon Foreign Relations

The Ministry emphasizes that China "has attached great importance to" this case. App'x 650. In a brief filed in the Supreme Court, the Ministry stated

> The Ministry has been actively involved in this litigation since 2005. It first presented the Chinese government's authoritative interpretation of Chinese law in 2006, when it filed an *amicus* brief in the district court. It reaffirmed its position in supplemental submissions to the district court in 2008 and 2009, and in an *amicus* brief in the court of appeals in 2014. As both courts [] observed, this was 'historic.'

Brief of *Amicus Curiae* Ministry of Commerce of the People's Republic of China in Support of Respondents, No. 16-1220 (U.S.) at 1. It appears that China perceives this case as threatening its rights as a sovereign to enact and enforce regulations

governing Chinese companies conducting business within China's borders.[42] We discern that China has already taken umbrage at the district court's treatment of its representations about the meaning and operation of its law. In our judgment, the enforcement of a sizeable damages award and permanent injunction against defendants is likely to prove a considerable further "irritant." App'x 175 (quoting *O.N.E. Shipping*, 830 F.2d at 454). On such matters, we generally assign considerable significance to the views of the U.S. Department of State, for the Constitution primarily entrusts foreign relations to the Executive Branch, and we are ill-equipped to assess the numerous, cross-cutting bilateral and multilateral issues properly informing such decisions. As the Department of State has not weighed in or otherwise signaled a view one way or another on this case, we are left somewhat in the dark.[43] Nonetheless, we remain cognizant of the Supreme

---

[42] *See* App'x 175 (respecting "China's sovereign policy decisions about how best to manage its economic transformation"); *id*. at 206–07 (respecting "Chinese government's sovereign actions over the conduct solely of its own citizens"); *id*. at 653 (respecting "China's export regulations of Vitamin C at issue in this case").

[43] This should come as no surprise, as the Department of State generally "adheres to a policy that it does not take positions regarding, or participate in, litigation between private parties, unless required to

Court's general observation—raised in the context of the presumption against extraterritoriality—that the Judiciary is understandably cautious not to "erroneously adopt an interpretation of U.S. law that carries foreign policy consequences not clearly intended by the political branches." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013). This presumption "serves to avoid the international discord that can result when U.S. law is applied to conduct in foreign countries." *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2100 (2016). After all, "[t]he Judiciary does not have the institutional capacity to consider all factors relevant to creating a cause of action that will inherently affect foreign policy." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1940 (2021).

Consequently, to the extent the record reflects protestations of the Chinese government at the application of U.S. antitrust law to Chinese companies implementing export policy in China, and no contrary view of the Executive

---

do so by applicable law." *Société Nationale Industrielle Aérospatiale*, 482 U.S. at 554 n.5 (Blackmun, *J.*, concurring in part and dissenting in part).

Branch is expressed, this factor tips in favor of dismissal for reasons of international comity.

### E. International Comity Principles Favor Dismissal[44]

Balancing these factors, we decline to construe U.S. antitrust law as reaching defendants' conduct in the circumstances presented here, and we conclude that

---

[44] Defendants relied on two other closely related doctrines in defense of their conduct abroad, act of state and foreign sovereign compulsion, but we find it unnecessary to reach a decision as to the applicability of either doctrine in light of our international comity holding.

As to the act of state doctrine, because our analysis is centered on whether defendants were required under Chinese law to engage in anticompetitive conduct, we are concerned with whether China's regulatory regime was responsible for that conduct, not whether such a Chinese governmental mandate (if there was one) would itself be legal or valid. Accordingly, "the factual predicate for application of the act of state doctrine does not exist" here because "[n]othing in the present suit requires the Court to declare invalid, and thus ineffective as a rule of decision for the courts of this country the official act of a foreign sovereign." *W.S. Kirkpatrick*, 493 U.S. at 405 (internal quotation marks and citation omitted). We are thus not called upon to express any view about the legality – under Chinese or international law – of the vitamin C export regime that the Chinese government implemented. Nor, by taking into account the Ministry's submissions to the district court, this Court, and the Supreme Court concerning the nature of Chinese law, do we sit in judgment of any official act of the Chinese government in formulating or transmitting those submissions. We merely afford those submissions careful consideration (but not conclusive deference) as we reach our conclusions about the reach of the U.S. antitrust law.

As to foreign sovereign compulsion, we might be inclined to the view that Chinese law compelled at least part of the defendants' anticompetitive conduct with sufficient coercive force to trigger this doctrine. But there is good reason to proceed with caution in such a high-stakes arena fraught with uncertainty. To conclude that this action merits dismissal on foreign sovereign compulsion grounds, we would be required to predict the severity of sanctions defendants might have faced in China for noncompliance, as well as pass on whether the defendants acted in bad faith—or simply had no alternative—given that they did not petition Chinese authorities to harmonize their vitamin C export

principles of international comity warrant dismissal. The existence of a true conflict between Chinese and U.S. antitrust law, Chinese nationality of all of the defendants, extraterritorial nature of the anticompetitive conduct, and potential impact upon foreign relations together strongly favor dismissal.[45] While the efficacy of enforcing a judgment is unclear, we acknowledge that enforcement could be salutary for the international Vitamin C market, especially given that economic harm to American consumers was foreseeable. The United States undoubtedly has a substantial interest in the uniform enforcement of its antitrust laws, including the deterrence value of treble damages against foreign companies whose anticompetitive conduct causes substantial and foreseeable economic injury to American consumers. Yet the U.S. Department of Justice has not brought criminal antitrust enforcement actions against these defendants, and the

---

regime with U.S. antitrust law. Yet we need not reach these vexed questions because international comity provides ample basis for declining to apply U.S. antitrust law to defendants' conduct in this case.

[45] *See O.N.E. Shipping*, 830 F.2d at 453 (affirming dismissal of complaint for reasons of international comity where foreign sovereign's cargo reservation laws "were alleged to be at the core of" the anticompetitive harm).

Department of State has not weighed in as an *amicus curiae* on either side of the issue.[46] There are also alternate means for the United States to vindicate those interests, such as through bilateral diplomatic efforts, multilateral discussions, trade proceedings in the WTO, or dispute resolution in another international forum. While the stakes are high for both countries, we conclude that the United States' concern with extraterritorial enforcement of a private civil judgment under its antitrust laws is substantially diminished in these circumstances. In light of

---

[46] While the Office of the Solicitor General filed a brief in support of plaintiffs' petition for certiorari in the Supreme Court, that brief primarily addressed the question of what level of deference U.S. courts should extend to a foreign sovereign's statement of its own law. *See* Brief for the United States as Amicus Curiae Supporting Petitioners, 138 S. Ct. 1865 (No. 16-1220), at 12-29. As the dissent observes, *see* Dissent at 9 n.4, the Solicitor General criticized our prior opinion in passing for giving "inadequate weight to the interests of the U.S. victims of the alleged price-fixing cartel and to the interests of the United States in enforcement of its antitrust laws," and "too much weight to China's objections to this suit," Brief for the United States at 20. But it is the Legal Adviser of the Department of State who expresses the Executive Branch's view on internationally significant cases and their ramifications for foreign relations. *See, e.g.*, *Khulumani v. Barclay Nat. Bank Ltd.*, 504 F.3d 254, 296 (2d Cir. 2007) (Korman, *J.*, concurring in part and dissenting in part). The Solicitor General's brief neither claimed to report the views of the Executive Branch or the Department of State in this respect, nor otherwise purported to represent that a decision one way or the other in this case might have any particular effect on foreign relations.

these considerations of international comity, we do not construe the Sherman and Clayton Acts to reach the present controversy.

## IV. CONCLUSION

We therefore **REVERSE** the judgment of the district court, and **REMAND** with instructions to **DISMISS** the complaint with prejudice.